UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| LAUREN VARALLO,<br><br>　　　　　　　　　Plaintiff,<br><br>v.<br><br>TOWN OF NANTUCKET - POLICE<br>DEPARTMENT and JAMES SAMSON,<br><br>　　　　　　　　　Defendants. | CIVIL ACTION<br>NO: 05-11547RWZ |

**PLAINTIFF'S L.R. 56.1 CONCISE STATEMENT OF DISPUTED
FACTS IN OPPOSITION TO THE DEFENDANT TOWN OF
NANTUCKET'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

In accordance with Fed. R. Civ. P. 56 and L.R. 56.1 of the United States District Court for the District of Massachusetts, plaintiff Lauren Varallo submits the following concise statement of additional and disputed facts:

**SEQUENCE OF EVENTS**

1.　On July 21, 2002, plaintiff Lauren Varallo attended a beach party with friends. After returning home to change, she and her mother argued about whether she would be allowed to go out again that evening because, against her parents wishes, Lauren had been drinking. Frustrated, Lauren locked herself in a bathroom and superficially cut herself with a safety razor. Lauren's sister found her and her parents dialed 911. *See* Plaintiff's Answers to Interrogatories, No. 3 attached as **Exhibit 1**.

2.　The Nantucket Fire Department responded, accompanied by a Nantucket police officer, and transported the plaintiff in an ambulance from her home to the Nantucket Cottage Hospital ("the hospital"). *See* **Exhibit 1**, Ms. Varallo's Answer No. 3. *See also*, Defendant's Answers to Interrogatory No. 8 attached as **Exhibit 2**; Deposition of Lauren Varallo ("Varallo Depo."), pp. 17-40 attached as **Exhibit 3**; Deposition of Dispatch Officer John J. Welch ("Welch Depo."), pp. 36-38, attached as **Exhibit 4**.

3.　Ms. Varallo's doctor concluded that she should be admitted for observation overnight because she was intoxicated and had injured herself. **Exhibit 3**, Varallo Depo. pp.17-18.[1] The hospital then contacted the Nantucket Police Department ("the Department") for a

---

[1] Plaintiff challenges as untrue and inaccurate the assertion in the defendant's filing that she was ever admitted for "major depression." *See* Defendant's Statement of Facts, ¶ 3. However, it is also the plaintiff's position that this is not a material fact.

police officer to conduct what they termed as a "one-on-one" observation or "suicide watch." **Exhibit 4**, Welch Depo. pp. 39-44; Deposition of Sergeant Christine Ladner ("Ladner Depo."), pp. 21-23 attached as **Exhibit 5**.

   4. Dispatch Officer Welch, who was the dispatcher that responded to the hospital's call to the Department, testified that to fulfill the request he first contacted the Department's Temporary Summer Police Officers barracks to determine whether anyone could perform what he called "a suicide watch." **Exhibit 4**, Welch Depo. pp.34, 40. It was his understanding that the subject was young, female and suicidal. *Id.* at pp.41-42. When the hospital called a second time, Sergeant Ladner also made calls to assign an officer. **Exhibit 5**, Ladner Depo., pp. 48-50. Neither Welch nor Ladner limited their search to women officers even if that was the "preferred response." **Exhibit 4**, Welch Depo. pp.34, 40; **Exhibit 5**, Ladner Depo., pp. 48-50. A Summer Police Officer named James Samson stated that he was interested in the assignment and, when Officer Ladner agreed, Samson reported to the hospital. **Exhibit 5**, Ladner Depo. p. 49. *See also*, **Exhibit 4**, Welch Depo. p. 42-44.

   5. Officer Samson arrived at the hospital, in uniform and with his duty baton and mace on his utility belt, and reported to Ms. Varallo's hospital room where she was in bed, partially clothed in a hospital gown and connected to an IV. *See* **Exhibit 1**, Ms. Varallo's Answer No. 3;**Exhibit 3**, Varallo Depo. pp. 23-24 and Deposition of James Samson, pp. 27-28 attached as **Exhibit 11**. He stationed himself inside the plaintiff's hospital room on a chair. **Exhibit 1**, Ms. Varallo's Answer No. 3. Although nurses occasionally entered the room, Officer Samson remained in the room, alone with the plaintiff, for most of the night. **Exhibit 1**, Ms. Varallo's Answer No. 3; **Exhibit 3**, Varallo Depo. pp. 23-24. The plaintiff drifted in and out of sleep. **Exhibit 1**, Ms. Varallo's Answer No. 3; **Exhibit 3,** Varallo Depo., pp.20-27.

   6. The Defendant repeatedly claims that "[a]t no time was plaintiff in protective custody." *See e.g.*, **Exhibit 2**, Defendant's Answers to Interrogatory No. 10, 12. Rather, the Department claims that Ms. Varallo was merely the subject of a police "detail." **Exhibit 2**, Defendant's Answers to Interrogatory No. 12. However, both Ms. Varallo and Officer Samson, the only two persons in the hospital room for most of that night, understood and believed that Ms. Varallo was in "protective custody" and that she was not free to leave and that Officer Samson would have restrained her if she tried to leave. **Exhibit 3**, Varallo Depo. p. 20; **Exhibit 11**, Samson Depo. at pp. 29, 31. According to Officer Samson, he specifically understood that his assignment was to prevent the plaintiff from harming herself and others and to restrain her if she attempted to leave. **Exhibit 11**, Samson Depo. at pp. 31-32, 35.

   7. In fact, Nantucket Police Officers have performed protective custody watches at the hospital "numerous times" -- sometimes as a "detail," and sometimes pursuant to their regular departmental duties. **Exhibit 5**, Ladner Depo. pp. 14-15; **Exhibit 6**, Gibson Depo. p. 22; **Exhibit 3**, Welch Depo. pp.33-34. In fact, Officer Welch himself testified that he had performed protective custodies at the hospital "about six times." **Exhibit 3**, Welch Depo. pp. 21, 34.

8.      However, depending on whose testimony one believes, the Department either has no policies or procedures for conducting such protective custodies or it has a "preferred response" that calls for the assignment of females to guard females. *Compare* **Exhibit 6**, Gibson Depo. p. 45 with **Exhibit 5**, Ladner Depo. pp.15-17, 32 and Deposition of Suzanne Gale ("Gale Depo."), p. 12, attached as **Exhibit 8**. Neither does the Department have any policies or procedures that apply to details (except for traffic details), but the Department does determine whether a detail request is appropriate, and may decline the request if it violates department practices. Deposition of Deputy Chief Charles Gibson ("Gibson Depo."), pp. 25-26, 29-30, 33 and 36 attached as **Exhibit 6**. Facts relating to policy issues are addressed more fully below.

9.      A "detail" is "a request for police presence, not incorporated with [an officer's] general duty, [an officer's] general shift assignment, paid by" a private party. A detail is optional, but the Chief of the Department can, if necessary, direct officers to perform them. When officers perform a detail, the policies and practices of the police department apply, and the officer should exercise police powers when necessary. **Exhibit 4**, Welch Depo. p. 12; **Exhibit 7**, Expert Disclosure of Plaintiff's Liability Expert, Paul J. Mackowski ("Mackowski Report") ¶ 3.

10.     Sometime before 7:00 a.m., Ms. Varallo woke up to find Officer Samson hovering over her bed "with his fingers in [her] vagina." **Exhibit 3**, Varallo Depo. pp.17-18; **Exhibit 1**, Ms. Varallo's Answer No. 3. He pulled back when he saw that she was awake and the plaintiff immediately got up and left the room to report the incident to the nurse. Exhibit 3, Varallo Depo., p. 26; **Exhibit 1**, Ms. Varallo's Answer No. 3.

11.     The Department did not conduct a standard investigation into the plaintiff's allegation of sexual assault. Instead, two officers interviewed the plaintiff at the hospital and cautioned her against filing charges because it could ruin Officer Samson's life. **Exhibit 3**, Varallo Depo. pp. 31-32. There was no formal notification of the Department's statutorily mandated "Rape Officer" and no duties were performed as required of the Department's Rape Officer. **Exhibit 3**, Varallo Depo. pp.17-18; Exhibit 7, Mackowski Report, ¶ 4. In fact, none of the so-called testing was undertaken by the police and such testing was not completed until the intervention of a local Rape Crisis Center the next day, after the plaintiff had left the hospital and showered, the hospital sheets had been removed, and Officer Samson had left the premises. **Exhibit 7**, Mackowski Report, ¶ 4; **Exhibit 3**, Varallo Depo., pp. 30-34, 38-40.

## LACK AND INADEQUACY OF DEPARTMENT POLICIES

12.     The Department's various personnel also cannot seem to agree on whether there were any policies or practices in place that applied to the proper assignment and conduct of officers engaged in a protective custody. Samson's immediate supervisor, Sergeant Ladner, testified that there is no policy or practice that required her, or Officer Welch, to locate a woman to perform the so-called "suicide watch." **Exhibit 5**, Ladner Depo. pp.15-17, 32. This belief is shared by at least one other officer who was working that night who testified that she was "not familiar with any policies regarding gender at all." **Exhibit 8**, Gale Depo., p. 12.

13. Dispatch Officer Welch testified, however, that he believed it to be a preferred practice to have a female guard a female, at least if it is conducted at the police station. *See* **Exhibit 4**, Welch Depo. pp. 29-30. Nevertheless, on the evening of the incident, Officer Welch quickly abandoned any pretense of locating a female officer and simply said "we need a guy or a girl, one-on-one." *See* Department Transcript of Dispatch Calls, July 21-22, 2007, pp. 18-22 attached as **Exhibit 10**. Officer Welch further testified that it was the Department's practice that if a woman were in custody in a cell, then a woman officer, or two male officers, must be present if the door is unlocked. **Exhibit 4**, Welch Depo. pp. 24-25.

14. Deputy Chief Gibson, on the other hand, testified that the Department had in place a "preferred response" that called for the assignment of females to guard females. **Exhibit 6**, Gibson Depo. p. 45. If there was any such practice, as Deputy Chief Gibson seems to suggest, then based on the same testimony cited above, there obviously was no awareness or training relating to such a practice on the part of the officers working that evening. *See e.g.*, **Exhibit 8**, Gale Depo., p. 12 and **Exhibit 5**, Ladner Depo. pp.15-17, 32.

15. Deputy Chief Gibson, testified that he would not have authorized the use of a "detail" such as the one he believed Samson was performing on July 22, 2002 because paying a police officer to serve as the primary custodian of a patient in a hospital setting would be an improper use of a detail -- not because she was a female and Samson was a male officer. **Exhibit 6**, Gibson Depo., p. 36. However, this directly contradicts the testimony of Dispatch Officer Welsh who testified that he had performed such protective custodies at the hospital "about six times." **Exhibit 3**, Welch Depo. pp. 21, 34.

## **NEED FOR A POLICY IS OBVIOUS**

16. Notwithstanding the Department's lack of policies pertaining to the assignment of male officers to protective custodies of female detainees or the proper performance of a "suicide watch" at the hospital (*i.e*., to serve only as back-up to nurses and never to be alone with a patient), the Department did have in place a written policy requiring that female prisoners "be searched by a female Officer, dispatcher, or matron, unless there are extenuating circumstances such as possession of a dangerous weapon." *See* Nantucket Police Department "Lock Up Procedure" attached as **Exhibit 9**.

17. A "matron" is a woman who is not a police officer but who serves and is trained to perform such tasks when needed. **Exhibit 7**, Mackowski Report, ¶ 2. According to the Deputy Chief, the officers in the Department adhere to the search policy uniformly, although no officer referenced in his or testimony the use or even the existence of any matrons. **Exhibit 9**, "Lock Up Procedure"; **Exhibit 7**, Mackowski Report, ¶ 2; **Exhibit 6**, Gibson Depo. p. 12.

18. The Department's "search" policy is consistent with the practice of other departments in the Commonwealth, and its is also standard practice during an officer's training with a police department to be informed that every effort should be made to minimize a male

4

officer's unsupervised contact with females in custody, and to require a male officer transporting a female in custody to contact his dispatcher, state his location and intended destination, and note the reading on his odometer before he departs. **Exhibit 7**, Mackowski Report, ¶ 2.

19. It is well known in the law enforcement community that sexual misconduct by police officers occurs with some frequency, and ranges in severity from pulling a woman over because she is attractive, to rape and sexual assault. **Exhibit 7**, Mackowski Report ¶ 4. *See also*, M. Naught on, "Trooper Sentenced to 8-10 Years for Rape," The Boston Globe, April 18, 2007 attached to Plaintiff's Opposition as **Exhibit A**; S. Walker & D. Irlbeck, "Driving While Female: A National Problem in Police Misconduct," Special Report by the Police Professionalism Initiative, Univ. of Nebraska at Omaha, May 2002, p. 2 attached to Plaintiff's Opposition as **Exhibit B**; Pennsylvania State Police Year 2003 Press Releases, "State Police Commissioner Calls for Independent Review of Department's Examination of Sexual Misconduct attached to plaintiffs' Opposition as **Exhibit C**; and T. Maher, Police Sexual Misconduct: Officers' Perceptions of its Extent and Causality, Criminal Justice Review, V. 28, No. 2, Autumn 2003, p. 355 attached to plaintiff's Opposition as **Exhibit D**.

> Respectfully submitted,
> PLAINTIFF LAUREN VARALLO,
> By her attorneys,
>
> */s/ Bradley M. Henry*
> _____
> Bradley M. Henry, BBO No. 559501
> Suleyken D. Walker, BBO No. 654933
> MEEHAN, BOYLE, BLACK & BOGDANOW, P.C.
> Two Center Plaza - Suite 600
> Boston, MA 02108-1922
> PH:  617-523-8300

**CERTIFICATE OF SERVICE**

I, Bradley M. Henry, certify that on May 15, 2007, I served the foregoing Plaintiff's L.R. 56.1 Concise Statement Of Disputed Facts In Opposition To The Defendant Town Of Nantucket's Motion For Partial Summary Judgment, by electronic filing and by mailing an exact copy thereof, postage prepaid to all parties of record: Douglas I. Louison, Esq., Merrick, Louison & Costello, LLP, 67 Batterymarch St., Boston, MA 02110 and Philip Slotnick, Esq., Shocket & Dockser, LLP, 6 Huron Dr., P.O. Box 2219, Natick, MA 01760.

> */s/ Bradley M. Henry*
> _____
> Bradley M. Henry