UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF MASSACHUSETTS

LAUREN VARALLO,
                Plaintiff,

v.

TOWN OF NANTUCKET - POLICE
DEPARTMENT and JAMES SAMSON,

                Defendants.

CIVIL ACTION
NO: 05-11547-RWZ

**PLAINTIFF'S OPPOSITION TO DEFENDANT TOWN OF
NANTUCKET - POLICE DEPARTMENT'S MOTION FOR PARTIAL
SUMMARY JUDGMENT AND PLAINTIFF'S REQUEST FOR HEARING**

    This civil action arises from an indecent sexual assault by a Nantucket Police Officer upon twenty-year old Lauren Varallo on July 22, 2002 while she was in overnight protective custody at Nantucket Cottage Hospital. Ms. Varallo was assaulted while lying in her hospital bed, partially clothed, connected to an IV, and sleeping. She had been informed that the officer stationed in her room was there to protect her and so she felt no reason to be anxious or concerned with respect to her vulnerability. However, early in the morning she awoke to find the police officer standing over her, lifting her sheets, with his fingers in her vagina. When the officer realized she was awake, he pulled back and moved away from the bed. Horrified, Ms. Varallo quickly got up and left the room to report the assault to the nurses and to request that the officer, James Samson, be removed from her room.

    Following an independent investigation by the Massachusetts State Police, Officer Samson (who, one week after the incident and in the midst of the investigation was also caught hovering over the bed of a sleeping, female summer officer) was later indicted on charges of rape

and indecent sexual assault.  He pled guilty to the latter charge before the Honorable Regina L. Quinlan in Superior Court on August 26, 2005.

Among other things, Ms. Varallo asserted claims under 42 U.S.C. § 1983 against the Town of Nantucket - Police Department for the violation of her constitutional rights.  The Town now seeks partial summary judgment contending that no reasonable jury could find that the Town was liable to Ms. Varallo for the actions of its Officer, James Samson.  In doing so, the Town first argues that the doctrine of *respondeat superior* does not apply to questions of municipal civil rights liability which, had the plaintiff asserted such a theory, would be as pertinent as it is true.  But, plaintiff has not asserted such liability based on *respondeat superior*.  The Town then claims that there is an insufficiency of evidence to support the plaintiff's other bases for liability - namely, that the Town's own conduct led to and caused serious violations of the plaintiff's constitutional rights.  Insofar as a jury could reasonably find more than enough evidence for such direct liability, the defendant's motion should be denied.

## ARGUMENT

Plaintiff Lauren Varallo's *Statement of Additional and Disputed Material Facts Pursuant to L.R. 56.1* which accompanies this Opposition sets forth the detailed factual background relevant to the Town's motion and, therefore, is not recounted in full here.  The following is the Plaintiff's argument based upon that factual background.

The Town of Nantucket's Police Department (the "Department") is, at best, uncertain whether it has in place any policies or practices providing that female officers or matrons are to be assigned to guard female detainees in protective custody or that supervisory officers are to either avoid assigning a male officer to guard a female detainee or to closely supervise and monitor

such a scenario. In fact, the Department's various personnel cannot seem to agree on whether Officer Samson had been assigned to protective custody duty of Lauren Varallo (as both Ms. Varallo and Officer Samson clearly believed) or whether, instead, he was covering some type of "detail" which: (1) the Department could have declined but, instead, accepted; and (2) under which the officer was to remain outside Ms. Varallo's room merely to back-up the nurses on duty as necessary (as, for example, Deputy Chief Gibson and Samson's immediate supervisor, Sergeant Christine Ladner, seem to have believed.)

While the Department's most senior personnel seem to suggest that there is an unwritten policy or, as Deputy Chief Gibson puts it "a preferred response," that female detainees should be guarded by females in an unsupervised setting and that, at the hospital, only the nurses were to conduct so-called "one-on-one" watches with an officer available merely as back-up and never alone with a detainee, according to their testimony, neither Officer Samson nor his supervisor, Sergeant Ladner, were aware of any such policy. Consequently, either there was no policy in place or, if there was, then there was no training related to it which is the same as having no policy at all.

The Town will be liable to Lauren Varallo for damages sustained as a result of James Samson's sexual assault if a jury finds that, in the ordinary course of its operations, the Police Department's failure to have in place a policy prohibiting a male officer from being alone in guarding a woman in protective custody constituted deliberate indifference to a woman's constitutional right to bodily integrity. The Town would likewise be liable to the plaintiff if a jury finds that there *was* such a policy (which the plaintiff denies, but which remains a disputed issue of fact), but that the Department was nevertheless deliberately indifferent to the rights of women detainees in protective custody because that policy was inadequate or no one received

training relating to it. A jury could find deliberate indifference in this case because a highly predictable consequence of the Department's failure was that a police officer would sexually assault or otherwise sexually take advantage of a female in custody. The jury need not find that it would, or did, happen often, but only that the Department reasonably should have known it was a sufficiently obvious danger to be reasonably protected against and that the severity of the constitutional violation necessitated a policy and proper training as to that policy. Finally, the evidence supports a finding that the Department's failures in these regards led to and caused injury to the plaintiff.

### I. SUMMARY OF APPLICABLE LAW

As the Court is no doubt aware, pursuant to 42 U.S.C. § 1983, the defendant Town of Nantucket may be held liable for violations of the plaintiff's constitutional right to bodily integrity[1] if the Nantucket Police Department's failure to have a policy constituted deliberate indifference to the likelihood that the failure would result in a violation of that constitutional right. *Board of the County Commissioners of Bryan County v. Oklahoma,* 520 U.S. 397, 404 (1997).[2] Following the Supreme Court's holding in *Monell v. Dept. of Social Services,* 436 U.S. 658, 694 (1978) that a municipality is liable where the "execution of a government's policy or

---

[1] This constitutional right is based upon the plaintiff's "due process right to be free from physical abuse or sexual assault by state actors ... The right [to bodily integrity] has been employed to protect against non-consensual intrusion into one's body[.]" *Rogers v. City of Little Rock*, 152 F.3d 790, 795-796 (8th Cir. 1998).

[2] Liability for failing to have in place, or to train on, a necessary policy is distinct from municipal liability arising under §1983 for the deprivation of a federal right where the policy or practice *itself* is either facially, or in its execution, unconstitutional. *See e.g., Monell v. Dept. of Social Services,* 436 U.S. 658, 694 (1978) (Municipality could be found liable under §1983 because official policy requiring pregnant women to take unpaid leaves of absence was unconstitutional.) However, in both categories of §1983 cases, the policy must have been adopted either by the municipality's governing body, or an agency or individual exercising delegated authority. *Putnam v. Town of Saugus*, 365 F. Supp. 2d, 151, 178 (D. Mass. 2005). The Police Department in this case does not deny and cannot reasonably dispute its role as the policymaker for the Town on issues related to police policy.

custom ... inflicts the injury," the Court has specified that a cognizable "policy" may, indeed, be the very absence thereof. *City of Canton, Ohio v. Harris*, 489 U.S. 378 (1989). Numerous cases have since held that a municipality's failure or refusal to take necessary action has evidenced such disregard for constitutional rights that the courts have applied the long standing principal that such omissions may certainly form the basis for liability. *See e.g., Young v. City of Providence,* 404 F.3d 4 (1st Cir. 2005).[3] The essential question in such cases is whether the risk to a constitutional right is sufficiently obvious that the omission constitutes culpable conduct -- what the Supreme Court has termed "deliberate indifference." *See Board of the County Commissioners of Bryan County,* 520 U.S. at 407, *citing City of Canton, Ohio v. Harris*, 489 U.S. at 388.

Deliberate indifference exists not merely where the municipality failed to act despite repeated violations of constitutional rights, but *also* where the violation complained of was a "highly predictable consequence" of the failure to have in place an appropriate policy or adequate training regarding such a policy. *Young,* 404 F.3d at 28.[4] Evaluating whether the municipality was deliberately indifferent does not require consideration of the policymakers' subjective state of mind, *Farmer v. Brennan,* 511 U.S. 825, 841 (1994),[5] but rather, whether the municipality reasonably should have known of the sufficiently obvious risk. The determination raises various

---

[3] *See also, Armstrong v. Squadrito,* 152 F.3d. 564 (7th Cir. 1998); *Reynolds v. Borough of Avalon,* 799 F. Supp. 442 (D. N.J. 1992); *Doe v. Calumet City*, 754 F. Supp. 1222 (N.D. Ill. 1990).

[4] It is worth noting that the Town's statement of the law in this regard is simply incorrect. *See* Defendant's Memorandum, p. 4. As Judge Young explained at length in *Putnam v. Town of Saugus*, 365 F. Supp. 2d 151, 178-182 (D. Mass. 2005), U.S. Supreme Court and First Circuit precedent clearly provides that municipal liability [may] be based upon a single incident of misconduct." *Id.* at 181.

[5] S*ee also, Armstrong v. Squadrito,* 152 F.3d. 564, 577 (7th Cir. 1998).

questions of fact upon which courts frequently deny summary judgment. For instance, in *Reynolds v. Borough of Avalon,* 799 F. Supp. 442 (D. N.J. 1992), the court denied a defendant's summary judgment motion because the plaintiff, a court clerk, expected to show at trial that the risk of sexual harassment was obvious and that the failure to have a policy in place addressing it clearly created a risk that constitutional violations would occur. In *Doe v. Calumet City*, 754 F. Supp. 1211, 1223 (N.D. Ill. 1990), the court denied summary judgment because a jury could find that the City knew that its officers routinely conducted strip searches of women and "it should have been clear" that specific training was needed on the constitutionally permissible scope of those searches. Likewise, summary judgment was denied in *DiLoreto v. Borough of Oaklyn*, 744 F. Supp. 610, 623 (D. N.J. 1990) where a police officer ordered his female detainee to be accompanied to the bathroom and observed by another officer while she urinated. The evidence indicated that neither officer was aware of any policy on the scope or limits to searching individuals in custody. The court noted: "As can be seen from the large number of cases discussing the issue, strip searching by police and accompanying detainees to the bathroom is not an uncommon occurrence. It is something the police confront daily and an area in which they should receive training." *Id*.

The United States Supreme Court has held, with respect to causation, that the predictability of such inevitable violations of constitutional rights "also support an inference of causation -- that the municipality's indifference led directly" to the plaintiff's injury. *Board of the County Commissioners of Bryan County,* 520 U.S. at 409-410. The broader framework for considering causation however, is whether the existence of a policy "would have made a difference." *Young,* 404 F.3d at 29. In *City of Canton, Ohio*, the leading case addressing

municipal liability arising from an omission, the Supreme Court stated "the proper inquiry to be: '[w]ould the injury have been avoided had the employee been trained ... under a program that was not deficient in the identified respects?'" *Vineyard v. County of Murray, Georgia*, 990 F.2d 1207, 1213 (11th Cir. 1993), *quoting City of Canton, Ohio*, 489 U.S. at 391.

The determination of municipal liability requires a fact intensive analysis that is ill-suited to summary judgment. As set forth below, there is sufficient evidence in this case to support every one of the essential elements of the plaintiff's case and, therefore, the defendant Town of Nantucket's motion for partial summary judgment should be denied.[6]

## II.   A REASONABLE JURY COULD FIND IN FAVOR OF THE PLAINTIFF

In essence, the Town's motion for summary judgment amounts to a string of citations and general statements concerning the law of municipal liability, some of which are simply erroneous.[7] To the extent the defendant fails to address the particulars of this case, it inaccurately characterizes the plaintiff's position and states that "it is axiomatic that no amount of training offered by the Town could have prevented Officer Samson's alleged acts."[8] The defendant fails to recognize the central issue in this case -- which is not whether the "Town adopted a deliberate policy or practice of failing to train its officers [not to commit sexual assaults.]" *Id.* The plaintiff does not contend, and never has contended, that the Town should have trained Officer Samson not to commit sexual assaults. Rather, the plaintiff contends that the Department should have

---

[6] *See Allen v. Muskogee, Oklahoma*, 199 F.3d 837, 841 (10th Cir. 1997) (discussing summary judgment standard in context of suit against municipality.)

[7] *See e.g.,* note 4, *supra*.

[8] Defendant's Memorandum of Law in Support of Summary Judgment, p. 7.

-7-

had in place a clear policy that prohibited, or otherwise governed Sergeant Ladner and other departmental personnel from authorizing Officer Samson to perform, without training, guidance or any limitations, the protective custody of Lauren Varallo in July 2002.  If the Town contends that the Department *had* such a policy (which is, at best, unclear and disputed in the evidence), then it was clearly inadequate and none of the relevant officers (e.g., Officer Samson, Dispatch Officer Welch or Sergeant Ladner) had any knowledge of, or training on, any such policy.[9]

In its Supplemental Statement of Undisputed Facts filed on May 3, 2007, the defendant repeatedly claims that Officer Samson was merely performing a police "detail" and, therefore, was somehow not an on-duty police officer.[10]  This is neither true nor relevant.  Detail or no detail, Officer Samson was acting under the color of law, in uniform and was present at the express direction and authority of the Nantucket Police Department.  And, while the local hospital may have paid the Department for Samson's time (plus, apparently, a 10% profit for the Department), Officer Samson's assignment was to protect the plaintiff from harming herself and others and to restrain her if she attempted to leave.  Both Lauren Varallo and Officer Samson clearly believed and understood this.  The plaintiff was therefore in protective custody and was entitled to the protections of departmental policies.[11]

---

[9] *See* Plaintiff's Statement of Disputed Facts, ¶¶ 8, 12-15.

[10] *See* Defendant's Supplemental Statement of Facts (May 3, 2007), ¶¶ 4,7,8,15,16.

[11] Plaintiff's Statement of Disputed Facts, ¶ 6. *See also, Buffington v. Baltimore County, Maryland*, 913 F.2d 113, 119 (4th Cir. 1990) (A state's constitutional duties of protection while an individual is in custody do not "somehow turn on the reason for taking custody.  Such duties have been found both where the state takes custody incident to enforcement of its criminal laws ... and where the custody serves civil, regulatory purposes.... [Case law does not imply] that it is relevant to the existence of the duty whether a state or private actor brought the need for custody to the state's attention."); and Black's Law Dictionary, B. Garner, Ed., 8th Ed. (2004) (defining "protective custody").

Therefore, the disputed issues in this case are as follows: first, whether a jury could reasonably find the Department's failure to have in place a clear policy prohibiting or limiting male officers from having unsupervised access to women detainees in protective custody, created a highly predictable risk that a woman's constitutional right to bodily integrity would be violated.[12] Second, to the extent that the Town claims that there *was* some type of policy, could a reasonable jury find that the policy was so inadequate -- or that few if any of the line personnel were aware of or properly trained regarding such a policy -- that it created a highly predictable risk that a woman's constitutional right to bodily integrity would be violated. And, finally, had there been a policy or had the Department's line personnel been aware of and/or properly trained regarding any such policy, would it more likely than not have prevented the violation of the plaintiff's constitutional rights? Plaintiff addresses each of these issues below.

### A.   **The Nantucket Police Department knew or should have known that there was a need for policies prohibiting or limiting unsupervised male officers from guarding women detainees in protective custody because the need was obvious.**

Unfortunately, police sexual misconduct is not rare and its existence is well known in both the Massachusetts and national law enforcement community. *See* Plaintiff's Statement of Disputed Facts, ¶ 19. For example, in Massachusetts, a state trooper was recently sentenced to 8-10 years for raping a woman he had pulled over while on duty.[13] A review of national print media between 1990 and 2001 "revealed literally hundreds of allegations of [so-called] 'driving

---

[12]   The defendant does not appear to dispute that the sexual assault violated plaintiff's constitutional right to bodily integrity.

[13]   *See* Michael Naughton, "Trooper Sentenced to 8-10 Years for Rape", The Boston Globe, April 18, 2007 attached hereto as **Exhibit A**.

while female' abuses, and an average of over a dozen substantiated cases each year."[14] Various states have conducted studies and surveys in attempts to address the problem. For example, in 2003, the State Police Commissioner for the Commonwealth of Pennsylvania went to far as to launch an independent review of allegations of police sexual misconduct after his own review revealed 163 complaints over just seven years, 68 of which were sustained by a follow-up investigation.[15] In Missouri, a survey of 40 police officers from different police departments in four counties around St. Louis found that sexual misconduct was considered commonplace.[16]

There are also numerous, often well-known, court cases involving the needless or inappropriate strip searching of women in custody and other sexual assaults by law enforcement officers. *See e.g., Swain v. Spinney*, 117 F.3d 1 (1st Cir. 1997) (strip search and visual body cavity search); *Rogers v. City of Little Rock*, 152 F.3d 790 (8th Cir. 1998) (rape by officer after traffic stop); *Haberthur v. City of Raymore, Missouri*, 119 F.3d 720 (8th Cir. 1997) (harassment and sexual assault of citizen by on duty officer); *Jones v. Wellham*, 104 F.3d 620 (4th Cir. 1997) (rape by on duty officer after stop for possible DUI); *Doe v. Calumet City, Illinois*, 754 F. Supp. 1211 (N.D.Ill. 1990) (class action against department for practice of strip searching women detainees with no justification); *DiLoreto v. Borough of Oaklyn*, 744 F. Supp. 610 (D.N.J. 1990) (strip search during interrogation); *Mary M. v. City of Los Angeles*, 54 Cal. 3d 202, 814 P.2d 1341 (1991) (rape by officer after field sobriety test and transport to woman's home).

---

[14] *See* **Exhibit B**, S. Walker & D. Irlbeck, "*Driving While Female: A National Problem in Police Misconduct,*" Special Report by the Police Professionalism Initiative, Univ. of Nebraska at Omaha, May 2002, p. 2.

[15] *See* **Exhibit C**, Pennsylvania State Police Year 2003 Press Releases, "State Police Commissioner Calls for Independent Review of Department's Examination of Sexual Misconduct."

[16] *See* **Exhibit D**, T. Maher, Police Sexual Misconduct: Officers' Perceptions of its Extent and Causality, Criminal Justice Review, V. 28, No. 2, Autumn 2003, p. 355.

The St. Louis area survey referenced above found that one of the significant factors that influenced police sexual misconduct is simply "opportunity."  When asked to rate, on a scale from one to four, the significant factors contributing to police sexual misconduct, among the highest ratings were: "self control (opportunity exists, little chance of discovery)" and "availability of misconduct opportunities."[17]  The law enforcement community has responded to the problem of police sexual misconduct by, among other things, adopting policies and practices designed to reduce those opportunities and increase the likelihood of getting caught.  Common examples of such policies include restrictions on male officers in searching female detainees and odometer checks when circumstances require a male officer, driving alone, to transport a female in custody.  It is also standard practice for male police officers to request that either another officer or a matron be present whenever circumstances would otherwise leave him alone with a female in custody. Plaintiff's Statement of Disputed Facts, ¶ 18.

**B.** **The Department either had no policy or practice prohibiting Officer Samson from guarding the plaintiff or that strictly governed his doing so, OR it had a policy about which neither Samson nor his immediate supervisor were aware or trained.**

There is more than sufficient evidence to support a finding that the Department had no policy or practice that prohibited or otherwise limited unsupervised male officers from guarding women in protective custody.  Officer Samson's immediate supervisor, Sergeant Ladner, approved Samson's assignment and testified that there was no policy or practice that called upon the department to find a woman to perform the observation.  Other officers working that night who testified in the case agreed. *See* Plaintiff's Statement of Disputed Facts, ¶¶ 8, 12-15.

---

[17]   *See* **Exhibit D**, T. Maher, Police Sexual Misconduct at p. 369.

Some of Nantucket's police officers seem to believe that the Department has a "preferred practice" or, using Deputy Gibson's term, "a preferred response" for women to guard women. However, Officer Suzanne Gale was working on the evening of the assault and testified that she had never heard of (much less, therefore, been trained regarding) any such policy or practice relating to gender. *See* Plaintiff's Statement of Disputed Facts, ¶¶ 8, 12-15.  To the extent any such "preferred response" was intended to pass for a departmental policy, a jury could reasonably find that it was grossly inadequate and poorly defined in light of the significant risk that a woman may be sexually assaulted or the victim of some other form of sexual misconduct.  While it may be true that, as in other fields, certain policies and practices may warrant exceptions for exigent circumstances, the officers of the Department seemed unaware of the need to follow any such policy or practice in the first place.  For example, on the evening that Dispatch Officer Welch was calling the Summer Officer's barracks to cover the protective custody of Lauren Varallo, he quickly abandoned any pretense of locating a female officer and simply said "we need a guy or a girl, one-on-one."[18]  Certainly neither Officer Samson nor Sergeant Ladner considered any "preferred practice" to prevent, or in any manner limit, Samson's assignment to the protective custody of Lauren Varallo.

In any event, nothing in the testimony of various police officers working that evening suggests that there was any policy or practice that prohibited unsupervised male officers from performing protective custody watches unless, for example, there were exigent circumstances. *See* Plaintiff's Statement of Disputed Facts, ¶¶ 8, 12-14.  Moreover, if in fact the Department did consider the assignment to be a private "detail" as its Statement of Facts repeatedly claims, then

---

[18] Plaintiff's Statement of Disputed Facts, Exhibit 10, Transcript of Dispatch Calls, pp. 18-22.

the performance of such duties would have been purely *optional* on the part of the Department. If the department did have any policy or practice that only female officers or matrons should guard females except in emergencies, then the Department would have, or certainly should have, simply declined the hospital's request in the first place on the grounds that it did not have the necessary personnel at the time. *See* Plaintiff's Statement of Disputed Facts, ¶¶ 9, 15.

Moreover, an inadequate policy, as opposed to a non-existent policy, certainly does not preclude a finding of liability. Either way, the law provides that the municipality must be held accountable. *Gibson v. City of Chicago*, 910 F.2d 1510, 1521 (7th Cir. 1990) ("Such inadequacies may be said to constitute a "policy" for which the City is responsible[.]") In *Doe v. Calumet City*, a case involving male strip searches of female detainees, the court stated:

> "It still remains true ... that one or both of two types of constitutional failures [to have no policy or to have an inadequate policy] by Calumet City itself was or were the primary cause of the wide pattern of unconstitutional searches proved here: (1) Whatever policy Calumet City did have was seriously deficient in constitutional terms; [OR] (2) Calumet City failed to train its officers adequately in the respects critical to this case." 754 F. Supp. at 1221-1222.

The same reasoning applies here. Whether the Department had no policy at all, or merely had a woefully inadequate policy, the standard remains whether the Department's omissions reflected a deliberate indifference to the constitutional rights of a women detainee in custody.

C. **The violation of a woman's constitutional right to bodily integrity was a highly predictable consequence absent a proper policy or practice and proper training.**

There is also ample evidence from which a jury could conclude that the risk of police sexual misconduct, absent a proper policy or practice and related training, was so predictable that the Department should have taken reasonable steps to prevent it. In evaluating predictability,

courts typically focus on whether: (1) the violation occurred in the context of a "usual and recurring situation;" and (2) the risk was widely known and obvious.

Two cases illustrate the first factor.  In *City of Canton,* the Supreme Court emphasized as a reason for finding deliberate indifference that the policymakers knew "with a moral certainty that their [armed] police officers [would] be required to arrest fleeing felons" and, so, the need for policies and training on the use of deadly force was "'so obvious' that failure to do so could properly be characterized as 'deliberate indifference' to constitutional rights." 489 U.S at 390 and n. 10, *quoting Tennessee v. Garner*, 471 U.S. 1 (1985).  Similarly, in *Allen v. Muskogee, Oklahoma*, 199 F.3d 837, 842 (10th Cir. 1997), a case arising from the shooting death of an armed, mentally ill civilian by police officers, the court stated that it was "common for officers to have to deal with [the] mentally ill ... [and that it was not] uncommon for officers to have to deal with persons armed with a deadly weapon."  In both *City of Canton* and *Allen*, the significant point was the Department's *awareness* of the likelihood that their officers would be placed in a position where there was an opportunity for the specific violation to occur.

With respect to the second factor, in *Young*, the First Circuit noted that expert evidence was expected to be introduced at trial that it "was common knowledge within the police community that [the City's policy created a high] risk of friendly fire shootings[.]" 404 F.3d at 29.  This was also a point relied upon by the court in *Armstrong v. Squadrito*, 152 F.3d 564, 578-579 (7th Cir. 1998), a case involving the erroneous detention of a pre-trial detainee.  The court noted that while the incident may have been the first in that particular county, it was "hardly an isolated incident in the country[,]" and was a "basic concern of jail administration."

In the instant case, considering the evidence in light of both of these factors, a jury could reasonably find that the violation of a woman's constitutional right to bodily integrity was a highly predictable consequence of the absence of a proper policy or practice or, for that matter, the absence of any training relating to any such policy or practice.

First, various Nantucket officers testified that their job duties included observing individuals in protective custody, whether at the police station or at the hospital. Sergeant Ladner testified that she had conducted protective custody watches "numerous times," and Officer Welch testified that he had performed them approximately six times including at least one instance that was remarkably similar to the plaintiff's protective custody. *See* Plaintiff's Statement of Disputed Facts, ¶ 7. Second, the Department was clearly aware of, or reasonably should have been aware of, the possibility of police sexual misconduct. *See infra*, pp. 9-10 and **Exhibits 1-3** attached. For example, Nantucket already had in place a written policy, and a somewhat more relaxed practice, that restricted the searching of female detainees to properly trained female officers or matrons. And, Deputy Chief Gibson, Sergeant Ladner and Officer Welch each agreed that it was at least a "preferred practice" for women officers to watch women in custody. *See* Plaintiff's Statement of Disputed Facts, ¶¶ 8, 13-14. Finally, the plaintiff's expert is expected to testify that the existence of police sexual misconduct is well known in the law enforcement community. *See* Plaintiff's Statement of Disputed Facts, ¶ 19.

It is worth noting that the law does not require that a jury find the violations to be predictably *frequent*, only that the circumstances make it highly predictable that the violation would likely occur at some point. The First Circuit made just this point in *Young*, *supra*, a case arising from the death of a police officer from "friendly fire." The court noted that, although the

incident appeared to be the first of its kind in the City, the City had a so-called "always armed / always on-duty policy" which meant that off-the-clock and out-of-uniform (but armed) police officers reacting to any crime they happened upon would often be in a position that could result in friendly fire upon the arrival of other officers. The court held that, in such circumstances, "the need for training should therefore have been obvious." *Young,* 404 F.3d at 29. Armed, but out-of-uniform personnel -- as well as officers responding to a crime scene -- obviously required training to identify friend from foe, otherwise there was a significant risk that, at one point or another, one of the armed but out-of-uniform officers would be shot by friendly fire. Likewise, in *Reynolds*, 799 F. Supp. at 446, a case involving policymakers who had no actual notice of prior incidents of sexual harassment in the workplace, the Court denied summary judgment finding that the plaintiff may be able to simply show that "the risk of sexual harassment occurring in the workplace is obvious[.]"

All of the factors that courts consider significant when evaluating whether a jury could find deliberate indifference are present in the instant case. The Nantucket Police Department knew that its officers' jobs involved performing protective custody watches and that, therefore, absent a proper policy, male officers would end up in a position where they were alone with a woman detainee in protective custody. The Department also knew, or reasonably should have known that sexual misconduct by police officers is a widely acknowledged and studied problem that is not limited to arguably less personally invasive conduct (for example, pulling a woman over because the officer finds her attractive[19]), but can rise to the level of rape and indecent

---

[19] Plaintiff's Statement of Disputed Facts, ¶ 19.

sexual assault if only given the opportunity. Thus, a "jury could conclude that the severity of the consequences ... forced the department to take notice of the high risk despite the rarity of such an incident." *Young*, *supra*, at 29.

### D. The Department's failures led to and caused injury to the plaintiff.

There is little doubt that the Department's culpable conduct led to and caused significant injury to the plaintiff. The Department cannot hide behind the admittedly reprehensible conduct of its Officer Samson given that, among other things, it was obliged to have in place policies and training that would have denied him the opportunity to engage in such conduct in the first place.

In the context of municipal liability law, a jury need only be shown sufficient evidence that the injury at issue would, more likely than not, have been avoided had a proper policy and necessary training been in place. *City of Canton, Ohio v. Harris*, 489 U.S. 378, 391 (1988). *See also, Putnam v. Town of Saugus,* 365 F. Supp. 2d 151, 181 (D. Mass. 2005); *Oviatt v. Pearce, et al.*, 954 F.2d 1470, 1478 (9th Cir. 1992) (proof that "injury would have been avoided had [the County] instituted some affirmative procedures[.]")

Unlike cases involving a failure to train officers in the use of force which necessarily involves questions of extent and degree and judgment, there is little question that in this case that, if the Department had a policy in place that prohibit or significantly limited the performance of protective custody watches of female detainees by unsupervised male officers, then Officer Samson would have been denied the state-sponsored opportunity to sexually assault the plaintiff. Consequently, the defendant's motion for partial summary judgment should be denied.

**CONCLUSION**

WHEREFORE, plaintiff respectfully requests that motion for partial summary judgment of the defendant Town of Nantucket - Police department be DENIED.

**REQUEST FOR ORAL ARGUMENT**

Plaintiffs respectfully request the opportunity for oral argument on these issues at the pre-trial conference scheduled for May 16, 2007 to the extent the Court considers argument of assistance. Plaintiff submits that argument should require no more than thirty (30) minutes.

> Respectfully submitted,
> PLAINTIFF LAUREN VARALLO,
> By her attorneys,
>
> */s/ Bradley M. Henry*
> _____
> Bradley M. Henry, BBO No. 559501
> Suleyken D. Walker, BBO No. 654933
> MEEHAN, BOYLE, BLACK & BOGDANOW, P.C.
> Two Center Plaza - Suite 600
> Boston, MA 02108-1922
> PH: 617-523-8300

**CERTIFICATE OF SERVICE**

I, Bradley M. Henry, certify that on May 15, 2007, I served the foregoing Plaintiff's Opposition to Defendant Town of Nantucket - Police Department's Motion For Partial Summary Judgment And Plaintiff's Request For Hearing, by electronic filing and by mailing an exact copy thereof, postage prepaid to all parties of record: Douglas I. Louison, Esq., Merrick, Louison & Costello, LLP, 67 Batterymarch St., Boston, MA 02110 and Philip Slotnick, Esq., Shocket & Dockser, LLP, 6 Huron Dr., P.O. Box 2219, Natick, MA 01760.

> */s/ Bradley M. Henry*
> _____
> Bradley M. Henry