UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF MASSACHUSETTS

LAUREN VARALLO,

                    Plaintiff,

v.

TOWN OF NANTUCKET - POLICE
DEPARTMENT and JAMES SAMSON,

                    Defendants.

CIVIL ACTION
NO: 05-11547-RWZ

**TABLE OF EXHIBITS**
**TO THE PLAINTIFF'S L.R. 56.1 CONCISE STATEMENT OF**
**DISPUTED FACTS IN OPPOSITION TO THE DEFENDANT**
**TOWN'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

| Exhibit Number | Description | Page(s) |
|---|---|---|
| 1 | Plaintiff's Answers to the Defendant Town of Nantucket's First Set of Interrogatories | . . . . . . . . . . . . . . . . . . . . . . . 1 |
| 2 | Defendant, Town of Nantucket's Answers to Plaintiff's First Set of Interrogatories | . . . . . . . . . . . . . . . . . . . . . . 1, 2 |
| 3 | Deposition of Lauren Varallo | . . . . . . . . . . . . . . . . . 1, 2, 3, 4 |
| 4 | Deposition of Officer John J. Welch | . . . . . . . . . . . . . . . . . 1, 2, 3, 4 |
| 5 | Deposition of Sergeant Christine Ladner | . . . . . . . . . . . . . . . . . . . 2, 3, 4 |
| 6 | Deposition of Officer Charles B. Gibson | . . . . . . . . . . . . . . . . . . . 2, 3, 4 |
| 7 | Plaintiff's Liability Expert Disclosures Pursuant to Fed.R.Civ.P. 26(a) | . . . . . . . . . . . . . . . . . . . 3, 4, 5 |
| 8 | Deposition of Suzanne Gale | . . . . . . . . . . . . . . . . . . . . . 3, 4 |

9          Nantucket Police Department Lock Up
           Procedure                                     . . . . . . . . . . . . . . . . . . . . . . 4

10         Department Transcript of Dispatch Calls,
           July 21-22, 2002                              . . . . . . . . . . . . . . . . . . . . . . 4

11         Deposition of James A. Samson                 . . . . . . . . . . . . . . . . . . . . . . 2

Respectfully submitted,
PLAINTIFF LAUREN VARALLO,
By her attorneys,

*/s/  Bradley M. Henry*

_____
Bradley M. Henry, BBO No. 559501
Suleyken D. Walker, BBO No. 654933
MEEHAN, BOYLE, BLACK & BOGDANOW, P.C.
Two Center Plaza - Suite 600
Boston, MA 02108-1922
PH:  617-523-8300

**CERTIFICATE OF SERVICE**

I, Bradley M. Henry, certify that on May 16, 2007, I served the foregoing Table of Exhibits for Plaintiff's
L.R. 56.1 Concise Statement of Disputed Facts in Opposition to the Defendant Town of Nantucket's Motion for
Partial Summary Judgment by electronic filing and by mailing an exact copy thereof, postage prepaid to all parties of
record:  Douglas I. Louison, Esq., Merrick, Louison & Costello, LLP, 67 Batterymarch St., Boston, MA 02110 and
Philip Slotnick, Esq., Shocket & Dockser, LLP, 6 Huron Dr., P.O. Box 2219, Natick, MA 01760.

*/s/  Bradley M. Henry*

_____
Bradley M. Henry

@PFDesktop\::ODMA/MHODMA/IMANAGE;BOSLIB;112858;1

EXHIBIT 1

NOTE: CONFIDENTIAL MEDICAL INFORMATION IS CONTAINED IN THIS DOCUMENT

UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF MASSACHUSETTS

LAUREN VARALLO,           Plaintiff,

v.

TOWN OF NANTUCKET - POLICE
DEPARTMENT and JAMES SAMSON,

                          Defendants.

CIVIL ACTION
NO: 05-11547-RWZ

## PLAINTIFF'S ANSWERS TO THE DEFENDANT TOWN OF NANTUCKET'S FIRST SET OF INTERROGATORIES

### INTERROGATORY NO. 1

State your full name, address, date of birth and social security number.

### ANSWER NO. 1

Name:  Lauren Varallo, Current Address:          REDACTIONS BY COUNSEL

### INTERROGATORY NO. 2

If you have been convicted of a felony and/or a misdemeanor, describe the offense or offenses and when, if applicable, where committed, and under what name you were convicted, and when and in what city, county and state.

### ANSWER NO. 2

Not applicable.

### INTERROGATORY NO. 3

Please identify in complete detail how the alleged incident that serves as the basis of your complaint occurred, stating what you saw and did prior to, during, and after each incident and what happened to you in the order in which the events took place including what you were doing immediately prior and up to the receipt of the injuries alleged in your complaint.

### ANSWER NO. 3

On the afternoon of July 21, 2002, Lauren Varallo attended a beach party with friends. After returning home to change, she and her mother argued about whether she would be allowed to go out again that evening because, against her parents wishes, Lauren had been drinking with her friends. Frustrated with her mother, Lauren locked herself in the bathroom and cut herself with a



NOTE: CONFIDENTIAL MEDICAL INFORMATION IS CONTAINED IN THIS DOCUMENT

safety razor causing her left wrist to bleed superficially. Lauren's sister found her and alerted her parents who dialed 911. The Nantucket Police department responded together with two Emergency Medical Technicians who took Lauren in an ambulance to Nantucket Cottage Hospital. Lauren's parents followed separately.

At the emergency room, Lauren's wrist was bandaged. Doctors told her parents that Lauren was not suicidal but that, as a precaution, she should stay at the hospital overnight in a special care unit. There was some discussion about whether Mrs. Varallo could stay with her daughter overnight, but she was told that a protective detail would be assigned to watch over Lauren for the night and that she should not stay.

A Nantucket Police Officer arrived at the hospital sometime after midnight in the early morning of July 22, 2002 and a nurse informed Lauren in her hospital room that the officer's name was James Samson. He was wearing a police uniform but, to Lauren, looked too young to be a police officer. Lauren told Samson that she was going to sleep and said that she did not mind if the officer watched the television even though the nurse had said that it was against policy for the officer to watch television. In the middle of the night, Lauren awoke with a stuffy nose and asked the officer for a tissue, which he provided. Lauren repeatedly woke up during the night, chilled, to find the covers off and she thought that she was just sleeping restlessly. Lauren woke up at one point to use the bathroom and drink some water. Each time she woke up, the police officer was either sitting in a chair near her bed or walking in and out of the room, but he did not engage in conversation with Lauren.

The next time that she woke up, she found the police officer next to her bed, the covers were off of her legs and body, her gown was pulled up from her legs, her underwear was pushed to the side and the police officer's fingers were inside her. When the police officer became aware that Lauren was awake, he quickly pulled his fingers out of her and pretended to be watching television.

Lauren immediately got up and, taking the mobile IV stand with her, went to speak with the nurses. The police officer followed her. Lauren told the nurse at the desk that she wanted to speak with her alone and that she wanted her mother. The nurse told Lauren that she would ask the officer to wait in another room. A second nurse sat with Lauren while the attending nurse asked the officer to leave. Lauren then told the second nurse what had happened.

Later in the morning, representatives of the Nantucket Police Department arrived and indicated to Lauren that they would give her a day to "really think about this before she made any accusations." They did not take a written statement. A nurse different from the attending nurse was present during the conversation. Mrs. Varallo and a counselor arrived in this time frame.

Lauren was eventually discharged to home with her mother later that day. Lauren thought about trying to go in to work, but she felt dirty and took a long, hot shower after which she stayed in her bedroom for the remainder of the day.

The next day, Tuesday, July 23, 2002, Lauren debated with her mother about going to work, because she wanted to go in and did not want to feel sickly or defeated. Lauren's mother checked with a counsellor and then called Lauren at work to ask her to go to the Rape Crisis Center for a sexual assault examination. Lauren met her mother at the center, where a so-called "Rape Test" was performed on her. The doctor indicated to Lauren that she should not have been allowed to clean up or take a shower until the sexual assault examination had been conducted. A counselor

NOTE: CONFIDENTIAL MEDICAL INFORMATION IS CONTAINED IN THIS DOCUMENT

then accompanied Mrs. Varallo and Lauren to the Nantucket Police Department where Lauren was told that the incident would be investigated. Even though the Police Department had indicated to Lauren and the Rape Crisis Center that the officer would be put on desk duty, friends of Lauren's brother had seen him on active duty at his usual post at Broad Street.

The Massachusetts State Police interviewed Lauren twice over the next week and a half and seemed much more understanding and motivated to investigate than the Nantucket Police Department had been.

## INTERROGATORY NO. 4

Describe all of the injuries and complaints of any nature whatsoever (whether objective or subjective) as a result of this incident of which you, or your doctors are aware or suspect as follows:

    a.    List and describe each in specific detail, giving the exact location within or upon your body of all your injuries, and nature of your complaint (whether physical, dental, emotional nervous, mental or psychological);

    b.    If you have completely recovered from each such injury and complaint, state the date you recovered from such injury or complaint:

    c.    List separately all of your present disabilities and complaints (whether objective or subjective), the frequency and duration of your complaints of pain. etc., the locations of and degree of any limitations of motion you now have, and a detailed description of any scars you have at the present time, which you attribute to the incident: and

    d.    Separately list and describe each of your claimed permanent disabilities.

## ANSWER NO. 4

Plaintiff objects to this interrogatory on grounds that it is overly broad, unduly burdensome and, given that this is matter involves sexual assault, appears in some respects more intended to embarrass or oppress the victim than to obtain legitimate discovery. Plaintiff further objects that the interrogatory is vague, ambiguous and unclear in its use of the phrase "injuries and complaints of any nature whatsoever (whether objective or subjective)." Finally, plaintiff objects that the interrogatory is overly broad and unduly burdensome to the extent it requires the plaintiff to research and detail information contained in records she has previously produced in this matter.

REDACTIONS BY COUNSEL

**NOTE: CONFIDENTIAL MEDICAL INFORMATION IS CONTAINED IN THIS DOCUMENT**

conclusions, opinions, or legal theories of plaintiff's counsel and is not reasonably calculated to lead to the discovery of admissible evidence. Notwithstanding these objections, plaintiff directs the defendant to her objections and answers to Interrogatory Nos. 3, 4 and 5 above and, further, reserves the right to supplement her answer, to the extent deemed necessary, as an when appropriate, once the defendant has produced discovery propounded upon it.

Signed under the pains and penalties of perjury this _10_ day of _October_, 2006.

_Lauren Varallo_
Lauren Varallo

As to objections:

Peter J. Black, BBO No. 044407
Bradley M. Henry, BBO No. 559501
MEEHAN, BOYLE, BLACK & FITZGERALD, P.C.
Two Center Plaza, Suite 600
Boston, MA 02108
(617) 523-8300

**CERTIFICATE OF SERVICE**

I, Bradley M. Henry, hereby certify that on _OCTOBER 16_ 2006, I served the foregoing Plaintiff's Answers to Defendant, Town of Nantucket's First Set Interrogatories, by mailing an exact copy thereof, postage prepaid to all parties of record: Douglas I. Louison, Esq., Merrick, Louison & Costello, LLP, 67 Batterymarch St., Boston, MA 02110 and Philip Slotnick, Esq., Shocket & Dockser, LLP, 6 Huron Dr., P.O. Box 2219, Natick, MA 01760.

Bradley M. Henry

- 18 -

EXHIBIT 2

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

### DOCKET NO. 05-111547RWZ

**LAUREN VARALLO**
      **Plaintiff,**

v.

**TOWN OF NANTUCKET POLICE
DEPARTMENT and JAMES SAMSON,**
      **Defendant,**

### DEFENDANT, TOWN OF NANTUCKET'S ANSWERS TO PLAINTIFF'S FIRST SET OF INTERROGATORIES

1.     State your full name, date of birth, city or town of residence, business address, occupation and the position and/or title which you hold with the defendant.

**Answer:**

Charles Gibson, Deputy Chief of Police, Nantucket Police Department, 20 South Water Street, Nantucket, MA 02554.

2.     Please identify each person or entity whom you consulted or caused to be consulted with respect to the matters inquired about in these interrogatories and, in answering, please specify for each such person or entity the interrogatory(ies) with respect to which consultation was sought.

**Answer:**

In addition to consulting with Attorney Douglas I. Louison in answering these interrogatories, I spoke with Sgt. Christine Ladner. I referred to those documents previously produced to the plaintiff through the Town's automatic discovery disclosure. Additionally, I reviewed portions of the Department's policies and procedures as well as reviewed certain relevant special orders of the Nantucket Police Department.

3.    Please identify with specificity each document which you reviewed or caused to be reviewed with respect to the matters inquired about in these interrogatories and, in answering, please specify for each such document the interrogatory(ies) with respect to which it was so reviewed.

**Answer:**

I reviewed the documents previously produced to the plaintiff through the Town's automatic discovery disclosure. Additionally, I reviewed portions of the Department's policies and procedures as well as reviewed certain relevant special orders of the Nantucket Police Department.

4.    If the defendant is insured for this claim, please answer the following questions with respect to each primary, excess and umbrella insurance policy applicable to the claim: please identify each and every primary, umbrella and excess insurer; please give the policy number and policy limits for each and every applicable insurance policy; if any such policy is an aggregate policy, please specify the aggregate amount of the losses which have been paid under each such policy to date; and if there is a deductible or self insured retention ("SIR") relating to any such insurance policy, please state the amount of the deductible or SIR and the terms under which it must be paid.

**Answer:**

A policy of insurance exists through the Massamont Insurance Company. The defendant will forward relevant coverage documents.

5.    With respect to each expert witness whom the defendant expects to call at trial of this case (including liability experts, medical experts, vocational experts and economic experts), please provide the following information: please identify each such expert by full name, date of birth, residential address, business address, employer, occupation and job title; please specify fully and in complete detail, the facts upon which each such expert will base his or her opinions; please state fully and in complete detail, the substance of all such experts' opinions, conclusions, data and testimony which the



defendant expects to adduce at trial; and please specify fully and in complete detail the grounds upon which each such expert will base his or her opinions.

**Answer:**

I am advised that a final decision as to the identity and use of expert witnesses has not yet been made.

6.      Please state the name, address and telephone number(s) of each person known or believed by the defendant to have knowledge regarding the circumstances and facts of the incident, liability or damages, as alleged in the Plaintiff's Complaint, including but not limited to employees, agents or representatives of the Town of Nantucket, the Nantucket Cottage Hospital, witnesses to the incident or its aftermath, medical personnel and investigators, and, for each, please provide a brief summary of the knowledge that each such person has or is believed to have.

**Answer:**

Please refer to those witnesses whose identities have been disclosed through the defendant's automatic discovery disclosures and production of documents response. I do not have a complete or specific understanding of the knowledge that each person might have beyond that related to the circumstances of the plaintiff's transportation and stay at the Nantucket Cottage Hospital and the defendant Sampson's employment with the Town of Nantucket.

7.      Please describe the history of employment of Officer James Sampson had with the defendant including in your answer: each position, role or assignment for which he was hired; the date on which he was hired for each such position; any commendations of his performance for the defendant either from members of the public or within the department; any complaints made against him either by members of the public or within the department; any disciplinary action of any nature or description taken against him; the date on, and reasons for, his termination, resignation or discontinuance of work for the defendant.

**Answer:**

The defendant Sampson was originally hired in 2001 as a summer special officer. He was again hired for the same position in 2002. He was assigned in both years to downtown foot patrol, traffic duties. He resigned his position in August, 2002.

8. Please describe in detail the defendant's knowledge, both prior to and after 2:00 a.m. on July 22, 2002, of any matter involving Lauren Varallo including, but not limited to such matters as any calls for assistance, arrests, detentions, citations, alleged violations of law, convictions, instances of police or governmental custody, service as a witness to any criminal matter, etc.

**Answer:**

The defendant objects to the interrogatory seeking the municipality's "knowledge" of any matter involving the plaintiff. Such question is not subject to clear understanding. However, without waiving its objection, the defendant states: there was an original 911 call seeking an ambulance to the Varallo home due to injuries the plaintiff sustained. A Nantucket Police Officer was dispatched as well to respond to that call and plaintiff was subsequently transported to the Nantucket Cottage Hospital. The plaintiff was never in the custody of the Nantucket Police Department at any time.

9. If the defendant or anyone acting on its behalf investigated the incident alleged in the Plaintiffs' Complaint, please state: the name and address of each person who conducted or participated in such investigation; all dates upon which such persons conducted or participated in such investigation; the results, findings or conclusions of each stage of any such investigation; the identity, including name, address and telephone number of any witnesses identified during such investigation; and if the results or conclusions of the investigation were reduced to written or recorded form (including, but not limited to electronic mail), then please state the date(s), author(s), recipient(s) and a brief, general description of each such writing.

4

**Answer:**

Nantucket Police Sgt. Ladner and Det. Adams and Det. Mack conducted the investigation relating to the plaintiff's complaint.   The personnel of the Massachusetts State Police subsequently took over the investigation.

10.    Please describe in detail the policies and procedures used by the Nantucket Police Department: (a) to select, assign and instruct officers, representatives or employees to cover a detail involving protective custody of a particular individual; (b) to supervise, monitor and evaluate the conduct of such protective custody; and (c) to address, evaluate and investigate claims or complaints of misconduct on the part of officers assigned to a protective custody detail.

**Answer:**

The defendant objects to this interrogatory as it seeks information not likely to lead to the discovery of admissible evidence.  However, without waiving its objection, the defendant states: At no time was plaintiff in protective custody.  The Nantucket Cottage Hospital called the Nantucket Police Department seeking a detail officer.  As with other complaints, if a complaint is received by the Nantucket Police Department, individual investigators will be assigned, depending on the nature of the complaint to conduct an investigation.  There is not a separate procedure for the investigation of claims or complaints relating to protective custody matters.

11.    Please identify (by name, rank, title or position, badge number, duty assignment and current address) all persons contacted, or whom the defendant attempted to contact, to cover the detail involving the protective custody of Lauren Varallo in July 2002 including in your answer: all persons responsible for initiating and following through with such communications; all persons reached or attempted to be reached by such communications; the means (e.g., telephone line numbers, mobile phone numbers, radio or radio-telephone, text message, pager, etc.) for each such communication; the date and time of each such communication; and the response or result of each such communication or attempt to communicate.

**Answer:**

There is no complete or concise record of persons who were asked to cover the detail. As best as I can determine, calls were made from the front desk to obtain an individual willing to fill the detail that was requested by the Nantucket Cottage Hospital. Some of those calls, but not necessarily all, were recorded and said recordings are produced in the compact disk produced as part of the Town of Nantucket's response to request for production of documents.

12. Please describe in detail the circumstances by which Officer James Samson came to be assigned to protective custody duty at Nantucket Cottage Hospital in July 2002 including in your answer, including the identities of all persons involved or with contemporary awareness of such circumstances, the persons responsible for such assignments and all persons responsible for supervising Officer James Samson on July 22, 2002.

**Answer:**

At no time was James Sampson assigned to protective custody duty at Nantucket Cottage Hospital relating to the plaintiff. As indicated above, the Nantucket Cottage Hospital had the custody and care and control of the plaintiff. Hospital personnel called the Nantucket Police Department seeking a detail officer to appear. As indicated, calls were made by police personnel seeking a detail officer who was interested in filling the detail. As best as I can determine, the defendant Sampson responded that he was available. The defendant Sampson was under the general supervisory authority of the shift supervisor on duty.

13. Describe each and every instance in which an officer, representative or employee of the defendant was dispatched, assigned or assumed protective custody duties or detail at (a) the Nantucket Cottage Hospital (57 Prospect Street, Nantucket, MA; 508-825-8255) between July 20, 1992 and July 21, 2002; and (b) any other medical facility of any type or description, between July 20, 1997 and July 2 1, 2002, including as to each and to the extent known: the reasons for the individual's placement in protective custody; the age and gender of each person in such custody; the full name, rank, title or position and the badge number of each person responsible for such duties; the date and duration of each

6

such detail; and the reason for assigning the particular officer, representative or employee to each such detail.

**Answer:**

The defendant objects to this request as it is overly broad and unduly burdensome and not reasonably calculated to lead to the discovery of admissible evidence. However, and without waiving its objection, the defendant states: Records are not maintained that would provide information responsive to this request relating to protective custody and/ or details at the Nantucket Cottage Hospital. In any regard, at no time was the plaintiff in protective custody of the Nantucket Police Department.

14.    Please describe in detail each policy, procedure and/or technique used, or intended to be used, by the defendant or its officers, representatives or employees in gathering physical or forensic evidence and/or investigating an allegation of physical sexual assault against a person who is still at the scene or premises of the alleged assault.

**Answer:**

The defendant objects to this request as it is overly broad and unduly burdensome and not reasonably calculated to lead to the discovery of admissible evidence. However, and without waiving its objection, the defendant states: Beyond general and specific law enforcement and investigatory techniques, some information responsive to this interrogatory is contained within the Department's sexual assault policy, produced to the plaintiff through the Town's production of documents response.

15.    Please identify each and every instance in which the defendant or its officers, employees or representatives, gathered physical or forensic evidence, investigated and/or interviewed any suspect in a case of alleged physical sexual assault between July 20, 1992 and July 22, 2002 and, in your answer: identify the officers, representatives or employees who gathered such evidence or undertook such investigation or interview(s); the nature of physical or forensic evidence gathered; and the identity of each laboratory, research facility, agency or specialist consulted to examine, handle or evaluate such evidence.

7

**Answer:**

The defendant objects to this request as it is overly broad and unduly burdensome and not reasonably calculated to lead to the discovery of admissible evidence. Further, the interrogatory seeks confidential non-discoverable information, the disclosure of which is prohibited by law. However, and without waiving its objection, the defendant states:  In matters in which forensic evidence of a crime are gathered, the physical evidence is collected and such materials is transported to the Massachusetts State Police crime lab where State Police personnel conduct the actual testing thereof.

16.    Please describe in detail the policies and procedures used by the Nantucket Police Department to investigate, evaluate and, if warranted, discipline officers, representatives and/or employees for instances of misconduct, including and not limited to, sexual harassment, sexual misconduct and/or sexual assault.

**Answer:**

The Nantucket policies and procedures manual relating to such incidents are produced to the plaintiff through the Town's response to request for production of documents.

17.    Please describe in detail each and every arrest, detention, search, transport, instance of custody and/or confinement of any individual conducted by, executed by or directly involving defendant Officer James Sampson, including in your answer: the full name and address of the persons involved; the date, time and location of each such instance; and the reason or reasons for each such arrest, detention, search, transport, instance of custody and/or confinement.

**Answer:**

I am not aware of any such circumstances involving the defendant Sampson during his period of employment with the Town of Nantucket.

18.    Please describe each and every complaint of sexual harassment, sexual misconduct and/or sexual assault alleged to have been perpetrated by an officer, representative or employee

of the defendant between July 20, 1992 and July 21, 2002, including in your answer: the full name and address of each complainant; the date of the alleged conduct; the circumstances surrounding the alleged conduct; the full name, address, rank, title or position and badge number of any and all persons against whom allegations were made; any and all disciplinary measures taken against such persons; and the result, findings or conclusion of any investigations, disciplinary, criminal or administrative proceedings related to such allegations.

**Answer:**

The defendant objects to this request as it is overly broad and unduly burdensome and not reasonably calculated to lead to the discovery of admissible evidence. However, and without waiving its objection, the defendant states:  I am aware of one instance wherein such allegations were made.  The Massachusetts State Police in or about 1997 investigated the allegations and to the best of my knowledge no charges or findings against the individual involved were made.

19.    Please describe the policies, procedures, custom and practices of the defendant in hiring, confirming information contained in job applications, checking the background, resumes and/or references of applicants for the following positions: full-time police officers; part-time, temporary, seasonal or auxiliary police officers; departmental employees who or not law enforcement officers.

**Answer:**

The defendant objects to this request as it is overly broad and unduly burdensome and not reasonably calculated to lead to the discovery of admissible evidence. However, and without waiving its objection, the defendant states:  In regard to seasonal personnel, the Department receives a written application from the applicant and thereafter the Department conducts a computerized criminal history check, RMV check and National Triple I check.  Further, employment references are, at times, checked.

20.    Please describe in detail all training provided, required, sponsored or suggested by the

defendant for both full-time police officers and for part-time, temporary, seasonal or auxiliary police officers with respect to: observing, protecting, guarding or supervising persons in custody, generally; observing, protecting, guarding or supervising persons specifically in protective custody; selecting, assigning, dispatching and instructing officers, representatives or employees to cover a detail involving protective custody of a particular individual; supervising, overseeing, monitoring or instructing part-time, temporary, seasonal or auxiliary police officers; initiating and completing an investigation of a reported sexual assault; and initiating and completing an investigation; and initiating and completing an investigation into accusations of sexual assault against an officer of the defendant.

**Answer:**

The defendant objects to this request as it is overly broad and unduly burdensome and not reasonably calculated to lead to the discovery of admissible evidence. However, and without waiving its objection, the defendant states: As to seasonal employees, they are processed through a two week/ eighty hour training program that encompasses the duties of a seasonal officer. Specific training as to protective custody is limited to observation activities. A seasonal officer would not be involved in a sexual assault investigation.

21.    Describe in detail all law enforcement training and instruction provided to, required of, attended or received by, Officer James Samson prior to July 22, 2002.

**Answer:**

The defendant Sampson attended and completed and received a certification through a Massachusetts Criminal Justice Training Academy for Reserve Police Officers in Boylston, Massachusetts. Such certification through a reserve academy was the equivalent to a full time police officer's accreditation. Sampson received greater training and certification than that which was usually required for seasonal employees through the Nantucket Police Department.

22.    Please describe any changes, modifications, updates, supplementation, deletions and/or

additions to any of the rules, regulations, policies or procedures identified in any of the answers above since July 22, 2002.

**Answer:**

To the best of my knowledge, no changes have been made since July 22, 2002.

23    Please state with specificity the factual knowledge, information, belief and/or good faith factual basis upon which the defendant relied in asserting the following affirmative defenses in defendant's Answer to Plaintiffs Complaint (or, in the alternative, merely indicate the defendant's withdrawal of said defense): (No. 2) that "plaintiff failed to commence her action within the applicable statute of limitations;" (No. 3) that "plaintiff failed to effectuate notice of claim to the defendant as precedent to suit;" and (No. 4) that any alleged injury or damage sustained by the plaintiff "was caused by a person or persons for whom the defendant is not legally responsible."

**Answer:**

The defendant, Town of Nantucket  objects to this interrogatory as it seeks legal conclusions.   Without waiving said objection, the defendant states that as to affirmative defense no. 4, the Town asserts that any damages or injury sustained by the plaintiff was caused by James Sampson.

Signed under the pains and penalties of perjury, this _____ day of

_____, 2006.

Town of Nantucket by:

Charles Gibson, Deputy Chief of Police

11

As to Objections:

Defendant, TOWN OF NANTUCKET,
By its attorney

Douglas I. Louison (BBO # 545191)
MERRICK, LOUISON & COSTELLO
67 Batterymarch Street
Boston, MA 02110
(617) 439-0305

## CERTIFICATE OF SERVICE

I, Douglas I. Louison, hereby certify that on the 9 day of May , 2006, I served the foregoing by causing a copy to be mailed, postage prepaid, directed to **Bradley Henry, Esquire**, Meehan, Boyle, Black & Fitzgerald, PC, Two Center Plaza, Suite 600, Boston, MA 02108 and **Philip Slotnick, Esquire**, Shocket & Dockser, LLP, 6 Huron Drive, PO Box 2219, Natick, MA 01760.

Douglas I. Louison

12

**EXHIBIT 3**

Page 1

VOLUME:  I
PAGES:  1 - 71
EXHIBITS:  None

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - - - - - x
LAUREN VARALLO,
              Plaintiff,

vs                                    No. 05-11547-RWZ

TOWN OF NANTUCKET - POLICE
DEPARTMENT AND JAMES SAMSON,
              Defendants.
- - - - - - - - - - - - - - - - x

HIGHLY CONFIDENTIAL



DEPOSITION of LAUREN VARALLO, a witness

called on behalf of the Defendant Town of Nantucket Police

Department, taken pursuant to notice before Deborah L.

Maren, Registered Professional Reporter and Notary Public in

and for the Commonwealth of Massachusetts, at the offices of

Merrick, Louison, & Costello, 67 Batterymarch Street,

Boston, Massachusetts, on Monday, October 23, 2006,

commencing at 10:35 a.m.

DUNN & GOUDREAU
COURT REPORTING SERVICE, INC.
ONE STATE STREET
BOSTON, MASSACHUSETTS 02109
TEL: 617-742-6900/FAX: 617-973-9500
www.dunnandgoudreau.com

1   A.    No.

2   Q.    Do you recall seeing some sort of emergency medical

3   technicians --

4   A.    Yes.

5   Q.    -- or paramedics?  They came?  Do you recall seeing

6   any police officers coming to help?

7   A.    Not that I know of.

8   Q.    What happened next?

9   A.    I was brought to the emergency room.

10  Q.    In the ambulance?

11  A.    Yes.

12  Q.    Did anyone accompany you in the ambulance?

13  A.    Not that I recall.

14  Q.    When you got to the emergency room, were your parents

15  there?

16  A.    Yes.

17  Q.    What occurred when you got to the emergency room?

18  A.    I had seen a doctor, and I remember them bandaging up

19  my wrist and telling me -- telling my parents in front of me

20  that it was not a suicide attempt and it was just being

21  angry.  And it wasn't anything to worry about but because of

22  the condition, I was admitted into the hospital.

23  Q.    What do you mean?

24  A.    Drinking.

1   A.     I recall that plain as day.  She liked my shoes, and

2   she wore a size 10.  And I said, You can have them if you

3   want them.  But her feet were too big.

4   Q.     How were you dressed at that point?

5   A.     I think at that point I was in a gown.

6   Q.     A hospital gown?

7   A.     Yes.

8   Q.     When you got to the hospital, what were you wearing?

9   A.     I'm not sure.

10  Q.     But clothes that you had changed into at the house?

11  A.     Correct.

12  Q.     And at some point you had changed into a hospital type

13  of gown?

14  A.     Correct.

15  Q.     What happened next?

16  A.     My mom left, and the officer came on duty as the

17  protective custody.

18  Q.     Did you know who that was?

19  A.     I had seen him before on the streets in Nantucket.

20  Q.     And did you recognize him as someone on the --

21  A.     A summer cop.

22  Q.     Yes, okay.  Had you ever talked to him before?

23  A.     No.

24  Q.     You just recognized him as a summer cop; correct?

Page 21

1    A.    Correct.

2    Q.    And when he came into the room, did you have any

3    conversation with him?  Or did he introduce himself to you

4    or anything like that?

5    A.    Yes.  He had introduced himself and then --

6    Q.    Do you have any conversation with him?

7    A.    Yes.  I told him he could watch the TV.  And then the

8    nurse had said that that was not -- he was not allowed to do

9    that, but he took the remote anyway.

10   Q.    Now, when he came into the room, were you in bed?  Or

11   were you standing up?  What were you doing?

12   A.    In bed.

13   Q.    And he came over and you had some sort of introduction

14   or discussion?

15   A.    Yes.

16   Q.    And when did you hear or learn that he wasn't supposed

17   to watch television?

18   A.    Right after the conversation that I had had with him

19   about he could change the channel and watch TV if he wanted.

20   Q.    And then did a nurse come in?  Or how --

21   A.    And a nurse was standing there and said,  That's

22   against hospital policy.  He cannot do that.

23   Q.    And then what happened next?

24   A.    He watched TV.

Page 24

1  Q.    To which side of the bed?

2  A.    To the right.

3  Q.    Did you have any contact or communication with the

4  officer when you did that?

5  A.    I don't remember.

6  Q.    Was that the only time you recall getting up and out

7  of bed?

8  A.    I may have gotten up one other time to go to the

9  bathroom.

10  Q.    Did you have any conversation with the officer beyond

11  what we've already talked about up to that point?

12  A.    There was one point later where he was on this side of

13  my bed adjusting the -- like the blinds and said, It's

14  getting very bright in here; morning is here or something

15  along those lines, which I thought was kind of odd.

16  Q.    Why?

17  A.    Every time I remember waking up he would be in a

18  different position in the room.

19  Q.    How many times do you recall, if you can, or estimate

20  recalling the times you woke up and observed him in the

21  room?

22  A.    I'm not sure how many times.

23  Q.    But you recall sleeping through the night?

24  A.    I recall waking up several times during the night.

1  Q.    At some point did something cause you some concern or

2  alarm?

3  A.    Yes.

4  Q.    What happened?

5  A.    Well, at different points during the night, I actually

6  had been waking up, and my covers would be off.  And I was

7  not necessarily alarmed, but I was freezing cold.  It's so

8  cold at night, and I only had that gown on.

9          And I thought, you know, that I had just been

10  sleeping restlessly.  But I'm not a restless sleeper, but I

11  thought maybe it was just me.

12  Q.    How many times did that occur?

13  A.    A few.

14  Q.    Then what happened next?

15  A.    Then I woke up -- after the turning of the blinds, I

16  woke up with Officer Samson over me with my gown up.

17  Q.    Let me stop for a second.  How much time elapsed, if

18  you can recall, between when you had that conversation about

19  the blinds and this next contact?

20  A.    I do not know.

21  Q.    Okay.  Do you think you fell back asleep after?

22  A.    Yes.

23  Q.    And given that his comment was that morning had come,

24  this next contact that you're about to describe, that was in

1  the morning hours?

2  A.    Yes.

3  Q.    All right.  Do you have a specific recollection of

4  what time it was?

5  A.    No.

6  Q.    All right.  Go on then.

7  A.    I woke up with my gown -- my covers off, my gown up,

8  him over me with his fingers touching my vagina.

9  Q.    And what did you do?

10 A.    I woke up, and I was -- I felt like I was going to

11 throw up.  And he pulled back very quickly and asked me what

12 was wrong.  And I didn't say anything.  I grabbed -- got out

13 of bed and grabbed my IV because I had an IV attached.  And

14 I walked as quickly as I could to the nurses' stand to the

15 right-hand side.

16 Q.    Okay.  And then what did you do?

17 A.    I asked if I could speak to one of the nurses alone.

18 Meanwhile, he kept asking me what was wrong and how he could

19 help me.

20 Q.    Did he follow you out of the --

21 A.    Yes.  That's why I asked if I could speak to one of

22 the nurses alone because I didn't want him to hear what had

23 gone on.

24 Q.    And then what happened next?

1    A.    I said -- and the nurse brought me into a room right

2    like behind the nurses' stand.  And I told her what had

3    happened.  And I remember her giving me a blanket.  And we

4    were in there -- I sat down in a chair.  And we were in

5    there for a little bit.  And she told me I could come back

6    into my room, and he wasn't there anymore.  And they told me

7    to go back to bed.

8    Q.    Okay.  What happened next?

9    A.    I asked -- before I went back to bed -- I wanted to

10   speak to my mom.  But they said they couldn't call my mom.

11   Q.    And what happened next that you recall?

12   A.    Then they told me to calm down.  I think they gave me

13   some water.  And I tried to go back to sleep, and I finally

14   got back to sleep.

15   Q.    How long did you sleep for?

16   A.    I'm not sure.

17   Q.    What happened next?

18   A.    I woke up, and there was a -- I remember a nurse being

19   in the room, a different nurse than I had seen in the

20   night.  I guess they switched -- changed shifts or

21   something.

22   Q.    Did you talk to her?

23   A.    I do not remember.

24   Q.    Was she a different nurse than the nurse you informed

1  A.    Because of my supposed suicide attempt.

2  Q.    So my point being, as far as you understand, the

3  counselor came because of the reason why you were admitted

4  and not because of the accusation you had made?

5  A.    Correct.

6  Q.    And was she there with you alone?  Or was she there

7  with you with your mother?

8  A.    I don't know.

9  Q.    And did you talk with that counselor?

10 A.    Yes.

11 Q.    And did you talk about the events of the preceding day

12 and night?

13 A.    Yes.

14 Q.    Did you talk about the accusations about Samson with

15 her?

16 A.    Yes.

17 Q.    And I'm sorry.  I know I asked you this.  Was your

18 mother present during that or not?

19 A.    I'm not sure.

20 Q.    And then were you alone with your mother at some

21 point?

22 A.    I'm not sure.

23 Q.    All right.  And you made reference to an Officer Mack

24 coming to see you; correct?

Page 31

1   A.    Yes.

2   Q.    How do you recall his name?

3   A.    I just remember him being such a big guy that I

4   couldn't forget him.

5   Q.    The name?  Now, did he come in with anyone else?

6   A.    One other officer.

7   Q.    And was your mother present at that time?

8   A.    Yes.

9   Q.    Were you still in your johnnie or robe or whatever it

10  was?

11  A.    Yes.

12  Q.    Were you still in the room?

13  A.    Yes.

14  Q.    And what occurred when you had that contact with the

15  officers?

16  A.    They told me that they had known of what had gone on

17  or what supposedly had gone on that night with Officer

18  Samson.  And I need to make sure that I want to press

19  charges like this before it could ruin someone's life.

20  Q.    And what did you say?

21  A.    I said, I'm sure.

22  Q.    Were you at that point feeling any effects of your

23  intoxication?

24  A.    No.

Page 32

1   Q.    Can you recall, when was the last point you had any

2   intoxication effects from your admission to the morning?

3   A.    Probably right after I went to sleep the first time.

4   Q.    Because when you next awoke after that first time, do

5   you recall having any effects of intoxication?

6   A.    Not that I recall.

7   Q.    Did you describe as you described today to Officer

8   Mack and the other officer what had occurred?

9   A.    Yes.

10  Q.    And you indicated what they said to you?

11  A.    Correct.

12  Q.    And after you indicated your -- your insistence of

13  going forward, what next occurred?

14  A.    They still treated me like they didn't believe me.

15  Q.    Okay.  And why do you say that?

16  A.    I was just constantly questioned about the -- what had

17  gone on and how can you ruin this young man's life and how

18  this is serious charges.  It was reiterated so many times

19  that I knew that they doubted me.

20  Q.    Okay.  At some point they left?

21  A.    Yes.

22  Q.    Was your mother present at any time when they were

23  there?

24  A.    Yes.

Page 40

1   mother went to the rape crisis center; correct?

2   A.    Correct.

3   Q.    And then sometime after that, you saw a counselor

4   there?

5   A.    Yes.  After I had a rape test.

6   Q.    When was this rape test administered?

7   A.    The 23rd.

8   Q.    How did that come about?

9   A.    The crisis center had told my mom that that's what --

10  that was the standard procedure, and that was -- that should

11  have been done when there's someone accused of a crime like

12  this.

13  Q.    And where did you go for that?

14  A.    The hospital.

15  Q.    Back to the hospital?

16  A.    Correct.

17  Q.    And did personnel administer the test?

18  A.    Yes.

19  Q.    And that was on what, the 23rd or the 24th?

20  A.    The 23rd.

21  Q.    Who accompanied you then?

22  A.    My mom.

23  Q.    And at some point after that you went to the center?

24  A.    I think it was right after that.

Case 1:05-cv-11547-RWZ    Document 31-5    Filed 05/16/2007    Page 1 of 9

**1**

UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF MASSACHUSETTS

05-11547-RWZ

.............................
LAUREN VARALLO,              *
            Plaintiff,       *
                             *
        V                    *
                             *
TOWN OF NANTUCKET - POLICE   *
DEPARTMENT and JAMES SAMSON, *
            Defendant.       *
.............................

        Deposition of JOHN D. WELCH, taken on

behalf of the Plaintiff, pursuant to Notice

under the Federal Rules of Civil Procedure,

before Janice A. Maggioli, RPR, RMR, CRR, and

Notary Public in and for the Commonwealth of

Massachusetts, at the Nantucket Police

Department, 20 South Water Street, Nantucket,

Massachusetts, on January 4, 2007, commencing

at 10:00 a.m.

MAGGIOLI REPORTING SERVICES, INC.
48 Watson Street
Braintree, Massachusetts 02184
(781) 356-2636

---

**2**

APPEARANCES:

Merrick, Louison & Costello, LLP
[By Douglas I. Louison, Esq.]
67 Batterymarch Street
Boston, Massachusetts 02110
    On behalf of the Town of Nantucket - Police
    Department.

Meehan, Boyle, Black & Bogdanow
[By Leo V. Boyle, Esq.]
Two Center Plaza
Boston, Massachusetts 02108
    On behalf of the Plaintiff.

---

**3**

I N D E X

Witness    Direct  Cross  Redirect  Recross

John D. Welch

By Mr. Boyle    6


EXHIBITS

Id.    Description              Page

1      Deposition notice        4

**EXHIBIT 4**

---

**4**

1        <u>STIPULATION</u>

2            It is agreed by and between counsel

3    for the respective parties that the reading

4    and signing of the deposition will not be

5    waived.  All objections, except as to the form

6    of the question, and motions to strike will be

7    reserved until the time of trial.

8            (Exhibit 1, Deposition Notice,

9            marked for identification.)

10           MR. BOYLE:  We're taking Officer

11   Welch's deposition here this morning pursuant to

12   a notice of taking deposition that was served in

13   November of '06.  We've reconvened in January of

14   '07 for the deposition.

15           We will reserve all objections,

16   except as to the form of the question.  We'll

17   reserve all motions to strike until the time of

18   trial.  Would you like the witness to read and

19   sign the deposition?

20           MR. LOUISON:  That will be

21   appropriate.  Just under the pains and penalties

22   of perjury will be fine.  I'll explain that to

23   you afterwards.

24           THE WITNESS:  Okay.

---

**9**

1  Q. So you have some familiarity with what his
2     training would have been and what would have
3     been expected of him?
4  A. Yes.
5  Q. September of '88 you went to the police academy?
6  A. Yes.
7  Q. And where did you attend that?
8  A. Barnstable Police Academy in Barnstable,
9     Massachusetts, and if I might add, it was the
10    62nd class of that academy, which is no longer.
11 Q. The academy is gone?
12 A. That academy has closed.
13 Q. And how long was your tour of duty at the
14    academy?
15 A. 14 weeks.
16 Q. You came back to Nantucket after that?
17 A. Yes, sir.
18 Q. And were commissioned as a full-time officer?
19 A. Yes, sir.
20 Q. And from 1988 through the present have your
21    responsibilities remained the same or have you
22    progressed through the ranks?
23 A. There is a progression. That progression is
24    limited to pretty much seniority. The job

---

**10**

1     description is very much the same as it was when
2     I had graduated from the academy, but through
3     the years there are seniority situations that
4     now become part of your patrol.
5  Q. And when you say "seniority," does that play
6     itself out in terms of what shift you get and
7     the like?
8  A. Yes.
9  Q. But your fundamental responsibility is pretty
10    similar to what you started out at almost 20
11    years ago?
12 A. Correct.
13 Q. And how would you describe for the court and
14    jury that day-to-day responsibility? Are you on
15    patrol? Are you in a car? Are you on foot?
16 A. I am currently assigned to the airport as one of
17    the three airport officers which oversees
18    security for the TSA, as well as the local
19    airlines.
20 Q. So you're part of the responsibility for
21    outgoing flights?
22 A. Yes, sir.
23 Q. And how long have you been doing that?
24 A. Going on year number three.

---

**11**

1  Q. Now, are you familiar -- I assume you are
2     familiar from your years with the various
3     policies and procedures that are followed by the
4     Nantucket Police Department?
5  A. Yes.
6  Q. And I take it that some of those procedures find
7     themselves in the procedure manual, correct?
8  A. Correct.
9  Q. And I assume that there are also other practices
10    that are followed fairly uniformly, which are
11    verbal and are not in the manual?
12 A. Yes.
13 Q. Are you familiar, for example, with protective
14    custody?
15 A. Yes.
16 Q. And how did you become familiar with the concept
17    of protective custody?
18 A. Well, that is early on a very common incident
19    that we run across on this island, mostly, in
20    part, because it's a resort community, and our
21    summer months bring a lot of revelers,
22    good-timers, and at times there is intoxication
23    that we continually run into, which exposes us
24    to the protective-custody statute.

---

**12**

1  Q. Are you also familiar with the custom and
2     practices of the police department as regards
3     details?
4  A. We define it as a third-party detail. Is
5     that --
6  Q. Okay.
7  A. Yes.
8  Q. And what do you understand to be a third-party
9     detail?
10 A. A third-party detail is -- it's a request for
11    police presence, not incorporated with our
12    general duty, our general shift assignment, paid
13    by the third-party requestee or private party, I
14    should say.
15 Q. So is a detail -- are details considered to be
16    optional?
17 A. Yes.
18 Q. So that --
19 A. Unless directed by the chief.
20 Q. So, if a request for what you have defined as a
21    detail were to come in and you found yourselves
22    without the proper resources to fulfill that
23    detail, the department can decline the detail?
24 A. Yes, provided there isn't a likely risk of

---

**21**

1     me correct.

2  **Q.**  How often does the hospital call the police

3     department and ask you to send an officer over

4     to watch a patient at the hospital?

5  **A.**  Not often.

6  **Q.**  So it's a rarity?

7  **A.**  It is. You could define it as a rarity I would

8     say.

9  **Q.**  Does it happen -- well, you have been with the

10    department for I guess around 18 years?

11  **A.**  Yes, sir.

12  **Q.**  And so it's happened to you once?

13  **A.**  I can recall one specific third-party detail

14    that I had taken at the hospital for a

15    distraught elderly woman. There may have been

16    more, but over the years what stands out is that

17    specific one.

18  **Q.**  Are PCs at the hospital much more common?

19  **A.**  No.

20  **Q.**  You've done about six at the hospital you

21    indicated?

22  **A.**  Yes. Protective custody, unless the actual

23    incident occurred at the hospital where you had

24    an intoxicated person acting up inside the

**22**

1    hospital and the hospital calls us and says, "We

2    need assistance here," and upon arrival we

3    discover that the person is intoxicated, under

4    the influence, we'll say, they are placed in

5    protective custody at that moment, and now they

6    are in our custody.

7          Generally, 99 percent of the time

8    protective custodies originate here at the

9    police department, and when I say "originate

10   here," they have been placed in protective

11   custody outside the police department via a

12   visual by an officer, a telephone call, a 911

13   call where we responded to a call about a

14   distraught person, and a drunk person, and

15   somebody under the influence and violent.

16         So, we have contact that way. We

17   bring them here. The booking procedure is done

18   here. If evaluations need to be done, it's done

19   here, and then it can expand to the hospital if

20   that's what's needed.

21  **Q.**  Do you have any contractual arrangement with the

22   hospital to provide details at the hospital?

23  **A.**  If there is. I'm not aware of a contractual

24   agreement.

**23**

1  **Q.**  How does it arise? The hospital calls?

2  **A.**  Yes.

3  **Q.**  And requests an officer to come over?

4  **A.**  Yes.

5  **Q.**  And how often does that happen? Is that an

6    annual event? Is it a monthly event? You've

7    indicated it's rare.

8  **A.**  No, it's infrequent.

9  **Q.**  Now, there are practices, I assume, within the

10   Nantucket Police Department that have to do with

11   attempting to find female officers to have

12   certain interactions with female citizens; is

13   that correct?

14         MR. LOUISON: Objection to the

15   form.

16  **A.**  Could you repeat it again, please?

17  **Q.**  Sure. There are practices within the police

18   department regarding, for example, women in

19   custody being searched, correct?

20  **A.**  Yes.

21  **Q.**  And would you describe those practices, please?

22  **A.**  The practice of frisking a woman party in our

23   custody would be the effort to have a woman

24   officer, a female officer or trained personnel,

**24**

1    trained female personnel to frisk that woman.

2  **Q.**  Now, how about with regard to if you have an

3    incarcerated woman, how about with regard to an

4    officer going into that woman's cell, is there

5    any practice in terms of gender in that

6    situation?

7  **A.**  Your question is female or male officer entering

8    the cell area?

9  **Q.**  Correct.

10  **A.**  I'll respond with a general rule of thumb. Our

11   practice -- and whether it's in our policy and

12   procedure book or not, I'm not sure, but our

13   practice is a woman on a woman, a woman one on

14   one with a male nearby in the frisking of a

15   female party.

16         If a female is not available, it

17   would be two male officers that one actually

18   performs the frisking and the other one is --

19   provides a visual. There is a second party, a

20   bystander. So we try to eliminate the

21   one-on-one male frisking a female alone with

22   nobody present -- nobody else present.

23  **Q.**  Would that also be true for entering a female's

24   cell; for example, if there was some reason that

**25**

1     an incarcerated female had to be helped for any
2     reason in her cell?
3   A.  It is our practice when you enter the cell area
4     if the door remains looked, the cell door
5     remains locked, you can have conversation one on
6     one. If you were to open the cell door for any
7     kind of contact, there would two male officers,
8     except in the case of a female where there's
9     less of a requirement amongst ourselves to have
10    two parties there.
11   Q.  So. If I'm hearing you, that if the
12     incarcerated party is behind bars and the lock
13     is not opened, there can be contact between one
14     male police officer and an incarcerated female?
15   A.  But not physical contact. It's limited to
16     verbal contact.
17   Q.  Thanks for that correction. If the cell is to
18     be opened, the first preference is to have a
19     female present?
20   A.  Correct.
21   Q.  And there is -- if there is a female present,
22     there's less of a requirement that there be a
23     second officer present with that female to open
24     the woman's cell?

**26**

1   A.  Correct.
2   Q.  If a man is going to open the cell, there's got
3     to be a second officer -- a second male officer
4     present?
5   A.  Yes.
6   Q.  I think I've got it. Now, if you could give me
7     the fullest explanation of why you have those
8     policies that you've just described?
9   A.  I can sum it up in one word for you, and that is
10    liability.
11   Q.  By which you mean what?
12   A.  We, as police officers, are very much in tune to
13     liability situations, situations where you can
14     be put in a legal position merely by -- merely
15     by your presence.
16   Q.  Now, these practices with respect to women being
17     searched and women in cells, do they also extend
18     to the apprehension of women suspects; for
19     example, if there's a complaint of a crime, be
20     it a felony or misdemeanor being committed by a
21     woman, and you need to respond, is there an
22     effort to send a woman out?
23   A.  No.
24   Q.  So the interaction involving women interacting

**27**

1     with women prisoners begins at the police
2     station?
3   A.  For the most part, yes.
4   Q.  So the initial apprehension of a woman suspect
5     would be made by the nearest available officer?
6   A.  Correct.
7   Q.  Now, how would a young officer -- would Officer
8     Samson, for example, have been taught about
9     these policies that you have now described for
10    me?
11   A.  Which specific policies?
12   Q.  Well, involving women who are interacting with
13     police officers.
14   A.  Yes.
15   Q.  And in what setting would he have learned about
16     those policies?
17   A.  He would have been taught that early on in the
18     classroom setting. It would have been his
19     criminal-justice training prior to his full-time
20     street employment as a reserve officer.
21   Q.  Now, you've also used the expression, quote,
22     "one on one," end quote. What does that mean?
23   A.  One on one is if an officer is going to watch a
24     detainee, a person in our custody more or less

**28**

1     related to a suicide watch within our
2     department, within our station, it would be a
3     one-on-one visual where an officer would have
4     this person in his visual sights at all times.
5   Q.  And is that what a suicide watch is, 100 percent
6     visualization of the person in custody?
7   A.  Yes.
8   Q.  And if the officer has to leave that person,
9     does he or she have to get coverage?
10   A.  Yes.
11   Q.  And is that required by any written procedure or
12     is that required by custom and practice?
13   A.  That is procedure specifically for a suicide
14     watch.
15   Q.  So, if I understand it, if there's a suicide
16     watch in the situation, you use the term "one on
17     one," and that means 100 percent visualization
18     of the detained person?
19   A.  Correct.
20   Q.  And is there -- if the detained person is a
21     female, do you have a custom and practice to try
22     to assign a female to the one on one?
23   A.  Yes.
24   Q.  And has that been the practice as long as you

Case 1:05-cv-11547-RWZ    Document 31-5    Filed 05/16/2007    Page 10 of 9

**29**

1     can remember?
2 A. Yes.
3 Q. And how many female police -- full-time police
4     officers were on the force back in '02,
5     approximately?
6 A. I cannot say with exact certainty, but I would
7     say at least three regular women officers.
8 Q. So, on a suicide watch within the station
9     itself, if it's a detained woman, your policy is
10    to have a woman conducting -- a woman officer
11    conducting the watch, correct?
12 A. The policy isn't to have a woman watch the
13    detained person. The policy is that that's what
14    is encouraged by the policy. If we were to go
15    back down the callback list, there would be
16    emphasis on a woman first, on a woman officer
17    first.
18 Q. Because for a number of reasons: The department
19    has determined that on a one-on-one observation
20    of a woman detainee, a woman officer is the
21    appropriate person to try to get?
22 A. Yes. That is encouraged, yes.
23 Q. Now, I would assume that if the watch were going
24    to take place in the context of a detail, but it

**30**

1     were still a person who had threatened suicide,
2     and that person was a female, you would also
3     attempt to get a female to conduct that watch,
4     correct?
5           MR. LOUISON: Objection to the
6     form.
7 A. That would come just from mere experience. You
8     would -- a police officer would automatically
9     turn to that just from practice, just from being
10    familiar with incidents involving women.
11 Q. So whether it comes from human nature or
12    otherwise, would it be fair to say that the
13    practice which you always followed as an officer
14    was that if there were a detail involving
15    watching a woman who had attempted suicide, you
16    would try to find a woman?
17 A. I would feel more comfortable with a woman
18    officer, yes.
19 Q. And you would try to find one?
20 A. Yes.
21 Q. And, that is, you would have to agree, the
22    policy of the department at large, as well;
23    would that be fair to say?
24          MR. LOUISON: Objection.

**31**

1 A. That is the policy of the department at large
2     within our department within our protective
3     custody policy.
4 Q. Sure. But if we shift it from a PC to a detail,
5     the person is still a suicide risk and an
6     officer is going to be there, that policy
7     doesn't change, does it?
8 A. Well, it does change because now you have to
9     define "custody." That person, that party that
10    you're describing as a suicide risk isn't in --
11    that's not our custody. That's not the -- that
12    party is not in our custody for reasons of
13    whatever they might be to have them there. That
14    becomes a separate incident. You are describing
15    a suicide person at a medical facility.
16 Q. Right.
17 A. Without our custody of that person.
18 Q. Well, let me come back and see if I can more
19    clearly understand what you are telling me.
20    Your personal practice is that if there's a
21    detail that has to be done watching a person who
22    might have attempted suicide at the Cottage
23    Hospital, you personally would try to find a
24    woman to send out there, correct?

**32**

1 A. Correct.
2 Q. And would it be fair to say that that
3     preference, you're not the only one who has it
4     at the Nantucket Police Department, are you?
5 A. No.
6 Q. Would it be fair to say that all of the other
7     officers in the same situation would try to find
8     a woman?
9 A. Yes.
10 Q. And that is what the department expects you to
11    do?
12          MR. LOUISON: Objection to the
13    form.
14          MR. BOYLE: Fair enough.
15 A. That's what our department would encourage us to
16    do, not expect, but encourage.
17 Q. And I don't mean to parse words, but would it be
18    fair to say that in the situation I described, a
19    woman in bed, may be a suicide risk, at the
20    hospital, is going to be watched by an officer,
21    the department would like you to first try to
22    find a woman?
23 A. To fulfill that request, yes.
24 Q. And that's the protocol?

**33**

1  A.  Yes.
2  Q.  Now, I assume also -- you mentioned that you had
3      one detail with an elderly woman at the
4      hospital.  Would it be fair to say that that
5      policy would be all the more important if the
6      person in the hospital were a 20-year-old
7      female, that you would want to find someone
8      other than a 20- or 21-year-old man for that
9      detail if you could?
10         MR. LOUISON:  Objection.
11  A.  The incident I was involved with, the one I can
12      recollect, involved an elderly woman who was
13      attempting suicide and required a search by our
14      department to try and locate her.  Her family
15      members relayed to us she was distraught and
16      suicidal.
17  Q.  Okay.
18  A.  So our contact with her stems from an initial
19      call.  She was located in her car on the beach.
20      She had attempted some form of --
21  Q.  Harming herself?
22  A.  Yes, of harming herself.  She was transported to
23      the hospital via ambulance.  Working the shift,
24      I became involved with the incident.  She was

**34**

1      being treated and evaluated at the hospital.
2      After my shift had finished, my actual required
3      shift had finished, I had stayed for the
4      third-party detail to watch her until she was
5      able to go to a facility.
6  Q.  Did it begin as a PC?
7  A.  She -- that's a tough one.  It began as an
8      incident, and the actual custody of her was
9      never completed.  She was -- an ambulance was
10     called in, and we assisted and followed her to
11     the hospital and remained to assist her.
12  Q.  Now, the events that occurred involving Lauren
13     Varallo, do you have a memory, as you sit here
14     today, of that night?  Do you remember that
15     night at all?
16  A.  I do have some recollection of that night, yes.
17  Q.  And is that recollection independent from just
18     reading logs?  Does it trigger in your mind some
19     memory of that night?
20  A.  It was actually triggered by your notification
21     and counsel's notification that I was going to
22     be called for a deposition.
23  Q.  What do you remember about that night?
24  A.  I recall being assigned to the dispatch desk.

**35**

1  Q.  Anything else?
2  A.  We could go on and on about this.
3  Q.  You have to end the suspense.
4  A.  It was a July evening, mid to end July, and July
5      historically is a very active time, July and
6      August in Nantucket, the community resort thing.
7      We're very active.  We're very busy, so it was a
8      typical July evening shift with many a calls for
9      police assistance.
10  Q.  And do you remember a call relating to Lauren
11      Varallo?
12  A.  I do.
13  Q.  Tell me what you remember, please.
14  A.  The 911 -- our E911 phone system was a little
15      active that evening, and there were two that had
16      come in, two 911 calls almost simultaneously.
17  Q.  Okay.
18  A.  One was an elderly man who had fallen and
19      injured himself, and that required a police
20      response and medical assistance.
21  Q.  Okay.
22  A.  The other was a suicidal female.
23  Q.  Okay.
24  A.  And the first 911 call was the elderly male, and

**36**

1      I had answered that call.  The second 911 call
2      was answered by a patrolman that was working the
3      shift that was in the dispatch area.
4  Q.  Okay.  And what else do you remember about the
5      Lauren Varallo incident?
6  A.  I really don't have a full recollection.  I know
7      there were conversations in the dispatch area
8      about, okay, who is going to be sent to this,
9      that, and the other thing because, as well as
10     the E911 system that we have, we also have that
11     walk-in foyer where people just continually walk
12     in and out with questions or incidents they'd
13     like to report.
14         So there was a lot going on, but
15     you try to -- you try to know about each
16     incident, at least something about it.
17  Q.  Yes.
18  A.  And I have a recollection that John Moran --
19     Officer John Moran, who answered that 911 call
20     by her family, Lauren's family, involved a bad
21     situation in that she had attempted to slit her
22     wrists.
23  Q.  Was an ambulance dispatched?
24  A.  Yes.

37

1   **Q.**  Did the fire department or police operate the
2      ambulance?
3   **A.**  Fire department.
4   **Q.**  And was a police officer also dispatched to the
5      house?
6   **A.**  Yes.
7   **Q.**  An ambulance took her to the hospital?
8   **A.**  Yes.
9   **Q.**  A police officer also went to the hospital?
10   **A.**  Yes.  A police officer accompanied the ambulance
11      to the hospital.
12   **Q.**  Now, does the police officer always go out with
13      the 911 ambulance?
14   **A.**  Depending on the 911 ambulance call.  Every
15      incident is different.
16   **Q.**  Did you dispatch the ambulance?
17   **A.**  I may have.  I can't say with certainty.  I know
18      the ambulance initially had a little trouble
19      locating her house.
20   **Q.**  Right.
21   **A.**  And then I know she was transported to Nantucket
22      Cottage Hospital.
23   **Q.**  Did you dispatch the police officer?
24   **A.**  The police officer was actually a bike officer

38

1      at the time whose name I can't recollect right
2      now.  The second one was Officer John Moran, the
3      officer that actually took the E911 call from
4      Lauren's home.
5   **Q.**  But who sent the bike officer to the house?
6   **A.**  That could have been either John Moran or
7      myself.
8   **Q.**  And how do you determine whether you are going
9      to send the ambulance plus an officer as opposed
10      to just the ambulance?
11   **A.**  That would depend on the nature of the incident,
12      what that specific incident involved.  If it
13      involved a violation of law, criminal law,
14      public-safety issues of the like would dictate
15      the police involvement to the 911 call that
16      would require us to continue that involvement to
17      the Cottage Hospital.
18   **Q.**  And the officer did go along to the Cottage
19      Hospital?
20   **A.**  He did.
21   **Q.**  Not on his bike, I assume?
22   **A.**  No, sir.
23   **Q.**  Hopped in the ambulance?
24   **A.**  No.  He would have traveled in his police

39

1      vehicle, his police cruiser, his assigned
2      cruiser.
3   **Q.**  And do you know how long he stayed at the
4      hospital?
5   **A.**  I do not.
6   **Q.**  What other contact, if any, did you have with
7      the Varallo matter?  Were you present when calls
8      came in from the hospital looking for a police
9      officer?
10   **A.**  Yes.
11   **Q.**  Is there anything you remember between when you
12      or someone else dispatched the police officer
13      and the ambulance until the hospital called?
14      Did anything else happen that you can recall
15      involving the Varallo matter?
16   **A.**  The only thing I can recall regarding the
17      Varallo matter was there was a reported assault
18      and battery that had taken place between Lauren,
19      the woman that attempted suicide, and her
20      mother, which is why we had Officer Muran's
21      involvement, which is why he accompanied the
22      ambulance to the hospital, to retrieve that
23      report.
24   **Q.**  What's the next thing you remember about the

40

1      Varallo matter?
2   **A.**  I remember the hospital calling for a patient
3      watch, and I can't say with certainty, but I
4      believe that they had requested a suicide watch.
5   **Q.**  That's your best memory?
6   **A.**  Yes.
7   **Q.**  And was it your job to try to find someone?
8   **A.**  Yes, yes.  Upon that request, yes.
9   **Q.**  And do you have a memory of trying to find
10      someone?
11   **A.**  I do.
12   **Q.**  Can you tell me everything you remember about
13      what you did to try to find someone?
14   **A.**  I would have followed our general shift
15      assignment log, which we have of current
16      officers working the shift or officers available
17      to work a shift, and I recall it being very
18      active that evening.  It was very busy, and
19      right, wrong or indifferent, I believe I elected
20      to rather than run down the immediate shift
21      list, the ones that were working with me at the
22      time, the ones that were on the shift, dogging
23      them with calls that they were already on with
24      another call of, hey, when you finish that, when

**41**

```
1    you finish the shift, do you want to cover a
2    detail at the hospital, I had telephoned the
3    Loran station, the barracks, which houses our
4    reserve officers.
5  Q.  So you didn't -- your first call to try to fill
6    this request from the hospital was to the
7    reserve officers?
8  A.  Yes.
9  Q.  As opposed to the on-duty --
10 A.  Yes.
11 Q.  -- or the -- are they call regular officers?
12 A.  Regular, full time.
13 Q.  And you knew the patient was a woman?
14 A.  I had learned it was a woman just with
15   conversation because we had two. We had the man
16   who had fallen, who also was transported, and we
17   had --
18 Q.  The potential suicide.
19 A.  Yes, and we had that one at the same time, and I
20   don't know how direct the hospital was with
21   saying who it was, but I know that they called
22   asking for a third-party detail officer.
23 Q.  But you made the connection, I assume, in your
24   mind between this suicide that had just been
```

**42**

```
1    phoned in and the watch?
2  A.  Yes. That would have been ascertained right
3    after the phone call because we would have been
4    in the dispatch area, "we" being any of the
5    officers, okay, which one is this the hospital
6    wants? It's a suicide watch on somebody they
7    have up there. Well, it's got to be the girl.
8  Q.  So you knew it was a young woman?
9  A.  Yes.
10 Q.  And that was before you made your call for the
11   reserve officers?
12 A.  Yeah. It would have been.
13 Q.  Now, what -- where did you call? What did you
14   say? Who did you speak with?
15 A.  I could not tell you who I spoke with, but the
16   call was made to the general phone at the Loran
17   barracks' housing. It's a pay phone.
18 Q.  Is that like a dormitory?
19 A.  Yes.
20 Q.  Do all the reserve officers live there?
21 A.  Two-thirds of them, yes.
22 Q.  Where do the rest live?
23 A.  They would either have a family connection on
24   the island or friends and made prior
```

**43**

```
1    arrangements for the season to stay wherever
2    that might be.
3  Q.  Are the reserve officers on beepers of any kind,
4    pagers?
5  A.  I would say no, but it's possible that some are.
6  Q.  And who did you speak with? What did you say?
7  A.  I'm not sure who I spoke with. I relayed to
8    whoever -- whatever reserve answered the phone
9    that there was a third-party suicide watch at
10   the hospital, and if anybody was interested,
11   that would be great, and if this specific person
12   wasn't interested, if he -- I'm pretty sure it
13   was a he, a male officer, could he find somebody
14   out there that would cover the third-party
15   detail.
16 Q.  Now, your personal preference was to have a
17   woman do this, correct?
18 A.  Correct.
19 Q.  And you understood that to be consistent with
20   department recommendations?
21 A.  Correct.
22 Q.  And yet the first person you encountered at the
23   reserve barracks was a male, and you offered the
24   detail to that person.
```

**44**

```
1  A.  We actually had a female reserve officer working
2    the shift that evening that wasn't finished with
3    her shift until 2 o'clock. So she was not
4    available until 2 o'clock.
5  Q.  And who was that?
6  A.  Officer Caron.
7  Q.  But you called the barracks, got a male officer,
8    and offered the detail to him?
9  A.  To he or anybody else out there that may want
10   it.
11 Q.  What did he say?
12 A.  He was not interested, but he'll go knock on
13   doors and see if he can locate somebody that was
14   I believe is what the conversation was.
15 Q.  Did you do anything further to find someone to
16   go over and do that suicide watch at the
17   hospital?
18 A.  I don't believe that I did.
19 Q.  Now, as I understand it, the reserve officers
20   can be called on to duty under their contracts
21   pretty much at any time; is that correct?
22 A.  Yes.
23 Q.  So if you had chosen to, you could have gone
24   down through the list of reserve officers, found
```

**45**

1   a woman officer, and said -- if one was there,
2   and said, "Sorry to interrupt your evening. I
3   need somebody over to the hospital," and you've
4   got to go?
5   A.  That would not have occurred.
6   Q.  How come?
7   A.  Because this was a third-party detail request
8       and not a custody suicide watch, whereas
9       involving us it would be a requirement that we
10      have somebody with that person via in our
11      satellite area or if that person is in the
12      medical facility, they would be there, as well.
13      It's entirely different.
14  Q.  But if it were a PC, it was within your power to
15      call up the reserve officers, find a female, and
16      order them on to duty to do the assignment;
17      would that be fair to say?
18  A.  It is somewhat fair.  In that instance, in the
19      instance you just described, it would be a shift
20      officer that would be involved with it.  We
21      would attempt to locate a female officer to take
22      over for this officer, and if that could not be
23      achieved because it is our custody, it would go
24      with our regular shift, our manning -- our

**46**

1   regular shift manning full-time officer.  It
2   would then go to the next shift, if there was an
3   officer available from that shift.
4          If our minimum manning staffing,
5   say, wasn't going to be affected by that regular
6   officer watching that individual at the medical
7   facility that's in protective custody, it would
8   then carry over to the reserve status in that
9   instance, in the protective custody suicide
10  watch instance.
11  Q.  Let's -- if it were a protective custody at the
12      hospital and you wanted to have a female
13      watching the detained person, did you back in
14      2002 have the power to order a reserve officer
15      who was not then on duty back on to duty so that
16      you could have a woman over there?
17  A.  Well, we could not order the woman officer to
18      come in and watch a suicide-risk person at the
19      hospital.  We would attempt that, as we've
20      discussed earlier, and certainly nobody would be
21      ordered for the third-party detail.  It would
22      just be -- it would be put out as a request,
23      "Can anybody take this watch?"
24  Q.  But if it's a PC -- well, let me state it

**47**

1   differently.  I thought I saw somewhere in the
2   agreement of these reserve officers to work that
3   they have to be available to get on.
4          I don't think there's a need to
5   mark this document, but on the -- when they
6   apply to work, as Mr. Samson did here, in their
7   employment application it says that, quote, "I
8   understand also that this department has
9   established day, night, and weekend tours for
10  which I must be available as required," end
11  quote.
12         Is it your understanding that if
13  you decided a female officer was required for
14  something within the responsibility of the
15  police department, you could bring a reserve
16  officer on to duty?
17  A.  Well, a female officer would never be required
18      to be involved in an incident.  It would be
19      encouraged if it was a woman that the incident
20      is about, but there's no direct requirement that
21      a woman has to be -- a woman officer has to be
22      the one in contact with the incident involving
23      another woman.
24  Q.  Well, my question, I think, was a little

**48**

1   different.  If you, as the dispatcher that
2   night, had needed to have a female officer on
3   duty and there wasn't one, could you call the
4   barracks where the reserve officers are and say
5   to a female officer, "You have to come on duty
6   now"?
7   A.  No.
8   Q.  Why is that not the case?
9   A.  It is encouraged that a woman have contact with
10      a woman within this department, period, but it's
11      not required.  If that woman refuses or cannot
12      or is not available, then it would go to a
13      regular officer, a male officer.
14  Q.  But can you call --
15  A.  And the reason for that is if we didn't have a
16      woman officer, period, available, maybe not even
17      a woman -- if an incident involved a woman, and
18      a woman officer would be the ideal party to have
19      with this woman party, and there was not one
20      available, be it sick time, comp time, vacation
21      time or what have you, then it would be a male
22      officer that would be involved in that incident,
23      and the reason for that is if you didn't have a
24      woman, you couldn't use a man, then the party in

**1**

UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF MASSACHUSETTS

05-11547-RWZ

...........................................
LAUREN VARALLO,
      Plaintiff,    :
     V             :
TOWN OF NANTUCKET - POLICE  :
DEPARTMENT and JAMES SAMSON,  :
      Defendant.    :
...........................................

Deposition of CHRISTINE E. LADNER,

taken on behalf of the Plaintiff, pursuant to

Notice under the Federal Rules of Civil

Procedure, before Janice A. Maggioli, RPR, RMR,

CRR, and Notary Public in and for the

Commonwealth of Massachusetts, at the Nantucket

Police Department, 20 South Water Street,

Nantucket, Massachusetts, on January 4, 2007,

commencing at 11:32 a.m.

MAGGIOLI REPORTING SERVICES, INC.
48 Watson Street
Braintree, Massachusetts 02184
(781) 356-2636

**2**

APPEARANCES:

Merrick, Louison & Costello, LLP
[By Douglas I. Louison, Esq.]
67 Batterymarch Street
Boston, Massachusetts 02110
  On behalf of the Town of Nantucket - Police
  Department.

Meehan, Boyle, Black & Bogdanow
[By Leo V. Boyle, Esq.]
Two Center Plaza
Boston, Massachusetts 02108
  On behalf of the Plaintiff.

**3**

I N D E X

| Witness | Direct | Cross | Redirect | Recross |
|---|---|---|---|---|

Christine E. Ladner

By Mr. Boyle  5

EXHIBITS

| Id. | Description | Page |
|---|---|---|
| 3 | Deposition Notice | 4 |
| 4 | Incident Report | 42 |
| 5 | List of Names | 51 |
| 6 | Active Duty List | 52 |
| 7 | Summer Officer List | 54 |

**EXHIBIT 5**

**4**

STIPULATION

It is agreed by and between counsel
for the respective parties that the reading
and signing of the deposition will not be
waived.  All objections, except as to the form
of the question, and motions to strike will be
reserved until the time of trial.
    (Exhibit 3, Deposition Notice,
    marked for identification.)
    MR. BOYLE:  You can swear her in,
please.

CHRISTINE E. LADNER,
having been satisfactorily
identified and duly sworn by the
Notary Public, was examined and
testified as follows:
    MR. BOYLE:  Why don't we reserve
all objections, except as to the form of the
question.  We'll reserve motions to strike.
We'll have the witness sign under the pains and
penalties of perjury.  We'll treat the
transcript as though signed after the lapse of
30 days after you receive the copy of the

## 9

1  him?
2  A. No, I did not.
3  Q. Did you get to know him in the summer of '01?
4  A. Yeah, I guess. I mean, I think so. We have so
5  many summer specials. I know who they are, but
6  some of them I don't have direct contact with
7  because they work certain shifts, and me
8  personally, being on the midnight shift, I
9  didn't really have any direct contact with
10 anyone because their shifts would stop either at
11 midnight or 2 a.m. or 3 a.m.
12 Q. Were there specials on duty all night?
13 A. No.
14 Q. It stopped at 3 a.m.?
15 A. Correct.
16 Q. And then from 3 a.m. until what, 7 a.m. regular
17 officers?
18 A. Until 8.
19 Q. 3 until 8?
20 A. Yes. Our shifts go from 11:45 to 8:15.
21 Q. And so it was the practice back then that the
22 last shift involving the specials or the summer
23 officers would end at 3 a.m.?
24 A. Correct.

## 10

1  Q. And then they would come back on duty at 8 a.m.?
2  A. Yes.
3  Q. And that was true in the high summer, as well?
4  A. Uh-huh.
5  Q. Now, are you familiar with policies and
6  practices within the department in regards to
7  searching and guarding female detainees?
8  A. Uh-huh.
9  Q. That doesn't come out unless you say yes.
10 Uh-huh --
11 A. Yes.
12 Q. She can't take down the uh-huh. Would you
13 describe those for me, please?
14 A. I don't really understand your question.
15 Q. Let me try it again. In one of the depositions
16 we had earlier today it was stated that searches
17 of female detainees is done ordinarily by female
18 officers, correct?
19 A. No.
20 Q. That's not a policy of the department?
21 A. No.
22 Q. So the department doesn't have any policy on
23 which gender person should --
24 A. If we have a female detainee and we have a

## 11

1  female officer on duty, then the female will,
2  but if there's no female available, then two
3  males -- one male will search her where the
4  other male observes.
5  Q. But if the shift includes a female officer, the
6  practice is to have that female officer search
7  that female detainee?
8  A. Yes, if she's not tied up, if she's available.
9  Q. Are you familiar with one-on-one watches?
10 A. I'm familiar with them, yes.
11 Q. And what is your understanding or definition of
12 a one-on-one watch?
13 A. An officer watching a detainee or a prisoner.
14 Q. As in a suicide watch?
15 A. Okay.
16 Q. Would that be one example of --
17 A. One on one?
18 Q. Yes.
19 A. Yes.
20 Q. Now, does the department have any practice or
21 policy with respect to whether a man or a woman
22 should conduct a one-on-one watch of a female
23 detainee?
24 A. Not to my recollection.

## 12

1  Q. Does the department have any practice or policy
2  with respect to opening the cell of a female
3  detainee, whether or not it should be done by a
4  female officer --
5  A. No.
6  Q. -- or a male officer?
7  A. Either/or.
8  Q. Does the department have any policy or procedure
9  as to whether or not the cell door of a female
10 detainee should be opened by two officers as
11 opposed to one?
12 A. No, it does not.
13 Q. So if you have a female incarcerated at
14 headquarters, it's acceptable within department
15 practice for a male officer to open the cell
16 door?
17 A. Correct.
18 Q. Even if there's not a second male officer
19 present?
20 A. There's no policy like that to my knowledge.
21 Q. Any practice on that?
22 A. What do you mean any "practice?"
23 Q. Well, apart from a written policy in a booklet,
24 any custom or traditional practice that you

13

1  follow on that?
2  A.  I'm not sure I understand your question.
3  Q.  I'm just -- I'm trying to define those
4      situations in which you take special precautions
5      if the detainee is a woman, and are there
6      special situations in which the department takes
7      special precautions if the detainee is a woman?
8  A.  Any special precautions?  Everything is
9      monitored in the dispatch area on the screen if
10     there's an officer in the female cell area where
11     somebody can observe at the same time.
12 Q.  Does the hospital sometimes ask for officers to
13     go out and watch suicidal patients at the
14     hospital?
15 A.  Yes.
16 Q.  Have you ever done that?
17 A.  In my career?
18 Q.  Well, your career at Nantucket.
19 A.  Yeah, I'm sure I have.
20 Q.  Do you have any memory of having done that?
21 A.  No.
22 Q.  Would that have been in connection with the
23     protective custody?
24 A.  I don't understand.

14

1  Q.  You understand what a protective custody is?
2  A.  Yes, I understand protective custody.
3  Q.  Have you --
4  A.  Are you saying if someone is in our custody and
5      we bring them to the hospital?
6  Q.  I guess my question was, have you ever watched a
7      patient at the hospital when that patient was in
8      protective custody?
9  A.  I'm sure I have.  I can't specify any certain
10     incident, but there have been numerous times
11     that I've gone to the hospital with someone
12     that's been in our custody.
13 Q.  And did you simply deliver them to the hospital
14     or did you stay and watch them at the hospital?
15 A.  And they were in my protective custody?
16 Q.  Yes.
17 A.  No, we stayed or I stayed.
18 Q.  Have you ever heard of there being a detail out
19     at the hospital to watch a potentially suicidal
20     patient?
21 A.  Yes.
22 Q.  And how many times are you aware that that has
23     happened?
24 A.  A few.

15

1  Q.  When you say "a few," is that in the course of
2      your, I guess, ten years with the department?
3  A.  Yeah, we've been up there a few times.
4  Q.  On details?
5  A.  Yes.
6  Q.  To sit and watch patients?
7  A.  Yes.
8  Q.  Now, is -- and you, yourself, have done that on
9      a few occasions?
10 A.  A few occasions, I have, yes.
11 Q.  And on those occasions do you get extra pay?
12 A.  Yes, it's a detail, correct?
13 Q.  Well, from your testimony I take it it was a
14     detail.
15 A.  If it is a detail, yes, we get extra pay.  You
16     get detail rate.  We have a set rate for
17     details.
18 Q.  If you are up there on a PC, it's not extra pay?
19 A.  No.
20 Q.  Now, is it preferable, in your opinion, if there
21     is a woman -- a young woman patient to be
22     watched at the hospital who is on a suicide
23     watch and it's a one-on-one watch, is it
24     preferable to have a woman officer there?

16

1           MR. LOUISON:  Objection to the
2      form.
3  A.  No.
4           MR. LOUISON:  You can answer.
5           THE WITNESS:  Sorry.
6  A.  No.
7  Q.  Does the -- so, as far as you're concerned, it's
8      acceptable to have a 20-year-old or a
9      21-year-old male officer watching a 20- or
10     21-year-old suicide risk one on one at the
11     hospital?
12 A.  Yes.
13 Q.  Now, does the department have any policy at all
14     on preferring to put female officers in that
15     situation rather than male?
16 A.  Not to my knowledge.
17 Q.  So, in your understanding if the call came in
18     that there was a detail to be filled at the
19     hospital, it was a 20- or 21-year-old female who
20     was a suicide risk, it wouldn't matter to you at
21     all whether or not a male or a female went up
22     there to fill that assignment?
23          MR. LOUISON:  Objection to the
24     form.

**17**

1  A.  Correct.
2  Q.  And you wouldn't make any efforts to try to find
3      an available female as opposed to a male to fill
4      that particular assignment, correct?
5  A.  I would try to find a person, a police officer
6      to fill that.
7  Q.  As opposed to?
8  A.  What I would do is I would go down the full-time
9      police officer list first, and as soon as that
10     was exhausted, I would move on to my next
11     opportunity, if I had a next opportunity.
12 Q.  But you would completely disregard gender in
13     that situation?
14 A.  I would send a certified police officer, whoever
15     it was, who was capable of doing a one on one.
16 Q.  But if the first available on the list was a
17     man, would you send a man?
18 A.  Seniority, yes.
19 Q.  Pure seniority?
20 A.  I would send a male or whoever is available.
21 Q.  And you would make no effort to try to find a
22     female officer to guard that -- not guard, but
23     to watch that female patient, correct?
24 A.  I'm sorry, I didn't understand your question.

**18**

1  Q.  Sure.  Given the fact that it's a 20- or
2      21-year-old female in a bed at a hospital in the
3      middle of the night one on one, you would not
4      because of that to fill the detail try to find a
5      woman --
6           MR. LOUISON:  Objection.
7  Q.  -- is that correct?
8           MR. LOUISON:  You can answer, if
9      you can.
10          THE WITNESS:  Okay.
11 A.  I would -- if I had a female available, I would
12     send her.
13 Q.  So your preference would be to send a female?
14 A.  If I had a female available, yes.
15 Q.  And why would it be your preference to send a
16     female?  Just because it's a woman being
17     watched, I assume?
18 A.  I assume, yes.
19 Q.  And, in your opinion, is it more appropriate for
20     a person in that situation, a suicide risk, 20-
21     or 21-year-old female in a bed in the middle of
22     the night, is it more appropriate, in your
23     opinion, to have that person watched by a
24     female?

**19**

1  A.  In my opinion?
2  Q.  Yes.
3  A.  No.  They are asking for a one on one.  A one on
4      one.
5  Q.  Okay.
6  A.  No specifics of anything.
7  Q.  Okay.
8  A.  So whoever I came across first who was available
9      would go.
10 Q.  So if the first one on the detail list was a
11     man, you would send a man?
12 A.  Yes, I would.
13 Q.  I don't know if I heard correctly.  Did I hear
14     you say a little while ago that your preference
15     would be a female?
16 A.  I would send the first person that was
17     available, which would probably in that case if
18     it was a man, it would be a man.
19 Q.  If the first available person was a man --
20 A.  Right.
21 Q.  -- he would get the assignment?  Now, are there
22     any standards or procedures for details, any
23     written standards or procedures for details?
24 A.  No, there's none.

**20**

1  Q.  Is there a detail list of some kind?
2  A.  No.
3  Q.  How do details get passed out, by seniority?
4  A.  We have a detail officer.  He handles all the
5      details, whether he has a callback list or -- it
6      depends on what time the detail comes in, if
7      that officer is working the detail officer is
8      working, he usually handles the details.
9  Q.  Does he work the midnight shift, he or she, the
10     detail officer?
11 A.  Right now?
12 Q.  Back in '02.
13 A.  I don't recall if he worked it or not.  We have
14     a shift bid, and it changes every four months,
15     so people rotate all over the schedules.
16     Sometimes they like to work days.  Sometimes
17     they like to work nights.  Summertime they like
18     to work eves.  It all depends.
19 Q.  Do you have a recollection of the events of July
20     22, I think it is -- let me get it exactly --
21     July 22, 2002, involving Ms. Varallo and Mr.
22     Samson?
23 A.  Yes.
24 Q.  And do you have a recollection, apart from the

**21**

1 written documents and records that have been
2 produced, in other words, as you sit here today,
3 can you remember that night?
4 A. I can vaguely remember it.
5 Q. Okay.
6 A. I remember some parts of it, yes.
7 Q. And what was your first knowledge that the
8 hospital was requesting an individual to come
9 out?
10 A. I believe that it was -- it came in on the
11 evening shift when they had requested that
12 detail.
13 Q. And were you on duty on the evening shift?
14 A. I believe I was. I worked a double that day.
15 Q. So by "evening" that's before midnight?
16 A. Right. So I started work at 3:30.
17 Q. On the 21st?
18 A. On the 21st.
19 Q. Yes.
20 A. And I finished work after 8 on the 22nd.
21 Q. And so you were on duty when the first call came
22 in from the hospital?
23 A. Yes.
24 Q. And did you take that call or do you have a

**22**

1 memory of that call?
2 A. I do not recall. I believe Officer Welch did.
3 Q. That's his memory, as well, by the way.
4 A. Okay.
5 Q. And as the shift supervisor, would that call
6 have come to your attention?
7 A. Yes.
8 Q. And so Officer Welch would have told you that
9 the hospital is looking for somebody?
10 A. Yes.
11 Q. What, if anything -- before the midnight shift
12 started, what, if anything, did you do to help
13 fulfill that request from the hospital?
14 A. I believe I asked Officer Welch to go down the
15 list to see if he could get an officer for that
16 detail.
17 Q. And by "down the list" do you mean down the
18 seniority detail list?
19 A. The full-time list.
20 Q. The full-time list?
21 A. Correct.
22 Q. And does that full-time list include off-duty,
23 as well as on-duty officers?
24 A. Yes, it does.

**23**

1 Q. And was it your expectation that he would go
2 down the list in order of seniority?
3 A. However he could do it to get somebody.
4 Q. Did you give him -- you knew that it was a
5 female patient at the hospital?
6 A. I did not know. He just told me that somebody
7 had called in for a one on one.
8 Q. Did you learn at or about the time of the second
9 call that it was a female patient?
10 A. Yes, I did.
11 Q. So, do you know whether or not he went down the
12 list of regular officers?
13 A. He told me that nobody wanted the detail.
14 Q. And did you take any other steps to fulfill that
15 request by the hospital?
16 A. We continued with trying to find a summer
17 special that was willing to take that detail.
18 Q. What did you do in that regard?
19 A. I don't recall. I know we tried, whether it was
20 myself or Officer Welch, calling to the Loran
21 barracks where all the summer specials live and
22 putting out a call if anybody wanted the detail.
23 I know it was late. Most of the specials were
24 asleep. I did attempt by the radio to contact a

**24**

1 couple of officers that were getting off later
2 in the night if they wanted to do the detail, as
3 well, and at that time nobody wanted it.
4 Q. So you personally made some of these contacts?
5 A. Uh-huh, I did.
6 Q. And was this before the second call from the
7 hospital?
8 A. I don't recall.
9 Q. If you could list off for me the people or
10 the -- well, what is your memory of about who
11 you called?
12 A. I don't even know. It was four and a half years
13 ago. Like I said, summer specials change every
14 year. I don't know if I specifically called
15 someone or not. I know over the radio people
16 that were already on bike patrol or foot patrol,
17 I was radioing to -- I don't recall back then
18 who was working for me at the time.
19 Q. Michele Caron, do you know who Michele Caron is,
20 C-A-R-O-N?
21 A. Was she a summer special?
22 Q. I think she was.
23 A. Probably -- like I said, people come in and out
24 the door every year. I've been here for 11

**25**

1    years, so the name rings a bell.
2  Q.  So the calls that you made, were they mostly by
3      radio as opposed to cellphone or telephone?
4  A.  Probably both, probably all three from the
5      station, have them call the station via the
6      radio.
7  Q.  Were you looking for women in particular?
8  A.  I probably did ask a couple of women if they
9      were available.
10 Q.  Do you remember which ones?
11 A.  No, I don't.
12 Q.  And did you happen to speak with them because
13     they were women; in other words, in this search
14     for someone to respond to the hospital, were you
15     looking for a woman in particular?
16 A.  No, I was looking for a police officer to
17     fulfill that detail.
18 Q.  And you just happened to call women and men?
19 A.  Correct. When we call out to the barracks at
20     that time that year, we make one phone call, and
21     that person that answers the call goes around
22     and asks somebody, if they are awake, if they
23     want the detail, whether it's male or female.
24 Q.  So you had absolutely no preference at that time

**26**

1      to finding --
2  A.  I just wanted to find someone for them, to be
3      honest with you, because they made two calls,
4      and I was giving every effort I could to find
5      somebody for them.
6  Q.  On the second call, did you actually speak with
7      the person at the hospital?
8  A.  Yes. I told her that I was unable to find
9      anybody at this time, but if they needed us at
10     any point, that we would be there right away.
11 Q.  Was that the second call or the first call?
12 A.  That was the second call. I believe I spoke to
13     Jill.
14 Q.  Okay.
15 A.  I think that's what her name was.
16 Q.  And on the second call, you told her --
17 A.  I didn't have anybody available at the time.
18 Q.  Did you ever say anything to Jill to the effect
19     that I don't have any women available?
20 A.  No, I said I don't have anyone.
21 Q.  So there was no specific statement to her like,
22     I've been unable to find a woman for this
23     assignment? You don't remember saying anything
24     like that?

**27**

1  A.  No, I don't. I do not recall.
2  Q.  And did Jill -- at the time of the second call
3      you knew it was a woman patient at the hospital?
4  A.  Yes.
5  Q.  And what happened next after the second call
6      when you told Jill that you didn't have anybody
7      available?
8  A.  In regards to?
9  Q.  To Mr. Samson and him getting the assignment.
10 A.  Okay. I believe Officer Samson had come into
11     the station because he heard me over the radio
12     trying to fill the detail and informing me that
13     he was available to go up there after he
14     completed his detail that he was already on.
15 Q.  And when you made your various calls to try to
16     find someone, did you limit it to full-time
17     police officers or did you call out to everybody
18     available?
19 A.  I first called out to full-time police officers.
20 Q.  Okay.
21 A.  And then --
22 Q.  Expanded?
23 A.  I exhausted that list or Officer Welch exhausted
24     that list and informed me we didn't have one,

**28**

1      and then we called the Loran to see if anybody
2      was available because everybody at the Loran
3      were off duty and would be immediately
4      available.
5  Q.  And do you have any way of contacting the summer
6      specials other than calling the pay phone at the
7      dormitory?
8  A.  Over the radio.
9  Q.  But if they are off duty, let's say the summer
10     specials that are off duty, do you have a way of
11     reaching them?
12 A.  I believe we have a list of their cellphone
13     numbers on the back of our call-back list.
14 Q.  Are they requested to leave with you their
15     cellphone numbers when they initially sign up
16     for duty?
17 A.  If they wish. Back then a lot of people didn't
18     have cellphones. It was just basically the
19     phone at the Loran was the main way of
20     contacting them.
21 Q.  When they are off duty, do any of them carry
22     pagers?
23 A.  No.
24 Q.  And so Mr. Samson responded in person or by

**29**

1 radio that he --
2 A. In person. He came into the station and said
3 when he was done with his detail at 2 o'clock,
4 which he was working over at the yacht club,
5 that he would be willing to do that next detail
6 at the hospital.
7 Q. And does -- how does he perform that? Does he
8 take his own car up there? Does he take a
9 police car?
10 A. No, he takes his own car or if he doesn't have a
11 car, which some specials don't, we give them a
12 ride up.
13 Q. Now, is there -- do you have the ability to call
14 a special officer back on to duty to give them
15 an assignment?
16 A. You mean order them?
17 Q. Right.
18 A. Are you just asking me if I have the ability to
19 do that?
20 Q. Yes. Is it within your powers as a shift
21 supervisor --
22 A. It depends upon the circumstances, the
23 situation.
24 Q. In what way?

**30**

1 A. It depends upon the situation, if it's an
2 emergency or if I need them right away or it
3 depends upon the circumstance, if I feel as
4 though I need to call them in for something.
5 Q. Was this request from the hospital, did you
6 consider it to be optional on the part of the
7 police department; in other words, if you could
8 accommodate it, fine?
9 A. Yes.
10 Q. But it was optional from the police department's
11 standpoint?
12 A. Yes.
13 Q. There was no -- you didn't sense that there was
14 any requirement --
15 A. No.
16 Q. -- that you provide a police officer?
17 A. Correct. If she got out of hand or whatever, my
18 shift would go up there and address the
19 situation, but for a third-party detail when
20 nobody wants it --
21 Q. So you the ability -- as a shift supervisor, if
22 you decided that it was inappropriate for a male
23 to take this assignment, for example, you could
24 have simply declined the detail from the

**31**

1 hospital?
2 A. I didn't feel as though it was inappropriate,
3 though.
4 Q. I know. Obviously because you sent Samson up
5 there, but my point is this --
6 A. If I didn't have anyone available and was not
7 willing to take the detail, I wouldn't send
8 anyone.
9 Q. So you had that option?
10 A. Uh-huh, and if the hospital did call us and
11 requested our assistance, we would immediately
12 respond.
13 Q. Because then it becomes a police matter if there
14 were a disturbance?
15 A. Correct.
16 Q. Or out-of-control person at the hospital?
17 A. Yes, and we would assist.
18 Q. Now, from time to time people are put into
19 protective custody and brought to the hospital;
20 are they not?
21 A. Yes.
22 Q. And how often does something like that happen?
23 A. A few times. I'm not going to say all the time.
24 It all depends. If we have someone in

**32**

1 protective custody and they are complaining of
2 some sort of an injury or they can't breathe
3 because they are hyperventilating from the small
4 space in the cell and we need to bring them up
5 to the hospital, we'll call in the fire
6 department, and they'll bring them up there, and
7 we send a police officer with them.
8 Q. And in a protective-custody situation as opposed
9 to a detail, does the gender of the detained
10 person and the gender of the officer matter?
11 A. No.
12 Q. And that's town policy? There's no policy that
13 it matters?
14 A. No. A police officer is a police officer.
15 Q. Now, did you learn that something had gone amiss
16 at the hospital at some point?
17 A. Yes.
18 Q. Tell me what you remember about that.
19 A. I got a phone call from Officer Samson about
20 7:30, quarter of 8. He was inquiring when his
21 relief was going to be there because he was
22 there until 8 o'clock. I told him as soon as
23 the day shift got on duty, I would try to send
24 somebody up there to relieve him.

**33**

1  Q. From the regular shift duty or from -- as a
2     detail?
3  A. Well, it would have been as a detail.
4  Q. What else happened?
5  A. And then he called back again requesting my
6     presence. They needed a shift supervisor, and,
7     like I said, I had been on work since 3:30 the
8     afternoon prior, so I was cleaning up my shift
9     and preparing to go home, and he wouldn't quite
10    tell me what was going on. I kept asking him,
11    "Well, why do I have to come up there? What's
12    the problem?"
13         And he said, "Well, she's
14    accusing me of messing up her bed sheets."
15         I said, "Okay," and I asked him
16    if he did it.
17         And he said, "No."
18         I said, "Well, why do I have to
19    come up there? I don't understand. You have
20    been up there with the nurses. You've been up
21    there all night. Why is there a problem all of
22    a sudden?"
23         "Well, the head nurse needs to
24    speak to you in regards to what I just told

**34**

1     you." So I was pretty frustrated, to be honest
2     with you. I was tired, so off I went. I didn't
3     want to go.
4  Q. Okay.
5  A. I was tired. I was really tired.
6  Q. Okay. Not pleased?
7  A. Not pleased, no, not at all.
8  Q. What did you find when you got up there?
9  A. Let's see. Who did I meet with? I met with
10    Nancy Luchini. We sat in the visitors' center
11    there, the little office there that was near the
12    nurses' station on the second floor, and she
13    said we had a problem, and she told me that
14    the -- what's her name? Laura, had accused
15    Officer Samson of messing up her bed sheets. I
16    said okay.
17         And we talked a little bit more.
18    She said -- she told me about her state, her
19    state of mind when she had come in, that she had
20    been drinking, and I said okay, and I talked to
21    her a little bit more, and then Officer Samson
22    and I left, and we came back to the station, and
23    then I advised my supervisor of what had
24    occurred.

**35**

1  Q. I take it that's the next shift's supervisor?
2  A. No, it would have been the administration's
3     supervisor, which I believe was Lieutenant -- he
4     was a lieutenant at the time, Lieutenant Gibson,
5     who is now a deputy chief. I believe I told
6     him.
7  Q. When you were up at the hospital, did you speak
8     with Lauren?
9  A. No, I did not.
10 Q. You just spoke with --
11 A. The head nurse, Nancy Luchini.
12 Q. What happened next?
13 A. I informed Lieutenant Gibson of what had
14    occurred, and I did a report. I had Officer
15    Samson do a report. I handed it over to
16    Lieutenant Gibson, and that was the end of my
17    investigation.
18 Q. Did you take -- did you debrief Samson? Did he
19    tell you what had happened?
20 A. Yes. Well, I had actually asked him what had
21    happened between the hours of 2 and quarter of
22    8.
23 Q. Okay.
24 A. And he told me he sat outside the room the

**36**

1     majority of the time. He got up to get some
2     coffee throughout the night. He had
3     conversations with nurses at the nurses' station
4     throughout the night, and that he didn't do
5     anything.
6  Q. Did he tell you where he was at the time that
7     Lauren made her complaint at the nurses'
8     station?
9  A. You know, I don't recall. I don't recall where
10    he was.
11 Q. Now, on an assignment like that, watching -- you
12    understood that this patient was a suicide risk,
13    correct?
14 A. Correct.
15 Q. And is the officer supposed to be with the
16    patient 100 percent of the time?
17 A. I don't know.
18 Q. How about you've got a suicide watch in the
19    lockup, is that a 100 percent full-time one on
20    one that is expected?
21 A. If we have the officer available. If we don't,
22    the dispatcher monitors him from the screen.
23 Q. But Officer -- or Mr. Samson that night was --
24    if his assignment was to be at the hospital and

37

| 1 | watch a suicide risk, is he supposed to be -- |
| 2 | have her in his eyesight 100 percent of the |
| 3 | time? |
| 4 | A. I told Officer Samson before he went to the |
| 5 | detail to heck in with the nurses at the nurses' |
| 6 | station and to do exactly what they told him to |
| 7 | do. |
| 8 | Q. But what is your custom and practice with a |
| 9 | potential suicide risk, is it 100 percent |
| 10 | observation? Would you ever leave and get |
| 11 | yourself a cup of coffee? |
| 12 | A. I would ask somebody to relieve me if I had to |
| 13 | go get a cup of coffee or go to the bathroom. |
| 14 | Q. So you would make certain that there was 100 |
| 15 | percent coverage even if you had to leave for a |
| 16 | few minutes for some necessity? |
| 17 | A. If it were me? |
| 18 | Q. Right. |
| 19 | A. If it were me. |
| 20 | Q. The answer is yes? |
| 21 | A. I would, yes, if it were me. All officers have |
| 22 | different ways of doing certain things and |
| 23 | approaching certain situations. |
| 24 | Q. Isn't it correct that there's a right way and a |

38

| 1 | wrong way to conduct a suicide watch; in other |
| 2 | words, if somebody is being watched as a suicide |
| 3 | risk, isn't it a fact that the watch ought to be |
| 4 | 100 percent of the time? |
| 5 | A. I can't answer that because I was not there that |
| 6 | night, and I don't know what he was instructed |
| 7 | on doing from the nurses, so I can't answer that |
| 8 | question. |
| 9 | Q. But your practice would be as described, 100 |
| 10 | percent of the time, and if you had to leave, |
| 11 | you would get backup? |
| 12 | A. That would be me, not my other officers. That |
| 13 | would be me. |
| 14 | Q. Are there any policies or procedures for |
| 15 | one-on-one watches within the department? |
| 16 | A. No, not that I'm aware of. |
| 17 | Q. So you came -- did Officer Samson tell you |
| 18 | anything else about what had happened that |
| 19 | night? |
| 20 | A. No. |
| 21 | Q. Did he say he left the room from time to time to |
| 22 | get coffee? |
| 23 | A. He said he was there the majority of the time, |
| 24 | and he did go get a cup of coffee, yes. |

39

| 1 | Q. Or that's what he told you he did? |
| 2 | A. Yes, that's what he told me he did. |
| 3 | Q. And you wrote up a report. Did you tell Samson |
| 4 | to write up a report? |
| 5 | A. Yes, I did. |
| 6 | Q. Did you have anything further to do with this |
| 7 | matter? |
| 8 | A. No. |
| 9 | Q. Were you interviewed by the State Police? |
| 10 | A. No. |
| 11 | Q. Other than your report, did you give anyone a |
| 12 | statement about this? |
| 13 | A. No. |
| 14 | Q. Did you communicate in any way by e-mail, by |
| 15 | telephone, any way with the State Police about |
| 16 | this? |
| 17 | A. No. |
| 18 | Q. So the last thing you had to do with this event |
| 19 | was the morning of the 22nd? |
| 20 | A. Correct. |
| 21 | Q. Are you familiar with another event allegedly |
| 22 | involving Officer Samson of entering a dormitory |
| 23 | room of a Michele Caron? |
| 24 | A. I heard about it. |

40

| 1 | Q. What did you hear about it? |
| 2 | A. That he had entered the room. I work midnights. |
| 3 | They don't really tell me much. At the time I |
| 4 | worked midnights. |
| 5 | Q. Okay. And did Ms. Caron make a complaint about |
| 6 | it? |
| 7 | A. I don't know, to be honest with you. I don't |
| 8 | know. I did hear some scuttlebutt about it, but |
| 9 | I don't know. If she made a complaint or if she |
| 10 | filed a complaint, to be honest, but it didn't |
| 11 | really pique my curiosity. |
| 12 | Q. You understand that it is alleged that Officer |
| 13 | Samson inappropriately touched Ms. Varallo, |
| 14 | correct? |
| 15 | A. Correct. |
| 16 | Q. And you are further aware, I would expect, that |
| 17 | Mr. Samson pled guilty to having done so? |
| 18 | A. Yes. |
| 19 | Q. You would have, of course, no way of knowing |
| 20 | whether or not that, in fact, took place; is |
| 21 | that correct? |
| 22 | A. Correct, I don't know. |
| 23 | Q. You certainly didn't witness anything that would |
| 24 | tell you whether or not it actually took place, |

**41**

1    did you?
2  A.  No, I did not.
3  Q.  So, in terms of determining whether or not that
4    event happened, you would have to really rely
5    upon the testimony of Ms. Varallo and Mr.
6    Samson, correct?
7  A.  Correct.
8  Q.  And you don't know anyone who witnessed the
9    event happening?
10  A.  No, I don't.
11  Q.  Let me pull out your report, if I can.
12    (Pause).
13  Q.  Did the police department take pictures up at
14    the hospital?
15  A.  I would assume so.
16  Q.  Did you have anything to do with that?
17  A.  No, I did not.  That would be the detectives
18    that would do that.
19  Q.  That investigated it?
20  A.  Correct.
21  Q.  I've got a four-page document, and it looks to
22    be computer generated, but I don't know.  Can
23    you tell me what that is?
24  A.  It's an incident report.

**42**

1  Q.  And is that what you referred to when you said
2    that you and Mr. Samson prepared reports?
3  A.  Correct.
4      MR. BOYLE:  Can you mark that as
5    Exhibit 4, please?
6      MR. LOUISON:  Can I just clarify
7    something for the record?  She identified it as
8    her report, but it's a sequential.  There are
9    others that are not hers.
10      MR. BOYLE:  Sure.  It's not
11    her -- all her authorship.  I don't mean to
12    suggest that.
13      (Exhibit 4, Incident Report,
14      marked for identification.)
15  Q.  And can you tell me what parts of this report
16    you generated?
17  A.  I generated the supplemental report.
18  Q.  And that begins halfway down page 2?
19  A.  Correct.
20  Q.  Did you generate anything that preceded that?
21  A.  No.
22  Q.  And does your report continue on to page 3 or
23    your portion of the report?
24  A.  Yes, it does.

**43**

1  Q.  And where does it stop?  At the bottom of page
2    3?
3  A.  Yeah, about three-quarters of the way down.
4  Q.  If I can borrow that back from you.
5      (Pause).
6  Q.  Now, this supplemental by you, it talks a little
7    bit about the events leading up to Mr. Samson
8    being dispatched to the hospital, and it says
9    that at about 2330 hours, I guess that would be
10    on July 21, the hospital called the station
11    requesting an officer for a detail to watch a
12    psych patient until 8 a.m. Monday.  Officer
13    Welch attempted to fill the detail, but no one
14    wanted it.  At approximately 0100 hours, Jill
15    Kennedy from the hospital called back and once
16    again requested a detail officer.
17      Did you have that conversation
18    with her?  Is that the time you spoke with her?
19  A.  At 1 o'clock?
20  Q.  Yes.
21  A.  I believe so.
22  Q.  It goes on to say that Jill was told that we did
23    not have a female officer available.  Now, that
24    is in your report, and that's a statement that

**44**

1    you made to Jill Kennedy?
2  A.  No, I told her at that time we didn't have
3    anyone available.
4  Q.  But your report says that you told her that you
5    didn't have a female officer available.
6  A.  I told her we didn't have anyone available at 1
7    o'clock, and then when Officer Samson came in
8    and stated that he was available, Dispatcher
9    Gale called Jill back and said now we do have
10    someone available, and it's not a female, but
11    this is who we have.
12  Q.  Just so I understand, you personally typed this
13    report up?
14  A.  Yes.
15  Q.  And you did type the words "Jill Kennedy from
16    the hospital called back" -- let me start over.
17    Quote, "At approximately 1011 hours, Jill
18    Kennedy from the hospital called back and once
19    again requested a detail officer.  Jill was told
20    that we did not have a female officer available,
21    but that officer James Samson volunteered for
22    the detail," end quote.
23  A.  Uh-huh.
24  Q.  And that's what you told Jill.  What I just

**45**

1  quoted from your report is what you told Jill?
2  A.  No.  The way I wrote my report was afterwards,
3    and at 1 o'clock when Jill called, I told her we
4    didn't have anyone available, and then
5    approximately a half hour after that, that's
6    when Officer Samson came in the station and said
7    that he was available for that detail, so I had
8    Dispatcher Gale call back the hospital and tell
9    them that Officer Samson was available for this
10    detail.
11  Q.  But on the night you wrote your report you said
12    that Jill Kennedy was told quote, "We did not
13    have a female officer available," end quote.
14  A.  By Dispatcher Gale.  I summarized my report.
15  Q.  Well, is it your testimony -- did you speak with
16    Jill Kennedy?
17  A.  Yes, I did, but I did not tell her that we did
18    not have a female.  I spoke to Jill Kennedy at 1
19    o'clock, and said I do not have anybody
20    available right now, but when -- if you do need
21    us, we will be there.
22  Q.  Do you understand what you have just told me is
23    inconsistent with what it says here in Exhibit
24    4?

**46**

1  A.  If you play back the recording, you will hear me
2    say to Jill that we don't have anyone available.
3  Q.  It may, and I'm not suggesting it doesn't.  I'm
4    just looking at your report, and it seems to me
5    you were focused on the issue of a female in
6    this report, and the report is in your own
7    typing?
8  A.  Uh-huh.
9  Q.  When you wrote the report, is this what you
10    wrote down?
11  A.  That's what I wrote.
12  Q.  And did you at some point tell Jill Kennedy --
13  A.  I did not tell Jill Kennedy anything.
14  Q.  Did you ever speak with Jill Kennedy at 1
15    o'clock?
16  A.  At 1 o'clock -- I told her I had no one
17    available at 1 o'clock when she called back.
18        MR. BOYLE:  Let's go off the
19    record for just one second.
20        (Discussion off the record.)
21        MR. BOYLE:  We might as well stay
22    on the record.
23  Q.  I guess I'm having trouble understanding this
24    because in your own typing it seems to

**47**

1  suggest -- first of all, you are the one that
2  spoke with Jill Kennedy at 1 o'clock?
3  A.  At 1 o'clock.
4  Q.  And thereafter Samson volunteered for the
5    detail, correct?
6  A.  Correct.
7  Q.  And did you call Jill Kennedy back to say, He's
8    on his way?
9  A.  I did not.
10  Q.  Someone else did?
11  A.  Correct.
12  Q.  The only person who spoke with Jill Kennedy at 1
13    o'clock was you?
14  A.  Correct.
15  Q.  And then you wrote down this report?
16  A.  I summarized my report, correct.
17  Q.  Well, when you say you summarized your report,
18    this is your report?
19  A.  That is my report, correct.  What I should say I
20    summarized the events that transpired that night
21    into my report.
22  Q.  And looking at this, does it refresh your memory
23    as to whether or not you were trying to find a
24    female officer?

**48**

1  A.  I probably was trying to find a female officer,
2    and I could not find one, and that's why I sent
3    Officer Samson.
4  Q.  So your first preference was a female officer?
5  A.  Probably, yes.
6  Q.  I appreciate the clarification.
7  A.  But it's so difficult in trying to fill details,
8    that the matter is whoever is available is going
9    to go, whether it's male or female.
10  Q.  I understand it's been a while, but trying to
11    get back into that night --
12  A.  I can't recall whether I was specifically
13    looking for a female or not.
14  Q.  But Exhibit 4 suggests that you were.
15  A.  Okay.
16        MR. LOUISON:  Objection to the
17    form.
18  Q.  I'll withdraw the question.  Does Exhibit 4
19    refresh your recollection as you sit here today
20    four years later that you, in fact, were trying
21    to find a woman?
22  A.  According to that, yes.
23  Q.  And you further state that you had difficulty
24    finding a woman, so you had to go to the next

Case 1:05-cv-11547-RWZ    Document 31-6    Filed 05/16/2007    Page 12 of 13

**49**

1  level, which would be a man? That's not well
2  worded.
3  A. Let me clarify. What I wanted to do was fill
4  the detail because they had called twice, so I
5  knew they were in urgency to have somebody
6  there.
7  Q. Okay.
8  A. I was unable to find a full-time officer to go
9  and fulfill that detail, which exhausted to my
10  next list, which was the summer specialists,
11  which I'm sure I had called females to see if
12  they were available, but nobody was available.
13  I was having a hard time trying to fill that
14  detail.
15  Q. Understood.
16  A. And Officer Samson came into the station and
17  said that he would take that detail, so to --
18  not to kill two birds with one stone, but it
19  made the hospital happy. They got an officer.
20  I felt comfortable because there was an officer
21  there.
22  Q. But, again, using this as refreshing your
23  memory, your mindset, if we could do back to
24  that night if you had your druthers, you would

**50**

1  like to find a female, but you had trouble
2  finding one?
3  A. I guess so, yes. I don't recall. To be honest
4  with you, I don't recall. I mean, the report
5  says that I was looking for a female officer. I
6  don't recall specifics.
7  Q. Understood. But the report certainly was an
8  honest one when you made it?
9  A. Uh-huh.
10  Q. And still is to this date?
11  A. From what I can recollect of that is I was
12  notifying the hospital that I could not get a
13  female officer, and I did have a male officer to
14  which they accepted the male officer.
15  Q. Thanks for clarifying that. Now, in terms of
16  who was on duty that night --
17  A. I have no idea.
18  Q. I wouldn't expect you to, but let me have you
19  take a look at that document, and I'm sorry it's
20  been marked up, but does that tell you who might
21  have been -- is that a kind of document you are
22  familiar with?
23  A. Yeah. Well, I know the names, if that's what
24  you're asking.

**51**

1  Q. But is this a duty roster?
2  A. No -- well, I guess so, not one that I'm
3  familiar with to be honest with you. Suzie
4  Gale, I believe, was working that night. She
5  was my dispatcher. Linda Burns, she is the
6  dispatcher for the day shift. Francis Bassett
7  was not working. I do not recall Jill Lynch,
8  and then there was me.
9       MR. BOYLE: Why don't we mark
10  this next one as Exhibit 5, please?
11       (Exhibit 5, List of Names,
12       marked for identification.)
13  Q. And you were referring to the highlighted items
14  on Exhibit 5?
15  A. Correct.
16  Q. And that's not a format of a document that
17  you're familiar with?
18       MR. BOYLE: Brother counsel can
19  probably help me in the future at some point,
20  but I won't trouble you with that any further.
21  A. It's not my everyday duty roster, put it that
22  way, of who was working that night and who
23  wasn't.
24  Q. How about this document? I think that's a

**52**

1  full-time police officer list as of '02, but
2  other than as indicated "no longer employed," is
3  that kind of document one you are familiar with?
4  A. Yes.
5  Q. And does that look like the active duty force
6  back in the summer of '02 as you glance through
7  the list?
8  A. Yes, I believe so.
9       MR. BOYLE: Let's make that 6,
10  please.
11  A. This was back in 2002, correct?
12  Q. Yes.
13  A. Okay.
14       (Exhibit 6, Active Duty List,
15       marked for identification.)
16  Q. Now, on this list I notice Chief Randolph Norris
17  is listed.
18  A. Uh-huh.
19  Q. Is he retired?
20  A. Yes.
21  Q. And when did he retire?
22  A. Two or three years ago.
23  Q. Is he on island?
24  A. He has a house on island, and he also has a

**53**

1  house in Florida.
2  **Q.** I'll take a wild guess at what address he's at
3  now, but his island address when he's here, is
4  that 9 Bayberry Lane?
5  **A.** Correct.
6  **Q.** And do you know what town in Florida he lives
7  in?
8  **A.** No, I don't.
9  **Q.** Do you stay in touch with him at all?
10 **A.** No, not really. His son was working for us as a
11 summer special for the past couple of years, and
12 I basically kept in contact through him.
13 **Q.** Through his son?
14 **A.** Yeah, through his son.
15 **Q.** And do you know what role Chief Norris played in
16 connection with the Samson/Varallo incident?
17 **A.** I do not.
18 **Q.** And I'm going to show you a document, which I
19 believe to be the summer officer list from 2002
20 which was produced by the town. Are you
21 familiar with a list like that?
22 **A.** You expect me to remember these guys from four
23 and a half years ago?
24 **Q.** No. Does the department keep a list of the

**54**

1  summer officers similar to that?
2  **A.** I believe so, yes.
3      MR. BOYLE: Can we stipulate
4  these were the summer officers in '02?
5  **A.** I can't stipulate that because I don't know.
6      MR. LOUISON: Why don't we go off
7  the record for one second?
8      (Discussion off the record.)
9      MR. BOYLE: That will be Exhibit
10 7, please
11     (Exhibit 7, Summer Officer List,
12     marked for identification.)
13 **Q.** Now, did you -- were you debriefed or
14 interviewed by Officers Mack and/or Adams in
15 connection with the event?
16 **A.** No.
17 **Q.** And I think you told me earlier you didn't speak
18 with the State Police?
19 **A.** No, I did not.
20 **Q.** Have any policies since the summer of 2002 at
21 the police station here changed with regard to
22 female officers watching female detainees as
23 opposed to male officers watching female
24 detainees?

**55**

1  **A.** Not to my knowledge, no.
2  **Q.** You do have internal policies and procedures on
3  protective custody; do you not?
4  **A.** Yes.
5  **Q.** And some of those, in fact, take place off
6  police premises; do they not?
7  **A.** Correct.
8  **Q.** Do they all start on police premises; in other
9  words, could you have a protective custody that
10 started outside the police station and ended up
11 in the hospital?
12 **A.** I'm not sure what you mean by that.
13 **Q.** Do all PCs, in your experience, come through the
14 police station at some point?
15 **A.** Yes.
16 **Q.** Do you ever have an event out in the community
17 that becomes a PC and a trip to the hospital at
18 the same time?
19 **A.** Are you saying that they are in our custody?
20 **Q.** Pick somebody up out on the street. Somebody
21 has a medical issue and is drunk, perhaps, and
22 is taken straight to the hospital or are they
23 all brought back here?
24 **A.** Some go straight to the hospital, yes, but we

**56**

1  don't PC them. They just go right to the
2  hospital. They are not under protective
3  custody.
4  **Q.** Now, do you know if -- how would payment take
5  place between the hospital and either Mr. Samson
6  or the police department for his detail at the
7  hospital?
8  **A.** You would have to ask my detail officer. He
9  handles all the paperwork. I don't know.
10 **Q.** But the town doesn't pay Samson for that?
11 **A.** I would assume since the hospital was requesting
12 the detail officer, the hospital was responsible
13 for paying for the detail.
14     MR. BOYLE: That's all I have.
15     (Deposition of CHRISTINE E. LADNER closed.)
16
17
18
19
20
21
22
23
24

1

# ORIGINAL

UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF MASSACHUSETTS

05-11547-RWZ

* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

LAUREN VARALLO,                                         *
                         Plaintiff,                     *
                                                        *
            V                                           *
                                                        *
TOWN OF NANTUCKET - POLICE                              *
DEPARTMENT and JAMES SAMSON,                            *
                    Defendant.                          *
* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

### EXHIBIT 6

Deposition of TOWN OF NANTUCKET -

POLICE DEPARTMENT, By CHARLES B. GIBSON, taken

on behalf of the Plaintiff, pursuant to Notice

under the Federal Rules of Civil Procedure

30(b)(6), before Janice A. Maggioli, RPR, RMR,

CRR, and Notary Public in and for the

Commonwealth of Massachusetts, at the Nantucket

Police Department, 20 South Water Street,

Nantucket, Massachusetts, on January 4, 2007,

commencing at 1:54 p.m.

MAGGIOLI REPORTING SERVICES, INC.
48 Watson Street
Braintree, Massachusetts 02184
(781) 356-2636

1        as to these topics?

2   A.   Yes, it would.

3   Q.   Now, does the Nantucket Police Department have

4        policies with regard to --

5                MR. BOYLE:  Can we take a

6        one-second break?

7                (Short break was taken.)

8   Q.   Now, you're familiar with the policies and

9        procedures, obviously, of the Nantucket PD?

10   A.   Yes.

11   Q.   And I guess you basically grew up in them from

12        the time that you were a summer special until

13        now as deputy chief?

14   A.   Yes.

15   Q.   And I've taken testimony from other individuals

16        here today, and would it be fair to say that

17        there are some special recommended practices or

18        procedures with regard to handling females who

19        are detained?

20   A.   As you phrase your question, no.

21   Q.   If a female is going to be searched, are there

22        any special procedures or practices with regard

23        to searching a female detainee?

24   A.   There are no special procedures.  The

```
 1         practice -- the practice is if we have a female

 2         officer available, that is often the path

 3         chosen, to have a female officer search a

 4         prisoner as opposed to having a male officer,

 5         but it is not a written policy that mandates

 6         that.

 7   Q.    I didn't mean to suggest that my question was

 8         limited to written policies.

 9   A.    When you refer to a policy or procedure, in my

10         answer that is framed within a written document.

11         All of our policies and procedures are written

12         documents.  When you refer to a practice, then

13         that is different from a policy and procedure.

14   Q.    So for purposes of your deposition, why don't we

15         use your own definition, that a policy or

16         procedure is something written, and a practice

17         is the practice which is followed, but is not

18         written.

19   A.    Correct.

20   Q.    Would that be fair to say?

21   A.    Yes.

22   Q.    And as a matter of practice, wouldn't it be fair

23         to say that female detainees are searched by

24         female officers when possible?
```

12

1   A.   That's a preferred course of action, yes.

2   Q.   And why is it preferred?

3   A.   For a variety of reasons:  Avoiding any

4        complaint of impropriety upon the officer doing

5        the search, also making it less confrontational.

6        Most of the time when we're arresting someone,

7        it's an adversarial relationship between the

8        officer and the person arrested.

9             So if we can diffuse that

10       situation by any means, whether it be by having

11       a female search the female, that would make it

12       easier and would diffuse the situation.  That

13       would be a practice we would try to do.

14  Q.   And is that a practice that you were taught as

15       you came up through the ranks of the police

16       department?

17  A.   Taught, no.  I think common sense has infused

18       that amongst officers.  I can't recall being

19       taught that or being told that.  I would just

20       say it's common sense.

21  Q.   And is it a practice that is pretty uniformly

22       adhered to by your fellow officers?

23  A.   Yes.

24  Q.   And as deputy chief, you have a lot of

```
 1        recordings, and then listening to those

 2        recordings as I was culling through those, I

 3        heard that exact phrase.

 4   Q.   Had you -- and when did you listen to the tapes?

 5   A.   When you asked for them.

 6   Q.   Spring of '06?

 7   A.   Or early '06.

 8   Q.   But did that phrase -- the phrase was used by --

 9   A.   The hospital.

10   Q.   The hospital.  Okay.  And had you heard the

11        phrase before?

12   A.   No, sir.

13   Q.   Do you occasionally assign an officer to watch a

14        detainee who may be a suicide risk?

15   A.   Yes.

16   Q.   And if that detainee is a woman and you have a

17        woman available -- a woman officer available, do

18        you try to match up the woman officer with the

19        woman detainee for that assignment?

20   A.   If we have an officer available working the

21        shift, yes.

22   Q.   And is it preferable to have a woman in that

23        setting for all of the same reasons that you

24        articulated earlier --
```

16

1   A.   Yes.

2   Q.   -- about searching?

3   A.   Yes.

4   Q.   So, as a matter of practice, would you generally

5        agree that if there is a woman police officer

6        available to interact with a woman citizen

7        either on arrest, on search, on entering a cell

8        or on a one-on-one watch, if a woman officer is

9        available, it's preferable to have that officer

10       handle the task?

11                    MR. LOUISON:   Objection to the

12       form.

13  A.   That's too broad.   I mean, can you -- you just

14       have to repeat it again.

15  Q.   Sure.

16  A.   If you wanted to ask each specific thing.

17  Q.   I thought I had, but we talked about search.

18       All things being equal if you've got a woman

19       detainee and a woman officer, you'll have the

20       woman officer do the search, correct?

21  A.   Correct.

22  Q.   The same question, if you've got a woman officer

23       available in the station and somebody has got to

24       go into a woman's cell, you'll send the woman?

1   A.   Correct.

2   Q.   One-on-one watch, a suicide watch, for example,

3        if you've got a woman officer available and the

4        detainee is a woman, generally you'll try to use

5        your woman officer, correct?

6   A.   I would have to say no, not on the suicide watch

7        because the suicide watch requires no

8        interaction with the prisoner.  The officer here

9        -- when we do suicide watches here, the officer

10       here sits in a chair outside the cell in the

11       holding area basically out of direct view of the

12       cell, but within eyeshot and earshot, and that

13       officer just sits there in a chair.  There's

14       no -- the cell door stays closed.  They don't

15       have a key.  They don't have any direct

16       interaction, so we've used people off the shift.

17       It doesn't matter in that instance.

18  Q.   So --

19  A.   I don't use the term "one on one."  That's a

20       foreign term to me.  We use prisoner watches,

21       suicide watch.  That's our phraseology here.

22  Q.   The phraseology is?

23  A.   Prisoner watch or suicide watch.

24  Q.   Are they one in the same thing?

1  A.    No.

2  Q.    What's the difference?

3  A.    Suicide watch would be something that's -- we've

4        had someone attempt suicide, done some sort of

5        action to cause us suspicions that they are a

6        threat of suicide, where a prisoner watch could

7        be their attorney is visiting them or we've

8        allowed a family member to visit them.  So we're

9        watching them or they are using a telephone or

10       something else where we need to observe them,

11       but not related to a mental condition or a

12       medical condition.

13 Q.    So, on a suicide watch in a cell, if I'm hearing

14       you correctly, the officer is physically outside

15       of the cell or the detainee is locked in the

16       cell so there's no possibility --

17 A.    Of interaction.

18 Q.    So, in that event where the possibility of

19       interaction is absent, gender really doesn't

20       matter?

21 A.    Correct.

22 Q.    Now, occasionally do you get requests to send an

23       officer to watch a suicide patient at a

24       hospital?  Have you ever heard of that

22

1    violent person.  That's why we go.

2                We're not there to restrain

3    people or to administer any type of medicine or

4    anything.  We're there in case the staff at the

5    hospital can't control the patient or needs help

6    controlling the patient or moving the patient.

7    That's generally why we go at the request of the

8    hospital.

9  Q.   And that would be about the only reasons you

10      would be over there?

11 A.   Yes, if the hospital called.

12 Q.   Have you ever been asked to go and sit and watch

13      a patient over there at the hospital?

14 A.   Yes.

15 Q.   Was that on a protective custody?

16 A.   Both.  We've had -- we call down the list.  We

17      have a list that's a union list.  It's a

18      seniority list.  Union rules dictate who gets to

19      go on details, and we have a hierarchy of

20      seniority that we go down, so the most senior

21      person -- it's a third-party detail.  If it's an

22      off-duty or an overtime shift, either way,

23      again, seniority union rules say who gets first

24      pick at it.

23

1              So it goes by seniority.

2       Full-time officers get to pick.  Usually if it's

3       1 o'clock in the morning, no one wants to do it,

4       and so then it just goes down to full-time

5       people by seniority and then part-time people,

6       summer officers.  It goes right down the list.

7   Q.  But my question was, have you personally been

8       ever asked by the hospital to go over and sit

9       and watch a patient?

10  A.  No, and no one here would be personally asked to

11      do that.

12  Q.  Well, has the police department ever been asked

13      by the hospital to send a police officer over to

14      watch a patient?

15  A.  Yes, they have.

16  Q.  On how many occasions?

17  A.  Where the hospital is simply requesting help,

18      very rare.  It would be hard to quantify when

19      that -- how many times because often the

20      hospital will call up the midnight shift.  They

21      will make a call to the dispatcher, Can you have

22      an officer swing by?  We're having a problem

23      moving a heavy patient.

24              A midnight officer will drive by,

24

1    assist where we can, and that will be the end of

2    it.  We wouldn't even track that.  The officer

3    would swing by, render whatever assistance he

4    could, then leave.

5                    An officer being called to stay

6    up there by the hospital for a period of time,

7    it's a rare occurrence.

8  Q.  Have you ever fulfilled such a duty?

9  A.  No.  I have never worked that detail at that

10    request for those circumstances, no.

11  Q.  Do you know of anybody else who has?

12  A.  Not specifically.  I know we have done it in my

13    24 years.  I know we have done details up there,

14    but I'm not sure.

15  Q.  Would it be fair to characterize it as quite

16    unusual to have a police officer sitting on a

17    detail watching a patient for eight hours or six

18    hours?

19  A.  At the hospital's request, yes.

20  Q.  And ordinarily is that something that you

21    wouldn't do?

22  A.  No.  We -- again, it's a small town.  We try to

23    help out where we can.  The hospital requests

24    assistance.  We would try to render whatever

1    assistance that we could.

2  Q.   You have indicated that you don't recall ever

3       having done such a detail.  Do you know -- apart

4       from this lawsuit, do you know of any other

5       occasion where any officer went over and spent

6       several hours at the hospital's request watching

7       a patient?

8  A.   Specific names, no, but I know we have done it.

9       Over the years we have done it.

10 Q.   Are there any policies or procedures that relate

11      to details?

12 A.   Yes.

13 Q.   Are they written policy and procedures?

14 A.   Yes.

15               MR. BOYLE:  Are they around?  Off

16      the record.

17               (Discussion off the record.)

18 Q.   Apart from the written procedures for how

19      details are passed out, are there any written

20      procedures within the department that would

21      govern one's conduct or behavior on details?

22 A.   Yes.

23 Q.   What do they relate to?  Traffic situations

24      only?

1   A.   Yes.

2   Q.   How about a detail over at the hospital, would

3        there be any procedure that would relate to

4        that?

5   A.   Other than the specific policies regarding

6        prisoner transportation, medical treatment of

7        prisoners, jail care, no.

8   Q.   Do you consider it an appropriate task for a

9        police officer by way of a detail to be sitting

10       at a hospital and being the primary person in

11       charge of watching a patient who may be

12       suicidal?

13  A.   You use the word "in charge," I think I have to

14       ask you to define what -- you need to define the

15       specific circumstances.  That's too general to

16       respond.

17  Q.   Well, let me start with you.  You, yourself,

18       have never fulfilled such a detail, correct,

19       watching a suicidal patient at the hospital?

20  A.   I have -- they were our prisoner.  It was a

21       police custody.  It was a police protective

22       custody.

23  Q.   Protective custody?

24  A.   Or police arrest, but they started in our jail.

1    Q.    Okay.

2    A.    And then went up to the hospital for the

3          treatment.

4    Q.    I guess my question to you is, setting aside

5          protective custodies that originate here, do you

6          consider it an appropriate use of a police

7          officer to have a detail at the hospital to be

8          the primary person watching a patient who may

9          attempt to harm herself?

10   A.    I would have to say the question whose

11         responsibility is the patient?  If the patient

12         is a Nantucket Police Department protective

13         custody or arrestee, then the responsibility --

14         the care and custody of that prisoner is ours.

15               If in this case where the patient

16         was not in the custody of Nantucket police, then

17         the hospital has the primary duty to watch that

18         patient.  That patient is owned by the hospital.

19         If the patient or prisoner is owned by the

20         police, then it is our primary responsibility.

21               In this case, this was a hospital

22         patient, so we did not have primary care and

23         custody of this patient.

24   Q.    Do you believe that was an inappropriate detail

28

1       to assign given the fact that you didn't, to use

2       your words, own that patient, end quote?

3  A.  Based on what I know of this case and the task

4       that was requested of us, we did not have

5       primary care of the patient.  We were asked, to

6       use the hospital words, do a one on one, which I

7       would analogize to our officer sitting outside a

8       secure cell watching a prisoner in a secure

9       area.  We are observing them, but the primary

10      responsibility to maintain care of the patient

11      would be with the hospital, not with us.

12            So is that a -- you use the word

13      "primary."  I don't believe we ever had that

14      role in this case.

15  Q.  I'm not sure I used the word "primary."  Maybe I

16      did, but what I'm getting at is this:  You know

17      that the patient in question was a 21-year-old

18      intoxicated female?

19  A.  I know that now, yes.

20  Q.  And, again, unfortunately, because you've been

21      designated, you have to have opinions on things

22      that you didn't actually see happen, but part of

23      the process of deposing the town is we have to

24      take individuals and ask questions that you may

29

1        have to form opinions about as we speak, but you

2        understand that the patient was a female,

3        correct?

4  A.   Correct.

5  Q.   The patient was 20 or 21 years old, correct?

6  A.   Correct.

7  Q.   The patient had been intoxicated, correct?

8  A.   Correct.

9  Q.   The patient was in bed, correct?

10  A.   Correct.

11  Q.   It was the middle of the night, correct?

12  A.   She was there I guess from 9 p.m. through the

13        day, so she was there for a period of time, yes.

14  Q.   And it originated when she tried to harm herself

15        at home?

16  A.   Correct.

17  Q.   You know that now?

18  A.   Correct.

19  Q.   Now, in that setting do you think it's an

20        appropriate thing to send a police officer out

21        on a detail to watch that patient at the

22        hospital?

23  A.   On a request from the hospital, it would not be

24        beyond the scope of what we do, no.

30

1    Q.    Well, my question was a little different.  Do

2          you think it's an appropriate use of a detail

3          officer to put him or her in that position on a

4          prisoner you don't own -- a patient you don't

5          own?

6    A.    To assist the hospital in maintaining patient

7          care for a potentially violent person, I think

8          that is appropriate, yes.

9    Q.    Did you have any indication that this person was

10         violent?

11   A.    No, I don't even believe she was based on what I

12         know now.

13   Q.    Now, do you think -- I would like you to assume,

14         if you would, please, that the hospital was

15         relying upon the detail officer to be the one

16         who had that patient in his sight at all times,

17         including times when hospital personnel were not

18         physically looking at the patient.  Is that an

19         appropriate use of a detail officer?

20               MR. LOUISON:  Objection.

21   A.    Based on what I know of the layout of the

22         hospital where they put these people, I would

23         say no, because the nurses' station is right

24         there by the room, so there would always be a

1    nurse there, and we would be there at the same

2    time.  So the nurse is always supposed to be

3    there.  So what I know of how it is laid out at

4    the hospital, I would say we're there right with

5    the nurse all the time.

6              So it's my understanding that we

7    are there to assist the nurse, and the nurse is

8    always the one who has responsibility to watch

9    the patient.

10   Q.  100 percent of the time?

11   A.  100 percent of the time.

12   Q.  So it would be inappropriate to try to shift or

13   for the hospital to try to shift that responsi-

14   bility to a detail officer?

15   A.  Yes.

16   Q.  So that if I'm following the thread of the

17   discussion, it would be an inappropriate use of

18   a detail officer to give that officer primary

19   responsibility for physically observing that

20   patient throughout the night?

21              MR. LOUISON:  Objection to the

22   form.

23   A.  If I knew that they wanted us to have that

24   primary responsibility, I would not allow the

1       officer to do it.

2  Q.   Why?

3  A.   Because we don't own that person.  We are not

4       primarily responsible for the care and custody

5       of that patient.  They are a patient in the

6       hospital.  We, the Nantucket police, do not have

7       responsibility for that person.  So the hospital

8       dictates what happens to that person.

9            So we would never have primary

10      care of that person.  It would always be to

11      assist, and, as I understand it, and it was my

12      understanding of how it should work, is that if

13      the nurse had to go in to restrain the patient

14      or the patient was trying to leave, our officer

15      is there to back up the nurse, to assist the

16      nurse in keeping the person in bed or putting

17      restraints on the person, but we would not have

18      primary responsibility, sole responsibility to

19      observe this patient at any time.

20  Q.  And I think I get the concept, and from your

21      testimony I assume it is your opinion that the

22      primary responsibility for physically keeping

23      that woman in sight 100 percent of the time was

24      with the nurse or nurses, correct?

1    A.    Correct.

2    Q.    And it was not delegable or delegatable to a

3          detail officer, correct?

4    A.    Correct.

5    Q.    And so if the detail officer had been placed in

6          charge in -- in primary charge of watching the

7          patient 100 percent of the time that night, that

8          would have been an inappropriate use of a

9          detail?

10   A.    That would be a violation of our practice.  Now,

11         when you say "inappropriate use," I don't know

12         who is using it, but the police department would

13         not allow that practice to happen if we knew of

14         it.

15   Q.    Because that would -- well, it would be a

16         violation of internal protocol?

17   A.    Right, and I believe it would be a violation of

18         hospital protocol.

19   Q.    So, on that night in question involving Mr.

20         Samson, in your view as you reconstructed these

21         events -- and I know you weren't out there that

22         night, but as you reconstruct everything, the

23         primary responsibility for keeping an eye on

24         that patient 100 percent of the time all night

1       have to watch that woman 100 percent of the

2       time, and a police officer is there only for

3       backup?

4   A.  Yes.  I mean, we could have been called to park

5       cars up there.  It doesn't matter.

6   Q.  But wouldn't have done it?

7   A.  Sure we would have.  If the hospital called us

8       up and said, "We need security in the lobby

9       because we have a high-profile person up there,"

10      we've gone up there to do security in the lobby.

11      We've gone up there to do security.  We've had

12      plane crashes where a lot of people have come to

13      the lobby.  The hospital has hired us as detail

14      officers to shut down hallways.  We've gone to

15      the hospital on details for numerous reasons.

16  Q.  But if anyone -- well, strike it out.

17                  If the Nantucket Police

18      Department knew that this request from the

19      hospital was for a police officer on detail to

20      be the primary person watching the patient all

21      night, would it be fair to say you wouldn't

22      accept that detail?

23  A.  Yes, that is fair to say.

24  Q.  Because that would violate your practices?

1   A.   It would violate our practices.

2   Q.   Now, would you also agree that if a police

3        officer is going to be sent up to watch a 20- or

4        21-year-old intoxicated woman in a bed at the

5        hospital in the middle of the night, it's

6        preferable to send a woman officer?

7   A.   No, it would not be preferable in this case, no.

8   Q.   What is it about this case which makes it not

9        preferable?

10  A.   If the hospital is calling us for either

11       manpower, someone to physically restrain someone

12       or someone to physically track someone down or

13       prevent some sort of harm happening, we may not

14       send a person of slight build to do a

15       physical -- if it involved physical interaction

16       with a violent person or something else that

17       they would want something to happen.

18              We could have -- if it's just

19       looking through a window to see if something is

20       happening, we could send anybody.  It doesn't

21       matter because there's not supposed to be any

22       interaction between the officer and the person

23       we're watching in this case.

24  Q.   An officer shouldn't even be in the room?

1   A.   I will say no.

2   Q.   And that's town or police department practice?

3   A.   It's the role that we fill in this instance.  If

4        we're called to watch someone, we'll watch the

5        door.  We'll watch with some -- we'll assist the

6        nurse.  We're not the primary person.  We

7        wouldn't know to watch them for a medical

8        condition.  We wouldn't know to monitor them.

9        That's not what we're doing.

10                   We're there to do a security job

11       or we're there to assist the nurse in physically

12       restraining the person who is trying to escape

13       or we've had them trying to escape the hospital

14       before.  That would be my interpretation of why

15       they would want someone there, that this person

16       is either putting up some physical restraint,

17       stopping the nurses from doing what they were

18       doing or was a flight risk, and they wanted

19       someone to either grab them or chase them down

20       and put them back in their bed.

21  Q.   But --

22  A.   But that would be at the request of the nurse.

23  Q.   But none of that happened with Lauren Varallo,

24       correct?

48

1          We're there to make sure that

2    patient doesn't harm themselves, harm the staff

3    or flee, and therefore, harm themself or someone

4    else.  That is our general understanding when

5    the hospital requests someone like this.

6          Being in bed or being anywhere is

7    not material to what we do.  We're supposed to

8    assist the hospital.

9  Q.  Now, if you had known that the assignment was to

10    be the primary observer of the patient, would

11    you have sent out an officer to do that?

12  A.  Again, I'm not sure we were the primary, and we

13    would not be the primary.  If the hospital said,

14    We want an officer to sit in a room with a

15    female patient and have the only interaction

16    with the female patient and there will be no one

17    else monitoring this male officer for the entire

18    night, I would say no.

19  Q.  Why?

20  A.  Why?  Because it would just breed any further

21    type of allegation.  It's something we don't do.

22    It is not our responsibility to monitor a

23    patient at the hospital.  Why interject

24    ourselves into a situation that is not our job?

1  Q.    That's different?

2  A.    Yes.

3                    MR. BOYLE:  On the ferry I'll

4        think of more questions, but I think that's all

5        I have.

6                    MR. LOUISON:  Just by agreement,

7        if you will, we're going to -- in regard to our

8        ongoing discovery, to the extent that there is a

9        detail policy --

10                   THE WITNESS:  That's the union

11       contract about assignment of details.

12                   MR. LOUISON:  I'm sorry --

13                   THE WITNESS:  The hospital

14       billing.

15                   MR. LOUISON:  The hospital

16       billing on the Samson detail, if there are

17       documents that we can retrieve indicating the

18       method of payment or the payment history, we'll

19       get that and produce that, and to the extent, if

20       this is acceptable to you, explain or further

21       clarify the exhibit, which is entitled "Summer

22       Officers," if there is any change in the

23       testimony we produced, I will forward you a

24       letter --

EXHIBIT 7

UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF MASSACHUSETTS

LAUREN VARALLO,
                              Plaintiff,

v.

TOWN OF NANTUCKET - POLICE
DEPARTMENT and JAMES SAMSON,

                              Defendants.

CIVIL ACTION
NO: 05-11547-RWZ

### Plaintiff's Liability Expert Disclosures Pursuant to Fed. R. Civ. P. 26(a)

Plaintiff expects to offer the testimony of the following liability expert at the trial of this matter: Paul J. Mackowski, 250 Melrose Street, Melrose, Massachusetts 02176. This written report has been prepared by the witness, with the assistance of counsel for the plaintiff, to set forth his qualifications, a summary of his opinions, the basis for those opinions, the data and information upon which he relies, materials which he expects may be used at trial in support of his opinions and other information required by Fed. R. Civ. P. 26 (a)(2). Plaintiff notes, however, that certain factual information from defendant Town of Nantucket - Police Department has yet to be disclosed or produced or is not yet available for review by Mr. Mackowski and, therefore, plaintiff reserves her right to amend and/or supplement this disclosure as necessary and appropriate upon receipt of the Town's remaining discovery.

**Summary of Expected Testimony:** Mr. Mackowski is expected to testify regarding his education, training and experience, his review of the disclosures, written discovery, documents produced, deposition and trial testimony and exhibits as well as other evidence in this case, his analysis of that material, his observations regarding law enforcement policies, procedures, practices, customs, circumstances and training in general, and those of the Nantucket Police Department in particular, as well as regarding the events leading up to, during and following the sexual assault of Lauren Varallo by Nantucket Special Police Officer James Samson. More specifically, Mr. Mackowski is expected to testify as follows:

**Qualifications:** Detective Paul J. Mackowski has been a police officer with the Medford Massachusetts Police Department for 22 years and has been a detective for seven of those years. In addition to serving Medford, early in his law enforcement career, he served as a special police officer in Brattleboro, Vermont, as a Temporary Summer Officer in Scituate, Massachusetts and as a security officer at the Boston Gardens. Mr. Mackowski also has a consulting firm, The M Group, that specializes in law enforcement training, program consulting and private investigation services.

Mr. Mackowski graduated from Northeastern University in 1984 with a Bachelor of Science degree in Criminal Justice and received his Masters in Criminal Justice in May 2001. During his years as a police officer and detective, he has received additional law enforcement training in numerous programs through, among others: the Federal Bureau of Investigation; the U.S. Attorney General's Office; the Massachusetts Attorney General's Office; the Middlesex County District Attorney's Office; the Massachusetts Criminal Justice Training Council; Suffolk University in Boston and Oxford University in England. He has considerable training in such matters as the proper training for, and conduct of, protective custodies and the investigation and prosecution of sexual assaults.

Mr. Mackowski has served as a consultant in assessing the law enforcement needs of Russia in coping with burgeoning criminal activity resulting from the collapse of communism. He coordinated the first United States / Russia Police exchange program. In 1996, he was assigned to the United States Department of Justice in Washington, DC where he assessed the policing needs and development of both short-term and long-term police training for the countries of the former Soviet Union. He has given briefings on the status of police and law enforcement training needs in former Soviet Union states to: the Central Intelligence Agency; the Federal Bureau of Investigation; the United States Senate's Permanent Subcommittee on Investigation; and the United States State Department. In other countries, he coordinated a police human rights training program for the United States Naval Justice Center of Newport, Rhode Island, for police officers from Papua New Guinea and Fiji. He served as a staff instructor at the Haitian National Police Academy in Port-au-Prince, Haiti.

**Statement of Opinions:** Noting that the disclosure or production of certain information from the Nantucket Police Department is, as yet, incomplete or is not yet available for review, Mr. Mackowski is nevertheless prepared to offer opinions regarding the following issues, subject to the right to amend and/or supplement such opinions upon receipt of the Town's remaining discovery.

(1)     Mr. Mackowski is expected to testify regarding the meaning of "protective custody" in the field of law enforcement. He is expected to testify that an individual is in police custody if a police officer, acting in his role as a law enforcement officer, speaks, acts or behaves in such a way that an ordinary person in the individual's position would reasonably believe they were not free to leave or that their freedom was restrained. That individual is in protective custody if that restraint, or the reasonable belief of restraint, exists in order to protect the individual from harming himself or herself or others. Mass. Gen. L. c. 111B is one type of protective custody by which a Massachusetts police department is authorized to take an impaired individual who is out in the community into custody for the purpose of protecting the individual from injuring him or herself or others. However, Chapter 111B is not the only form of protective custody.

(2)     Regarding this case in particular, Mr. Mackowski is expected to testify regarding the training, policies, procedures, customs and practices used by police departments to protect the rights of females in protective custody on the one hand, and individual police officers and the department on the other. He is expected to testify that it is standard practice during an officer's training with a police department, to be informed that every effort should be made to minimize a male officer's unsupervised contact with females in custody. He is expected to testify that it is

2

standard practice for departments to, for example, insist that only female officers or matrons (women who are not officers of the department but who are hired and trained to perform such tasks when needed) search females in custody, only female officers or matrons observe or guard females in custody if it is an unsupervised setting, and a male officer transporting a female in custody should contact his dispatcher, state his location and intended destination, and report his vehicle odometer readings before he departs with a female in custody and when he arrives. The primary purpose for such steps is to avoid, or to closely supervise and monitor, a male officer who has a female detainee in custody in order to minimize the risk of and opportunity for a sexual assault upon a female detainee as well as allegations of any such assault against the officer.

Mr. Mackowski is expected to testify that he has been required to follow these practices in small police departments as well as in the City of Medford. He has personally trained numerous officers to abide by these practices, and has observed officers training new recruits to abide by them as well. He is expected to testify that in his 22 years of experience as a police officer, he has not encountered any debate regarding the necessity of these procedures because the need for such steps is quite clear.

(3)    Mr. Mackowski is expected to testify regarding police work that is at least in part paid for by a third-party, sometimes referred to as "details." He is expected to testify that a "detail" typically identifies the method by which certain Town or police services are paid. A "detail" may also define the relationship between a company or community organization (such as a construction company, a school or a hospital) and the police department, but it does not define the relationship between an officer and a person in custody during or as a result of police services performed on that detail. He is further expected to testify that, unlike typical calls for police assistance, a police department may decline a call to conduct a detail if the department does not have the ability or personnel needed to perform the job properly or safely. He is expected to testify that in performing details, officers are still required to follow the polices and practices of the department, and are expected to exercise police powers when necessary. He is expected to testify that, generally, it would be contrary to well-established law enforcement policy to ignore police policies and practices relied upon during usual police operations simply because the officer was being paid by a third party. An officer serving a detail remains a law enforcement officer subject to department regulations, practices and procedures regardless of who or which community organization is paying for the police department's services.

(4)    Mr. Mackowski is expected to testify concerning the law enforcement community's awareness of the problem of sexual misconduct by police officers. He is expected to testify that during his years as a police officer he knows of numerous incidents of police sexual misconduct and that its existence is well known in the law enforcement community. The conduct ranges from stopping a woman for a traffic violation solely for the purpose of obtaining more information about her, to engaging in sexual intercourse in a police cruiser, to sexual assault. Some conduct is reported, some is not. He is expected to testify that his personal knowledge from working as a police officer in Massachusetts is consistent with national reports and literature concerning the issue, and that the risk of police sexual misconduct is obvious to anyone working in the field of law enforcement.

(5)     Mr. Mackowski is expected to offer his opinion that the Nantucket Police Department's failure to have in place clear policies and practices concerning the assignment of male officers to supervision of women in protective custody was contrary to standard practices and was negligent and reckless in its failure to anticipate the possibility of police sexual misconduct. He is further expected to testify that if, in fact, the assignment to a so-called "suicide watch" (as one officer called it) of a female was considered by the Department to be a "detail," then there were no policies and procedures in place directing the dispatch officers or their superiors to decline it if a properly trained female officer or matron was unavailable at the time. He is further expected to testify that, while the Department's most senior personnel seem to claim the existence of an unwritten policy that females should be guarded by females in an unsupervised setting and that, at the hospital, only the nurses were to perform "one-on-one" watches with a police officer available only as back-up (and never alone with a detainee), neither Officer Samson nor his immediate superior, Sergeant Ladner (or any of the other line personnel), were aware of any such policy. Therefore, either no such policy, in fact, existed or there was no training on any such policy which is the same as having no policy at all.

Mr. Mackowski is also expected to testify regarding the Department's assignment of Officer Samson to protective custody of a young, intoxicated woman in an unsupervised setting, and its failure to follow the most basic procedures for investigating an allegation of sexual assault. Mr. Mackowski is expected to testify that the Department should have either declined to accept the detail, if that was what it was, or it should have assigned a female officer or matron to perform the so-called "suicide watch." He is expected to testify that a male officer such as Officer Samson should not have been assigned to so-called "one-on-one" duty of a female detainee and should not have stationed himself or been allowed to station himself in her room and next to her bed. Officer Samson testified that, even though he considered Lauren Varallo to be in protective custody, that she was not free to leave and that he would not have let her leave, he had not received any training that he was not supposed to be stationed inside her room or that he was supposed to be serving only as back-up to nurses who were primarily to conduct any one-on-one observations. The Department has produced no evidence that it had in place any training consistent with such policies or that Officer Samson or his immediate supervisor, Sergeant Ladner, ever received such training.

Mr. Mackowski is expected to testify that upon learning of the allegation against Officer Samson, Sergeant Ladner should have immediately given formal notice to the Department's designated "Rape Officer" and to have: ordered that the scene, including the victim's bedding and clothing, be preserved for possible testing; created an evidence sheet; requested Officer Samson to cooperate and remain available during investigation; and contacted either the Department or the Massachusetts State Police to find out the proper way to obtain any necessary skin, tissue, hair and/or other samples for possible testing. None of these usual police steps regularly followed in a sexual assault investigation were taken with respect to the allegations against a fellow officer in this case.

**Basis of the Opinions:**   Mr. Mackowski's opinions are based upon his review of: the pleadings in this case including the Complaint, the Answers of James Samson and of the Town of Nantucket; written discovery responses and disclosures including the Defendant Town of Nantucket's Response to Plaintiff's First Request for Production of Documents, Defendant Town

4

of Nantucket's Supplemental Response to Plaintiff's First Request for Production of Documents, Defendant Town of Nantucket's Answers to Plaintiff's First Set of Interrogatories, Plaintiff's Answers to the Defendant Town of Nantucket's First Set of Interrogatories, Plaintiff's Responses to Defendant Town of Nantucket's First Request for Production of Documents, Plaintiff, Lauren Varallo's Automatic Disclosures, Defendant Town of Nantucket's Automatic Disclosures and Defendant James Samson's Automatic Disclosures; and testimony and related exhibits from the Depositions of Lauren Varallo, Christine Ladner, Charles Gibson, Suzanne Gale, James A. Samson, and John Welch. The depositions of Nantucket Police Detectives Adams and Mack and of retired Police Chief Norris were not available for review at the time of his opinions and plaintiff has reserved her right to have Mr. Mackowski amend and/or supplement this report upon receipt of such materials. Finally, Mr. Mackowski's opinions are based upon his education, training and experience and his observations, review and analysis of Massachusetts statutes and law enforcement policies, procedures, practices, customs, circumstances and training materials in general, and those of the Nantucket Police Department in particular. He expects to refer to and use such materials as he offers his opinions during the trial of this matter.

In accordance with Fed. R. Civ. P. 26(a)(2), Mr. Mackowski states that his compensation is $150 an hour, that he has not issued any publications in the past ten (10) years and, while he has testified in many dozens of criminal matters in the past four (4) years as an arresting or investigating officer, he has not testified in the capacity of a retained expert at trial or at deposition in the past four years.

SIGNED UNDER THE PAINS AND PENALTIES OF PERJURY THIS _____ DAY OF

MAY, 2007.

_____
Paul J. Mackowski

5

**1**

UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF MASSACHUSETTS

05-11547-RWZ

.................................... *
                                     *
LAUREN VARALLO,                      *
          Plaintiff,                 *
                                     *
     V                               *
                                     *
TOWN OF NANTUCKET - POLICE           *
DEPARTMENT and JAMES SAHSON,         *
          Defendant.                 *
.................................... *

Deposition of SUZANNE GALE, taken on

behalf of the Plaintiff, pursuant to Notice

under the Federal Rules of Civil Procedure,

before Janice A. Maggioli, RPR, RMR, CRR, and

Notary Public in and for the Commonwealth of

Massachusetts, at the Nantucket Police

Department, 20 South Water Street, Nantucket,

Massachusetts, on January 4, 2007, commencing at

11:16 a.m.

MAGGIOLI REPORTING SERVICES, INC.
48 Watson Street
Braintree, Massachusetts 02184
(781) 356-2636

---

**2**

APPEARANCES:

Merrick, Louison & Costello, LLP
[By Douglas I. Louison, Esq.]
67 Batterymarch Street
Boston, Massachusetts 02110
     On behalf of the Town of Nantucket - Police
     Department.

Meehan, Boyle, Black & Bogdanow
[By Leo V. Boyle, Esq.]
Two Center Plaza
Boston, Massachusetts 02108
     On behalf of the Plaintiff.

**EXHIBIT 8**

---

**3**

INDEX

| Witness | Direct | Cross | Redirect | Recross |
|---|---|---|---|---|

Suzanne Gale

By Mr. Boyle   5

EXHIBITS

| Id. | Description | Page |
|---|---|---|
| 2 | Deposition notice | 4 |

---

**4**

STIPULATION

It is agreed by and between counsel
for the respective parties that the reading
and signing of the deposition will not be
waived. All objections, except as to the form
of the question, and motions to strike will be
reserved until the time of trial.

(Exhibit 2, Deposition Notice,
marked for identification.)

MR. BOYLE: Could you swear her
in, please?

SUZANNE GALE,
having been satisfactorily
identified and duly sworn by the
Notary Public, was examined and
testified as follows:

MR. BOYLE: We're taking this
deposition pursuant to Exhibit 2, which is a
notice of taking deposition served November 30th
of '06 and reconvened until today, January 4th
of '07, and we'll reserve all objections, except
as to the form of the question, reserve motions
to strike until the time of trial, if that's

**5**

1    acceptable.
2                    MR. LOUISON:  Yes.
3                    MR. BOYLE:  Have the witness sign
4    it under the pains and penalties of perjury
5    rather than before the Notary, if that's
6    acceptable.
7                    MR. LOUISON:  Yes.
8                    MR. BOYLE:  And we'll treat it in
9    all respects as though signed if we don't get a
10   signature page back within 30 days.
11                   MR. LOUISON:  Yes.
12                   MR. BOYLE:  Any other prelims or
13   are we all set?
14                   MR. LOUISON:  We're all set
15        __EXAMINATION BY MR. BOYLE__
16   Q.  Would you please state your name for the record?
17   A.  I'm Suzanne Gale.
18   Q.  And your age is?
19   A.  36.
20   Q.  My name is Leo Boyle, and I represent the
21       plaintiff in this case, Lauren Varallo.  And
22       your professional address is?
23   A.  My professional address --
24   Q.  Your office address?  What's your office

**6**

1    address?
2    A.  Office as in the police department?  20 South
3        Water Street, Nantucket, Mass., 02554.
4    Q.  And can you tell me about where you went to high
5        school and what year you graduated?
6    A.  I graduated in '87, Suffield, S-U-F-F-I-E-L-D,
7        High School.
8    Q.  Is that Connecticut?
9    A.  That's correct.
10   Q.  And did you have education beyond high school?
11   A.  I went to two years of college for art, was an
12       art major.
13   Q.  Whereabouts?
14   A.  That was in New Haven, Connecticut.
15   Q.  And after that, did you go right into police
16       work or did you work?
17   A.  I worked.  I was an assistant manager with
18       Parcel Plus -- it's packaging and shipping --
19       for a couple of years until I became a
20       dispatcher with the police department like three
21       years after that.
22   Q.  And when you say "the police department," you
23       mean Nantucket?
24   A.  Yes, Nantucket.

**7**

1    Q.  So would that be about -- what year did you
2        start as a dispatcher?
3    A.  I started in 1991, September, as a dispatcher.
4    Q.  And is that a uniformed position?
5    A.  Yes.
6    Q.  Did you have to go to the police academy
7        before --
8    A.  No, it's a civil -- I mean I'm a civilian
9        dispatcher.
10   Q.  Did you carry a weapon in that position?
11   A.  No.
12   Q.  And how long were you a dispatcher?
13   A.  I was a dispatcher for ten years.
14   Q.  Until 2000 --
15   A.  2002 I went to the academy as a full-time police
16       officer.
17   Q.  So you've lived on the island full time since
18       '91?
19   A.  '87.  As soon as I graduated, I came to live
20       with my father here on Nantucket.
21   Q.  Okay.  And which police academy did you go to in
22       2002?
23   A.  Plymouth Police Academy.
24   Q.  And did you go to the academy after the

**8**

1    events --
2    A.  Yes.
3    Q.  -- involving Miss Varallo and Mr. Samson?
4    A.  Yes.
5    Q.  But at the time of the events, you were a
6        full-time employee of the Town of Nantucket as a
7        dispatcher?
8    A.  Correct.
9    Q.  Which means you didn't have any foot-patrol
10       duties or any duties outside the station,
11       correct?
12   A.  No.
13   Q.  Now, do you have a recollection of the events of
14       the night in question?
15   A.  No, I can't remember everything.  I mean, it
16       was -- I don't know how many years ago.
17   Q.  It was 2002.
18   A.  So, it's a typical July.  I worked the midnight
19       shift as a dispatcher.
20   Q.  What are the hours for that?
21   A.  You come in at quarter of midnight, and you're
22       done at 8:15.
23   Q.  And apart from looking at any records, do you
24       have a recollection of the events of that night?

**9**

1   A.  No, I didn't know anything about that until a
2       couple of days later.  So, as a civilian
3       dispatcher, I'm up in the front there.  I
4       don't -- like everything is -- there's officers
5       and everything behind me.  So I don't know what
6       the officers are doing unless I send them on a
7       call, and once I give the call, then they do
8       their thing, so --
9   Q.  Do you remember -- apart from anything you've
10      read to get ready for the deposition today, do
11      you remember getting a call from the hospital?
12  A.  Yes, looking for a -- someone to watch somebody
13      up at the hospital.
14  Q.  Tell me what you remember about that.
15  A.  Just looking to see if they could get a person
16      to come watch a party up at the hospital.
17      That's all they said or -- I don't know any more
18      than that.
19  Q.  At the time you got that call, were you made
20      aware that they had called a couple of hours
21      earlier?
22  A.  No.  The sergeant that was on the evening shift
23      was also the sergeant for the midnight shift.
24      So I just told the sergeant that they are

**10**

1       looking for someone up the hospital, and she
2       took over the phone call.
3   Q.  Her name?
4   A.  That would be Sergeant Ladner.
5   Q.  Did she take it over in your presence or did you
6       switch it to another line?
7   A.  Switched -- put the line on hold, and she picks
8       up.
9   Q.  Were you within earshot when she picked up?
10  A.  No.
11  Q.  Do you know what she said to the hospital or
12      what they said to her?
13  A.  No.
14  Q.  When you got that call, did you have an
15      understanding that it was a woman to be watched
16      at the hospital?
17  A.  No.
18  Q.  You just didn't know?
19  A.  No.  I was just coming on my shift.
20  Q.  Okay.  After you transferred the call to
21      Sergeant Ladner, did you have anything further
22      to do with --
23  A.  No.
24  Q.  -- this assignment at the hospital?

**11**

1   A.  No.
2   Q.  Were you asked to try to find somebody to cover
3       the assignment?
4   A.  No, not to my recollection, no, because she was
5       -- like I said, I guess it happened during the
6       evening shift, so she was handling it.
7   Q.  So, in terms of responding to the hospital's
8       request for someone to watch this patient, you
9       transferred that entire responsibility to
10      Sergeant Ladner?
11  A.  Correct.
12  Q.  And that was all you had to do with it?
13  A.  Correct.  To my recollection, that's all I can
14      remember, her taking the call.
15  Q.  She didn't come back to you and ask you to make
16      some calls to the dormitory?
17  A.  Not that I can remember.
18  Q.  Are you familiar with police department
19      policies?  I know you are a dispatcher, but are
20      you familiar with policies with regard to
21      whether or not a female in custody should be
22      guarded by a female versus a male?  Are you
23      familiar at all with those policies?
24          MR. LOUISON:  Objection to the

**12**

1       form of it.  Go ahead.  You can answer.
2   A.  There are no policies saying a female has to
3       watch a female.
4   Q.  Are you aware of any practices or preferences
5       within the department that, for example, if it's
6       a one-on-one watch in the station, that if the
7       incarcerated person is a female, that it's
8       preferable to have a female officer doing the
9       watch?  Are you familiar with that?
10  A.  No.
11  Q.  Are you familiar with a policy that if a female
12      in custody is to be searched, that the search be
13      done by a female?
14  A.  No.
15  Q.  So basically you're not familiar with any
16      policies regarding gender at all?
17  A.  Correct.
18  Q.  And you understand I'm talking not just about
19      written policies, but also verbal policies or
20      practices that are followed; you're not aware of
21      any such --
22  A.  No.
23  Q.  You are now a police officer for the town?
24  A.  Correct.

**13**

1  Q. Have you -- since you stopped being a
2     dispatcher, have you become familiar with any of
3     these policies?
4  A. No. If I make an arrest, if I arrest a male, I
5     treat him the same way. I mean, you do -- you
6     do everything every other police officer does.
7     I always make sure that someone is present, but
8     that's just practice for my party, safety.
9     There's always someone standing there. No one
10    told me that's how it's done. That's police
11    officer safety-wise, that's what you do.
12 Q. Apart from the police academy, did you get any
13    formal training by the Nantucket Police
14    Department?
15 A. To be a dispatcher?
16 Q. No, to be a police officer.
17 A. What do you mean? I went to the academy they
18    sent me to.
19 Q. But beyond that, are there courses that the
20    police department here gives you about their
21    internal practices and procedures?
22 A. Well, every year we have our updates on our
23    laws, and we call it in-service.
24 Q. Do you know why Officer Samson was -- -- he

**14**

1     wasn't an officer -- Reserve Officer Samson
2     resigned from the force in August of '02?
3  A. I did not know what was going on. As I said,
4     he's a summer special, and I work a lot of
5     hours, and the summer specials come and go. So
6     I was never told, well, this person is leaving
7     because of this.
8           MR. BOYLE: That's all I have.
9     Thanks.
10    (Deposition of SUZANNE GALE closed.)

**15**

1           I hereby certify that I have read the
2  foregoing deposition transcript of my testimony,
3  and further certify that said transcript is a
4  true and accurate record of said testimony.


                    _____
8                        SUZANNE GALE


11    Signed under the pains and penalties of
12 perjury this ____ day of _____, 2007.

**16**

1  Commonwealth of Massachusetts
   Suffolk, ss.
2
3     I, Janice A. Maggioli, a Registered
4  Professional Reporter and Notary Public duly
5  commissioned and qualified within and for the
6  Commonwealth of Massachusetts, do hereby certify
7  that there came before me on the 4th day of
8  January 2007 at 11:16 a.m., the person
9  hereinbefore named, who was by me duly sworn to
10 testify to the truth and nothing but the truth
11 of his knowledge touching and concerning the
12 matters in controversy in this cause; that he
13 was thereupon carefully examined upon his oath
14 and his examination reduced to typewriting under
15 my direction; and that the deposition is a true
16 record of the testimony given by the witness. I
17 further certify that I am not interested in the
18 event of the action.
19    IN WITNESS WHEREOF, I have hereunto set my
20 hand and affixed my notarial seal this 10th day
21 of January 2007.
22
                    _____
23                       Notary Public

| ' | 8 |
|---|---|
| **'02** [1] 14:2 | **8:15** [1] 8:22 |
| **'06** [1] 4:21 | — |
| **'07** [1] 4:22 | [1] 15:12 |
| **'87** [2] 6:6 7:19 | [1] 16:22 |
| **'91** [1] 7:18 | [1] 15:7 |

| 0 | A |
|---|---|
| **02108** [1] 2:7 | **Am** [1] 1:20 |
| **02110** [2] 2:3 | **Academy** [4] 7:6,15,21,23– 24 13:12,17 |
| **02184** [1] 1:24 | **Acceptable** [1] 5:1,6 |
| **02554** [1] 6:3 | **Accurate** [1] 1:4 |
| **05-11547-RWZ** [1] 1:3 | **Action** [1] 16:18 |
| **1** | **Address** [1] 5:22,24 6:1 |
| **10th** [1] 16:20 | **Affixed** [1] 16:20 |
| **11:16** [2] 1:20 16:8 | **Age** [1] 5:18 |
| **1991** [1] 7:3 | **Ago** [1] 8:16 |
| **2** | **Agreed** [1] 4:2 |
| **2** [3] 3:9 4:8,19 | **Ahead** [1] 12:1 |
| **20** [2] 1:18 6:2 | **Answer** [1] 12:1 |
| **2000** [1] 7:14 | **Apart** [1] 8:2 3:9 9:13:12 |
| **2002** [3] 7:15,22 8:17 | **APPEARANCES** [1] 2:1 |
| **2007** [4] 1:19 15:12 16: 8, 21 | **Arrest** [1] 13:4 |
| **3** | **Art** [1] 6:11,12 |
| **30** [1] 5:10 | **Assignment** [1] 10:24 11:3 |
| **30th** [1] 4:20 | **Assistant** [1] 6:17 |
| **356-2636** [1] 1:24 | **August** [1] 14:2 |
| **36** [1] 5:19 | **Aware** [1] 9:20 12:4,20 |

| 4 | B |
|---|---|
| **4** [2] 1:19 3:9 | **Battery-march** [1] 2:3 |
| **48** [1] 1:23 | **Became** [1] 6:19 |
| **4th** [2] 4:21 16:7 | **Become** [1] 13:2 |
| **5** | **Behalf** [1] 1:13 2:4,7 |
| **5** [1] 3:4 | **Behind** [1] 9:5 |
| **6** | **Between** [1] 4:2 |
| **67** [1] 2:3 | **Beyond** [1] 7:6 10:13 19 |
| **7** | **Black** [1] 2:5 |
| **781** [1] 1:24 | |

**Bogdanow** [2] 2:5
**Boston** [2] 2:3,7
**Boyle** [11] 2:5–6 3:4 4: 10,18 5:3,8,12, 15,20 14:8
**Braintree** [1] 1:24

| C |
|---|
| **Carefully** [1] 16:13 |
| **Carry** [1] 7:10 |
| **Case** [1] 5:21 |
| **Center** [1] 2:6 |
| **Certify** [4] 15:1,3 16:6,17 |
| **Civil** [2] 1:14 7:8 |
| **Civilian** [2] 7:8 9:2 |
| **Closed** [1] 14:10 |
| **College** [1] 6:11 |
| **Coming** [1] 10:19 |
| **Commencing** [1] 1:19 |
| **Commissioned** [1] 16:5 |
| **Commonwealth** [3] 1:16 16:1,6 |
| **Concerning** [1] 16:11 |
| **Connecticut** [2] 6:8,14 |
| **Controversy** [1] 16:12 |
| **Correct** [7] 6:9 8:8,11 11: 11,13 12:17,24 |
| **Costello** [1] 2:2 |
| **Counsel** [1] 4:2 |
| **Couple** [3] 6:19 9:2,20 |
| **Courses** [1] 13:19 |
| **COURT** [1] 1:2 |
| **Cover** [1] 11:7 |
| **Cross** [1] 3:2 |
| **CRR** [1] 1:15 |
| **Custody** [2] 11:21 12:12 |

| D |
|---|
| **Days** [2] 5:10 9:2 |
| **Defendant** [1] 1:9 |
| **Department** [1] 16:... |

**Bogdanow** [10] 1:9,18 2:4 6: 2,20,22 11:18 12: 5 13:14,20
**Deposition** [10] 1:12 3:9 4:4, 8,19–20 9:10 14: 10 15:2 16:15
**Description** [1] 3:8
**Direct** [1] 3:2
**Direction** [1] 16:15
**Dispatcher** [12] 6:20 7:2–3,9, 12–13 8:7,19 9:3 11:19 13:2,15
**DISTRICT** [2] 1:2
**Done** [3] 8:22 12:13 13: 10
**Dormitory** [1] 11:16
**Douglas** [2] 2:2
**Duly** [3] 4:15 16:4,9
**During** [1] 11:5
**Duties** [2] 8:10

| E |
|---|
| **Earshot** [1] 10:9 |
| **Education** [1] 6:10 |
| **Employee** [1] 8:6 |
| **Entire** [1] 11:9 |
| **Esq** [2] 2:2,6 |
| **Evening** [2] 9:22 11:6 |
| **Event** [1] 16:18 |
| **Events** [4] 8:1,5,13,24 |
| **Examination** [2] 5:15 16:14 |
| **Examined** [2] 4:16 16:13 |
| **Example** [1] 12:5 |
| **Except** [2] 4:5,22 |
| **Exhibit** [2] 4:8,19 |
| **EXHIBITS** [1] 3:7 |

| F |
|---|
| **Familiar** [7] 11:18,20,23 12: 9,11,15 13:2 |
| **Father** [1] 7:20 |
| **Federal** [1] 1:14 |
| **Female** |

| [8] 11:21–22 12:2, 3,7–8,11,13 |
|---|
| **Followed** [1] 12:20 |
| **Follows** [1] 4:17 |
| **Foot** [1] 8:9 |
| **Foot-patrol** [1] 8:9 |
| **Force** [1] 14:2 |
| **Foregoing** [1] 15:2 |
| **Form** [2] 3:4 5:23 12:1 |
| **Formal** [1] 13:13 |
| **Front** [1] 9:3 |
| **Full** [3] 7:15,17 8:6 |
| **Full-time** [2] 7:15 8:6 |

| G |
|---|
| **Gale** [6] 1:12 3:3 4:13 5:17 14:10 15:8 |
| **Gender** [1] 12:16 |
| **Given** [1] 16:16 |
| **Graduated** [3] 6:5–6 7:19 |
| **Guarded** [1] 11:22 |
| **Guess** [1] 11:5 |

| H |
|---|
| **Hand** [1] 16:20 |
| **Handling** [1] 11:6 |
| **Haven** [1] 6:14 |
| **Hereby** [2] 15:1 16:6 |
| **Hereinbefore** [1] 16:9 |
| **Hereunto** [1] 16:19 |
| **High** [3] 6:4,7,10 |
| **Hold** [1] 10:7 |
| **Hospital** [7] 9:11,13,16 10: 1,11,16,24 |
| **Hospital's** [1] 11:7 |
| **Hours** [3] 8:20 9:20 14:5 |

| I |
|---|
| **Id** [1] 3:8 |
| **Identification** [1] 4:9 |
| **Identified** [1] 4:15 |

**In-service**
[1] 13:23
**INC**
[1] 1:23
**Incarcerated**
[1] 12:7
**Interested**
[1] 16:17
**Internal**
[1] 13:21
**Involving**
[1] 8:3
**Island**
[1] 7:17

**J**

**JAMES**
[1] 1:9
**Janice**
[2] 1:15 16:3
**January**
[4] 1:19 4:21 16:8, 21
**July**
[1] 8:18

**K**

**Knowledge**
[1] 16:11

**L**

**Ladner**
[3] 10:4,21 11:10
**Lauren**
[2] 1:6 5:21
**Laws**
[1] 13:23
**Leaving**
[1] 14:6
**Leo**
[2] 2:6 5:20
**Line**
[2] 10:6-7
**Live**
[1] 7:19
**Lived**
[1] 7:17
**LLP**
[1] 2:2
**Looking**
[4] 8:23 9:12,15 10:1
**Louison**
[7] 2:2 5:2,7,11, 14 11:24

**M**

**Maggioli**
[3] 1:15,23 16:3
**Major**
[1] 6:12
**Male**
[2] 11:22 13:4
**Manager**
[1] 6:17
**Marked**
[1] 4:9
**Mass**
[1] 6:3
**Massachusetts**
[8] 1:2,17,19,24 2: 3,7 16:1,6
**Matters**

[1] 16:12
**Mean**
[5] 6:23 7:8 8:15 13:5,17
**Means**
[1] 8:9
**Meehan**
[1] 2:5
**Merrick**
[1] 2:2
**Midnight**
[3] 8:18,21 9:23
**Miss**
[1] 8:3
**Motions**
[2] 4:6,23

**N**

**Name**
[3] 5:16,20 10:3
**Named**
[1] 16:9
**Nantucket**
[10] 1:8,17-18 2:4 6:3,23-24 7:20 8: 6 13:13
**Never**
[1] 14:6
**New**
[1] 6:14
**Night**
[2] 8:14,24
**Notarial**
[1] 16:20
**Notary**
[5] 1:16 4:16 5:5 16:4,23
**Nothing**
[1] 16:10
**Notice**
[4] 1:13 3:9 4:8,20
**November**
[1] 4:20

**O**

**Oath**
[1] 16:13
**Objection**
[1] 11:24
**Objections**
[2] 4:5,22
**Office**
[3] 5:24 6:2
**Officer**
[9] 7:16 12:8,23 13:6,11,16,24 14: 1
**Officers**
[2] 9:4,6
**Once**
[1] 9:7
**One**
[1] 13:9
**One-on-one**
[1] 12:6
**Outside**
[1] 8:10

**P**

**Packaging**
[1] 6:18
**Page**
[2] 3:8 5:10

**Pains**
[2] 5:4 15:11
**Parcel**
[1] 6:18
**Parties**
[1] 4:3
**Party**
[2] 9:16 13:8
**Patient**
[1] 11:8
**Patrol**
[1] 8:9
**Penalties**
[2] 5:4 15:11
**Perjury**
[2] 5:4 15:12
**Person**
[4] 9:15 12:7 14:6 16:8
**Phone**
[1] 10:2
**Picked**
[1] 10:9
**Picks**
[1] 10:7
**Plaintiff**
[4] 1:6,13 2:7 5:21
**Plaza**
[1] 2:6
**Plus**
[1] 6:18
**Plymouth**
[1] 7:23
**Police**
[19] 1:8,17 2:4 6: 2,15,20,22 7:6, 15,21,23 11:18 12:23 13:6,10,12- 13,16,20
**Policies**
[8] 11:19-20,23 12: 2,16,19 13:3
**Policy**
[1] 12:11
**Position**
[2] 7:4,10
**Practice**
[1] 13:8
**Practices**
[3] 12:4,20 13:21
**Preferable**
[1] 12:8
**Preferences**
[1] 12:4
**Prelims**
[1] 5:12
**Presence**
[1] 10:5
**Present**
[1] 13:7
**Procedure**
[1] 1:14
**Procedures**
[1] 13:21
**Professional**
[3] 5:22-23 16:4
**Public**
[4] 1:16 4:16 16:4, 23
**Pursuant**
[2] 1:13 4:19

**Put**
[1] 10:7

**Q**

**Qualified**
[1] 16:5
**Quarter**
[1] 8:21

**R**

**Rather**
[1] 5:5
**Read**
[2] 9:10 15:1
**Reading**
[1] 4:3
**Ready**
[1] 9:10
**Recollection**
[4] 8:13,24 11:4,13
**Reconvened**
[1] 4:21
**Record**
[3] 5:16 15:4 16:16
**Records**
[1] 8:23
**Recross**
[1] 3:2
**Redirect**
[1] 3:2
**Reduced**
[1] 16:14
**Regard**
[1] 11:20
**Regarding**
[2] 12:16 13:8
**Registered**
[1] 16:3
**Remember**
[6] 8:15 9:9,11,14 11:14,17
**Reporter**
[1] 16:4
**REPORTING**
[1] 1:23
**Represent**
[1] 5:20
**Request**
[1] 11:8
**Reserve**
[3] 4:22-23 14:1
**Reserved**
[1] 4:7
**Resigned**
[1] 14:2
**Respective**
[1] 4:3
**Respects**
[1] 5:9
**Responding**
[1] 11:7
**Responsibility**
[1] 11:9
**RMR**
[1] 1:15
**RPR**
[1] 1:15
**Rules**
[1] 1:14

**S**

**Safety**

[2] 13:8,11
**Safety-wise**
[1] 13:11
**Samson**
[4] 1:9 8:3 13:24 14:1
**Satisfactorily**
[1] 4:14
**School**
[3] 6:5,7,10
**Seal**
[1] 16:20
**Search**
[1] 12:12
**Searched**
[1] 12:12
**See**
[1] 9:15
**Send**
[1] 9:6
**Sent**
[1] 13:18
**September**
[1] 7:3
**Sergeant**
[6] 9:22-24 10:4, 21 11:10
**Served**
[1] 4:20
**Service**
[1] 13:23
**SERVICES**
[1] 1:23
**Set**
[3] 5:13-14 16:19
**Shift**
[5] 8:19 9:22-23 10:19 11:6
**Shipping**
[1] 6:18
**Sign**
[1] 5:3
**Signature**
[1] 5:10
**Signed**
[2] 5:9 15:11
**Signing**
[1] 4:4
**Someone**
[5] 9:12 10:1 11:8 13:7,9
**Soon**
[1] 7:19
**South**
[2] 1:18 6:2
**Special**
[1] 14:4
**Specials**
[1] 14:5
**Ss**
[1] 16:1
**Standing**
[1] 13:9
**Start**
[1] 7:2
**Started**
[1] 7:3
**State**
[1] 5:16
**STATES**
[1] 1:2

**Station**
[2] 8:10 12:6

**STIPULATION**
[1] 4:1

**Stopped**
[1] 13:1

**Street**
[4] 1:18,23 2:3 6:3

**Strike**
[2] 4:6,24

**Suffield**
[2] 6:6

**Suffolk**
[1] 16:1

**Summer**
[2] 14:4-5

**Suzanne**
[6] 1:12 3:3 4:13 5:17 14:10 15:8

**Swear**
[1] 4:10

**Switch**
[1] 10:6

**Switched**
[1] 10:7

**Sworn**
[2] 4:15 16:9

## T

**Ten**
[1] 7:13

**Terms**
[1] 11:7

**Testified**
[1] 4:17

**Testify**
[1] 16:10

**Testimony**
[3] 15:2,4 16:16

**Thereupon**
[1] 16:13

**Three**
[1] 6:20

**Today**
[2] 4:21 9:10

**Took**
[1] 10:2

**Touching**
[1] 16:11

**Town**
[4] 1:8 2:4 8:6 12:23

**Training**
[1] 13:13

**Transcript**
[2] 15:2-3

**Transferred**
[2] 10:20 11:9

**Treat**
[2] 5:8 13:5

**Trial**
[2] 4:7,24

**True**
[2] 15:4 16:15

**Truth**
[2] 16:10

**Try**
[1] 11:2

**Two**
[2] 2:6 6:11

**Typewriting**
[1] 16:14

**Typical**
[1] 8:18

## U

**Under**
[4] 1:14 5:4 15:11 16:14

**Uniformed**
[1] 7:4

**UNITED**
[1] 1:2

**Unless**
[1] 9:6

**Up**
[6] 9:3,13,16 10:1,8-9

**Updates**
[1] 13:22

## V

**Varallo**
[3] 1:6 5:21 8:3

**Verbal**
[1] 12:19

**Versus**
[1] 11:22

## W

**Waived**
[1] 4:5

**Watch**
[6] 9:12,16 11:8 12:3,6,9

**Watched**
[1] 10:15

**Water**
[2] 1:18 6:3

**Watson**
[1] 1:23

**Weapon**
[1] 7:10

**Whereabouts**
[1] 6:13

**WHEREOF**
[1] 16:19

**Wise**
[1] 13:11

**Witness**
[4] 3:2 5:3 16:16,19

**Woman**
[1] 10:15

**Written**
[1] 12:19

## Y

**Year**
[3] 6:5 7:1 13:22

**Years**
[5] 6:11,19,21 7:13 8:16

| NANTUCKET POLICE DEPT. | ORDER | ISSUE DATE | EFFECTIVE DATE | NUMBER |
|---|---|---|---|---|
| | General | 05-01-87 | 05-01-87 | 87-40 |

| SUBJECT | REFERENCE | AMENDS | RESCINDS |
|---|---|---|---|
| LOCK UP PROCEDURE | | | 82-05 79-02 |

EXHIBIT

Gibson 10
1-4-07

PENGAD 800-631-6989

EXHIBIT 9

## POLICY

To secure a set of rules pertaining to prisoners while in the Departments lock up; on being searched and providing hospitality as the need so dictates:  Also our releasing procedures.

## PROCEDURES

A.  Prisoners:  All prisoners arrested and brought to the station shall be accompanied by the arresting Officer and an assistant Officer during the booking procedure or until incarceration. If at all possible, prisoners will be brought in through the garage entrance.  The OIC shall immediately be advised and is responsible for the prisoner.

B.  All Officers should secure their weapons prior to entering the cell area and while processing prisoners, said weapons should be secured in weapons locker in booking area.

C.  All prisoners should be thoroughly searched prior to incarceration for security and individual protection.  Before handcuffs are removed, prisoners should have a pat down frisk for weapons and once the cuffs have been removed, a more thorough inventory search should be done.

   1.  Any and all clothing apparel ie; belts, ties, shoes,laces, tie strings, rings, ear rings, necklaces, watches etc., which could be used by said prisoner to harm himself or others should be confiscated and held in safe keeping.

   2.  All money & personal items confiscated will be counted and noted on the prisoner Property Bag.

   3.  Jackets, shoes, belts, etc., should be put into appropriate prisoner locker.

D.  All female prisoners should be searched by a female Officer, dispatcher, or matron, unless there are extenuating circumstances such as possession of dangerous weapon.  Said female officer should be present dureing the entire procedure.

E.  Cells should be searched before placing any prisoner therin, and after a prisoner is released from the cell.

F.  When a prisoner has any visible injuries or complains of injury, it shall be documented on the arrest sheet (see MGL Ch. 276 Sec. 33).  Photographs shall be taken where appropriate to document said visible injury.  If the prisoner refuses medical attention but in the judgment of the oIC, the prisoner should

| NANTUCKET POLICE DEPT. | ORDER | ISSUE DATE | EFFECTIVE DATE | NUMBER |
|---|---|---|---|---|
| | GENERA1 | 05-01-87 | 05-01-87 | 87-40 |

| SUBJECT | REFERENCE | AMENDS | RESCINDS |
|---|---|---|---|
| LOCK UP PROCEDURE CONTINUED | | | 81-05 79-02 |

receive medical attention, the EMTS should be called to respond.

G. If the prisoner is transported to the hospital to receive further medical attention he/she should be accompanied by a Police Officer.  If admitted and is under arrest, the Clerk of Courts should be notified so that the prisoner can be bailed.  If the prisoner is not bailed, an Officer shall be assigned to stay with the prisoner at the hospital for the duration of the admittance or until bail is made.  In the case of protective custody, the Doctor can assume the responsibility for the incarcerated individual.

H. Before being released, a computer check (M&W) will be done on any and all persons arrested or incarcerated in this agency.

I. All photos and prints must be completed before any prisoner is released.

*Randolph P. Norris*

Per The Order Of The Chief

Volume:    I
Pages:     34

\* \* \* \* \* \* \* \* \* \* \* \* \*
\*
POLICE RADIO TRANSMISSIONS    \*
\*
RE: VARALLO    \*
\*
\* \* \* \* \* \* \* \* \* \* \* \* \*

# EXHIBIT 10

DUNN & GOUDREAU
COURT REPORTING SERVICE, INC.
One State Street, Suite 1150
Boston, Massachusetts 02109
Telephone (617) 742-6900

---

2

POLICE RADIO TRANSMISSIONS

RE: VARALLO

911 REAR 1ST CALL

911 DISPATCHER: 911, state your emergency.

MOTHER: Yes, I do, I need an ambulance or someone to come to my daughter, she just cut her wrist –

911 DISPATCHER: Okay.

MOTHER: – at 16 –

911 DISPATCHER: Fire department? It's a different call.

MOTHER: 16 Galen Ave.

911 DISPATCHER: All right. Where are you calling from?

MOTHER: 16 Galen Ave.

911 DISPATCHER: 16 Galen Ave.

MOTHER: Um-hum.

911 DISPATCHER: And – yup. Your daughter cut her wrist?

MOTHER: Um-hum.

911 DISPATCHER: Okay. How bad is it? Is it bleeding bad?

MOTHER: Umm –

911 DISPATCHER: Do you have pressure put on

DUNN & GOUDREAU COURT REPORTING SERVICE, INC.

---

3

it, or –

MOTHER: Hold on one second.

911 DISPATCHER: – you're not even around her?

MOTHER: My husband's with her, I was –

911 DISPATCHER: Okay.

MOTHER: I came out to call.

911 DISPATCHER: All right.

MOTHER: Is it bleeding bad?

FATHER: Yeah.

MOTHER: Yes.

DAUGHTER: Not at all –

911 DISPATCHER: I don't know, she's trying to find – how old is your daughter, ma'am?

MOTHER: Well, it's –

DAUGHTER: Are you kidding (inaudible)?

911 DISPATCHER: Hello?

MOTHER: She was drinking, and –

DAUGHTER: (inaudible)

MOTHER: – she cut her wrist.

DAUGHTER: No.

FATHER: You need to be admitted (inaudible) –

DAUGHTER: No, I (inaudible).

911 DISPATCHER: You're going to pick and choose, huh? Hey, ma'am?

DUNN & GOUDREAU COURT REPORTING SERVICE, INC.

---

4

MOTHER: Yes?

911 DISPATCHER: How old is your daughter?

MOTHER: Ahh, twenty.

911 DISPATCHER: Your daughter's twenty. Okay. Is someone – is it bleeding where – is it still bleeding through the bandage that you have wrapped around her?

MOTHER: Ah, we don't have a bandage around it, no. If I put pressure on it, (inaudible) –

911 DISPATCHER: All right, put pressure on it.

DAUGHTER: (inaudible) fine.

911 DISPATCHER: Where's Galen Ave.?

MOTHER: Yes.

911 DISPATCHER: What's Galen Ave. off of, ma'am?

MOTHER: Okay, off of East Lincoln.

911 DISPATCHER: East Lincoln. Okay, I'm –

MOTHER: And if you come straight down East Lincoln, right in the middle of the block, the house is named Tucked Away, there's a mailbox on the left about midway there.

911 DISPATCHER: Okay. All right, bye, Liz.

MOTHER: On the left.

DUNN & GOUDREAU COURT REPORTING SERVICE, INC.

5

1  911 DISPATCHER: All right, ma'am, the
2  ambulance and the police officers are en route, okay?
3  MOTHER: Okay, thank you.
4  911 DISPATCHER: All right, bye, now.
5  MOTHER: Bye-bye.
6
7  911 REAR CONT 1ST CALL
8  911 DISPATCHER: Okay.
9  MOTHER: -- at 16 --
10  911 DISPATCHER: Fire department? It's a
11  different call.
12  MOTHER: 16 Galen Ave.
13  911 DISPATCHER: All right. Where are you
14  calling from?
15  MOTHER: 16 Galen Ave.
16  911 DISPATCHER: 16 Galen Ave.
17  MOTHER: Um-hum.
18  911 DISPATCHER: And - yup. Your daughter cut
19  her wrist?
20  MOTHER: Um-hum.
21  911 DISPATCHER: Okay. How bad is it? Is it
22  bleeding bad?
23  MOTHER: Umm -
24  911 DISPATCHER: Do you have pressure put on

DUNN & GOUDREAU COURT REPORTING SERVICE, INC.

6

1  it, or -
2  MOTHER: Hold on one second.
3  911 DISPATCHER: - you're not even around her?
4  MOTHER: My husband's with her, I was -
5  911 DISPATCHER: Okay.
6  MOTHER: I came out to call.
7  911 DISPATCHER: All right.
8  MOTHER: Is it bleeding bad?
9  FATHER: Yeah.
10  MOTHER: Yes.
11  DAUGHTER: Not at all -
12  911 DISPATCHER: I don't know, she's trying to
13  find - how old is your daughter, ma'am?
14  MOTHER: Well, it's -
15  DAUGHTER: Are you kidding (inaudible)?
16  911 DISPATCHER: Hello?
17  MOTHER: She was drinking, and -
18  DAUGHTER: (inaudible)
19  MOTHER: - she cut her wrist.
20  DAUGHTER: No.
21  FATHER: You need to be admitted (inaudible) -
22  DAUGHTER: No, I (inaudible).
23  911 DISPATCHER: You're going to pick and
24  choose, huh? Hey, ma'am?

DUNN & GOUDREAU COURT REPORTING SERVICE, INC.

7

1  MOTHER: Yes?
2  911 DISPATCHER: How old is your daughter?
3  MOTHER: Ahh, twenty.
4  911 DISPATCHER: Your daughter's twenty.
5  Okay. Is someone - is it bleeding where - is it still
6  bleeding through the bandage that you have wrapped
7  around her?
8  MOTHER: Ah, we don't have a bandage around
9  it, no. If I put pressure on it, (inaudible) -
10  911 DISPATCHER: All right, put pressure on
11  it.
12  DAUGHTER: (inaudible) fine.
13  911 DISPATCHER: Where's Galen Ave.?
14  MOTHER: Yes.
15  911 DISPATCHER: What's Galen Ave. off of,
16  ma'am?
17  MOTHER: Okay, off of East Lincoln.
18  911 DISPATCHER: East Lincoln. Okay, I'm -
19  MOTHER: And if you come straight down East
20  Lincoln, right in the middle of the block, the house
21  is named Tucked Away, there's a mailbox on the left
22  about midway there.
23  911 DISPATCHER: Okay. All right, bye, Liz.
24  MOTHER: On the left.

DUNN & GOUDREAU COURT REPORTING SERVICE, INC.

8

1  911 DISPATCHER: All right, ma'am, the
2  ambulance and the police officers are en route, okay?
3  MOTHER: Okay, thank you.
4  911 DISPATCHER: All right, bye, now.
5  MOTHER: Bye-bye.
6  911 DISPATCHER: (inaudible) Galen Ave. or
7  Derrymore? Derrymore is kind of far. 872 to Victor
8  5.
9  OFFICER: (inaudible) Derrymore.
10  911 DISPATCHER: Where's Galen Ave.?
11  OFFICER: Off of East Lincoln, East Lincoln.
12  911 DISPATCHER: Can you respond to 6
13  Derrymore Road for a man that has fallen and needs
14  help getting up? However, he is on oxygen.
15  OFFICER: (inaudible) en route from
16  (inaudible).
17  911 DISPATCHER: 87 - NFD also is en route,
18  Victor 5.
19  OFFICER: Very good.
20  OFFICER: I think I'll -
21  911 DISPATCHER: 872 to the downtown bike
22  officer.
23  OFFICER: (inaudible) in the middle of the
24  police (inaudible).

DUNN & GOUDREAU COURT REPORTING SERVICE, INC.

9

1    OFFICER:  Bike 7.

2    911 DISPATCHER:  Bike 7, can you head to 16

3  Galen Ave., which is off of East Lincoln Ave, for a

4  twenty-two-year-old woman that has cut herself and

5  needs assistance?  NFD has been called.

6    OFFICER:  Received.

7    OFFICER:  (inaudible) get in the car and go to

8  the hospital.  No, let's activate the EMS system.

9    OFFICER:  She's been drinking, she's been

10  drinking (inaudible).

11    OFFICER:  (inaudible) take your daughter to

12  the hospital.

13    OFFICER:  (inaudible).  Probably a good thing

14  you weren't on the desk for the last fifteen minutes.

15    OFFICER:  I know, I've been hearing it.

16    OFFICER:  (inaudible) stupid fucking thing

17  (inaudible).

18    OFFICER:  I have a meltdown in here, I fucking

19  hate it.

20    OFFICER:  Police department, can I help you?

21

22    CALL-BACK ADDR

23    OFFICER:  (inaudible) 04.

24    (Phone being dialed, ringing.)

DUNN & GOUDREAU COURT REPORTING SERVICE, INC.

---

10

1    911 DISPATCHER:  You do know it's off of East

2  Lincoln, correct?  NFD?

3    MOTHER:  Hello?

4    911 DISPATCHER:  Hi, this is the police

5  department.

6    MOTHER:  Yes, no, the ambulance is on Galen,

7  but we're on East Lincoln - we're off of East Lincoln,

8  I told them.

9    911 DISPATCHER:  Okay, I know, you told me.

10    MOTHER:  Yeah, okay.

11    911 DISPATCHER:  Did you -

12    MOTHER:  They're all the way over by Walsh.

13    911 DISPATCHER:  Walsh?

14    MOTHER:  By Walsh.  That's where Galen comes

15  in from.  We're not on - over there -

16    911 DISPATCHER:  No, no, they - he's off of -

17  she's off of East Lincoln.  NFD, do you realize that

18  it's off of East Lincoln?  Spell Galen Ave.

19    MOTHER:  G-A-L-E-N.

20    911 DISPATCHER:  Yup?

21    RESCUE:  872, we're all set with the rescue.

22  It's actually on East Lincoln, not Galen.

23    MOTHER:  Right.

24    911 DISPATCHER:  Okay.  All right?  They

DUNN & GOUDREAU COURT REPORTING SERVICE, INC.

---

11

1  should be there.

2    MOTHER:  Okay, thank you.

3    911 DISPATCHER:  Thank you.  Bye, now.

4

5    CAR 6 FROM NCH

6    DISPATCHER:  Nantucket Police Department,

7  Officer Bartlett speaking.

8    OFFICER:  Where's Jonny Walsh?

9    DISPATCHER:  He's here.  How may I service

10  you?

11    OFFICER:  How may you service me, yeah, right.

12  Is Smitty there?

13    DISPATCHER:  No, he's on a rescue call.

14    OFFICER:  What kind of rescue call?

15    DISPATCHER:  What do you need?  What'd you

16  have to go to the hospital for?

17    OFFICER:  Well, this lady tried - this girl

18  tried to commit suicide, and I have to call in a

19  counselor to - because that's what the parents want.

20  But -

21    DISPATCHER:  Oh, okay.  Oh, the parents are

22  there with her?

23    OFFICER:  Yeah.

24    DISPATCHER:  Oh, okay.

DUNN & GOUDREAU COURT REPORTING SERVICE, INC.

---

12

1    OFFICER:  It's a long story.  It's actually

2  more than that, she wants to take out charges, but

3  she's shit-faced.

4    DISPATCHER:  Who wants to take out charges?

5    OFFICER:  The daughter.

6    DISPATCHER:  Against who?

7    OFFICER:  The mother.

8    DISPATCHER:  For what?

9    OFFICER:  For what?  For an assault that took

10  place a couple of days ago.

11    DISPATCHER:  Oh.

12    OFFICER:  I know, it means nothing.  I talked

13  to both - everyone in the family so far -

14    DISPATCHER:  Oh, okay.

15    OFFICER:  - and it's her -

16    DISPATCHER:  All right.

17    OFFICER:  - it's just her alcoholism.

18    DISPATCHER:  Do you want me - you want me to

19  call - have Smitty - what do you want me to do?  Do

20  you want me to have him stop up there and see you?

21    OFFICER:  Well, it's going to be - yeah, have

22  him stop up here.

23    DISPATCHER:  Okay.

24    OFFICER:  All right, bye.

DUNN & GOUDREAU COURT REPORTING SERVICE, INC.

13

DISPATCHER: All right.

CAR 6 FROM NCH2

OFFICER: Victor 6 (inaudible).

OFFICER: Go ahead.

OFFICER: (inaudible) from NCH and (inaudible).

FIRE DISP

911 DISPATCHER: They hung up.

(Phone being dialed, ringing.)

FIRE DISPATCHER: Nantucket Fire Department, your call is recorded.

911 DISPATCHER: Hey, some guy fell on the ground, in his house, I should say, at 6 Derrymore Road, and he can't get up, he needs help.

FIRE DISPATCHER: Okay.

911 DISPATCHER: He is breathing. However, he is on oxygen.

FIRE DISPATCHER: Okay.

911 DISPATCHER: And the wife is pretty shooken up.

FIRE DISPATCHER: What's his name?

911 DISPATCHER: His name is Roland Kenyan

---

14

(phonetic). All right, here's 911 again, so I'm –

FIRE DISPATCHER: Okay.

911 DISPATCHER: – going to assume that it's going to be him again.

FIRE DISPATCHER: Okay, we'll head out.

911 DISPATCHER: 911, state your emergency.

FIRE DISPATCHER: Okay, oh.

911 DISPATCHER: Okay.

FIRE DISPATCHER: Okay.

911 DISPATCHER: Fire Department?

FIRE DISPATCHER: Yup.

911 DISPATCHER: It's a different call.

FIRE DISPATCHER: Oh. Hold on.

911 DISPATCHER: All right. Where are you calling from? 16 Galen Ave., and –

FIRE DISPATCHER: 16 Galen?

911 DISPATCHER: Yup. And your daughter cut her wrist? Okay. How bad is it? Is it bleeding bad? Do you have pressure put on it, or you're not even around her? Okay.

FIRE DISPATCHER: Okay. How old is this kid?

911 DISPATCHER: I don't know, she's trying to find – how old is your daughter, ma'am? Hello?

FIRE DISPATCHER: We need a second crew.

---

15

Wait, wait, I think this is one we're going to want to go on.

911 DISPATCHER: You're going to pick and choose, huh?

FIRE DISPATCHER: Yes.

911 DISPATCHER: Hey, ma'am? How old is your daughter? Your daughter's twenty. Okay. Is someone – is it bleeding where – is it still bleeding through the bandage that you have wrapped around her?

FIRE DISPATCHER: Man fallen, can't get up.

911 DISPATCHER: All right, put pressure on it.

FIRE DISPATCHER: Where's Galen?

911 DISPATCHER: Where's Galen Ave.?

FIRE DISPATCHER: Yeah.

911 DISPATCHER: What's Galen Ave. off of, ma'am? East Lincoln.

FIRE DISPATCHER: East Lincoln, okay. East Lincoln.

911 DISPATCHER: Okay, I'm –

FIRE DISPATCHER: All right, well, we're going to head to that one and get somebody to help the old guy. Okay?

911 DISPATCHER: Okay.

---

16

FIRE DISPATCHER: All right.

911 DISPATCHER: All right, bye, Liz.

FIRE DISPATCHER: Bye.

NCH 2ND REQ

DISPATCHER: Nantucket Police.

HOSPITAL: Yeah, hi, this is Jill calling from the hospital.

DISPATCHER: Yes, Jill.

HOSPITAL: Do you have somebody coming over to do this one-to-one supervision?

DISPATCHER: Hold on a moment, I'm not sure on that. Hold on.

(Conversation in background):

OFFICER: 403.

DISPATCHER: Would you be interested in a one-on-one detail at the hospital for a psych. patient?

OFFICER: Negative, I worked a double today.

DISPATCHER: Received.

HOSPITAL (voice in background): What'd he say?

HOSPITAL: "I worked a double today."

DISPATCHER: (inaudible) 2:00 to do this detail at the hospital?

17

1  HOSPITAL:  2:00?

2           (Pause.)

3  DISPATCHER:  Jill?

4  HOSPITAL:  Yeah?

5  DISPATCHER:  Nobody has called back yet on it.

6  HOSPITAL:  Yeah, I hear you.

7  DISPATCHER:  You know?

8  HOSPITAL:  All right.

9  DISPATCHER:  If you do need us, please do call

10 us.

11 HOSPITAL:  All right.

12 DISPATCHER:  Okay?

13 HOSPITAL:  Yup.

14 DISPATCHER:  Thanks.

15 HOSPITAL:  Thanks.

16

17         NCH DETAIL

18         (Phone being dialed, ringing.)

19 HOSPITAL:  Emergency room, may I help you?

20 POLICE:  Hi, Susan down at the police

21 department.  I'm actually trying to reach Jill.

22 HOSPITAL:  Oh, okay.

23 POLICE:  Want to just give her a message that

24 we do have somebody that's going to be there at 2:00?

18

1  HOSPITAL:  Okay, great, I'll tell her.

2  POLICE:  Okay, thanks.

3  HOSPITAL:  Bye-bye.

4  POLICE:  Bye-bye.

5

6         NCH REQ

7  POLICE:  Nantucket Police.

8  HOSPITAL:  Hi, it's Elizabeth calling from the

9  hospital.

10 POLICE:  Hi, Elizabeth from the hospital.

11 HOSPITAL:  How are you doing?  Do you guys

12 have somebody that can do a one-on-one tonight?

13 POLICE:  A one-on-one?

14 HOSPITAL:  Yes.

15 POLICE:  Who is it with?

16 HOSPITAL:  A suicidal patient.

17 POLICE:  A suicidal patient.

18 HOSPITAL:  Yes.

19 POLICE:  Okay.  Yeah, we could get somebody up

20 there.

21 HOSPITAL:  You could?

22 POLICE:  Yup.

23 HOSPITAL:  Oh, okay.

24 POLICE:  Are they going to be there for the

19

1  whole night?

2  HOSPITAL:  Yes.

3  POLICE:  Okay.

4  HOSPITAL:  When do you think someone could

5  come?

6  POLICE:  Within the next 8.56 minutes.

7  HOSPITAL:  That would be awesome.

8  POLICE:  Okay, cool.

9  HOSPITAL:  Thanks, bye.

10 POLICE:  All right, bye.

11

12        PD ATTMPT 1

13 POLICE:  Nantucket Police.

14 MICHELLE:  Hi, it's Michelle.

15 POLICE:  Hey, Michelle.  How long are you down

16 there for?  Until 2:00?

17 MICHELLE:  Yes.

18 POLICE:  We have a psych. patient up at the

19 hospital, it's a female, that needs to be on a one-on-

20 one until about 8:00 in the morning.  Would you be

21 interested after 2:00, or . . .

22 MICHELLE:  Umm . . . yeah.

23 POLICE:  Yeah?

24 MICHELLE:  Yeah.

20

1  POLICE:  If we can't find anybody else?

2  MICHELLE:  If you can't find anybody else, but

3  if you can, that would be better.

4  POLICE:  Okay, because we have a call into

5  Loran, somebody's going door-to-door to see if they

6  want it.

7  MICHELLE:  Okay, but, yeah, that'd probably be

8  better, because I'm really tired, so I don't know if

9  I'd be able to make it.

10 POLICE:  Okay.

11 MICHELLE:  But, all right, thanks.

12 POLICE:  Thought I'd ask you anyways.

13 MICHELLE:  Okay.

14 POLICE:  All right.

15 MICHELLE:  Bye.

16 POLICE:  Bye.

17

18        PD ATTMPT2

19 POLICE:  Nantucket Police, Suzy speaking, may

20 I help you?

21 MICHELLE:  Hi, Suzy, it's Michelle again.  I'm

22 definitely not going to be able to do that tonight.  I

23 don't think I'm going to be able to stay up.

24 POLICE:  Okay, I'll let them know.

21

1  MICHELLE:  All right, thank you.

2  POLICE:  Bye.

3  MICHELLE:  Bye..

4

5  PD ATTMPT3

6  (Phone being dialed, ringing.)

7  POLICE:  Book of apologies.

8  POLICE:  Book of apologies, book of apologies.

9  Because it was stolen, you will get the truth in your

10  life, you will know who did (inaudible), and, in

11  turn -

12  UNIDENTIFIED:  Hello?

13  POLICE:  Hello?  Hello?

14  UNIDENTIFIED:  Hey.

15  POLICE:  Hey.  It's the police department.

16  UNIDENTIFIED:  How's it going?

17  POLICE:  Good, how you doing?  You got a hell

18  of a tick going on over there.

19  UNIDENTIFIED:  Yeah.

20  POLICE:  I can hardly hear you.  There is a -

21  the hospital called for a detail, one-on-one, tonight

22  up at the hospital.

23  UNIDENTIFIED:  Yeah.

24  POLICE:  And it's for a girl, not a guy, and

DUNN & GOUDREAU COURT REPORTING SERVICE, INC.

22

1  the girl's just, I don't know, she's asleep, so I

2  don't know if anybody down there wanted it.

3  UNIDENTIFIED:  All right, so do you need a

4  girl?

5  POLICE:  No, we need a guy or a girl, one-on-

6  one.

7  UNIDENTIFIED:  Okay.  What time does it start?

8  POLICE:  From now until 8:00 or maybe 7:30.

9  UNIDENTIFIED:  All right.  I'll try and find

10  people.  Most people are sleeping.

11  POLICE:  Okay.

12  UNIDENTIFIED:  And (inaudible) have to work in

13  the morning, so . . .

14  POLICE:  Okay.

15  UNIDENTIFIED:  I'll try and find someone.

16  POLICE:  All right.  It's detail pay.

17  UNIDENTIFIED:  Okay.

18  POLICE:  Okay, thank you.

19  UNIDENTIFIED:  Bye.

20  POLICE:  Bye.

21

22  PD ATTMPT 4

23  DISPATCHER:  872 to 403.

24  OFFICER:  403.

DUNN & GOUDREAU COURT REPORTING SERVICE, INC.

23

1  DISPATCHER:  Would you be interested in a one-

2  on-one detail at the hospital for a psych. patient?

3  OFFICER:  Negative.  I worked a double today.

4  DISPATCHER:  Received.

5

6  RADIO DISP1

7  911 DISPATCHER:  72 to Victor 5.

8  OFFICER:  Victor 5.

9  911 DISPATCHER:  Can you respond to 6

10  Derrymore Road for a man that has fallen and needs

11  help getting up?  However, he is on oxygen.

12  OFFICER:  (inaudible) en route from

13  (inaudible).

14  911 DISPATCHER:  87 - NFD also is en route,

15  Victor 5.

16  OFFICER:  Very good.

17  911 DISPATCHER:  872 to the downtown bike

18  officer.

19  OFFICER:  Bike 7.

20  911 DISPATCHER:  Bike 7, can you head to 16

21  Galen Ave., which is off of East Lincoln Ave., for a

22  twenty-two-year-old woman that has cut herself and

23  needs assistance?  NFD has been called.

24  OFFICER:  Received.

DUNN & GOUDREAU COURT REPORTING SERVICE, INC.

24

1  RADIO DISP2

2  NFD:  (inaudible), do you have a better number

3  for Galen, or a call-back?  Galen stops at 16 - at

4  number 12.

5  911 DISPATCHER:  I'll tell you what, I'm going

6  to call the number now.

7  UNIDENTIFIED:  (inaudible) 04.

8  911 DISPATCHER:  You do know it's off East

9  Lincoln, correct?  NFD?

10

11  RADIO DISP3

12  911 DISPATCHER:  NFD, do you realize that it's

13  off of East Lincoln?

14  UNIDENTIFIED:  872, we're all set with the

15  rescue.  It's actually on East Lincoln, not Galen.

16

17  RADIO DISP4

18  OFFICER:  Bike 7 to 872.

19  DISPATCHER:  Go ahead, Bike 7.

20  OFFICER:  (inaudible)

21  DISPATCHER:  Received.

22

23  RADIO DISP5

24  OFFICER:  (inaudible) to 872.

DUNN & GOUDREAU COURT REPORTING SERVICE, INC.

25

1    DISPATCHER: 72's on, go ahead.

2    OFFICER: Yeah, John, we're going to need a

3  full-time officer (inaudible) at NCH on the purpose of

4  filing a complaint.

5    DISPATCHER: Received, sir.

6

7    RADIO DISP6

8    OFFICER: Bike 7 to 872.

9    DISPATCHER: 872.

10    OFFICER: I'll be 05.

11    DISPATCHER: Received.

12

13    RADIO DISP7

14    OFFICER: 6, 872.

15    DISPATCHER: Go ahead, 6.

16    OFFICER: I'm going out at NCH.

17    DISPATCHER: Received.

18

19    RADIO DISP8

20    OFFICER: (inaudible) 05.

21    OFFICER: Received.

22    DISPATCHER: Victor 1, could you swing by NCH

23  and speak to 220?

24    OFFICER: (inaudible) 05.

DUNN & GOUDREAU COURT REPORTING SERVICE, INC.

26

1    OFFICER: Received.

2    DISPATCHER: Victor 1, could you swing by NCH

3  and speak to 220?

4    OFFICER: Received.

5

6    SAMPSON CALLS PD

7    DISPATCHER: Nantucket Police.

8    SAMPSON: Suzy, it's Sampson.

9    DISPATCHER: Yes.

10    SAMPSON: Is Sergeant Lardner (phonetic)

11  there, by any chance?

12    DISPATCHER: Yeah, hold on.

13    SERGEANT: Yeah?

14    SAMPSON: Sergeant Lardner.

15    SERGEANT: What?

16    SAMPSON: I just wanted to let you know

17  something.

18    SERGEANT: What?

19    SAMPSON: All right. I'm over here, umm, I

20  haven't - I've been in her room, like, a couple of

21  times, and I've been with the nurses.

22    SERGEANT: Yup.

23    SAMPSON: But - and I haven't been doing

24  anything except for watching her and then talking to

DUNN & GOUDREAU COURT REPORTING SERVICE, INC.

27

1  the nurses, because she was sleeping.

2    SERGEANT: Yup.

3    SAMPSON: Well, now she's claiming that I

4  supposedly lifted up the covers or something, which I

5  didn't, because -

6    SERGEANT: Sampson, will you relax?

7    SAMPSON: What?

8    SERGEANT: Okay? Just relax.

9    SAMPSON: All right.

10    SERGEANT: All right? Don't get all upset

11  about anything, all right? She's a - she's a psych.

12  patient, what do you expect?

13    SAMPSON: Well, I know, but I wanted to let

14  you know before anything else happens.

15    SERGEANT: (laughing). You're with the

16  nurses, just relax, you're covered, all right?

17    SAMPSON: All right. And I guess a supervisor

18  is going to call back in a couple of minutes, they

19  have to call a supervisor.

20    SERGEANT: Okay. For what?

21    SAMPSON: I don't know, I guess they don't

22  know what to do.

23    SERGEANT: They don't know what to do with

24  her? Aren't they going to ship her?

DUNN & GOUDREAU COURT REPORTING SERVICE, INC.

28

1    SAMPSON: I don't know. I mean, I kind of

2  want to get out of here, because -

3    SERGEANT: Okay. Like I said, I told you

4  you'd be there 8:00, so as soon as the day shift -

5    SAMPSON: Yeah.

6    SERGEANT: - gets in, you'll be relieved, so

7  keep your pants on.

8    SAMPSON: All right. All right.

9    SERGEANT: Okay?

10    SAMPSON: So what do I do about this?

11    SERGEANT: What do you do about what? Just

12  stay there.

13    SAMPSON: Okay. But she - apparently she

14  doesn't want me in the room.

15    SERGEANT: Then don't stay in the room, stand

16  outside the room.

17    SAMPSON: Yeah, I am, I'm staying in another

18  room.

19    SERGEANT: Okay.

20    SAMPSON: All right.

21    SERGEANT: All right?

22    SAMPSON: All right, so if anything happens,

23  I'll let you know.

24    SERGEANT: You let me know there, tough guy.

DUNN & GOUDREAU COURT REPORTING SERVICE, INC.

29

1    SAMPSON: All right, thanks.
2    SERGEANT: Okay.
3    SAMPSON: Bye.
4    SERGEANT: Bye.
5
6         SAMPSON CALLS PD2
7    DISPATCHER: Nantucket Police.
8    SAMPSON: Sergeant Lardner there, please?
9    DISPATCHER: Hold on, please.
10   SERGEANT: Sergeant Lardner.
11   SAMPSON: Sergeant Lardner, it's Sampson.
12   SERGEANT: Yup.
13   SAMPSON: (inaudible) I guess I have to ~ I
14   have to fill out a report or something, or someone has
15   to come talk to me.
16   SERGEANT: About what?
17   SAMPSON: About, I guess, the incident, they
18   have to write up a report, so -
19   SERGEANT: Well, you're going to have to wait
20   for the next shift, because I'm on a double.
21   SAMPSON: Yeah, I guess, umm, they said that
22   they might - they might have an attendant watch the
23   person (inaudible) -
24   SERGEANT: Um-hum. Do you need somebody to

DUNN & GOUDREAU COURT REPORTING SERVICE, INC.

30

1    relieve you, or no?
2    SAMPSON: Umm, they're not sure, they're going
3    to ask the person, but I told them, you know, that
4    they might have a female watch the person.
5    SERGEANT: Okay, because we got female
6    (inaudible) specials.
7    SAMPSON: All right, yeah, so that would
8    probably be the best option.
9    SERGEANT: Okay.
10   SAMPSON: For that.
11   SERGEANT: What do you want to do about . . .
12   SAMPSON: I guess I have to wait until 8:00,
13   until the people - until the supervisor comes or
14   something and talks to me.
15   SERGEANT: Yup.
16   SAMPSON: So . . . but I just wanted to let
17   you know I have to do a report, I guess, I don't know.
18   SERGEANT: A report on what?
19   SAMPSON: The incident.
20   SERGEANT: What -
21   SAMPSON: They said they have to take it
22   seriously.
23   SERGEANT: And what's that? That you did
24   what?

DUNN & GOUDREAU COURT REPORTING SERVICE, INC.

31

1    SAMPSON: I don't know, I guess I -
2    SERGEANT: If you were sitting with the nurses
3    the whole time, why is there a problem?
4    SAMPSON: I don't know, that's what they said.
5    SERGEANT: You know what I mean? If there's
6    a -
7    SAMPSON: Yeah.
8    SERGEANT: If you're sitting in the nurses -
9    with the nurses the whole time, why is there a
10   problem?
11   SAMPSON: I don't know, I mean, the door was
12   open, I mean, everyone was looking in. You know? I
13   mean, the door wasn't closed at all. I mean, there
14   were nurses all over the place coming in from the 7:00
15   shift.
16   SERGEANT: Yeah.
17   SAMPSON: So, I mean, I, you know, I was told
18   just check up on her, and I was with the nurses the
19   majority of the time.
20   SERGEANT: Yeah.
21   SAMPSON: Talking to them.
22   SERGEANT: And so what is she saying?
23   SAMPSON: The girl?
24   SERGEANT: Yeah.

DUNN & GOUDREAU COURT REPORTING SERVICE, INC.

32

1    SAMPSON: I guess the nurse told me that she
2    said that I lifted up the covers.
3    SERGEANT: Did you?
4    SAMPSON: No, I didn't.
5    SERGEANT: Okay.
6    SAMPSON: I'd never, ever do that.
7    SERGEANT (in background): You need to sign
8    that complaint (inaudible)?
9    MALE: Yeah.
10   SERGEANT: Okay. Yeah.
11   SAMPSON: So -
12   SERGEANT: And why aren't the nurses that were
13   there, why aren't they going to - why aren't they
14   saying anything, that you were with them the whole
15   time?
16   SAMPSON: They are, they're backing me up.
17   SERGEANT: Yeah.
18   SAMPSON: They're backing me up, but I guess
19   the supervisor says we have - the report has to be
20   written about it, about the - an incident report.
21   SERGEANT: All right. Where are you at -
22   where are you at the hospital?
23   SAMPSON: I'm in - it's like a waiting room.
24   SERGEANT: Yup.

DUNN & GOUDREAU COURT REPORTING SERVICE, INC.

33

1    SAMPSON:  Off to the side.

2    SERGEANT:  Where are you, second floor, first

3  floor, emergency room?

4    SAMPSON:  Second, second floor.

5    SERGEANT:  Second floor?

6    SAMPSON:  Yup.

7    SERGEANT:  All right.  Goodbye.

8    SAMPSON:  All right, bye.

9

10      * * * end of recording * * *

11

12

13

14

15

16

17

18

19

20

21

22

23

24

DUNN & GOUDREAU COURT REPORTING SERVICE, INC.

---

34

C E R T I F I C A T E

This is to certify the foregoing is a true and
accurate transcript, to the best of my skill and
ability, of the police radio transmissions regarding
Varallo.

_____          _____
Lisa M. Cimmino                   Date
Notary Public

DUNN & GOUDREAU COURT REPORTING SERVICE, INC.

**1**

UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF MASSACHUSETTS

05-11547-RWZ

. . . . . . . . . . . . . . . . . . . . . . . . . . . . .
LAUREN VARALLO,                    :
              Plaintiff,           :
                                   :
V                                  :
                                   :
TOWN OF NANTUCKET - POLICE         :
DEPARTMENT and JAMES SAMSON,       :
              Defendant.           :
. . . . . . . . . . . . . . . . . . . . . . . . . . . . .

Deposition of JAMES A. SAMSON, taken

on behalf of the Plaintiff, pursuant to Notice

under the Federal Rules of Civil Procedure,

before Janice A. Maggioli, RPR, RMR, CRR, and

Notary Public in and for the Commonwealth of

Massachusetts, at the offices of Meehan, Boyle,

Black & Bogdanow, Two Center Plaza, Boston,

Massachusetts, on January 25, 2007, commencing

at 10:25 a.m.

MAGGIOLI REPORTING SERVICES, INC.
48 Watson Street
Braintree, Massachusetts 02184
(781) 356-2636

---

**2**

1   APPEARANCES:

2   Merrick, Louison & Costello, LLP
      [By Robert Stewart, Esq.]
3   67 Batterymarch Street
    Boston, Massachusetts 02110
4        On behalf of the Town of Nantucket - Police
         Department
5
    Meehan, Boyle, Black & Bogdanow
6   [By Leo V. Boyle, Esq.]
    Two Center Plaza
7   Boston, Massachusetts 02108
         On behalf of the Plaintiff.
8
    Of Counsel
9   Shocket & Dockser, LLP
    [By Philip Slotnick, Esq.]
10  P.O. Box 2219
    Natick, Massachusetts 01760
11       On behalf of James A. Samson.

---

**3**

I N D E X

Witness        Direct Cross Redirect Recross

James A. Samson

By Mr. Boyle       5
By Mr. Stewart        77

EXHIBITS

Id    Description                      Page

1     Handwritten Diagram               45

2     Incident Report                   57

**EXHIBIT 11**

---

**4**

STIPULATION

It is agreed by and between counsel
for the respective parties that the reading
and signing of the deposition will not be
waived. All objections, except as to the form
of the question, and motions to strike will be
reserved until the time of trial.

MR. BOYLE: Stipulations: Shall
we have the transcript signed under the pains
and penalties of perjury?

MR. SLOTNICK: Waive Notary?

MR. BOYLE: We'll waive the
notarization. Okay. We'll get you a copy of
the transcript and the original signature page,
and then there will be a 30-day period for the
signature; is that acceptable?

MR. SLOTNICK: Fine.

MR. BOYLE: And if we don't get
it back within the 30 days, the transcript can
be treated in all respects as though signed.

MR. SLOTNICK: Agreed.

MR. BOYLE: And shall we waive
the reading -- I'm sorry, all objections, except
as to the form of the question, and all motions

VARALLO V SAMSON, ET AL

JAMES A. SAMSON

**13**

1  A.  Yes, sir.
2  Q.  And that if you lied in the course of testimony
3       either then to Judge Quinlan or today in this
4       proceeding, that would be a felony; you
5       understand that?
6  A.  Yes, sir.
7  Q.  And, of course, from your training you
8       understand that a person with a background in
9       criminal justice should tell the truth under
10      oath, correct?
11 A.  Yes, sir.
12 Q.  And did you do so when you testified to Judge
13      Quinlan?
14 A.  In terms of?
15 Q.  Well, she asked you a bunch of questions,
16      correct?
17 A.  That's correct.
18 Q.  After the court officer or the clerk swore you
19      in, correct?
20 A.  Yes, sir.
21 Q.  And you answered those questions, correct?
22 A.  Yes, sir.
23 Q.  And you gave truthful answers; did you not?
24 A.  Under advice from counsel.

**14**

1        MR. SLOTNICK:  Could we have a
2   minute, please?
3        MR. BOYLE:  Sure.
4        MR. SLOTNICK:  I would like the
5   advice of counsel stricken because I don't want
6   to get into attorney-client issues here.  I want
7   to hold the attorney-client line both with
8   regard to me and with regard to criminal
9   counsel, I'll just say it for the record.  We
10  can go back.
11 Q.  Let me rephrase the question, then.  You
12      remember Judge Quinlan; do you not?
13 A.  Partially, yes.
14 Q.  And she asked you a number of questions about
15      what happened the night of July 22, 2002,
16      correct?
17 A.  Correct.
18 Q.  And she first asked you a bunch of questions
19      whether or not you were on medications, whether
20      you understood what the questions were, correct?
21 A.  Correct.
22 Q.  And you answered in the affirmative right down
23      the line; did you not?
24 A.  Yes, I did.

**15**

1  Q.  And then she asked you questions about the night
2       that the trial was going to be about, correct?
3  A.  Yes.
4  Q.  And you admitted to certain facts; did you not?
5  A.  I did.
6  Q.  Now, when you were there under oath under the
7       pains and penalties of perjury answering Judge
8       Quinlan's questions, did you do so truthfuly?
9  A.  No, I did not.
10 Q.  So you committed perjury?
11 A.  Counsel --
12        MR. SLOTNICK:  Once agair, I
13  would like the questions fully answered, but I
14  don't want what any lawyer who was representing
15  Samson said to him.  That's not the question
16  that's out.  I would like it to be out.
17 Q.  Well, Judge Quinlan asked you, among -- now, she
18      asked you, you'll recall, whether or not you
19      were at the time of this plea under the
20      influence of any drugs, alcohol or medication,
21      and you said no, you weren't, correct?
22 A.  That's correct.
23 Q.  Did you tell her the truth when you said that?
24 A.  Yes, I did.

**16**

1  Q.  She asked you:  "Have you taken any medication
2       in the last 24 hours?"
3        You said, "No, ma'am."
4        Was that the truth?
5  A.  That's correct.
6  Q.  She asked you whether you had been told the
7       elements of the crime of indecent assault and
8       battery of a person over the age of 14, and you
9       said yes, you had been told the elements of the
10      offense.  Was that true?
11 A.  Yes, it was.
12 Q.  She asked you if you had been told what the
13      maximum penalty was.  You said, "Yes, ma'am."
14      Was that answer to Judge Quinlan which you gave
15      under oath true?
16 A.  I don't remember what the answer was, if you
17      could refresh my memory.
18 Q.  Well, she -- in the colloquy she asked you:
19      "Have you been told what the maximum penalty
20      is?"
21        You said, "Yes."
22        Was that truthful when you gave
23      it?
24 A.  Could you remind me what the maximum penalty is

VARALLO V SAMSON, ET AL      JAMES A. SAMSON

**17**

1  right now?
2 **Q.** I believe I can. For indecent assault and
3  battery, ten years.
4 **A.** That's correct.
5 **Q.** So you gave a truthful answer to her when she
6  asked you that, correct?
7 **A.** Yes, sir.
8 **Q.** She then asked the assistant district attorney
9  to outline the evidence that would be presented
10  against you. You remember that; do you not?
11 **A.** Yes.
12 **Q.** And Ms. Marchard, who was the assistant
13  attorney -- assistant district attorney said
14  that -- said, quote, "Judge, if this case went
15  to trial, the Commonwealth would show that on
16  July 22nd, 2002, the Defendant while employed as
17  a summer reserve police officer for the
18  Nantucket Police Department was assigned to a
19  detail at the Nantucket Cottage Hospital. His
20  assignment was to watch a patient, Lauren
21  Varallo, for the night. According to Miss
22  Varallo, the Defendant approached her while she
23  was in the bed, lifted her bed covers and
24  clothing and touched her genital area without

**18**

1  her permission or consent," end quote.
2   Now, that's essentially what Miss
3  Marchard told the court that the Commonwealth
4  was prepared to prove; is it not?
5 **A.** That's correct.
6 **Q.** And the court then asked you: "You understand,
7  Mr. Samson, that by pleading guilty, you admit
8  those facts to be true?"
9   And you answered: "Yes, ma'am."
10   Was that an honest answer?
11 **A.** I plead The Fifth.
12 **Q.** On whose advice do you plead The Fifth?
13 **A.** On my own advice.
14 **Q.** You have already been found guilty on your plea,
15  sentenced, and you served your sentence for that
16  crime. What are you pleading The Fifth over?
17 **A.** Self-incrimination. That's what pleading The
18  Fifth is.
19 **Q.** I respectfully disagree. You've got to answer
20  these questions. Did you lie to Judge Quinlan
21  under oath, yes or no?
22 **A.** Could I have a minute with Philip Slotnick,
23  please?
24   MR. SLOTNICK: I feel

**19**

1  uncomfortable about, you know -- I think if you
2  want to go out and think about this. I don't
3  think that I should be involved in discussing
4  this question or answer with my client. I just
5  don't feel comfortable with that, but if you
6  want some time to think about it, step outside
7  and think about it. I would ask that you give
8  him time to think about it.
9   MR. BOYLE: That's why we took
10  the break first thing in the morning, so people
11  could think about what they were going to say
12  under oath today.
13 **Q.** Did you commit the crime you pleaded to, sir?
14 **A.** No, I did not.
15 **Q.** So you lied to Judge Quinlan under oath?
16 **A.** What I did was I chose a life, that I could have
17  a life. I have a life right now. I'm currently
18  employed. I work for a great company. I am
19  engaged to my fiancee. The path of life that I
20  chose was a great path. I don't have any
21  holding back.
22 **Q.** Well, let's get back to my question. Judge
23  Quinlan in the next question says to you: "Do
24  you agree with the facts as stated by the

**20**

1  district attorney?"
2   Your answer is: "Yes, ma'am."
3   Next question by Judge Quinlan:
4  "Are there any you disagree with?"
5   Answer: "No, sir. No, ma'am."
6   Next question: "Are you pleading
7  guilty willingly, freely and voluntarily?"
8   Answer: "Yes, ma'am."
9   Were those all lies?
10 **A.** I pled guilty so that I could live my life in
11  the world, not possibly in a jail cell.
12   MR. BOYLE: I'm going to move to
13  strike that answer as nonresponsive.
14 **Q.** The question before you now is, when you
15  answered those questions to Judge Quinlan, did
16  you lie?
17   (Pause).
18 **A.** Yes, I did.
19 **Q.** Isn't the fact of the matter, sir, that you
20  touched Lauren Varallo inappropriately and
21  without her consent on the evening of July 22,
22  2002? Isn't that a fact?
23 **A.** No, sir.
24 **Q.** Judge Quinlan goes on to ask you: "Has anyone

VARALLO V SAMSON, ET AL             JAMES A. SAMSON

**21**

1    forced you to plead guilty?"
2           And you answered: "No, ma'am."
3           Was that true?
4   A.   Yes, that was true.
5   Q.   Question: "And have any threats or promises
6      been made to get you to plead guilty," asks
7      Judge Quinlan?
8           And you say: "No, ma'am."
9           Was that true?
10   A.   That was true.
11   Q.   She then asked you: "Now, have you been
12      represented by Mr. Tracy?"
13           You answer: "Yes, ma'am."
14           Was that true?
15   A.   Yes, sir.
16   Q.   She then asked you: "Do you feel he's
17      represented you competently and fairly, acted in
18      your best interests?"
19           You say: "Yes, ma'am."
20           Was that true?
21   A.   Yes.
22   Q.   She then asks you: "Are you confused in any way
23      by the plea or by any of the consequences of the
24      plea?"

**22**

1           You answered: "No, ma'am."
2           Was that true?
3   A.   Yes.
4   Q.   So on that occasion you lied under oath to
5      further your best interests in what you have
6      described as having a life that you have?
7   A.   Yes, sir.
8   Q.   So you are willing -- you are willing to lie
9      under oath to protect your own best interests in
10      fairness to you, correct?
11   A.   I did not tell the truth because the odds were
12      against me, unfortunately.
13   Q.   And you would agree, would you not, that if we
14      can't trust your oath before the court, before a
15      justice of the superior court, we can't trust
16      your oath here today, can we?
17   A.   You have the oath in the report from many
18      people.
19   Q.   Well, the person I'm interested in right now is
20      you.
21   A.   Uh-huh.
22   Q.   You're under oath today. Would you agree with
23      me that you're willing to lie under oath to
24      protect your own self-interests on the right

**23**

1    occasions?
2   A.   What would you do, sir?
3   Q.   I'm just asking you.
4   A.   I understand. If your life was backed up
5      against a wall, what would you do? Would you
6      face life in prison or would you say, okay, I
7      have a life with my fiancee. I'm going to get
8      engaged. I love my fiancee. I would like to
9      rent an apartment. I would like to have a job.
10      What would you do?
11           I think in all fairness, that's
12      what everyone would do, and in studying criminal
13      justice for the amount of years that I have,
14      there are many, many people who, unfortunately,
15      in life do this.
16           It's not what I wanted. How do
17      you think I felt going before the judge and
18      doing that? Yes, it hurt, but, fortunately, I
19      have a life here. I am sitting before you and
20      not in a jail cell. So for me personally, yes,
21      I looked out for my best interest.
22           MR. BOYLE: I'm going to move to
23      strike the answer as nonresponsive, and I'm
24      going to try to get back to my question.

**24**

1   Q.   Isn't it a fact that under oath you would lie to
2      protect your own self-interest; is that true?
3   A.   I would never have to do that ever again.
4   Q.   Well, you are under oath today, aren't you?
5   A.   That's correct.
6   Q.   You are being sued for money damages, correct?
7   A.   Which I have none, correct.
8           MR. BOYLE: I'm going to move to
9      strike that as unresponsive.
10   Q.   You are being sued for money damages, correct?
11   A.   That's correct.
12   Q.   And it's in your own self-interest to lie to me
13      here today, isn't it?
14   A.   I do not lie to you, sir.
15   Q.   You lied to Judge Quinlan, didn't you? Didn't
16      you?
17   A.   I could have. Yes, I did.
18   Q.   Now, let's -- first of all, have you ever
19      reported to -- well, you were on probation for
20      this crime; were you not?
21   A.   Yes, sir.
22   Q.   And how long were you on probation?
23   A.   Three years, one year supervised.
24   Q.   And what did your probation consist of?

VARALLO V SAMSON, ET AL                                    JAMES A. SAMSON

---

**25**

1  A. Monthly fees every month for $65, a victim
2      witness fee for $75.
3  Q. Per month?
4  A. No, just one, $75. I provided a DNA sample for
5      the Massachusetts State Police, along with a fee
6      of $110, and attended sex offender counseling,
7      and registered as a sex offender with the Sex
8      Offender Registry Board.
9  Q. And does that registration expire at any point?
10 A. Currently after ten years you can appeal the
11     Registry for being registered.
12 Q. Now, when you applied for the two jobs that you
13     have referenced that you've had since getting
14     your degrees, did you reveal the criminal --
15     your criminal record?
16 A. When I worked for Walgreen's, it was not the --
17     it was not part of it. It did not come against
18     a background check.
19 Q. Well, when you applied for Walgreen's, did they
20     ask you whether or not you had a criminal
21     record?
22 A. Yes, they did.
23 Q. At the time did you?
24 A. No, I did not.

---

**26**

1  Q. Because the case was still proceeding?
2  A. That's correct.
3  Q. At the time you applied for the Dollar Tree
4      Stores --
5  A. Yes, sir.
6  Q. -- did they ask you if you had a criminal
7      record?
8  A. No, sir.
9  Q. No question at all in the application process
10     whether or not you had a criminal record?
11 A. No, sir.
12 Q. Do they know you have a criminal record?
13 A. No, sir.
14 Q. Do you know if they did a background check on
15     you?
16 A. No, they did not.
17 Q. Now, do you plan to try to get into criminal
18     justice work at any time in the future?
19 A. No, sir.
20 Q. You are going to stay in corporate work?
21 A. Yes, sir.
22 Q. July 22nd of 2002, how did it come to your
23     attention that the hospital was looking for
24     someone to guard Lauren Varallo?

---

**27**

1  A. I was on foot patrol working from 7 p.m. until 3
2      a.m., and there was a radio call asking the
3      dispatcher -- the dispatcher asked four
4      different summer specials if they would like a
5      detail, two of them were female, two of them
6      were male. All of them declined. I volunteered
7      in dispatch and was assigned the detail.
8  Q. Which dispatcher called for specials?
9  A. I'm not sure at the time.
10 Q. Who were the four -- how do you happen to
11     remember there were two female and two male?
12     Were they looking for a female specifically?
13 A. No, they were looking for anybody in general.
14 Q. And which two females and which two males
15     declined?
16 A. I don't remember at the time.
17 Q. Can you name any of them?
18 A. I don't remember. It was so long ago.
19 Q. How did you hear about it? By radio?
20 A. Yes, sir.
21 Q. And you carried a handheld radio on your patrol
22     that evening?
23 A. Yes, sir.
24 Q. Did you carry a weapon?

---

**28**

1  A. No, sir.
2  Q. Did you carry mace?
3  A. Yes, sir.
4  Q. Did you carry any other weapon of any kind,
5      besides the mace?
6  A. A duty baton.
7  Q. How do you know that there were two females and
8      two males who were asked to do this assignment?
9  A. I just remember there was two females and two
10     males.
11 Q. Did the dispatcher tell you that?
12 A. It went over the radio.
13 Q. What went over the radio?
14 A. The dispatcher asked two females over the radio.
15     They are called by number, and they all
16     declined.
17 Q. Could you hear their voices declining? Are you
18     on the same radio wavelength?
19 A. Yes, sir.
20 Q. But you don't know who they were?
21 A. No, sir.
22 Q. You were on from 7 p.m. to 3 a.m.?
23 A. That's correct.
24 Q. But you cut that shift short, did you, to go to

---

VARALLO V SAMSON, ET AL                                    JAMES A. SAMSON

**29**

1   this assignment?
2   A.  Yes, sir.
3   Q.  And what did you understand your responsibility
4       was that night?
5   A.  To watch a female patient who had tried to
6       commit suicide.
7   Q.  And who told you that?
8   A.  The nurses when I went to the hospital, and the
9       dispatcher had informed me partially.
10  Q.  So was this a so-called protective custody?
11  A.  Yes, sir.
12  Q.  And you understand what a protective custody is?
13  A.  Yes, sir.
14  Q.  Is protective custody something that you studied
15      at Anna Maria?
16  A.  Yes, sir.
17  Q.  And it's laid out by a statute, correct?
18  A.  That's correct.
19  Q.  And had you read and studied that statute?
20  A.  Yes.
21  Q.  So when you were asked to handle this
22      assignment, you had familiarity with that
23      particular assignment, that is to say,
24      protective custody?

**30**

1   A.  Yes, sir.
2   Q.  And had you done -- and are they called PCs, as
3       well?
4   A.  Short abbreviation, yes.
5   Q.  And had you done PCs with other individuals for
6       the Nantucket Police Department?
7   A.  Yes, I did.
8   Q.  Had you ever done other PCs outside the police
9       station?
10  A.  Yes.
11  Q.  Whereabouts?
12  A.  At the Nantucket Cottage Hospital.
13  Q.  How many PCs had you -- how many other PCs,
14      besides Lauren Varallo, had you done at the
15      Nantucket Cottage Hospital before this?
16  A.  One.
17  Q.  And can you describe for me the circumstances of
18      that?
19  A.  The patient?
20  Q.  Yes, and the assignment.
21  A.  The patient was a male.  He was older,
22      approximately late 40's, early 50's.  He was
23      well-known by the police department, someone who
24      was violent, and I know the incident.  He tried

**31**

1       to hurt himself that day, and that was -- it
2       occurred the previous year in 2001.
3   Q.  And that individual you held in protective
4       custody at the hospital in his bed, just as you
5       did Lauren Varallo the night of July 22, 2002?
6   A.  That's correct.
7   Q.  And there are certain formalities to a
8       protective custody; are there not?
9   A.  Yes, sir.
10  Q.  And one of the basic principles of a protective
11      custody is that the freedom of the person in
12      custody is, in fact, restrained, correct?
13  A.  That's correct.
14  Q.  And Lauren Varallo was in that situation the
15      night of July the 22nd, 2002, correct?  Her
16      freedom was restrained?
17  A.  Yes.
18  Q.  And part of your job was to make sure that she
19      didn't get up and leave, correct?
20  A.  Yes.
21  Q.  And to make sure she didn't do anything further
22      to hurt herself, correct?
23  A.  That's correct.
24  Q.  And you understood that she was a suicide risk,

**32**

1       correct?
2   A.  Correct.
3   Q.  And protective custody by its very term means
4       that you were there to protect her, correct?
5   A.  Correct.
6   Q.  From any further harm to herself, correct?
7   A.  Correct.
8   Q.  Whether self-inflicted or otherwise, correct?
9   A.  Correct.
10  Q.  You were her custodian, so to speak, correct?
11  A.  Correct.
12  Q.  And did the hospital have any policies or
13      procedures for these protective custodies that
14      were done at the hospital?
15  A.  Could you go into detail about that?
16  Q.  Sure.  Were there policies or procedures which
17      the hospital set down for protective custodies
18      at the hospital?
19  A.  In regards to what exactly?
20  Q.  Well, what you're supposed to do.
21  A.  The nurse advises me of the situation when the
22      officer arrives on scene.  The officer asks, is
23      there anything that the officer needs to know
24      about?  And the main duty, which was understood

**33**

1 from the police department, was to watch the
2 patient until further notice or until someone
3 relieves the officer.
4 **Q.** And you understood that you, as opposed to
5 somebody on the nursing staff, was principally
6 responsible for watching her that night, Lauren
7 Varallo, that is?
8 **A.** The nurses had come in every five or ten minutes
9 to check in with her, but I was there as a
10 guardian to make sure that she did not hurt
11 herself further or hurt others.
12 **Q.** But other than those intermittent times when the
13 nurses came in, the person principally
14 responsible for watching Lauren Varallo was
15 yourself, correct?
16 **A.** It was a share between me and the nurses.
17 **Q.** But most of the time the nurses weren't there,
18 correct?
19 **A.** Oh, the nurses were there.
20 **Q.** I understand they were in the hospital, but the
21 nurses didn't physically have their eyes on
22 Lauren Varallo all the time, did they?
23 **A.** Every five minutes they did, yes.
24 **Q.** That wasn't my question, was it?

**34**

1 **A.** If it wasn't, could you repeat it?
2 **Q.** Sure. Your job was to watch Lauren Varallo 100
3 percent of the time, correct?
4 **A.** That's correct.
5 **Q.** And there was no nurse watching Lauren Varallo
6 100 percent of the time, was there?
7 **A.** There was no nurse physically in the room 100
8 percent all the time, that is correct.
9 **Q.** So my statement is correct, okay. Now, you
10 understand in a suicide risk you obviously
11 simply can't leave the patient, correct?
12 **A.** That's correct, but I did.
13 **Q.** We'll get to what actually happened that night,
14 but I want to first see if you understand what
15 the protocol is.
16 **A.** Okay.
17 **Q.** The protocol is that if you are on a suicide
18 watch, that patient can never be left unwatched;
19 isn't that the protocol?
20 **A.** I'm not sure. I never got training in that.
21 **Q.** Well, you certainly understood that the patient
22 could never be left alone, correct?
23 **A.** It was never told to me that I had to stay with
24 the patient 100 percent.

**35**

1 **Q.** But you knew you did, didn't you?
2 **A.** No, I didn't.
3 **Q.** You think you could come and go as the evening
4 went by?
5 **A.** The nurse advised me that she was under
6 medications, and that she would be sleeping, and
7 there was no specific direction that I had to
8 stay with the patient 100 percent of the time.
9 **Q.** Isn't it a fact that when you have someone in
10 protective custody, they have to be watched 100
11 percent of the time? Isn't that police
12 protocol?
13 **A.** I mean, I never got the training for that,
14 though. I don't know.
15 **Q.** So your answer is you don't know?
16 **A.** If you have someone in handcuffs, yes, you are
17 to watch them 100 percent. If they are not
18 handcuffed, which Ms. Varallo wasn't, there was
19 no specific directive that I needed to stay with
20 her 100 percent.
21 **Q.** Well, didn't you understand that your assignment
22 was to make sure she didn't harm herself or
23 others?
24 **A.** Yes, that's correct.

**36**

1 **Q.** Wasn't it your assumption that you were supposed
2 to be in there all the time?
3 **A.** There was no directive. Like I said, there was
4 no directive. I did not assume anything.
5 **Q.** What did you think your job was?
6 **A.** My job was to watch her for the night.
7 **Q.** When you felt like it?
8 **A.** No, my job was to watch her. I asked -- well,
9 you want to go into it later, but I want to go
10 into it now.
11 **Q.** Well, I just -- I want to see -- before we get
12 to how you did your job, I want to just
13 understand your view of what your job was that
14 night, and the question may be answered, but
15 I'll ask it this last time: Did you realize
16 that if you're conducting a suicide watch, that
17 someone has to be watching the patient 100
18 percent of the time?
19 **A.** I was not aware of that. The police department
20 did not specifically tell me that I had to be
21 there 100 percent of the time.
22 **Q.** You knew this was a protective custody?
23 **A.** Yes, I did. She was not in handcuffs.
24 **Q.** What happened that night? Tell me your memory

VARALLO V SAMSON, ET AL

**37**

1    of what happened that night, please.
2  A.  I heard over the radio they were looking for a
3    police officer to watch a female patient who had
4    previously committed suicide (sic). After four
5    officers declined, I went to dispatch and asked
6    if I could do it, the reason being is because
7    I -- my family, my father and my brother, and I,
8    was meeting my girlfriend, now fiancee, at the
9    time over in Hyannis the next day.
10       So, initially I was taking the
11    detail to have some extra money. I have -- I
12    did one detail before at the hospital, and I
13    performed many other details over the course of
14    the two summers.
15       I arrived at the hospital via my
16    friend's car. He had dropped me off at the
17    hospital because I left my car back at the
18    barracks, at the Coast Guard barracks, and I
19    arrived at the hospital, spoke with the nurses.
20       The first nurse I had remembered
21    from the previous year. We talked for a little
22    bit. She asked me how my summer was going. We
23    recognized one another from the previous year.
24    She asked me a couple of questions, Do I like

**38**

1    coming back? Was it a good year? So on and so
2    forth.
3       I asked her about the patient.
4    She told me she was -- she tried to commit
5    suicide. She was currently under heavy
6    medications, and she was about ready to go to
7    sleep.
8       So I went into the ICU room. The
9    room was a glass room. It was the second room.
10    There was the first room. Then there was the
11    second room. There was a hallway where the
12    nurses could look in directly (Indicating). My
13    chair was directly inside the room to the right,
14    right next to the door.
15       There were two nurses in the room
16    at the time when I first arrived. She was awake
17    at the time. Her eyes were extremely glassy.
18    She could not talk, slurred speech. She wanted
19    to talk with me for a little bit, say how are
20    you doing? You must be in a bad situation
21    coming over here and watching me, you know, the
22    person who tried to kill herself, and I didn't
23    really say much, and she was watching TV. The
24    nurse brought her some water, and the nurse made

**39**

1    sure she was okay, and then they both had walked
2    out.
3       At the time the nurses would come
4    in every five minutes. I was sitting in the
5    chair comfortably. We talked about -- she asked
6    me about the television station MTV, asked me
7    about a TV program that was on, and she said
8    that if I wanted to change the channel, I could
9    later on, and then throughout the course of the
10    night I had gotten up twice, left the room, go
11    to the bathroom, was gone for approximately 10
12    or 15 minutes.
13  Q.  Each time?
14  A.  That's correct. I got up a couple other times
15    to get some food throughout the course, and at
16    one point I had fallen asleep for half an hour
17    in the chair. The nurse had come in and woken
18    me up. Approximately between 6:30 and 7 I had
19    gotten up, gotten some coffee. I was gone for
20    about 10, 15 minutes.
21       I had come back. I took the
22    coffee -- the old coffee cups and emptied them
23    out into the water bubbler that was in the
24    hallway area right next to the room, and I

**40**

1    had -- was getting -- I was emptying them out,
2    and Lauren had come out, and that's when I
3    told the nurses her side of the story.
4  Q.  Now, did you review any documents to refresh
5    your memory of the events that night before you
6    came in here today?
7  A.  No, I did not.
8  Q.  Have you read your report at any time?
9  A.  Which report is that?
10  Q.  The one that you made of this event after the
11    event.
12  A.  Before today?
13  Q.  Right.
14  A.  No, I did not.
15  Q.  When is the last time you read that report?
16    Back when you wrote it?
17  A.  It was the summer that it happened. Yes, that's
18    correct.
19  Q.  So, if I understand it, there were two occasions
20    of 10 or 15 minutes each that you went out to
21    the bathroom; is that correct?
22  A.  Give or take, yes.
23  Q.  There were a couple of other times you went out
24    to get food, correct?

**VARALLO V SAMSON, ET AL**

**JAMES A. SAMSON**

---

**41**

1  A.  That's correct.
2  Q.  And I assume that those times would be longer
3      than the bathroom; is that fair to say?
4  A.  Yes, that's correct.
5  Q.  So, on the order of 20 or 30 minutes each?
6  A.  I can't remember. I brought a sandwich with me.
7      I believe I brought a sandwich with me then and
8      some other food, but I'm not positive.
9  Q.  So when you say you went out to get food, what
10     does that mean?
11 A.  The food was with me. I had to heat it up in
12     the microwave.
13 Q.  And you did that on two separate occasions. You
14     went out to eat?
15 A.  Yes, sir.
16 Q.  And something in excess of 10 or 15 minutes for
17     each time?
18 A.  Yes. Like I said, give or take. It --
19 Q.  Would 20 minutes each time be a fair estimate?
20 A.  Sure.
21 Q.  Then at one point you were found asleep in the
22     chair; is that right?
23 A.  Yes, sir.
24 Q.  And approximately when was that in the course of

---

**42**

1      the evening?
2  A.  Right now, I don't remember. I don't remember
3      the exact time.
4  Q.  Was it the middle of the night? Was it dawn?
5      Can you peg it down at all?
6  A.  I can't. I really don't remember.
7  Q.  Do you know how long you were asleep when the
8      nurse woke you up?
9  A.  Approximately about half an hour or so.
10 Q.  And at 6:30 or 7 you went out to get some
11     coffee, and, again, on that occasion you were
12     gone for 10 or 15 minutes, correct?
13 A.  That's correct.
14 Q.  And, as I understand it, in order to go from
15     where Lauren Varallo's room was to get the
16     coffee you have to walk right by the nurses'
17     station; is that correct?
18 A.  Yes, that's correct.
19 Q.  And you would, of course, exchange greetings of
20     some kind with them as you passed, correct?
21 A.  Yes, sir.
22 Q.  And at 6:30 or 7 o'clock that morning, you would
23     have done the same, correct?
24 A.  Yes, sir.

---

**43**

1  Q.  And to get the coffee, you keep walking down the
2      hall. You turn a corner, correct?
3  A.  I can't remember. I haven't been there since
4      2002.
5  Q.  Is it on the same floor that you get the coffee?
6  A.  Yes, sir, I believe. I'm just guessing.
7  Q.  It's a coffee machine?
8  A.  I'm guessing. I don't remember.
9  Q.  And also to go to the bathroom, you have to walk
10     by the nurses' station, correct?
11 A.  Yes.
12 Q.  So you walked by the nurses' station twice to go
13     to the bathroom. To get your food to I guess
14     heat it up, you had to walk by the nurses
15     station, correct?
16 A.  Yes.
17 Q.  And you heat your food up in the same place that
18     you get your coffee, correct?
19 A.  Yes, that's correct.
20 Q.  Does that jog your memory?
21 A.  Yes. Now it's coming back, yes.
22 Q.  So is it on the same floor, do you now remember?
23 A.  Yes. It's in a small room with a refrigerator,
24     and then there's the coffee machine, and like

---

**44**

1      utensils, a break room, more or less.
2  Q.  And so when you -- on all of these occasions,
3      the two times to the bathroom, the two times to
4      get food, getting coffee at 6:30, 7 in the
5      morning, all of those trips brought you right by
6      the nurses' station; is that correct?
7  A.  That's correct.
8  Q.  And there was always a nurse there, correct?
9  A.  Correct.
10 Q.  And they could see when you went to do these
11     various tasks, and they could see when you
12     returned from the tasks, correct?
13 A.  Correct.
14 Q.  And if you were coming from the lunch or coffee
15     room to the nurses' station, you would be coming
16     from -- as the nurses sit at the nurses'
17     station, you would be coming from the nurses'
18     station; am I correct about that?
19 A.  The coffee room was on the right-hand side.
20     When you come off the elevator, you have to pass
21     the nurses station to go into where Lauren
22     Varallo's room was.
23 Q.  I'm going to take a minute and ask you if you
24     wouldn't mind drawing a diagram of the corridor.

---

VARALLO V SAMSON, ET AL                                    JAMES A. SAMSON

45

1   and showing the nurses' station, Lauren's room,
2   and then the coffee/microwave room where you
3   took these various trips, and if you remember
4   it, where the men's room is, as well.
5   A.  Okay. I'll do that to the best my knowledge.
6   Q.  Sure.
7         (Pause).
8   Q.  And would you underneath please put your
9   signature and today's date, January 25?
10        MR. SLOTNICK: I just want to
11  look at it. Sign it.
12  A.  (Witness complies).
13  Q.  And could you walk me through what we have on
14  the diagram so we all understand it?
15  A.  This is the bathroom here (Indicating).
16  Q.  On the far left of the exhibit.
17        MR. BOYLE: And let's put an
18  Exhibit 1 sticker on that, please.
19        (Exhibit 1, Handwritten Diagram,
20        marked for identification.)
21        MR. BOYLE: This is Samson
22  Exhibit 1.
23  Q.  So on the left end of Samson Exhibit 1, that's
24  the men's room that you used that night,

46

1   correct?
2   A.  Correct.
3   Q.  And the two lines that look like a road would be
4   the corridor, correct?
5   A.  Yes, that's correct.
6   Q.  And the coffee room is located between what
7   you've marked as the nurses' station and the
8   men's bathroom; is that correct?
9   A.  That's correct.
10  Q.  And can you describe for me what is behind the
11  nurses' station, please?
12  A.  The nurses' station is the ICU, the Intensive
13  Care Unit. There is a long -- there is a
14  hallway here (Indicating) where there are blood
15  pressure kits, monitors for other patients.
16  Q.  Okay.
17  A.  There was a monitor that was around here for
18  another patient that was across the hall
19  (Indicating).
20  Q.  And would you write in small letters in that
21  hallway, would you write the word "hallway" so
22  we know that that's a hallway?
23  A.  Okay. (Witness complies).
24  Q.  And which one is Lauren Varallo's room?

47

1   A.  The box that's marked "Lauren V."
2   Q.  Lauren V, okay. And was there -- there was a
3   second ICU room between Lauren's room and the
4   nurses' station, correct?
5   A.  Correct.
6   Q.  Was there a patient in that room that night?
7   A.  No.
8   Q.  And the nurses' station, is it on the same side
9   of the main corridor as the entrance to the
10  hallway that you have marked?
11  A.  Yes.
12  Q.  So if I'm understanding your diagram correctly,
13  for you to go to any of the locations that you
14  went to that night, that being the coffee room
15  and the bathroom, you had to walk right around
16  the nurses' station, correct?
17  A.  That's correct.
18  Q.  And does the nurse at the nurses' station face
19  the corridor or does he or she face into the
20  ICU?
21  A.  Initially they face the corridor.
22  Q.  The main corridor?
23  A.  Yes, that's correct.
24  Q.  So if -- would the nurse -- I'll clarify later

48

1   on the record. Would the nurse be sitting here
2   looking out in this direction (Indicating)?
3   A.  There were -- I don't know the exact, but there
4   are four or five nurses that were on duty at the
5   time. One of them could be sitting, two of them
6   could be standing positioned at either angle.
7   They could be positioned looking into the
8   hallway at different times or they could be
9   positioned depending on what they were doing at
10  the time.
11  Q.  Where is the chair or the chairs for the nurses'
12  station? Are they on the hallway side of the
13  nurses' desk or are they on the opposite main
14  corridor side?
15  A.  They are on this side right here (indicating).
16  Q.  Would you put an X in a circle so that we will
17  know where the chair at the nurses' station is?
18  A.  I know there was three or four chairs. Do you
19  want me to do three or four?
20  Q.  Yes, that's fine.
21  A.  I'll do them all in a row, I guess.
22  (Indicating).
23  Q.  So it was pretty close quarters when you had to
24  leave to go to the bathroom? You passed in very

VARALLO V SAMSON, ET AL                                      JAMES A. SAMSON

49

1    close proximity to them?
2  A.  Yes, sir.
3  Q.  They had to know you left?
4  A.  Yes, sir.
5  Q.  Same with coming back, they had to know you came
6       back?
7  A.  Yes, sir.
8  Q.  Now, you left again, according to your testimony
9       here today, between 6:30 and 7 to get some
10      coffee from what you've marked on Exhibit 1 as
11      the coffee room, correct?
12 A.  Yes.
13 Q.  And, again, the nurses had to know you left,
14      correct?
15 A.  Correct.
16 Q.  And that was while you were out getting coffee
17      that Ms. Varallo -- that you say Ms. Varallo
18      went with her complaint to the nurses' station,
19      correct?
20 A.  I was coming back from the coffee machine. I
21      went into the room, put the new cups of coffee
22      on the table that was in front of me, took the
23      old cups, brought them to the water fountain,
24      and as I was bringing them to the water

50

1       fountain, Lauren had come out of the bed with
2       her -- the IV and walking with it out to the
3       nurses' station.
4  Q.  So your testimony is that you went and got the
5       coffee. You came back, went into Lauren's room;
6       is that right?
7  A.  That's correct.
8  Q.  And how many cups of coffee did you come back
9       with?
10 A.  I believe two.
11 Q.  Were they both for you?
12 A.  Yes.
13 Q.  You put them on a table inside the room?
14 A.  Yes. There was a table right next to me on the
15      right-hand side, and I had stood up to take the
16      old cups out.
17 Q.  And where is the water fountain that you say you
18      emptied the old cups into?
19 A.  In the hallway right -- in the same hallway
20      right next to the room that was unoccupied.
21 Q.  And by "the hallway" we're not talking about the
22      main corridor, but we're talking about -- I'm
23      sorry, you've actually marked "water fountain"
24      on the map.

51

1              And you dumped those cups into
2       the water fountain, correct?
3  A.  As I was dumping them out, she was coming out of
4       the room.
5  Q.  And how much time had gone by between when you
6       passed the nurses' station and went back into
7       Lauren's room with the new coffee until the time
8       that she came out to make her complaint? About
9       how much time went by?
10 A.  Two to three minutes. As I exited the coffee
11      room to her room; is that the question?
12 Q.  No. My question was, from the time that you
13      passed the nurses' station with the fresh coffee
14      and walked into Lauren's room, in that time
15      until the time Lauren walked out with her
16      complaint to the nurses' station, how much time
17      went by?
18 A.  Probably 30 seconds when I passed the nurses'
19      station, grabbed the cups right away, walked
20      right out and was starting to empty them out,
21      probably about 40 seconds.
22 Q.  And what did Lauren do at this time? Tell me,
23      please, your memory of what Lauren did at that
24      time.

52

1  A.  I said -- I asked her, as she was exiting going
2       to the nurses' station, I said, "Are you okay?"
3       I followed behind her to make sure that she
4       didn't have anything in her hands or anything
5       like that to hurt herself, and then I backed
6       away when she was talking with the nurses.
7  Q.  Did you hear what she said?
8  A.  No, I did not.
9  Q.  You knew she was upset?
10 A.  I didn't know at the time.
11 Q.  When she walked out of her room and you said to
12      her, "Is everything okay," what was her
13      response?
14 A.  She didn't say anything. She might have
15      mumbled, "I need to see the nurse."
16 Q.  Now, when you were guarding her that night,
17      during the time that you were in the hallway or
18      in her room, where physically did you position
19      yourself to guard her, in the hallway or in her
20      room?
21 A.  There was a chair right as you entered the room
22      to the right-hand side.
23 Q.  And is that where you positioned yourself to
24      guard her?

VARALLO V SAMSON, ET AL                                    JAMES A. SAMSON

53

1   A.  Yes.
2   Q.  So you were physically inside her room?
3   A.  Directly to the right of the door inside.
4   Q.  The wall on which the door is mounted, is it a
5       glass wall or is it a solid wall?
6   A.  Can you repeat the question?
7   Q.  Sure.  Can you see into her room from the
8       hallway?
9   A.  Yes.
10  Q.  Is it a glass wall?
11  A.  Yes, glass wall.
12  Q.  Was there a chair in the hallway?
13  A.  No, there wasn't.
14  Q.  Was there room for a chair in the hallway?
15  A.  I suppose you could put a chair outside.
16  Q.  So you -- for the whole time that you were
17      watching her when you weren't at the bathroom or
18      getting food or getting coffee, you were
19      physically in her room; is that right?
20  A.  That's correct.
21  Q.  And how close to her bed?
22  A.  I'm not good with estimating.
23  Q.  Six feet, the height of a --
24  A.  If I'm sitting here, her bed is where the wall

54

1       is starting there (Indicating).
2   Q.  Would eight feet be something taller than --
3   A.  Yeah, that's a possibility.  I don't know the
4       exact, unfortunately.
5   Q.  So when Lauren went out to the desk, did you
6       follow her out to the desk -- nurses' station, I
7       should say?
8   A.  I was behind her, and she and another nurse went
9       off to the other side and went to I believe an
10      empty room, but I'm not positive.
11  Q.  So, if I understand you correctly, going back to
12      an earlier answer that you gave, the time period
13      between you passing the nurses' station with the
14      fresh coffee, going down the short hallway and
15      into Lauren's room, picking up the old coffee,
16      and dumping it out in the water fountain, and
17      Lauren coming out of her room with her IV pole
18      headed for the nurses' station, that was only
19      about 30 or 40 seconds?
20  A.  Yes.
21  Q.  So whoever -- and when you came back with the
22      fresh coffee, there were nurses at the nurses'
23      station, of course?
24  A.  Yes.

55

1   Q.  About how many were there?
2   A.  I don't know off the top of my head.  It might
3       have been three or four.
4   Q.  And you would have been gone something on the
5       order of I think you told us earlier 10 or 15
6       minutes, correct?
7   A.  That's correct.
8   Q.  So the nurses that morning had to see you leave,
9       be gone for 10 or 15 minutes, correct?
10  A.  Yes.
11  Q.  They had -- and, in fact, they did see you,
12      according to your testimony, come back into the
13      hallway, correct?
14  A.  Yes.
15  Q.  And 30 or 40 seconds later Lauren Varallo comes
16      out with her complaint that you had done
17      something to her, correct?
18  A.  My back was turned as I was emptying the old
19      coffee into the water fountain, and that's when
20      she had -- when she had come out, my back was
21      turned.
22  Q.  But all of these nurses at the nurses' station
23      would have known if your story is correct, that
24      you had only been in her room for 30 or 40

56

1       seconds since you returned from 10 or 15 minutes
2       in the coffee room?
3   A.  That's correct.  There was a shift change, so I
4       believe there was more than four nurses.
5   Q.  Well witnessed?
6   A.  Yes.
7   Q.  And they had to know that you had been out of
8       the room for the 10 or 15 minutes before her
9       complaint is made with the exception of the 30
10      or 40 seconds immediately before she comes to
11      the desk, correct?
12  A.  That's correct.
13  Q.  Now, in your study of Anna Maria College, did
14      you study how to make police reports?
15  A.  No, we did not.
16  Q.  Do you know the importance of a police report?
17  A.  Yes, I do.
18  Q.  And the facts have to be precisely accurate,
19      correct?
20  A.  That's correct.
21  Q.  And details matter a lot, correct?
22  A.  That's correct.
23  Q.  And as part of your job at the Nantucket Police
24      Department, you had made out a number of police

**VARALLO V SAMSON, ET AL**                                    **JAMES A. SAMSON**

57

1   reports; had you not?
2   A.  Yes, that's correct.
3   Q.  Dozens and dozens of reports over the two
4        summers, if you count up the two summers?
5   A.  The only time that we made out a police report
6        is when we arrested an individual or placed them
7        in protective custody.
8   Q.  Okay.
9   A.  So, give or take, probably in my entire two
10      summers, four total maybe.
11  Q.  You understand that -- now, I'd like you to take
12      a look.  Your counsel was good enough to produce
13      a number of documents, and they include the
14      Nantucket Police Department Incident Report of
15      July 22, 2002, at 8:30 a.m. by James Samson, and
16      I wonder if you would be so kind as to read your
17      initial report, which goes from the bottom of
18      page 1 over to the top of page 2?
19                  MR. BOYLE:  And we'll mark this
20      as exhibit it, please.
21              (Exhibit 2, Incident Report,
22              marked for identification.)
23  A.  If I may, may I please use the rest room?
24  Q.  Sure, of course.

58

1               (Short break was taken.)
2   Q.  I'm going to ask you to read --
3                  MR. SLOTNICK:  You didn't read
4        the report before you left?
5                  MR. BOYLE:  No, he didn't.
6   Q.  I'm going to include all three pages as Exhibit
7        2, and if you would just read those three pages,
8        which comprise Exhibit 2, to yourself, please,
9        and when you're done, I'm going to be asking you
10      whether the information that is attributed to
11      you is accurate?
12  A.  (Witness complies).
13              (Pause).
14  Q.  Have you had a chance to read Exhibit 2?
15  A.  Where does it end?
16  Q.  It's a three-page exhibit.
17  A.  Okay, yes, I did.
18  Q.  And do you see anything that's attributed to
19      you, which you say is wrong?
20  A.  No, everything is correct.
21  Q.  On the first page of Exhibit 2, there's a part
22      at the bottom that says "Initial Report as of
23      July 22, '02, at 0830 by James Samson," correct?
24  A.  That's correct.

59

1   Q.  Now, that part of the report that continues over
2        to the first half of page 2 you personally wrote
3        yourself, correct?
4   A.  Yes.
5   Q.  And do you do that by sitting down at a computer
6        terminal at headquarters?
7   A.  We sit down at a computer station that's in the
8        station.
9   Q.  So you physically typed in that report at 8:30
10      a.m. on the morning of July 22nd, correct?
11  A.  Correct.
12  Q.  And in that report at page 1 I would like to
13      read to you a couple of sentences at the bottom
14      of the page -- first of all, you made this
15      report under the pains and penalties of perjury;
16      did you not?
17  A.  Yes, I did.
18  Q.  And in the last two sentences it says, quote,
19      "At approximately 0700 hours, Ms. Varallo came
20      out of her room and asked to speak with one of
21      the nurses.  At that time I was out of the room
22      getting a cup of coffee," end quote.  First of
23      all, did I read that correctly?
24  A.  That's correct.

60

1   Q.  That's different from what you've told me today,
2        isn't it?
3   A.  That is the truth what I said to you, and that
4        is the truth (Indicating).
5   Q.  Well, in this report what I just read to you is
6        a different story from what you've said here
7        today, correct?
8   A.  That's not correct.  That's incorrect.
9   Q.  Well, when Ms. Varallo came out of her room to
10      speak with one of the nurses, in your report you
11      said, quote, "I was out of the room getting a
12      cup of coffee," end quote.
13  A.  Yes, I was out of the room in the hallway.
14  Q.  But you weren't getting a cup of coffee, were
15      you?
16  A.  Yes, I was.  I was getting a cup of coffee, and
17      I came back into the room with the old cups,
18      went to the water fountain, emptied them out.
19      That's the exact same thing.  The general gist
20      of getting a cup of coffee is the generalization
21      of getting a cup of coffee.  That's what it
22      means.
23  Q.  Is there any reference in this report to you
24      having returned to her room, picking up old cups

VARALLO V SAMSON, ET AL

**61**

1　of coffee, and bringing them to the water
2　fountain? Is there any reference?
3　A.　No, there is not.
4　Q.　It simply says flat out, quote, "At that time"
5　　-- being when Ms. Varallo came out of her room
6　　and asked to speak with one of the nurses,
7　　quote, "At that time I was out of the room
8　　getting a cup of coffee," end quote.
9　A.　Yes.
10　Q.　Now, that's different from what you told me
11　　today, isn't it?
12　A.　I wrote down exactly the generalization of what
13　　had happened. I asked the sergeant on at the
14　　time, Sergeant Christine Ladner, how I should
15　　phrase it. She explained to me to write that.
16　Q.　Oh, okay. So --
17　A.　I'm being honest with you.
18　Q.　Well, first of all, do you understand that what
19　　you wrote in this report is literally -- is from
20　　a literal standpoint different from what you've
21　　testified to here today; do you understand that?
22　A.　If I wrote minute per minute -- exactly what I
23　　did minute per minute in a report at that time,
24　　the report would have been at least 15 pages

**62**

1　long. The job of a police officer's report is
2　to recall the events to his best of the
3　ability --
4　Q.　Well --
5　A.　-- a police officer at the time. That's what
6　a police report is.
7　　　　MR. BOYLE: I'm going to strike
8　as nonresponsive.
9　Q.　Your story here today is not that you were out
10　of the room getting a cup of coffee. It's that
11　you were in the hallway out of her room
12　disposing of old coffee; is that right?
13　A.　The general action that I was doing was getting
14　a cup of coffee.
15　　　　MR. SLOTNICK: Could I have a
16　minute with my client? Okay, go on.
17　　　　MR. BOYLE: Go ahead if you want
18　to.
19　　　　MR. SLOTNICK: Could I just talk
20　to you outside for a minute?
21　　　　(Short break was taken.)
22　　　　MR. SLOTNICK: Thank you.
23　　　　MR. BOYLE: Great.
24　Q.　I guess we're back at when you wrote your report

**63**

1　at 8:30 in the morning, you said, quote, "At
2　that time I was out of the room getting a cup of
3　coffee," end quote; did you not?
4　A.　Yes, I did.
5　Q.　And that, as you look at it, refers -- the
6　　reference "at that time" means when Ms. Varallo
7　　came out of her room and went to the nurses'
8　　station, correct?
9　A.　Yes.
10　Q.　So, in your report, you said, "When she came out
11　　to go to the nurses' station," quote, "I was out
12　　of the room getting a cup of coffee," end quote;
13　　is that right?
14　A.　Yes. It's different than what I had said today,
15　　yes.
16　Q.　So today's story is different, correct, in all
17　　honesty? Isn't today's story different?
18　A.　It is to an extent.
19　Q.　Okay.
20　A.　The wording is different. The generalization
21　　isn't. I'll leave it at that.
22　Q.　But you wrote this report, Exhibit 2, literally
23　　an hour and a half after Ms. Varallo made her
24　　complaint to the nurse, correct?

**64**

1　A.　That's correct.
2　Q.　And when you wrote it down, you made the claim
3　　that you were out getting a cup of coffee,
4　　correct?
5　A.　Yes, that's correct. To the best of my ability
6　　when I wrote that down, yes.
7　Q.　Now, certainly -- well, and today you are saying
8　　you weren't out getting a cup of coffee. You
9　　had finished getting the cup of coffee, and you
10　　were emptying out some old cups of coffee,
11　　correct?
12　A.　That's correct, yes, sir.
13　Q.　And you understand that's different; do you not?
14　A.　From what I wrote, that's correct.
15　Q.　You went on at page 3 of this report, and page 3
16　　is Christine Ladner's summary of the events, and
17　　Christine Ladner said the following: Quote,
18　　"He," meaning Mr. Samson, "stated that when she
19　　woke up, she requested to see the nurse.
20　　Officer Samson was out of the room at that time
21　　getting a cup of coffee," period, end quote.
22　　　　Now, you said that to Christine
23　　Ladner; did you not?
24　A.　Yes.

VARALLO V SAMSON, ET AL                                              JAMES A. SAMSON

65

1  **Q.** So when she -- she came to the hospital, and she
2     was trying to figure out what happened, correct?
3  **A.** Correct.
4  **Q.** And she asked you what happened, correct?
5  **A.** Correct.
6  **Q.** And you told her, as you wrote in your own
7     report, as well, you told her that when Lauren
8     Varallo woke up and requested to see the nurse,
9     you were, quote, "out of the room at the time
10    getting a cup of coffee," end quote; is that
11    right?
12 **A.** That may have happened, yes.
13 **Q.** Well, that's what you told her on the very
14    morning of these events, correct?
15 **A.** That's correct.
16 **Q.** And it's different from what you've said today,
17    correct?
18 **A.** That may have happened. That's correct. I
19    don't --
20 **Q.** Well, now, did you ever tell anyone about the
21    fact that you had gotten a cup of coffee, went
22    back into the room, you put the fresh coffee on
23    the table, you took the old coffee, you walked
24    out to the hallway and were disposing of your

66

1     coffee? Before today, did you ever tell anybody
2     that story?
3  **A.** Yes, I did.
4  **Q.** Who did you tell that story to? Christine
5     Ladner?
6  **A.** I told Christine Ladner exactly what happened,
7     and she advised me to write in the report a
8     generalization of what happened. She told me to
9     write that sentence.
10 **Q.** But did Christine Ladner write that sentence for
11    you?
12 **A.** She didn't write the sentences for me. She told
13    me to generalize the report as to what happened,
14    so I generalized.
15 **Q.** So did she tell you to claim you were out of the
16    room getting coffee when Ms. Varallo came to the
17    desk?
18 **A.** She did not claim me to do anything. She told
19    me to generalize what happened.
20 **Q.** As opposed to write specifics?
21 **A.** That's what she told me to do. I didn't go into
22    any detail with her on what she had said.
23 **Q.** As you sit here today, do you see the
24    inconsistency?

67

1  **A.** I just did what I was told. That was my job as
2     a summer special police officer.
3  **Q.** And you were told to write something down which
4     was different from what actually happened?
5  **A.** I was told as a police officer by the Nantucket
6     Police Department to write to the best of my
7     knowledge what happened. That's what police
8     reporting is, what I was told.
9  **Q.** Have you ever heard the term "a one-on-one
10    assignment?" Is that a term that you would use
11    in connection with a protective custody? Have
12    you ever heard that term?
13 **A.** I may have heard it in conversation.
14 **Q.** How did it come about that you left the
15    Nantucket Police Department? Were you fired or
16    did you resign?
17 **A.** I resigned.
18 **Q.** And did you personally type up the resignation
19    letter, do you recall?
20 **A.** Yes, I did.
21 **Q.** Now, prior to working at the Nantucket Police
22    Department you had to apply for the job,
23    correct?
24 **A.** Yes, sir.

68

1  **Q.** And there's an employment application that you
2     filled out, correct?
3  **A.** Yes, sir.
4  **Q.** Under "Medical Data" it says in the application,
5     it asks or reads as follows, paragraph 4 of page
6     2 out of ten pages: "List any mental illnesses,
7     including outpatient care by a psychiatrist or
8     psychologist," and the date of application is
9     May of '01. Had you ever been treated by a
10    psychiatrist or psychologist for any reason at
11    any time in your life before you applied to the
12    Nantucket Police Department?
13 **A.** I know I was in for math help, math tutoring,
14    but that was tutoring -- can you repeat the
15    question?
16 **Q.** Sure. Before you applied to the police
17    department in Nantucket, had you ever been seen
18    for any reason by any psychiatrist or
19    psychologist of any kind?
20 **A.** No.
21 **Q.** Did you have any run-in of any kind with the law
22    before you started work at the Nantucket Police
23    Department?
24 **A.** With the exception of speeding tickets, you

VARALLO V SAMSON, ET AL                                    JAMES A. SAMSON

69

1    know, moving violations, no.
2  Q. First of all, had you ever been arrested at any
3    time?
4  A. No.
5  Q. Had you ever had a matter continued without a
6    finding?
7  A. No.
8  Q. Had you had any encounter whatsoever with the
9    police, even if it didn't result in an arrest,
10   which pertained to your conduct, apart from
11   automobile violations, which we'll talk about?
12 A. No.
13 Q. Did you have some automobile violations?
14 A. Yes, I did.
15 Q. And about how many have you had?
16 A. Prior to the incident?
17 Q. Yes, prior to the incident.
18 A. One.
19 Q. And what was that?
20 A. It was speeding?
21 Q. And did you plead guilty or how was it resolved?
22 A. I appealed the speeding ticket, and I went
23   before a clerk magistrate, and I believe he
24   reduced the fine to -- he reduced the fine. I'm

70

1    not sure how much it was.
2  Q. What court was that in?
3  A. Worcester.
4  Q. And what town had issued the speeding ticket?
5    What police department?
6  A. Paxton Police Department.
7  Q. And what was the year of that?
8  A. 1999.
9  Q. And at the time were you in college?
10 A. Yes.
11 Q. Had you ever been suspended from school for any
12   reason?
13 A. No.
14 Q. Had you ever been dismissed, censured or fired
15   by any employer before these events?
16 A. No.
17 Q. On your application you put down some
18   references, some individuals who you used as
19   references. Do you know if they ever got calls
20   from the Nantucket Police Department
21   investigating your background?
22 A. I'm not positive. I don't think it was released
23   to me.
24 Q. Now, do you recall an event of August -- it's

71

1    either August the 2nd or August the 7th, I'm not
2    sure which, of '02, in which a complaint was
3    made about you by a Michele Caron, C-A-R-O-N?
4  A. Yes.
5  Q. Can you tell me about the circumstances of that
6    event, please?
7  A. That night -- the previous night Michele had
8    been drinking. She had come to my room, was
9    upset because another officer that she had liked
10   did not like her back. She was crying to me,
11   was upset. She was sitting on the chair, and I
12   was sitting on the bed, and then she said she
13   had -- she said, "I'm going to bed." She was
14   upset.
15 Q. Where was this all taking place, by the way, in
16   her room?
17 A. It was in my room.
18 Q. What happened next?
19 A. And I went to bed. She went to bed, and then
20   the next thing I know that night I was awoken by
21   her, by Michele, and I looked around me, and I
22   was in her room. I was unaware of how I had
23   gotten there. I was unaware of what I was
24   doing, and all I remember is her yelling my name

72

1    out loud.
2        She told me the next day that --
3    I went back to my room. I don't remember
4    anything. She told me the next day -- she asked
5    me what happened. I said, "I really don't
6    know," and I said, "I could have possibly been
7    sleepwalking." I told her I had a history of
8    sleepwalking at home in my family, talking out
9    loud at night, talking in loud dreams, things of
10   that nature, and the next thing I know there
11   were two letters that were given to the -- I
12   believe the lieutenant at the time explaining
13   the situation. That was that.
14 Q. Whose letters were they?
15 A. One was Michele Caron. The other was Emily
16   Murphy.
17 Q. And who is Emily Murphy?
18 A. Her roommate.
19 Q. Did you ever have a relationship with Emily
20   Murphy?
21 A. No.
22 Q. Just a fellow officer?
23 A. Correct.
24 Q. And did you see copies of the letters?

VARALLO V SAMSON, ET AL                                          JAMES A. SAMSON

<table>
<tr><td>

73

1  A. No, I did not.
2  Q. What did they say in substance?
3  A. They just -- from what I was told, they had just
4     described the incident, that I was in their room
5     at night.
6  Q. Would it be fair to characterize them in the
7     nature of complaints about that, the letters?
8  A. I don't know. I haven't seen them.
9  Q. Was Michele upset that you were in her room like
10    that?
11  A. I didn't really talk to her. There was limited
12    contact between me and her. She could have been
13    upset. We were really close friends at the
14    time.
15  Q. Are you in touch with her at all today?
16  A. No.
17  Q. Do you know where she is?
18  A. No.
19  Q. Are you in touch with Emily Murphy at all today?
20  A. No.
21  Q. Do you know where she is?
22  A. No.
23  Q. Why were you in the room that night, do you
24    know?

</td><td>

75

1     that's all she said, to my knowledge, that I
2     recall.
3  Q. Did you file a letter with the police department
4     about this event?
5  A. No, I did not.
6  Q. Do you know if they were required or asked to
7     file that letter by the police department, the
8     letters that they did file?
9  A. To my knowledge, I don't know.
10  Q. You don't have copies of them?
11  A. No, I don't.
12  Q. Now, on any of the occasions that you left Ms.
13    Varallo's room during the night, would one of
14    the nurses come and cover for you until you got
15    back?
16  A. No. She was not handcuffed at any time.
17  Q. I didn't ask that. At any time when you would
18    leave the hallway or leave her room, actually go
19    down the hallway and do any of the tasks that
20    you've described, would one of the nurses come
21    and sit in her room until you returned?
22  A. The first two times, yes, the nurse did sit in
23    the room. The other times I would ask the
24    nurse, could you please watch her while I run to

</td></tr>
<tr><td>

74

1  A. Like I said, I don't know. I don't remember
2     anything that happened that night.
3  Q. You just blacked out or --
4  A. I don't know. The only thing I do remember is I
5     had a dream that night of Michele was yelling.
6     She was upset, and that's all that I remember.
7  Q. And would you sometimes do things in your sleep
8     that you didn't remember when you woke up?
9  A. In general?
10  Q. Yes.
11  A. I know my fiancee and my family said I talked in
12    my sleep. Physically, the only thing that
13    people told me is that I walked, and that's it.
14  Q. Have you done that before, sleepwalked before?
15  A. Yes.
16  Q. So that night in the event involving Miss Caron
17    and Ms. Murphy you simply ended up in their
18    room, you have no idea how?
19  A. I have no idea.
20  Q. What did Ms. Caron say to you when she woke you
21    up? Was she upset then?
22  A. I remember she yelled my name loud, and that was
23    the trigger that woke me up, and I believe, if I
24    recall, she said, "What are you doing?" And

</td><td>

76

1     the bathroom or the time that I was heating my
2     food up.
3  Q. How about when you went for coffee in the
4     morning --
5  A. I let the nurse know I was going to get a cup of
6     coffee.
7  Q. And did you ask the nurse to keep an eye on her
8     while you were gone?
9  A. Yes, I did.
10  Q. Do you remember which nurse that was?
11  A. I don't remember.
12  Q. Tall, short, blonde?
13  A. I don't remember. It was long ago.
14  Q. No memory at all?
15  A. One of the nurses.
16  Q. So you said to them, Please keep an eye on her
17    while I'm gone?
18  A. While I go get a cup of coffee, that's correct.
19  Q. And did that nurse then go into her room to
20    watch her while you were gone?
21  A. She may have I don't know. I know at the time
22    that I had left. I was passing by, and I said
23    to her, "I'm going to get a cup of coffee. Can
24    you watch her?" She said yes. She may have

</td></tr>
</table>

VARALLO V SAMSON, ET AL

JAMES A. SAMSON

**77**

1     gone in when I was going to get the cup of
2     coffee. She may not have. I don't know.
3 Q. What did you understand it to mean for her to
4     watch Lauren? She obviously couldn't do it from
5     the nurses' station because that's why they had
6     you come over, I take it.
7 A. She could do it from the nurses' station. She
8     could -- the nurses could look into the room.
9 Q. When they looked down the hallway, they couldn't
10     see her in the bed, could they?
11 A. Oh, yes.
12 Q. From the nurses' station without getting up?
13 A. It was all glass (Indicating). Both rooms were
14     all glass.
15          MR. BOYLE: That's all I have.
16     Thank you for your patience. I don't know if
17     brother counsel has any.
18         <u>CROSS-EXAMINATION BY MR. STEWART</u>
19 Q. My name is Rob Stewart. I'm with Merrick,
20     Louison & Costello. Just some quick questions
21     so I understand.
22         When you testified earlier that a
23     person in protective custody is in handcuffs, is
24     it your responsibility to watch that person --

**78**

1     as a police officer -- is it your responsibility
2     as a police officer to watch that person 100
3     percent of the time?
4 A. If they are in handcuffs, it all depends on what
5     I was told to do. We didn't get much training
6     on that. They didn't really specify, whereas
7     Nantucket is a town where it's not like Boston.
8     Nantucket is a relaxing, easygoing town. The
9     crime isn't what it is over here. So our job
10     wasn't like a Boston police officer would do
11     here.
12 Q. To your knowledge, it's up to the officer's
13     discretion?
14 A. I would assume. I don't know, but we weren't
15     specifically told.
16 Q. Thank you. Just a follow-up to that. When you
17     went to the hospital on the night of July 22,
18     2002, were you told that Ms. Varallo was in
19     police custody?
20 A. I wasn't told that specifically that, no, I
21     wasn't. I wasn't told that she was in police
22     custody. The only thing I was told specifically
23     was she tried to commit suicide, and she was
24     under a watch so that she would not hurt herself

**79**

1     again. That's all I was told. I wasn't told
2   that specifically.
3         MR. STEWART: Thank you. I have
4   no further questions.
5         MR. SLOTNICK: No questions.
6         MR. BOYLE: Thanks. Good luck.
7   (Deposition of JAMES A. SAMSON closed.)
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

**80**

1       I hereby certify that I have read the
2 foregoing deposition transcript of my testimony,
3 and further certify that said transcript is a
4 true and accurate record of said testimony.
5
6
7
8                JAMES A. SAMSON
9
10
11     Signed under the pains and penalties of
12 perjury this ____ day of _____, 2007.
13
14
15
16
17
18
19
20
21
22