UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF MASSACHUSETTS

LAUREN VARALLO,
                        Plaintiff,

v.                                                    CIVIL ACTION
                                                      NO: 05-11547-RWZ
TOWN OF NANTUCKET - POLICE
DEPARTMENT and JAMES SAMSON,
                        Defendants.

## TABLE OF EXHIBITS TO THE PLAINTIFF'S OPPOSITION TO THE DEFENDANT TOWN'S MOTION FOR PARTIAL SUMMARY JUDGMENT

| Exhibit | Description | Page(s) |
|---|---|---|
| A | Michael Naughton, "Trooper Sentenced to 8-10 Years for Rape", The Boston Globe, April 18, 2007 | . . . . . . . . . . . . . . . 9 |
| B | S. Walker & D. Irlbeck, *Driving While Female: A National Problem in Police Misconduct,* Special Report by the Police Professionalism Initiative, Univ. of Nebraska at Omaha, May 2002 | . . . . . . . . . . . . . . . 10 |
| C | Pennsylvania State Police Year 2003 Press Releases, "State Police Commissioner Calls for Independent Review of Department's Examination of Sexual Misconduct." | . . . . . . . . . . . . . . . 10 |
| D | T. Maher, Police Sexual Misconduct: Officers' Perceptions of its Extent and Causality, Criminal Justice Review, V. 28, No. 2, Autumn 2003 | . . . . . . . . . . . 10, 11 |

PLAINTIFF LAUREN VARALLO,  By her attorneys,
*/s/  Bradley M. Henry*

_____
Bradley M. Henry, BBO No. 559501
Suleyken D. Walker, BBO No. 654933
MEEHAN, BOYLE, BLACK & BOGDANOW, P.C.
Two Center Plaza - Suite 600
Boston, MA 02108-1922      PH:  617-523-8300

### CERTIFICATE OF SERVICE

        I, Bradley M. Henry, certify that on May 16, 2007, I served the foregoing Table of Exhibits to Plaintiff's Opposition by electronic filing and by mailing an exact copy thereof, postage prepaid to all parties of record: Douglas I. Louison, Merrick, Louison & Costello, 67 Batterymarch St., Boston, MA 02110 & Philip Slotnick, Shocket & Dockser, 6 Huron Dr., Natick, MA 01760.

*/s/  Bradley M. Henry*
Bradley M. Henry

EXHIBIT A

Sponsored Links

**Are You Nursing Material?**
Take this Quiz to Find Out if
Nursing is the Career For You!
www.chatterbean.com/Nurse

**Online Degree Programs**
Browse online law schools
programs.
Find a Course that is Right for you
www.OnlineDegreeDirect.com

**Online Law School**
Juris Doctor JD & LLM Masters
Low Tuition, Free Textbooks
www.edu-onlinedegree.org

**Law Degree Online**
Convenient Online Programs, 100+
Accredited Schools – Learn More!
www.ClassesUSA.com

**boston.com** Local News    *your connection to* The Boston Globe

GREATER BOSTON | BOSTON GLOBE | EVENTS | YELLOW PAGES     [SEARCH] BETA

Home | News | A&E | Business | Sports | Travel | Your Life | Cars | Jobs | Real Estate | Yellow Pages    Sign In | Register Now

Today's Globe | Local | Politics | Opinion | Magazine | Education | NECN | Special reports | Obituaries    Traffic | Weather | Mobile

HOME > NEWS > LOCAL

# Trooper sentenced to 8-10 years for rape

*The Boston Globe*

By Michael Naughton, Globe Correspondent | April 18, 2007

A suspended state trooper was sentenced yesterday to at least eight years in jail for raping a 26-year-old woman and threatening to plant drugs on her if she did not comply with his advances last year, authorities said.

Daniel Grant, 42, of Holbrook was found guilty Friday of three counts of rape. Yesterday, he was sentenced in Middlesex Superior Court to serve between 8 and 10 years in state prison, followed by five years probation, the Middlesex district attorney's office announced.

While on duty on Jan. 20 last year, Grant, who was in full uniform, approached a parked car in Cambridge at 11:15 p.m. He told the woman inside the car that he was doing her a favor by not arresting her and removed from his pocket what appeared to be a small bag of cocaine and said that it could very easily be hers and asked if she would like to spend time in a women's prison, the district attorney's office said.

Grant, a 17-year veteran assigned to the Boston barracks at Leverett Circle, ordered the woman to follow him to a building near the Royal Sonesta Hotel in Cambridge, where he repeatedly raped her.

"Daniel Grant abused his position of authority to prey upon a vulnerable victim, and he has brought dishonor to himself and the uniform he was privileged to wear," said a statement issued by Middlesex District Attorney Gerard T. Leone Jr. "The victim in this case went through a deeply traumatic experience, and she deserves great credit for bravely coming forward and recounting this incident to the jurors."

The woman reported the rape to relatives and to Stoneham police. During the investigation, Grant was suspended without pay.

"I strongly denounce the actions of Daniel Grant," said a statement issued by Mark F. Delaney, superintendent of the State Police. "He has disgraced and dishonored himself by his wanton and willful criminal actions. His actions are not reflective of the excellence and tradition of the Massachusetts State Police and the men and women who serve this proud department." ∎

© Copyright 2007 Globe Newspaper Company.

**ARTICLE TOOLS**

🖶 PRINTER FRIENDLY

✉ E-MAIL TO A FRIEND

LOCAL RSS FEED

REPRINTS & LICENSING

SHARE ON DIGG

SHARE ON FACEBOOK

SAVE THIS ARTICLE
powered by Del.icio.us

**MORE:**
Globe City/Region stories
Latest local news

ADVERTISEMENT



DISCOVER
THE LATEST
FROM HYATT

CHECK-IN NOW ›› HYATT
HOTELS & RESORTS

**LATEST LOCAL NEWS**

› Summary Box: Iran Divestment
› Lawmakers' own portfolios had Iran investment ties
› Connecticut lacrosse team shaken up when bus overturns
› Fire code commission hears proposals for changes
› Democrats turn up pressure on Rell on I-84 project
› **More local news**

**BOSTON.COM'S MOST E-MAILED**

› A pregnant pause
› Hearts & Minds
› This is a huge change from their usual route
› Biotech firms sprint to cut ethanol's cost
› His find could be a chocolate lover's dream
› See full list of most e-mailed

**SEARCH THE ARCHIVES**

[GO]

All Globe stories since 2003 are now FREE

○ Today    ⊙ Past 30 days    ○ Since 1979
○ Yesterday    ○ Last 12 months

› More search options

ADVERTISEMENT

› Get 50% off Boston Globe home delivery.
Order now!

Ads by Google    what's this?

EXHIBIT B

| *Chief Penny Eileen Harrington* |
|---|
| chiefpenny@aol.com |

# "DRIVING WHILE FEMALE":
# A NATIONAL PROBLEM IN POLICE MISCONDUCT

**Samuel Walker and Dawn Irlbeck**
**Department of Criminal Justice**
**University of Nebraska at Omaha**
**May 2002**
**A Special Report by the**
**Police Professionalism Initiative**
**University of Nebraska at Omaha**

The Authors would like to thank Lenora Lapidus, Director of the ACLU Women's Rights Project, Loren Siegel, former Director of the ACLU Public Education Department, and Susan Martin, Ph.D., of Washington, DC for their assistance in preparing this report.

## I. THE STORIES

In April, 2002 a Virginia state trooper was indicted for soliciting sex from female drivers in return for dropping traffic charges against them. [1]

Just one week earlier a San Bernardino, California police officer was charged with sexually assaulting or raping 11 women while on duty. [2]

Also in March, 2002 a suburban Philadelphia police officer was convicted of raping an intoxicated woman while on duty and in uniform. [3]

These and numerous other cases highlight a national problem of "driving while female" where police officers use their authority, often in traffic stops, to harass or assault women drivers, or to take advantage of women who have been stopped for legitimate violations. The "driving while female" problem became apparent in early 2001 in a series of cases on Long Island, New York. On New Year's Day 2001, a Suffolk County (NY) police officer stopped a female driver for an alleged
traffic violation and instead of issuing her a traffic ticket forced her to strip and walk home wearing only her underpants. The report of this incident brought forth similar allegations of sexual abuse arising from traffic stops conducted by Long Island police by 13 women and one man. Several of the cases involved allegations that officers coerced sexual favors as the price of avoiding a traffic ticket.[4] The publicity also brought forward a spate of nearly identical allegations against officers with the neighboring Nassau County police department. Allegations of harassment of female drivers by Walkill (NY) police officers led to a suit by the Attorney General of New York and a consent
decree requiring a sweeping reforms in the police department.[5] Reports of "driving while female" abuses are found in every part of the country, and the level of abuse runs the gamut

from harassment to sexual assault and even murder: [6]

In 2000, a Houston, Tex., police officer was convicted and sentenced to 20 years in prison for the sexual assault of a female driver. Also in 2000, a San Francisco police officer pleaded no contest to
charges of fondling teenage girls during traffic stops. In 1998, a Washington, DC, police officer was convicted of sexually assaulting a 14-year-old girl and an adult woman. A Milwaukee police officer was sentenced to eight years in prison in 1998 for sexually assaulting a female driver. In 1996, a Chicago police officer was sentenced to four years in prison for fondling women during traffic stops.
A suburban Chicago police officer was convicted in 1996 for stalking several women between the years 1990 and 1994. And in perhaps the most grotesque case of all, Cara Knott was murdered
in 1986 by a predatory California Highway Patrol officer who stopped her for a traffic violation. [7]

These are not isolated incidents. A review of national print media from 1990 to 2001 revealed literally hundreds of allegations of "driving while female" abuses, and an average of over a dozen substantiated cases each year.[8]The estimate cited in this report is conservative in two ways. First, it only includes abuses that were substantiated by the criminal justice system (i.e., the officer was indicted,, found guilty, etc.). Second, it defines "cases" by the number of victims. Many officers were charged with several criminal counts associated with each victim. Additionally, there is good reason to believe that these cases represent only the tip of the iceberg. Many victims do not come forward because of humiliation and fear of reprisal. And some police departments do not accept and investigate complaints from many victims who do come forward.

## II. THE PATTERNS

Several patterns emerge from these stories: First, there is a pattern of police officers using their traffic  enforcement powers to abuse women. [9] The problem of "driving while female" parallels the national problem of racial profiling or "driving while black" (DWB). Substantial evidence indicates that police officers stop African American drivers because of their race and not because of any
evidence of illegal activity. In other parts of the country, police officers stop Hispanic/Latino drivers solely because of their ethnicity, a practice that has been labeled "driving while brown."[10] On Interstate 95 in Maryland, for example, white and African American drivers were independently observed to violate traffic laws at the same rate. Yet, 73 percent of the drivers stopped by Maryland State Troopers were African American. Moreover, of those drivers who were stopped, 80 percent were either African American or Hispanic. In the case of driving while black or brown, police officers engage in an illegal form of discrimination based on race or ethnicity. Racial and ethnic stereotypes about minority involvement in crime are part of anti-crime crackdowns, most notably in the war on drugs. In some driving while female cases innocent drivers are similarly stopped based on an
immutable characteristic: gender. Just as they abuse their law enforcement power to stop drivers of color, police officers abuse their power to stop and harass women drivers. In other cases, the driver is guilty of an offense and the police officer takes advantage of her vulnerable legal status. An important difference between the DWB and DWF problems, however, is that officers engaged in racial profiling are usually acting in accord with department crime-fighting policies, while officers targeting female drivers represent the classic "rogue" officers who are violating the law

and department policy. Second, a major part of the DWF problem is the failure of police departments to investigate allegations that come to their attention. In a number of cases, supervisors disregarded citizen complaints filed by female victims. In one of the Nassau County cases, the female victim filed a formal complaint with the department in a timely fashion, but the department did not investigate it for almost nine months.[11] This aspect of the DWF problem is very similar to the DWB problem, where police departments do not take seriously and investigate allegations of

discrimination on the basis of race or ethnicity and deny that their officers are doing anything wrong.

Similarly, "rogue" officers are able to continue their sexual predatory activity because the department looks the other way. An Indianapolis, Ind., officer who was finally caught in 1996 made 224 traffic stops in a four month period in 1995, with 199 of those stops (89 percent!) involving

female drivers. [12] Third, as in the case of DWB, DWF abuses continue because police departments tolerate them by failing to maintain an open and accessible citizen complaint system.

Most people who feel they have been mistreated by a police officer –regardless of the circumstances– do not file a complaint. In part, this is due to a complaint process that is not user-friendly. Some complainants who do come forward, meanwhile, are actively discouraged from filing complaints. These problems are compounded in DWF cases because the victims feel particularly traumatized or humiliated. Fourth, DWF abuses continue because departments do not have policies and procedures that ensure close supervision and accountability of officers.

In many of the cases that have come to light, the officer had committed a number of offenses. The behavior of the Virginia state patrol officer was well-known to people in the department and around the local court-house. The abuses continued because the officer was not closely supervised and no

one in the department acted on the information that was available. Fifth, DWF is often symptomatic of a pervasive sexist culture within a police department.[13] This sexist culture manifests itself in several ways:

(1) employment discrimination against women, including the failure to promote women to supervisory positions;[14]
(2) tolerance of sexual harassment within the department;[15]
(3) a systematic failure to investigate domestic violence incidents where the alleged perpetrator is an officer in the department;[16]
(4) inadequate policies regarding pregnancy and parental leave.[17]

## III. THE REMEDIES

There are several remedies that can and should be taken immediately to curb DWF abuses. These are steps that law enforcement chief executives can take without requiring additional statutory authority.

Step One: **Data Collection**
Law enforcement agencies need to begin collecting data to determine whether there is a pattern of DWF abuses by their officers. At present we don't know exactly how extensive the DWF problem is. The anecdotal evidence, particularly the many cases of officers who have been convicted

of some form of sexual abuse, suggests that the problem is serious and widespread. Fortunately, many police departments are already collecting traffic stop data to investigate

possible racial profiling. Virtually all of the data collection instruments record the gender of the driver. Where the identity of the officer is also indicated, it is a very simple matter of analyzing the data to determine if certain officers are stopping a suspiciously high number of female drivers. In those departments where the identity of officers is not part of the data collection process it needs to be added. [18]

Step Two: **Official Policies and Training**

Every law enforcement agency should immediately issue a formal policy prohibiting "driving while female" abuse.[19] The policy should define DWF as the use of law enforcement powers for the purpose of stopping female drivers where there is no suspected criminal activity or traffic law
violation, and also taking advantage of women drivers who have been stopped for legitimate violations. The policy should clearly state that any form of sexual harassment or assault of an individual, regardless of gender, is impermissible conduct that will result in termination proceedings. Every law enforcement agency should immediately incorporate the new "driving while female" policy into both pre-service and in-service training programs. Pre-service training or police academy training is provided to all new recruits. In-service training is provided to officers who are already on the force. The in-service training is especially important because experienced officers who may have engaged in some form of DWF in the past need to be instructed that such activity violates department policy.

Step Three: **Better Supervision**

Law enforcement chief executives need to take immediate steps to ensure proper supervision of officers on the street. They need to ensure that supervisory officers are alert to the potential problem of DWF and take the necessary steps to curb it. Supervisors need to be advised that all allegations and rumors of possible DWF abuses are taken seriously and promptly investigated. In cases where
alleged abuse is suspected but cannot be proven, supervisors should counsel strongly the suspected officer that any such abuse will not be tolerated by the department.  How should departments respond to allegations? The chief of the Homewood, Ill., police department adopted a vigilant policy, announcing in 1996: "We'll take anonymous complaints, third-hand complaints, we'll take anything."[20]The chief executive needs to make it clear that any attempt to cover up alleged abuse by a police officer is a serious violation of department rules.

Step Four: **An Open and Accessible Citizen Complaint System**

Law enforcement chief executives should take immediate steps to ensure that the department's citizen complaint system is open and accessible to all members of the community.[21] Where an independent citizen oversight agency does not exist, local communities need to create one that is open and accessible.[22]  The minimum conditions of an open and accessible citizen complaint system include: (1) publication and dissemination of materials explaining the complaint system; (2) publication and dissemination of such materials in all languages appropriate to the local community; multiple and convenient locations for filing complaints, including locations separate from police
facilities; (3) procedures to ensure the proper receipt, classification, and investigation of all complaints; and (4) annual publication of complaint data.  Special steps need to be taken to make the complaint process comfortable for female citizens. If a complainant expresses a desire to discuss the incident with a female officer, the department should promptly make a female investigator available. Also, each department needs to have a process where female employees can
bring complaints against other employees and be assured that the complaint will be taken seriously and investigated.

Step Five: **Hire More Female Officers**

Studies have shown that male officers are much more likely to use excessive force and engage in misconduct than female officers. One solution to this problem is simply to hire more

women.
The Feminist Majority Foundation and The National Center for Women & Policing conducted a study on the costs of police misconduct and abuse in the Los Angeles police department as a result of civil liability lawsuits between 1990-1999.[23] The study only analyzed cases involving excessive
force allegations, police officers involved in sexual assaults, and police officers involved in domestic violence incidents that had judgments or out-of-court settlements exceeding $100,000. Between 1990-1999, there were 80 such lawsuits, which cost a total of $67.8 million. Of the 80 lawsuits,
the gender of the officers could be determined in 78, which cost a total of $66.3 million. The study found that female officers were involved in excessive force lawsuits at much lower rates than male officers. No cases of sexual assault or domestic violence listed a female officer as a defendant. Of
the total $66.3 million in payouts, male officers were responsible for $63.4 million, or 95.8 percent. Female officers accounted for $2.8 million, or 4.2 percent. Sexual assault and domestic violence cases, involving only male officers, resulted in $10.4 million in judgments and settlements. The overall ratio of male to female officers and sergeants from 1990-1999 was 4:1. Male officers were also involved in or at the scene of an incident compared to women by a ratio of 9:1. Of the 27 female
officers at the scene of an excessive force incident, only 15 were alleged to be "directly involved in the use of excessive force." The ratio of payouts for killings by male and female officers was 43:1, and the ratio of payouts for assault and battery was 32:1. "Moreover, not one female police officer was named in more than one lawsuit, while some male officers were defendants in more than one case, evidencing a pattern of use of excessive force among these male officers." The National Center for Women & Policing has recommended that departments hire more women not only to change from an aggressive style of policing to one that emphasizes communication, but also to stem the use of excessive force and misconduct.

## IV. CONCLUSION

DWF is a real problem -- spread nationwide – not just isolated incidents here and there. Police departments need to address it as such. Without proper training, supervision, and punishment of offending officers, the problem will continue; and without a commitment to protecting victims of
DWF, police departments will force them to remain silent. Departments must implement complaint systems that allow victims to come forward, and they must take these complaints seriously.

## APPENDIX

[1] Josh White, "Honored Trooper Charged in Bribery," Washington Post
(April 3, 2002).
[2] Daren Briscoe, "Accused Officer is Called Devoted Father, Worker," Los Angeles Times (March 30, 2002).
[3] Mary Anne Janco, "Delco Jury Convicts Officer of Rape Charge,"
Philadelphia Inquirer (March 15, 2002).
[4] Michael Luo, "Officers May Face Federal Charges," Newsday (March 9, 2001).
[5] Dean Esserman, Monitor, First Report of the Monitor (January 2002).
New York v. Town of Wallkill (U.S. District Court, Southern District of New York (01-CIV-0364 (CM).
[6] "Betrayed by a Badge," Newsweek (June 18, 2001): 38-41.
[7] Joe Cantlupe and Lisa Petrillo, Badge of Betrayal: The Devastating

Strue Story of a Rogue Cop Turned Murderer (New York: Avon Books, 1991).
[8] See appendix. An earlier study of this problem is Peter B. Kraska and Victor E. Kappeler, "To Serve and Pursue: Exploring Police Sexual Violence Against Women," Justice Quarterly, 12 (March 1995): 85-111.
[9] Sexual abuse of individuals by police officers is not confined to female drivers. There are also a number of stories of officers entering private homes on the pretext of a search and then assaulting women who live there. In addition, there are a number of stories of male officers harassing or assaulting male drivers whom they have stopped for an alleged traffic violation.
[10] The best book on racial profiling is David Harris, Profiles in Injustice (New York: The New Press, 2001). [See ACLU, Driving While Black (New York: ACLU, 1999). [Available at http://www.aclu.org].
[11] Oscar Corral, "Failure to Go by the Book," Newsday (February 1, 2001).
[12] R. Joseph Gelarden, "Ex-Police Officer Faces New Misconduct Charges," The Indianapolis Star (August 22, 1996).
[13] This is again similar to racist environments in many police departments that have records of DWB abuses. [See reports of suit by officers of color against NJ State Police, alleging racism and forced use of DWB practices.]
[14] National Center for Women & Policing, Equality Denied: The Status of Women in Policing (Los Angeles: NCWP, 1998). [Available at http://www.feminist.org].
[15] Susan Martin, On the Move: The Status of Women in Policing (Washington, DC: The Police Foundation, 1990), pp. 139-164.
[16] See the pioneering effort by Katherine Mader, then-Inspector General of the Los Angles Police Department: Inspector General, Domestic Violence in the Los Angeles Police Department: How Well Does the Los Angeles Police Department Police its Own? (Los Angeles: Office of the Inspector General, 1997).
[17] National Center for Women and Policing, Recruiting and Retaining Women: A Self-Assessment Guide for Law Enforcement (Los Angeles: NCWP, 2000), Ch. 9., "Implementing Family-Friendly Policies," pp, 111-115.
[18] Samuel Walker, "Searching for the Denominator: Problems with Police Traffic Stop Data and an Early Warning System Solution," Justice Research and Policy, 3 (Spring 2001): 63-95.
Deborah Ramirez, Jack McDevitt, and Amy Farrell, A Resource Guide on Racial Profiling Data Collection Systems: Promising Practices and Lessons Learned (Washington, DC: Government Printing Office, 2000). [Available at http://www.ncjrs.org].
[19] See the similar recommendations related to racial profiling in Police Executive Research Forum, Racially Biased Policing: A Principled Response (Washington, DC: Police Executive Research Forum, 2001). [Available at http://www.policeforum.org].
[20] Pamela Cytrynbaum, "Police Sex Abuse Tears at Code of Silence," The Chicago Tribune (February 29, 1996).
[21] U.S. Department of Justice, Principles for Promoting Police Integrity (Washington, DC: Government Printing Office, 2001). [Available at http://www.ncjrs.org].
[22] Samuel Walker, Police Accountability: The Role of Citizen Oversight (Belmont, CA: Wadsworth, 2001). {See http://www.policeaccountability.org].
[23] National Center for Women & Policing, Gender Differences in the Cost of Police Brutality and Misconduct: A Content Analysis of LAPD Civil Liability Cases 1990-1999 (September 5, 2000) [Available at http://www.feminist.org].

Copyright 2002, Samuel Walker, UNO Police Accountability Initiative.
For problems or questions regarding this web site contact Webmaster.

Case 1:05-cv-11547-RWZ   Document 32-3   Filed 05/16/2007   Page 7 of 7



# Pennsylvania State Police
### HONOR, SERVICE, INTEGRITY, RESPECT, TRUST, COURAGE, DUTY

**EXHIBIT C**

**PSP Search**



[ ] [Go!]

▸ Department Information
▸ Frequently Asked Questions
▸ Press Releases
▸ PSP Bureau and Troop Web Directory
▸ PSP Car Safety Seat Information
▸ PSP Crime Prevention Tips
▸ PSP History And Information
▸ PSP Kids' Zone
▸ PSP Memorial Wall
▸ PSP Personal Safety Tips
▸ PSP Telephone Directory
▸ Public Documents, Brochures and Forms
▸ View as Text-Only
▸ Home

[Login]

## Year 2003 Press Releases

PSP Home  Back  Printable Version  eMail  Previous  Next

## State Police Commissioner Calls for Independent Review of Department's Examination of Sexual Misconduct Cases

Implements Steps to Prevent Future Misconduct Cases

HARRISBURG: (June 25, 2003)  State Police Commissioner Jeffrey B. Miller today called  for Governor Edward G. Rendell to seek an independent review of the Department's investigation of sexual misconduct cases between 1995 and 2001.

"I make this recommendation not because I believe the State Police did not handle the cases properly, but because I believe that it is extremely important that an independent reviewer be brought in to examine the information that I have reviewed and make an independent assessment of how the Department handled these allegations," Col. Miller said.

"I believe that by doing this, my review can be confirmed by someone independent of the agency who may also be able to offer additional suggestions or insights that we could employ with the goal of improving the way we handle and prevent this type of misconduct in the future".

Col. Miller said his review of the allegations of sexual misconduct involving Department personnel from 1995 through 2001 found 163 total complaints. Of those, 39 were withdrawn by the complainant, 26 were unfounded, 26 could not be conclusively proven or disproven, 2 are still pending and 2 involved civilian employees that were handled under a previous accelerated grievance procedure and the dispositions are no longer available.

Col. Miller said 68 total complaints in the seven-year period were sustained by  investigation.  Those cases involved 75 troopers, two Liquor Control Enforcement officers and two civilian employees.  In an agency of 5,750 employees, this amounts to 0.19 percent, or less than one-fifth of one percent of the workforce per year.

Twenty of the 68 cases were referred to prosecutors, Col. Miller said.  Eight of the cases resulted in prosecution; in 12 cases, the District Attorney declined to prosecute.  In all cases where the district attorney declined to prosecute, the Department took disciplinary action against the department personnel, up to and including dismissal.  Fourteen department employees were dismissed for sexual misconduct between 1995 and 2002.

Col. Miller also said the Department recently has instituted procedures designed to ensure that persons with psycho-sexual problems are not admitted to the Pennsylvania State Police.  Col. Miller said a polygraph test and complete psychological testing are now administered to every Cadet applicant, a more stringent background investigation is now in place, and the department has added a full-time psychologist to the medical staff.

In addition, Col. Miller said he has implemented a number of steps to ensure that sexual misconduct is eradicated, including:

· A Zero Tolerance Policy on all sexual misconduct cases to ensure that appropriate administrative action is pursued when instances of sexual misconduct, whether on or off duty, are investigated and sustained.

· A department-wide Early Intervention Program to identify any problem behavior or indicators of a potential problem behavior prior to it reaching a critical stage.

· Directing the Deputy Commissioner of Administration to ensure that all Commanders receive enhanced training on the adjudication of investigations referred to them from the Bureau of Professional Responsibility.

· Implementing a new procedure in the Cadet background screening process, which currently requires a two-thirds vote of three members of the screening panel for action.  The new procedure will call for a second panel to convene to review the Cadet package if there is any dissenting opinion on the original panel.

· Instituting additional training at the State Police Academy for all new  cadets on the consequences of violating the Code of Conduct.

"I am extremely proud to be a member of the Pennsylvania State Police, one of the finest police organizations in the world," Col. Miller said.  "I am equally proud of the men and women of the State Police, the overwhelming vast majority of whom always conduct themselves professionally and are dedicated to solving problems and to helping others."

# # #

Pennsylvania State Police
Public Information Office
1800 Elmerton Avenue
Harrisburg, PA 17110
717-783-5556



Home

© Copyright 2003-04, Commonwealth of PA - Pennsylvania State Police

This Web Site is for information and Online Services only - If you have an emergency, crime, or incident  to report,  please contact your nearest Police Agency or call 911.

Some Documentation/Information on this site may require the ADOBE Acrobat Viewer...

Comments/Suggestions/Technical Questions? Use our PSP Contact Web Form.

# Criminal Justice Review

http://cjr.sagepub.com

**Police Sexual Misconduct: Officers' Perceptions of its Extent and Causality**
Timothy M. Maher
*Criminal Justice Review* 2003; 28; 355
DOI: 10.1177/073401680302800209

The online version of this article can be found at:
http://cjr.sagepub.com/cgi/content/abstract/28/2/355

Published by:
SAGE Publications
http://www.sagepublications.com

On behalf of:
Georgia State University, College of Health and Human Sciences

Additional services and information for *Criminal Justice Review* can be found at:

**Email Alerts:** http://cjr.sagepub.com/cgi/alerts

**Subscriptions:** http://cjr.sagepub.com/subscriptions

**Reprints:** http://www.sagepub.com/journalsReprints.nav

**Permissions:** http://www.sagepub.com/journalsPermissions.nav

**Citations** (this article cites 13 articles hosted on the
SAGE Journals Online and HighWire Press platforms):
http://cjr.sagepub.com/cgi/content/abstract/28/2/355#BIBL

Downloaded from http://cjr.sagepub.com by guest on April 29, 2007
© 2003 Georgia State University, College of Health and Human Sciences. All rights reserved. Not for commercial use or unauthorized distribution.

EXHIBIT D



**THE COMMONWEALTH OF MASSACHUSETTS**
**MIDDLESEX DISTRICT ATTORNEY**
40 THORNDIKE STREET CAMBRIDGE MA 02141

Tel: 617-679-6500
Fax: 617-494-5558

GERARD T. LEONE JR.
DISTRICT ATTORNEY

---

### FACSIMILE TRANSMITTAL SHEET

| TO: Police Prosecutor | FROM: Tom Sullivan |
|---|---|
| COMPANY: Medford PD | DATE: May 1, 2007 |
| FAX NUMBER: (781) 395-5177 | TOTAL NO. OF PAGES INCLUDING COVER: 2 |

RE: Commonwealth v. Bryan Saintilus

---

☐ URGENT    ☐ FOR REVIEW    ☐ PLEASE COMMENT    ☐ PLEASE REPLY    ☐ PLEASE RECYCLE

---

PLEASE FIND THE ATTACHED NOTIFICATION FOR SGT. MONTANA. IF YOU
HAVE ANY QUESTIONS PLEASE CALL ME AT 617-679-6591. THANK YOU.

*Criminal Justice Review*
Volume 28, Number 2, Autumn 2003

©2003 College of Health and Human Sciences
Georgia State University

# POLICE SEXUAL MISCONDUCT: OFFICERS' PERCEPTIONS OF ITS EXTENT AND CAUSALITY

## Timothy M. Maher

This article reports on a survey of police officers in 14 different police agencies in four counties in the St. Louis metropolitan area. Results from a self-administered questionnaire followed by an oral interview indicate that officers reported sexual misconduct to be common and reveal a broad consensus among officers that the more serious forms of this behavior should not be tolerated. Nevertheless, none of the departments studied was found to have a formal policy specifically proscribing sexual misconduct, and criminal justice officials have done little to help control the problem, suggesting that this problem may in part be fostered by the police subculture. The conclusion explores policy implications within law enforcement and suggests the need for increased attention from researchers and from criminal justice officials and personnel.

"Police deviance" is a term that refers to a wide variety of activities that are not consistent with an officer's authority or that violate the standards of ethical conduct expected of members of the criminal justice system. Although police deviance has received substantial public and scholarly attention in recent years (Barker & Carter, 1994; Carter 1990; Christopher Commission, 1992; Kappeler, Sluder, & Alpert, 1998), sexual misconduct, especially nonviolent sexual misconduct, has been largely neglected. Media attention to some cases involving police sexual misconduct suggests that members of the public are concerned about and interested in controlling such behavior (Bryant, 2000; Parish, 1998a, 1998b, 2001).

Police sexual misconduct (PSM) compromises the integrity of the law enforcement community and interferes with police officers' ability to effectively perform their duties. Police work provides a unique opportunity for sexual misconduct. The combination of police authority, an unsupervised atmosphere, and the frequent isolated contact with the public helps create situations where police officers have ample opportunity to participate in various forms of this behavior. In addition, policing is a predominantly male institution dominated by the masculine culture. Some argue that, when combined with the monopoly that police have on state-sanctioned violence, this male-dominated culture presents a basis for sexual victimization (McGurrin & Kappeler, 2002).

The present article examines police officers' perceptions of the extent of PSM, as well as factors that may influence officers' decisions to engage in or refrain from this behavior. All forms of PSM, including the more serious, violent criminal incidents as well as the less serious, noncriminal forms of this behavior, are

Downloaded from cjr.sagepub.com by guest on April 29, 2007
© 2003 Georgia State University, College of Health and Human Sciences. All rights reserved. Not for commercial use or unauthorized distribution.
from the SAGE Social Science Collections. All Rights Reserved.

addressed. To begin, an operational definition of "police sexual misconduct" is developed. Second, prior research on PSM is reviewed. Third, the results of a survey of active police officers in the St. Louis metropolitan area are described. Key to this section of the article is an attempt to determine how the concept of sexual misconduct is constructed and perceived by police officers and to examine their views regarding levels of occurrence. Finally, implications are discussed, including the need to bring attention to PSM and to create an agenda for future research.

## DEFINING POLICE SEXUAL MISCONDUCT

There is a lack of uniformity in descriptions of deviance and of police deviance, which has created a problem in precisely defining these terms and makes it equally difficult to define PSM. Several approaches have been taken to describe police deviance, ranging from narrowly focused forms of deviance to more general classifications of categories of misconduct (Geller, 1984; Sherman, 1980).

Barker and Carter (1994) have proposed a two-category typology in the definition of police deviance. The first category, "occupational deviance," is defined as "deviant behavior both criminal and non-criminal, committed under the guise of a police officer's authority," which manifests itself in two forms, police corruption and police misconduct (p. 6). The second category, "abuse of authority," is described as "any action by a police officer without regard to motive, intent, or malice that tends to injure, insult, trespass upon human dignity, manifest feelings of inferiority, and/or violates an inherent legal right of a member of the police constituency in the course of performing police work" (p. 7). Both categories of Barker and Carter's definition of police deviance relate well to police sexual misconduct.

Kappeler et al. (1998) contend that general definitions of deviance referring to violations of society's norms create a problem because not all people or groups of people share the same ideas about what is deviant behavior and what is not. This may apply to PSM, because rules and standards governing this behavior are not clear, and not all PSM may be viewed as deviant by individual officers or police social groups.

Whether police behavior is deviant depends primarily on two sets of standards or rules. The first, "external rules or standards," includes constitutional, criminal, common, and civil laws, as well as public opinion. The second, "internal rules or standards," includes departmental policies, procedures, practices, and regulations. External standards are generally clear, at least in comparison with internal rules (Kappeler et al., 1998). Although most police departments have extensive lists of rules and regulations governing much police behavior, the 14 St. Louis area police departments that were surveyed for the present article were all found to have no formal policy specifically addressing sexual misbehavior.

Downloaded from http://cjp.sagepub.com by guest on April 29, 2007
© 2003 Georgia State University, College of Health and Human Sciences. All rights reserved. Not for commercial use or unauthorized distribution.

Review of the literature reveals no single definition of PSM that broadly describes this behavior. However, some researchers have focused more narrowly on PSM, with most attention being paid to the more violent forms of this behavior. For example, Kraska and Kappeler (1995) examined "police sexual violence" and defined it as "those situations in which a female citizen experiences a sexually degrading, humiliating, violating, damaging, or threatening act committed by a police officer through the use of force or police authority" (p. 93). Their work identifies a continuum of police violence ranging from very serious incidents such as rape and sexual assault to far less serious incidents such as voyeuristic behaviors. Although they acknowledge the existence of "consensual sex" and other less serious forms of sexual misconduct, they focus primarily on sexual misconduct that has been officially recognized and involves violence or the use of police force.

Because no single existing definition of PSM is comprehensive enough to meet the needs of this article, the following definition is used: "Any behavior by a police officer, whereby an officer takes advantage of his or her unique position in law enforcement to misuse his or her authority and power to commit a sexually violent act, or to initiate or respond to some sexually motivated cue for the purpose of personal gratification. This behavior must include physical contact, verbal communication, or a sexually implicit or explicit gesture directed toward another person." This definition was developed by elaborating on the police deviance literature and by incorporating general principles of acceptable and unacceptable behavior common to law enforcement.

## PRIOR RESEARCH

Historically, most of the research on police misconduct has focused on corruption and graft (Barker, 1978; H. Goldstein, 1975; Lundman, 1974; Sherman, 1980). Relatively little attention has been focused on less traditional forms of police misconduct. There does, however, appear to be a growing awareness among scholars that police abuse their position in pursuit of personal sexual interest. Nevertheless, few researchers have focused their attention specifically on police sexual misconduct, and a review of the literature reveals only a handful of studies.

One study examined the perceptions of employees in a small southern city police department about police officers' sexual activity while on duty. Barker (1978) reported that both civilian employees and police officers believed that many officers in that department had sex while on duty.

Kraska and Kappeler (1995) and McGurrin and Kappeler (2002) focused primarily on police sexual violence, examining cases exposed through the courts and the media. These two studies point to the lack of response by state officials, which suggests institutional and cultural support for PSM. These researchers contend that police secrecy and institutional support for PSM make it difficult to gather data on this topic.

Downloaded from ??? by guest on April 29, 2007
© 2003 Georgia State University, College of Health and Human Sciences. All rights reserved. Not for commercial use or unauthorized distribution.

358    *Timothy M. Maher*

Eschholz and Vaughn (2001), Kappeler and Vaughn (1997), and Vaughn (1999) focused on civil liability associated with police and correctional officer sexual violence. These researchers point out that police and correctional officers are increasingly being held civilly liable for sexual misconduct and that civil liability for PSM is currently more common than criminal litigation. These studies suggest that there is a high likelihood of municipal liability for PSM and that governmental agencies must take this behavior more seriously.

Sapp (1994) addresses PSM in a more general context and notes that it is a "problem worthy of study" (p. 188). He says that toleration of PSM at any level invites such conduct and that the problem will not be eliminated until the "boys will be boys" attitude (p. 198) among police administrators and supervisors is abandoned.

Finally, Walker and Irlbeck (2002) address the specific problem of "driving while female," which they describe as police officers stopping vehicles on the pretense of legitimate traffic violations in order to sexually harass and abuse female drivers. They conclude that the problem is widespread and that police departments need to address it as such.

These prior studies represent important steps in advancing our understanding of PSM, and the total weight of the evidence suggests that this behavior is not isolated. Much of the information in prior studies was taken from cases in which the victims made their victimization public, through either the media, the criminal justice process, or the civil courts. However, many citizens do not report crimes, provide information to the police, or testify, even when they have been victimized and it would appear to be in their best interest to do so (Kappeler et al., 1998). In addition, much of the previous research has focused primarily on police and correctional officer behavior involving sexual violence, which includes unobtrusive viewing, sexual harassment, kidnapping, rape, and murder (Baro, 1997; Kraska & Kappeler, 1995). As a result, many unreported incidents of PSM have not been addressed.

Previous research has drawn needed attention to PSM, especially the most serious forms of this behavior, but not enough research has been done using the technique employed in this article, which addresses a significant component of less intrusive but still morally questionable behavior. This behavior includes such activities as pulling over a driver to get a closer look at or flirt with the vehicle's occupants, running a computer check on a vehicle license plate to find out where an attractive driver lives, or having sex in the back seat of a police patrol car. Much of this behavior remains secret because the victims choose not to report the incidents, the behavior is consensual, the victims are unaware that they have been victimized, or the behavior is not considered serious enough to warrant formal reporting.

The full extent of PSM is unknown, and acquiring information on PSM is challenging. Efforts to uncover it are hampered by several factors. First, many women who are sexually victimized by police choose not to report the incidents out

Downloaded from http://ccj.sagepub.com by guest on April 29, 2007
© 2003 Georgia State University, College of Health and Human Sciences. All rights reserved. Not for commercial use or unauthorized distribution.

of fear of retaliation, fear of not being believed, or fear of being blamed for the incident (Kraska & Kappeler, 1995; McGurrin & Kappeler, 2002). Sykes and Matza (1957) argued that deviants use "neutralization techniques" that help to deflect the stigma of the deviant act from the offender to the victim. These techniques help to create an atmosphere where audiences (the public, policy makers, and law enforcement administrators) accept justification for deviance (e.g., sexual misconduct) and victims are reluctant to report it (Kappeler et al., 1998).

Some victims fear the depersonalization and humiliation of the phenomenon called "secondary victimization," by which victims of some crimes, especially sexual violence, are often subjected to negative experiences in the criminal justice system (Murram, Hellman, & Cassinello, 1994; President's Task Force on Victims of Crime, 1982; Schneider, 1993).

Finally, the blue wall of silence, the blue curtain, the code of secrecy, or the ethos of secrecy as it is sometimes called, restricts citizens from learning about police business. The code of secrecy, in its most general sense, means that officers are not to discuss the details of police behavior with others, especially the behavior of officers on their shift (Reuss-Ianni, 1983). Some contend that police departments and police officers cover up, ignore, or remain silent about incriminating matters even when they are brought to their attention (H. Goldstein, 1977; Parish, 2001; "Sexual Misconduct by Officer," 1992).

Reported cases of PSM are similar to the activities of other hidden populations, such as drug users, whose activities are clandestine and concealed from mainstream society and are frequently only exposed and made visible when they enter institutional settings. Although the courts and other institutional settings provide relatively easy access to some hidden populations, they are limited because they generally exclude the larger non-institutionalized populations (Watters & Biernacki, 1989).

## METHODS AND DATA

Two primary objectives of this work are to help identify hidden cases of PSM by exploring police officers' perceptions of the frequency of this behavior (in its various forms) and to identify factors that police officers believe influence officers' decisions to engage in or refrain from such behavior. By recruiting and interviewing active police officers, it is possible to uncover incidents of PSM that were not reported by citizens and to identify cases that have not entered institutional settings. Although the "blue wall of silence" is a formidable obstacle, Sapp (1994) successfully interviewed officers in several states about PSM. His research demonstrates that the wall of silence can be breached and that some officers are willing to discuss incidents involving PSM. He questioned officers about their involvement in seven different categories of PSM:

Downloaded from http://cjr.sagepub.com by guest on April 29, 2007
© 2003 Georgia State University, College of Health and Human Sciences. All rights reserved. Not for commercial use or unauthorized distribution.

1. *Nonsexual contacts that are sexually motivated.* Behaviors that are sexually motivated without direct sexual actions or inferences. These behaviors may or may not be recognized by the citizen as sexually motivated. An example of this type of behavior may include making a sexually motivated traffic stop, whether it is valid or invalid, for the purpose of getting a closer look at or information from an occupant of a vehicle.

2. *Voyeuristic contacts.* Behavior involving an officer seeking out opportunities to view unsuspecting citizens partially clad or nude. Examples of this behavior include looking in windows of houses or buildings and seeking out parked cars in hopes of observing sexual activities of the occupants.

3. *Contacts with crime victims.* Behaviors that involve an officer who takes advantage of the opportunity to contact a crime victim in part for the purpose of initiating sexual contact with that victim. Examples of this behavior include making unnecessary callbacks or visits to a crime victim or taking advantage of the susceptible emotional state of a sex crime victim.

4. *Contacts with offenders.* Behaviors that involve using police authority to take advantage of suspected offenders who are exposed to the sexually motivated actions of a police officer. These include any sexually motivated harassment by an officer. Examples include performing unnecessary searches, frisks, and pat-downs or rubbing against a suspect in an arrest situation for the purpose of sexual gratification.

5. *Contacts with juveniles.* Behavior that involves an officer accepting or initiating sexual contact with any juvenile. This also includes any sexually motivated harassment by an officer.

6. *Sexual shakedowns.* Behavior that involves the demand of sexual service from an unwilling citizen who is involved in some illegal activity. The citizen yields to the demands solely on the basis of police authority to arrest. An example of this misconduct is demanding sexual service from a suspect in exchange for the officer not arresting the suspect.

7. *Citizen-initiated sexual contacts.* This behavior involves an officer accepting any sexual contact that was initiated by a citizen.

These seven categories serve as the basis of the research reported in this article, with one additional category:

8. *Officer-initiated sexual contacts.* Any behavior that involves sexual contact between an officer and a citizen where the officer initiated the contact and the citizen willingly participates.

Although these eight categories are not exhaustive, they do account for a wide range of PSM, including both criminal and noncriminal incidents, and generally represent those areas involving the vast majority of sexual misconduct.

Downloaded from http://csp.sagepub.com by guest on April 29, 2007
© 2003 Georgia State University, College of Health and Human Sciences. All rights reserved. Not for commercial use or unauthorized distribution.

Some acts of PSM occur while an officer is off duty but result from contact that was initiated while the officer was on duty and are directly related to the officer's power and authority as a police officer. Although duty status is not important to the victims of PSM and off-duty PSM is no less deviant than the on-duty variety, the current article focuses exclusively on PSM that occurs while the officer is on duty in an official capacity.

To gather sensitive information from active police officers, one must gain at least partial access to the world of the police subculture in order to establish credibility and trust. Making the initial contact may be the most difficult aspect of gaining access to a hidden population. To obtain cases for this study, the researcher began by contacting and interviewing police officers with whom the researcher was personally acquainted. Those officers then provided names of other officers who were willing to participate in the study. This methodological approach is commonly referred to as a "chain-referral" or "snowball sample" and is extensively described in the literature (Erickson, 1979; Heckathorn, 2002; Sudman, 1976). Similar methods have been used successfully by researchers when gathering information from hidden populations on deviant, sometimes criminal behavior (Jacobs, 2000; Taylor, 1985; Wright & Decker, 1994).

Using a referral network for gathering research subjects does have its limitations. First, limitations arise from the choice of subjects in the initial sample, who in turn refer others with whom they have social ties, such as friends, relatives, and other associates, leading to sample "homophily" (Erickson, 1979). Second, referrals occur through network links, so those who are more gregarious and socially central are more likely to be drawn into the sample than those who are less social members of the population (Heckathorn, 2002). Third, the researcher's personal acquaintance with some of the respondents may have biased their responses. They may have been reluctant to divulge certain incidents of personal misconduct because they were uncomfortable or embarrassed or because they feared a breakdown in confidentiality. A fourth limitation relates to respondents' fear of violating the confidentiality of other population members, preventing them from referring certain individuals in order to avoid violating that confidentiality. The first two limitations, related to sample homophily and the more socially central individuals being represented in the study, could apply to this sample. Given the potential difficulties in accessing hidden populations, certain limitations must be tolerated. However, efforts were made to reduce the likelihood—and control for the effects—of the third and fourth limitations.

With respect to the third limitation, which suggests possible biased responses from study participants due to the personal relationship of the participants and the investigator, it is likely that this problem was reduced by allowing respondents to provide information without actually identifying themselves as having participated in the incident. Because responses included both incidents in which the officers themselves participated and incidents that were related to them firsthand by other

Downloaded from http://cjr.sagepub.com by guest on April 29, 2007
© 2003 Georgia State University, College of Health and Human Sciences. All rights reserved. Not for commercial use or unauthorized distribution.

362    *Timothy M. Maher*

officers, it was not possible to determine whether the respondent actually participated in the incident. The fourth limitation, which suggests that some officers may not be willing to refer some individuals for fear of breaching confidentiality, was addressed by providing initial respondents with the option of contacting potential referrals for their approval (which many did) prior to actually referring them to participate in the study.

The principal data-gathering instruments for this study consisted of survey questionnaires and personal interviews. The surveys were hand-delivered and were completed in the researcher's presence. The questionnaires consisted of 16 questions in four sections. The first section was designed to gather general information about the respondents and their police agencies. The second was designed to obtain information about the officers' firsthand and secondhand knowledge of PSM in metropolitan area police departments. Firsthand knowledge is defined as knowledge gained from having personally participated in PSM, from having personally witnessed PSM, or from having another officer relate an incident of PSM in which he or she participated. Secondhand knowledge is defined as knowledge gained from being told about an incident of PSM by a third party. Officers were advised to report those firsthand and secondhand incidents that were related to them by other officers only if they reasonably believed them to be true. The third section of the questionnaire focused on respondents' perceptions of the police assignments and shifts that were most likely to be associated with PSM. The final section requested officers to rate a list of nine factors on their level of influence on officers' decisions to engage in or refrain from PSM. A copy of the full survey instrument appears in the Appendix.

Completion of the questionnaire required approximately 30 minutes to an hour, after which an unstructured interview was conducted lasting approximately 20 minutes to an hour. During these interviews officers were asked to elaborate on and provide more specific detail for their survey responses. In addition, all participants were asked questions that were not included in the written survey. Officers were asked, for example, to estimate the percentage of officers whom they believed to engage in PSM, to state whether they would report a fellow officer for PSM, and to relate at least one specific example of an "outrageous" or "notable" incident of PSM of which they had firsthand knowledge. Interviews were not tape recorded, and officers' responses were reconstructed as accurately as possible from handwritten notes. To accommodate the participants, they were asked to suggest a convenient yet private location to complete the surveys and interviews. Locations included the researcher's office at the university, various locations within the participants' own police stations (e.g., their personal offices and police department interview and interrogation rooms), public parks, participants' homes, and the researcher's home.

A total of 40 police officers from 14 police agencies participated in the study. The researcher was personally acquainted with 16 officers, who represented 10 of

Downloaded from http://online.sagepub.com by guest on April 29, 2007
© 2003 Georgia State University, College of Health and Human Sciences. All rights reserved. Not for commercial use or unauthorized distribution.

the agencies in the sample. The remaining 24 participants were recruited using recommendations and referrals from the first 16 officers. The sample consisted of at least two officers from every participating agency, with two exceptions. Thus, although 14 police agencies are "represented" in this study, the absence of random sampling and the small sample size do not allow for systematic comparisons across agencies. Although the representativeness of this sample can never be determined conclusively, it must be recognized that PSM is a sensitive subject and this article is exploratory in nature.

Overall, the sample of officers possessed considerable experience and were employed at larger departments. Twenty-four of the officers were employed at departments with more than 50 sworn officers, and 15 officers were employed at medium-size agencies that employed between 20 and 50 sworn officers. Only one officer in the sample was employed at a small department with fewer than 20 officers. The respondents' average number of years of experience was 13.3. In terms of occupational role, 19 officers were assigned to the patrol division, 13 were assigned to detective units, four were assigned as sergeants in the patrol division, and two held the rank of lieutenant. Thirty-five officers were male and five were female. Thirty-two of the subjects reported that they were currently married, four reported that they were single, and four reported that they were divorced. Although not random, the sample does reflect differences in agency size, rank, and experience that are roughly typical of officers employed with police departments in the St. Louis metropolitan area (St. Louis County Police Department, 2000).

## FINDINGS

The number of reported incidents of PSM ranged considerably among the responding officers. Table 1 presents the total number of incidents, mean, median, and standard deviation for all cases reported by the 40 officers. In addition, Table 1 shows the frequencies for the total number of incidents reported by the 40 officers divided by the total years of service and the average number of incidents reported per year of service, per officer. The total number of incidents reported by all officers was 20,582 for an average of 515 per officer. The standard deviation was 595. The average number of incidents reported by all officers per year of service was 39.

The distribution of reported incidents is highly skewed, as reflected by the much larger mean than median number of incidents per officer-year, as well as the large standard deviation in relation to the mean. Two officers reported exceptionally high numbers of incidents. Officer #17 reported a total of 3,470 incidents over a four-year career, averaging 867.5 incidents per year. Officer #19 reported a total of 1,446 incidents over a two-year career, averaging 723 incidents per year. Both of these cases were outliers. With those cases removed from the sample, the total number of incidents is reduced to 15,666 and the average per year drops from 39 to

Downloaded from http://cjr.sagepub.com by guest on April 29, 2007
© 2003 Georgia State University, College of Health and Human Sciences. All rights reserved. Not for commercial use or unauthorized distribution.

29, with a standard deviation of 25. At the same time, some officers reported exceptionally low numbers of incidents, averaging only three incidents per year.

Table 1

PSM Incidents Reported by 40 Police Officers

|  | Incidents reported |
| --- | --- |
| Total | 20,582 |
| Mean | 515 |
| Median | 268 |
| Standard deviation | 595 |
| Mean per total years of service per officer | 39 |

Some variation in perceived levels of PSM occurred among officers employed at the same agency. For example, officers #26 and #36 were both employed at the same police department as officer #17, who reported an average of 867.5 incidents per year, the largest number reported. Officer #26 by contrast reported an average of 12.4 incidents per year, and officer #36 reported an average of 134 incidents per year. Moreover, officer #19, who reported an average of 723 incidents per year, was employed at the same agency as officer #28, who reported 7.5 incidents per year, and officer #38, who reported an average of 119.5 incidents per year. This suggests that the officers had very different experiences with regard to their knowledge of PSM and that there is much variability in PSM within police agencies.

The mean number of reported firsthand-knowledge and secondhand-knowledge incidents for the 14 departments ranged from a low of nine incidents per officer per year to a high of 261 incidents per officer per year. When the two outliers are removed, the high number drops to 68. The average number of incidents reported per officer per year by department was 54.25, with a standard deviation of 74. The average drops to 22.52 when the outliers are removed (standard deviation = 17).

### Officers' Firsthand and Secondhand Knowledge of PSM

Officers' recorded firsthand and secondhand knowledge of incidents of PSM was listed in two categories: those incidents that occurred during the last year and those that occurred since the time the officers were first employed in the St. Louis metropolitan area. As shown in Table 2, the 40 officers reported a total of 671 firsthand-knowledge incidents during the last year, for an average of 16.77 per officer. The participants reported a total of 8,306 firsthand-knowledge incidents

Downloaded from http://csx.sagepub.com by guest on April 29, 2007
© 2003 Georgia State University, College of Health and Human Sciences. All rights reserved. Not for commercial use or unauthorized distribution.

since they were first employed in the St. Louis area. The officers served a total of 532 years of service; therefore, 15.61 firsthand-knowledge incidents per year of service were reported.

**Table 2**

**Knowledge of PSM Reported by 40 Police Officers**

| | Firsthand knowledge | | | Secondhand knowledge | | |
|---|---|---|---|---|---|---|
| | Last year | Ever | Per year service | Last year | Ever | Per year service |
| Nonsexual contacts | 213 | 3,481 | 6.54 | 374 | 3,901 | 7.33 |
| Voyeuristic behavior | 122 | 1,426 | 2.68 | 259 | 3,032 | 5.69 |
| Contacts with juveniles | 2 | 66 | .12 | 2 | 47 | .08 |
| Contacts with crime victims | 35 | 242 | .45 | 74 | 202 | .37 |
| Sexual shakedowns | 1 | 11 | .02 | 4 | 40 | .07 |
| Contacts with offenders | 27 | 168 | .31 | 91 | 314 | .59 |
| Citizen-initiated contacts | 110 | 1,150 | 2.16 | 246 | 1,899 | 3.56 |
| Officer-initiated contacts | 161 | 1,762 | 3.31 | 436 | 2,841 | 5.34 |
| Total | 671 | 8,306 | | 1,486 | 12,276 | |
| Mean total per year | 16.77 | 15.61 | | 37.15 | 23.07 | |

Secondhand-knowledge responses were also listed in two categories: those incidents that occurred during the last year and those that occurred since the time the officers were first employed in the St. Louis area. The 40 officers reported a total of 1,486 secondhand-knowledge incidents of PSM during the last year, for an average of 37.15 incidents per officer. They reported a total of 12,276 secondhand-knowledge incidents since the time they were first employed in the St. Louis area, for an average of 23.07 incidents per year of service.

"Telescoping," a problem common to some survey research, is the tendency to report incidents that occurred outside the reference period used in the survey. The data for firsthand-knowledge and secondhand-knowledge incidents exhibit measurement instability, suggesting that telescoping may have occurred among officers reporting PSM. It is important to mention that the numbers of incidents reported as having occurred beyond the last year, over the entire careers of the officers, are in some cases approximations, especially for those categories where large numbers of incidents were reported. Although unfortunate, this is to be expected in a study of this nature, and this especially holds true for the more experienced officers who had to recall from longer periods.

Downloaded from http://cjr.sagepub.com by guest on April 29, 2007
© 2003 Georgia State University, College of Health and Human Sciences. All rights reserved. Not for commercial use or unauthorized distribution.

366    *Timothy M. Maher*

The number of PSM incidents reported by officers in this study may appear high or even alarming, but, because no previous research has employed the technique used in this study, it is difficult to determine whether these figures are unusual. This demonstrates the need for additional research in this area. It is likely, however, that not all reported incidents of PSM in this study are mutually exclusive and that some incidents were reported by more than one officer and consequently were counted more than once. Duplication of reported incidents is more likely to have occurred among officers employed at the same agency, as opposed to interagency reporting. It is also likely that more duplication occurred in reporting for secondhand-knowledge incidents than for firsthand. How much duplication in reported incidents occurred is unknown. However, duplication of reported incidents did in all likelihood result in an inflated value in the overall number of incidents.

Three categories of PSM account for a majority of the incidents: nonsexual contacts, voyeuristic behavior, and officer-initiated contacts. Two categories of behavior reveal very low levels of misconduct: contacts with juveniles and sexual shakedowns. The remaining three categories, citizen-initiated contacts, contacts with crime victims, and contacts with offenders, show moderate to low levels of PSM. The same three categories that reveal high levels of firsthand knowledge also reveal high levels of secondhand knowledge.

The data from this study indicate that officers perceive that the majority of PSM incidents do not involve conduct of a serious criminal nature (e.g., rape, sexual assault, contacts with juveniles, and sexual shakedowns). Firsthand-knowledge and secondhand-knowledge incidents involving juveniles, sexual shakedowns (e.g., trading sex for not arresting the suspect), and contacts with offenders (e.g., unnecessary searches) account for only three percent or 646 of the 20,582 total incidents ever reported. The data also reveal that PSM is rarely violent (in comparison to nonviolent incidents) and that it frequently involves consensual behavior (willing participants not coerced through police power or authority or acting under some form of duress). A total of 7,652 or 37 percent of incidents ever reported (firsthand and secondhand knowledge of citizen-initiated and officer-initiated contacts) involved consensual contacts among adults. It is important to note, however, that the data reflect the worldviews of the reporting officers, and incidents that were reported as consensual by survey participants may not be viewed as consensual by others, including other participants.

Nonsexual contacts (e.g., making a traffic stop for the purpose of getting a closer look at or information from the driver), voyeuristic behavior (e.g., viewing unsuspecting lovers having sex in their automobile), and contacts with crime victims (e.g., unnecessary callbacks or visits with an attractive crime victim) account for 60 percent or 12,284 of the total incidents ever reported. These categories of PSM all involve the misuse of police authority and in some instances could potentially be classified as criminal offenses. (These percentages remain very similar with the two outliers removed from the data.)

Downloaded from http://criminology.com by guest on April 29, 2007
© 2003 Georgia State University, College of Health and Human Sciences. All rights reserved. Not for commercial use or unauthorized distribution.

The lack of reported serious incidents of PSM could be interpreted in different ways. First, officers may not be willing to report serious incidents for fear of possible repercussions for offending officers. Second, there may be far fewer serious incidents actually occurring. Third, officers may be inaccurately reporting incidents because of their personal perceptions of what is forced and violent and what is not. However, even if the serious incidents in this study were underreported by a factor of two or three, the great majority of reported incidents would remain in the less serious categories. Although they are less intrusive, these less serious incidents are still morally questionable behavior, are no less wrong, should be addressed, and should not be tolerated. Although serious criminal incidents did not constitute a large percentage of the PSM reported in this survey, previous literature suggests that police sexual violence is not uncommon and is fostered by the police subculture (Eschholz & Vaughn, 2001; Kappeler & Vaughn, 1997; Kraska & Kappeler, 1995; McGurrin & Kappeler, 2002).

Officers in the current study were asked to estimate the level of participation for the eight categories of PSM addressed in this research. On average, they reported that 36.5 percent of all officers in their respective departments participated in at least one of the eight forms of misconduct. This figure is quite close to the prevalence measure reported in prior research in which it was related that police department employees believed that 31.84 percent of their fellow officers had sex while on duty (Barker, 1978). However, the level of perceived participation in PSM varied significantly among officers in this study, with two officers reporting less than five percent participation, while two others reported 100 percent participation.

## Officers' Definitions

Many officers struggled to provide a definition of sexual misconduct, and few were able to do so without significant deliberation. Two officers chose not to provide any definition. Those two officers stated that they could provide examples of this behavior but that they could not clearly define the term. One of the officers simply wrote "unsure" and the other wrote "awkward."

Variance in the number of reported PSM incidents depends on how officers define the behavior. Only one officer reported having seen a definition for PSM, but that officer could not recall the source. One officer stated that his department had a policy specifically addressing PSM; however, further investigation revealed that this was inaccurate and that no specific policy for PSM existed in that department. Even without specific policies, however, many definitions provided by survey participants were generally similar.

For example, common to many definitions was the distinction between consensual and nonconsensual or unwanted behavior. Of course, whether an act is truly consensual or unwanted is a matter of opinion, and some acts viewed as consensual by the officer may in fact be viewed as unwanted by the other person.

Downloaded from http://cjr.sagepub.com by guest on April 29, 2007
© 2003 Georgia State University, College of Health and Human Sciences. All rights reserved. Not for commercial use or unauthorized distribution.

Nevertheless, this perception among officers suggests that police officers view certain forms of PSM as less serious and that certain behaviors (e.g., those acts that are viewed by officers as consensual), although still wrong, are more likely to be tolerated, ignored, or covered up.

Many officers ($n = 20$) included in their definitions some reference to "on-duty" behavior or activities occurring in the official capacity of their job. Although officers generally agreed that sexual misconduct occurring on duty was inappropriate, only one officer mentioned "off-duty" behavior, and only one mentioned behavior pertaining to secondary police-related employment. This suggests that police officers may not perceive any connection between officers' sexual misconduct while off duty and the police profession, including the power and control that comes with the profession. Duty status is irrelevant, however, and the victim does not care about the time of occurrence (on duty or off duty) but is only concerned that the officer used the authority and power of their police position to perpetrate the act.

There was little agreement on exactly what behaviors constitute PSM. In addition, officers were generally uncertain about the disciplinary action associated with PSM and many suggested that it would probably depend on the severity of the incident. When interviewed about their definitions, many officers suggested that as long as the behavior was consensual and between adults it should not result in termination. Others, however, noted that if an officer were repeatedly disciplined for "less serious" forms of PSM it might be grounds for termination. On the other hand, all of the subjects agreed that any incident involving nonconsensual behavior is criminal, which is never acceptable and should result in termination or criminal charges.

How police officers construct their perception of PSM is crucial for identifying levels of PSM and ways to control it. In addition, the lack of consensus among police officers about what disciplinary measures should be taken for PSM suggests a need for specific guidance. Only one officer from the 14 departments represented in this sample reported having knowledge of a specific written policy on PSM. Official representatives of six of the 14 agencies were contacted, and they confirmed that their departments had no such policy; these included a representative of the agency of the officer who reported that his department had a policy on PSM. In addition, only three officers could vaguely recall PSM being mentioned during their police academy training or by their field-training officers. Consequently, officers who participated in this study had received virtually no official guidance or information for constructing a definition of PSM.

## Officers' Perceptions of Influential Factors

The survey participants were asked to rate a set of nine factors to assess those factors' influence on the decision to engage in or refrain from PSM. The rating

Downloaded from http://cjp.sagepub.com by guest on April 29, 2007
© 2003 Georgia State University, College of Health and Human Sciences. All rights reserved. Not for commercial use or unauthorized distribution.

*Criminal Justice Review*    369

scale ranged from one to four, with one being not important and four being very important. The nine factors and their ratings are displayed in Table 3.

**Table 3**

Views of 40 Police Officers on Factors Influencing PSM

| Factors | Mean rating |
| --- | --- |
| Personal morals and values | 3.8 |
| Self-control (opportunity exists, little chance of discovery) | 3.7 |
| Concern over reaction of spouse or significant other | 3.2 |
| Availability of misconduct opportunities | 2.9 |
| Disciplinary measures taken by department | 2.8 |
| Climate of department and/or squad assignment | 2.8 |
| Lack of adequate supervision | 2.7 |
| Officer peer pressure | 2.5 |
| Formal written policy of department on sexual misconduct | 2.4 |

Rating scale: 4 = very important, 1 = not very important.

The officers reported that their "personal morals and values" most influenced their conduct (mean = 3.8). The officers also indicated that self-control (mean = 3.7) and concern over the reaction of a spouse or significant other (mean = 3.2) were also very influential. Four factors received high to moderate ratings: availability of misconduct opportunities (mean = 2.9), disciplinary measures taken by the department if misconduct is discovered (mean = 2.8), climate of the department or squad assignment (mean = 2.8), and lack of adequate supervision (mean = 2.7). Officers were less likely to report that officer peer pressure (mean = 2.5) or a formal written policy of the department on sexual misconduct (mean = 2.4) influenced their behavior. Although participants in this study believed that an officer's personal moral code is the factor that most influences the likelihood of PSM, no factor received a rating of less than 2.4, suggesting that police officers perceive a number of factors as having influence on officers' decisions to engage in PSM.

## DISCUSSION

This section of the article discusses officers' comments about their survey responses and statements pertaining to additional questions that were not included

Downloaded from http://cjr.sagepub.com by guest on April 29, 2007
© 2003 Georgia State University, College of Health and Human Sciences. All rights reserved. Not for commercial use or unauthorized distribution.

in the written survey. These responses were reconstructed from handwritten notes and help provide a richer and more detailed understanding of police officers' perceptions of PSM.

The results of this article suggest that respondents viewed sexual misconduct as something primarily guided by personal ethics and morals, implying that officers choose to engage in sexual misconduct based primarily on individually caused and predetermined behavior. This lends support for the police myth of the "rotten apple" (Sherman, 1980), which suggests that police deviance is isolated, like a single rotten apple in a barrel of good apples. This myth suggests that police corruption and misconduct are viewed as singular aberrations and not as being widespread or in any way supported by the state, the police organization, or a deviant subculture. This contrasts with previous research suggesting that police deviance is in part explained by the networking of individuals within the police organization and that the police subculture sanctions and promotes such behavior (Best & Luckenbill, 1994; McGurrin & Kappeler, 2002). The idea that PSM is isolated also contradicts data reported in this article: Respondents reported that a substantial number (36.5 percent) of all officers engage in some form of PSM.

The "rotten apple" myth is a powerful construct, however, and it continues to be widely promoted by police administrators and management, helping to shape officers' worldviews (Kappeler et al., 1998). Therefore, officers in this survey may simply be reflecting a widely held view that they have been conditioned to accept. These contrasting views on the causes of PSM demonstrate the need for additional research to capture the nuances and complexity of the issue.

It should come as no surprise then that police officers in this study viewed control factors related to personal morals and values (e.g., self-control and concern over the reaction of a spouse) as most influential in their decisions to engage in PSM. Officer #32 concluded, "It all boils down to an officer's personal beliefs. Just as criminals choose to break the law or not, cops who do this sort of thing (PSM) make a choice to do it. I don't see anybody twisting officers' arms."

More surprising perhaps is the availability of misconduct opportunities influencing officers' behaviors. Much PSM occurs at night, under the cover of darkness, when officers are less busy, few people are around to interrupt such activity, and oversight by supervisors is at its lowest. Prior research suggests that opportunity is enhanced by the existence of lonely suitors seeking attention, or other willing participants such as young groupies who initiate sexual contacts because they are attracted to the uniform, the weapon, or the power of police officers (Sapp, 1998). Officer #2 said this about opportunity for PSM:

> I'd say there are lots of opportunities for a cop to indulge in some extra curricular activity. It's not like women are falling all over us or anything like that, but every once in a while some gal comes along that makes if pretty clear that she is interested. I think most guys ignore or blow off the advances, but some do not and set something up for after work. Some guys don't want to wait that long or can't make it happen after work because it might arouse suspicion by their wives or girlfriends, so they meet the gal in some secluded spot while on

Downloaded from http://tpj.sagepub.com by guest on April 29, 2007
© 2003 Georgia State University, College of Health and Human Sciences. All rights reserved. Not for commercial use or unauthorized distribution.

duty. Young, good-looking guys see it all the time. I remember this one guy (who is no longer employed at this department but still works in law enforcement) who got more girls than you could shake a stick at. I think that if he didn't get some action on a set of midnight shifts (11:00 p.m.–7:00 a.m.) he thought he was getting cheated.

Officer #19 observed, "Man, some women are just attracted to cops. I don't know if it's the uniform or what. I read somewhere that cops have one of the highest divorce rates. I guess its no surprise a lot of police officers' marriages don't work with women firing on them so much." Officer #6 made this comment about opportunity and supervision: "Most supervisors don't follow you around like a mother hen. They watch you pretty close at first, but once they get to know you and believe you are not a knucklehead, they pretty much leave you alone. Some days you only see your supervisor at the beginning and end of the shift. So, if a cop wanted to screw around, it wouldn't be hard to do. What I mean is that its not likely a supervisor will catch you."

Social factors or those factors related to the organizational culture of policing received mixed ratings. The police subculture is well documented and many writers have described it (Crank, 2000; Manning, 1995; Reuss-Ianni, 1983). Manning (1997) defined police culture as the "accepted practices, rules, and principles of conduct that are situationally applied, and generalized rationales and beliefs" (p. 360). All subgroups teach group members norms and values that are highly valued by the group. However, the isolation and separation of police officers from the public caused by the unusual work schedules and the continued formal socialization process of police work create a subculture that is especially powerful (Kappeler et al., 1998). It sets them apart from general society and greatly influences their lives and careers.

Kappeler et al. (1998) contend that, for those who deviate from the customs and practices of the police culture, it could mean suffering the consequences of sanctions by police coworkers. Those sanctions include being isolated from peers and even being placed in life-threatening situations. These researchers concluded that, in some cases, deviant practices may become part of the police culture. In this way, informal sanctions of certain deviant practices, including sexual behaviors, can be promoted or discouraged, depending on the informal values and norms of an organization. The extent to which the police subculture plays a role in officers forming attitudes and beliefs about sexual behavior is not known, but research of its function in this role should be pursued.

Officer peer pressure to engage in PSM received the second lowest rating of the nine factors identified in this article. Although peer pressure to actively engage in PSM may be perceived as low, the police culture may create an atmosphere in which officers are conditioned to be apathetic toward PSM, even if they themselves do not participate. Law enforcement is not alone, and similar atmospheres exist in other institutions where people in authority take advantage of their position and engage in sexual misconduct. Inappropriate behavior involving such authority

Downloaded from http://cjr.sagepub.com by guest on April 29, 2007
© 2003 Georgia State University, College of Health and Human Sciences. All rights reserved. Not for commercial use or unauthorized distribution.

figures as little league coaches, scout leaders, therapists, correctional officers, and religious leaders is well documented (Baro, 1997; Flowers, 1994; S. Goldstein, 1987; Grenz & Bell, 1995). The recent sexual abuse scandal confronting the Catholic Church provides a good example. Although the Catholic Church does not directly promote or encourage inappropriate sexual behavior among its priests, it may condone such behavior by failing to discipline abusive priests or report them to authorities. The failure of the Church to effectively deal with and report sexually abusive priests may have created an atmosphere where some men are drawn to the priesthood because they anticipate opportunities to engage in sexual misconduct without significant fear of formal discipline or punishment. Similar dynamics may operate in police agencies. Officer #33 had this to say:

> Most cops are good guys and don't commit crimes or make a habit out of breaking the rules, but this job sure does provide the opportunities and temptations. Lets face it, cops have a lot of power and if they decide to abuse that power, its not that hard for them to get away with it. Many cops will go a long way to help protect their own. I am not saying that cops cover for other cops in all cases . . . but if it is something minor, like having sex on duty, it isn't likely cops will "rat out" other cops for something that doesn't hurt anyone.

The social factor "climate of the department or workplace" ranked slightly higher. Although most officers indicated that they did not feel pressure to engage in sexual misconduct from fellow officers, they did acknowledge that the workplace climate or atmosphere might influence some officers. Although there may not be significant pressure to engage in PSM, there may be considerable pressure not to report such conduct due to the police cultural code of secrecy (Reuss-Ianni, 1983). Officer #3 summed it up this way:

> If there is a lot of "playing around" going on at a department or on a particular squad, then a guy might be more tempted to participate. This is especially true for new officers who want to fit in. I also think it is more likely if the bosses participate or don't seem to care very much if their officers do. Some supervisors and even chiefs are known to have been "real ladies men" in their day, so they aren't going to jump all over their men for doing the same thing they did or may still be doing. Generally, the only time supervisors talk to their officers about something like this (PSM) is when they get a complaint.

A department's formal written policy on PSM was identified as the factor least likely to influence officers' behavior in this area. However, formal written policies are currently the dominant approach to controlling police behavior, and officers are more likely to respect and follow the rules if they are formally adopted (Walker, 1999). No department represented in this article had a formal policy on PSM. Survey participants generally concluded that most officers know that PSM is wrong and that if discovered the behavior could result in some form of discipline. However, PSM is rarely officially detected, and most officers said that they did not believe discipline would be severe for most forms of PSM. Klockars, Ivkovich, Harver, and Haberfeld (2000) did not specifically address PSM in their study of police integrity, but they did report that police officers regarded nonserious rule violations as warranting little or no discipline. This supports the findings of McGurrin and Kappeler (2002), who suggested that there is a relative lack of

Downloaded from http://ijo.sagepub.com by guest on April 29, 2007
© 2003 Georgia State University, College of Health and Human Sciences. All rights reserved. Not for commercial use or unauthorized distribution.

*Criminal Justice Review*    373

response to police sexual violence by state officials. Officer #10 related the following about a policy for PSM: "For Pete's sake, cops know they are not supposed to have sex on duty. Condoms aren't exactly standard department-issue. We don't need a formal policy to tell us sex on duty is wrong. Still, some guys don't care. As long as they think they won't get caught, or punished severely if they do, they're not going to stop. When opportunity knocks . . ."

Officer #24 offered the following:

> I guess it couldn't hurt to have a policy for PSM, but only if it is enforced. The department would have to make it clear that this type of thing is not tolerated and if you get caught, you get canned. Right now, it is almost like nobody cares. Everybody knows it goes on, but nobody makes a big deal. Not until some citizen reports it, or the media gets a hold of it will PSM become a hot issue. Maybe then we will get a policy.

Officers suggested that PSM is relatively common. Although they generally contended that not all officers participate, they claimed that enough do participate to create an atmosphere where it is widely recognized by police personnel that sexual behavior related to the eight forms of misconduct examined in this article is not unusual. Officer #39 presented this conclusion:

> In the strict sense of the word, everybody I know has committed at least one of these violations. Cops are just like all men, if they get a chance they are going to do it. I don't mean they are all out cheating on their wives, but you can't tell me that when a cop catches a couple of young lovers making out or some girls skinny dipping, he isn't going to take a good hard look, probably a little longer than he should. So if looking for an extra moment or two before you make them get dressed qualifies as PSM, then I tell you all cops are guilty, even me.

The findings reveal that not all officers report similar levels of PSM. The variation in the numbers of PSM incidents reported was explored by asking survey participants to try to explain the lack of consistency in reported incidents. Many officers said that they would expect considerable differences. They suggested that some officers might be intentionally deceptive because they do not want this information to become public knowledge. Other officers by contrast stated that the numbers of reported incidents are likely to depend on shift or assignment workgroups. They said that certain officers or groups of officers engage in more PSM and that an officer who is assigned to one of those squads is more likely to have knowledge of sexual misconduct. In addition, 88 percent of the respondents indicated their belief that most PSM occurs on the midnight shift (11 p.m. to 7 a.m.). Some survey participants suggested that officers who spend more time working the midnight shift are more likely to be exposed to and to have knowledge of PSM. Although it may be true that more PSM occurs on the midnight shift, most of the officers in this study, especially those assigned to patrol, rotated between day, evening, and night shifts. Therefore the influence of temporal shift assignment on officers' knowledge of PSM is unclear.

Downloaded from http://cjr.sagepub.com by guest on April 29, 2007
© 2003 Georgia State University, College of Health and Human Sciences. All rights reserved. Not for commercial use or unauthorized distribution.

In terms of assignments, the vast majority of officers (92 percent) reported that misconduct is more likely to occur among patrol officers than among officers on other assignments. Only three officers (7.5 percent of the sample) indicated that more PSM occurs among officers assigned to duties other than patrol, such as undercover positions in vice or drug units. Only one officer reported that detectives are more likely to engage in PSM. Officers' perception that PSM occurs more among patrol officers is likely influenced by the fact that many (27 percent) of the officers in the sample have been assigned to no other duties than patrol. In addition, almost all of the officers in the sample have spent more time assigned to patrol than in other assignments. Officer #2 said this about the influence of assignment on PSM: "There is no doubt in my mind that most sexual misconduct occurs among patrol officers. I have worked as both a patrolman and detective, and patrol is where the action is. That doesn't mean patrol officers as a whole are more deviant or perverted, only that they have the most opportunity. Even though detectives are generally supervised less than patrol officers, the 'dicks' (detectives) spend a lot of time in the office sitting behind a desk."

Some respondents suggested that certain officers might have less knowledge of PSM because they are less sociable and keep to themselves. In addition, some officers have reputations as "straight" or "no nonsense" officers who are unlikely to participate in or approve of such conduct and as a result are less likely to have knowledge of PSM. For example, Officer #10 provided the following perspective:

> I don't care what other guys do. I just know I don't go in for that sort of thing and most of the other people around here know it. So I don't pay much attention to what some guys do when they aren't busy. I just know they better be there for me if the "shit" hits the fan. They better carry their part of the load and not expect me to cover for them when they are off having fun.

Officer #21 stated, "Everybody knows I don't approve of that behavior. If I observe another officer involved in some sort of sexual misconduct, I will report them in a heartbeat. I guess that is why I don't have a lot to report to you in this survey. Either the other guys hide it from me or there isn't much going on. I suspect however, there is more going on than I know about."

Officers were also asked to comment on the definition of PSM that they provided. Although there is some ambiguity about the definitions of PSM and the most appropriate sanctions, all participants indicated that they believed PSM to be covered under their department's general policy of "Conduct Unbecoming a Police Officer" (CUPO). None of the officers, however, could unequivocally state whether their department's policy specifically addressed PSM. A review of one participant's department policy on CUPO revealed that it did not specifically mention PSM. Officer #28 provided the following comment about his definition of PSM:

> Its pretty simple, you don't get paid to enhance your love life. You show up and do your job. I don't believe the job includes getting dates or having sex on duty. There may not be

Downloaded from http://ijo.sagepub.com by guest on April 28, 2007
© 2003 Georgia State University, College of Health and Human Sciences. All rights reserved. Not for commercial use or unauthorized distribution.

a list of sexual behaviors you can or can't do while on-duty, but I think most guys know certain things are not permitted. Still, some guys do it anyway. Not all questionable behaviors are completely clear though, like spending a lot of time with the night shift gas station attendant, just talking mind you, but with the intention of perhaps hooking up later when you get off work. You really aren't doing anything wrong per se, but I guess you are not paid to spend time flirting with people. Still, I think some officers would see this behavior as good public relations.

Participants in the survey also were asked to relate an "outrageous" or "notable" example of PSM of which they had firsthand knowledge. Many officers related similar incidents ranging from having sex in a patrol car to meeting a girlfriend at her house to have sex. Two of the examples are provided below. Officer #8 reported the following incident:

When I was brand new, I got put on a shift with some real wild guys. One night about two or three in the morning I thought something was a little strange because the other guys on my squad asked me to answer a couple of their calls. They were simple calls and I didn't mind, but I began to wonder what was going on, so I went looking for them. Well, I found them and I tell you it shocked me. It was truly unbelievable. I discovered two other officers and my sergeant standing around completely naked holding beer bottles in their hands. There were also four girls there who were also naked or topless. They were at a pool at the back of a private club. I tell you I wasn't happy. What if I needed some back-up? This occurred about three times that summer. They even asked me to join them one time, but I know it was just a joke because they knew I would turn them down. I think they did it just so I would not report them. Well I never did report them, like I said I was brand new and I didn't want to make waves.

Officer #11 reported this incident:

There was this other copper on our squad who had a few acres of property located in an unpopulated section in our sector. On occasion, some of the officers would go there and do a little partying. I recall one time when officers and civilians were drinking a bit and suddenly people began to take their clothes off and started dancing naked around the fire. I didn't see people having sex, but I did see some people kissing. I heard the party lasted all night and some officers made shift change and returned for more.

Finally, officers were questioned about their willingness to report a fellow officer for PSM. All but one respondent stated that it would depend on the severity of the violation. Only officer #21 indicated that he would report all incidents of on-duty sexual misconduct. The others stated that if the incident involved a serious violation of the law, for example a rape, sexual assault, or sex with a juvenile, they would most likely report the incident. However, if the incident involved something less serious, it was unlikely that they would report it, even if it clearly violated a minor law or a department regulation. This includes supervisors who stated that it was unlikely that they would report minor violations of PSM and that they would probably handle the situation informally. They stated that only if the behavior persisted would they be likely to formally report the officer.

This willingness among police officers to report some violations of PSM and not others provides an example of ethical relativism, which suggests that officers in

Downloaded from http://cjr.sagepub.com by guest on April 29, 2007
© 2003 Georgia State University, College of Health and Human Sciences. All rights reserved. Not for commercial use or unauthorized distribution.

376    *Timothy M. Maher*

different circumstances have different expectations of one another based on what they learn as a result of cultural traditions and socialization (Kleinig, 1996a). Police officers face a myriad of ethical dilemmas during their careers and must learn, primarily from other officers, how to react to situations and individuals, while keeping in mind potential gains and losses (Elliston, 1985). Officers frequently confront situations where no clear course of action emerges. They may be torn between doing what is legally correct and following what they feel is a more sympathetic course of action, deciding, for example, whether to arrest a woman on a misdemeanor traffic warrant when there are young children in the car, or whether to arrest a borderline drunk driver or simply to call a cab. Many officers also find themselves in a position where they are confronted by dilemmas regarding fellow officers, their families, or friends. Many report differences in how they handle situations involving other officers and indicate that they are more reluctant to report some incidents because they do not want to be responsible for getting a fellow cop in trouble (Pollock, 1997). Officer #33 had this to say about reporting a fellow police officer for PSM:

> I am not going to stand by while a police officer or anyone else for that matter gets away with raping a woman or molesting a child. On the other hand, I don't believe that most sexual misconduct committed by police officers involves rape or child molesting. I think the vast majority of misconduct is far less serious and I would hate to cause a fellow officer grief for something minor. You know every profession has its perks, so cops usually don't write other cops tickets or arrest cops for DWI. The same thing goes for this (PSM), as long as its not something real bad, I probably would let it ride.

Although the use of discretion in law enforcement is well documented (Davis, 1975; Greenlee, 1980; Kleinig, 1996b) and is generally accepted as an unavoidable and indispensable part of policing (Davis, 1975), some contend that increased scrutiny for the more serious ethical dilemmas facing police officers (e.g., reporting a fellow officer for PSM) is warranted (Pollock & Becker, 1991).

## SUMMARY AND IMPLICATIONS

Results of this article suggest that police officers perceive that PSM is common. Although this research did not uncover significant levels of serious criminal conduct, like the sexually violent behavior reported by Kraska and Kappeler (1995) and Vaughn (1999), it does suggest that much police sexual behavior at the very least violates widely accepted ethical standards commonly associated with law enforcement. Although much PSM typically does not stimulate the same level of media or citizen interest as some other forms of police deviance (e.g., brutality, drug corruption, or racial discrimination), most civilians would be outraged to discover, for example, that police officers commonly stop vehicles in order to "check out" or talk to the driver or passengers, simply because they find them attractive.

Downloaded from mcr-ics.sagepub.com by guest on April 29, 2007
© 2003 Georgia State University, College of Health and Human Sciences. All rights reserved. Not for commercial use or unauthorized distribution.

Having established that PSM is perceived by police officers to be relatively common, we are brought to the question of what should be done to address this matter. First, the primary goal of this article is to bring needed research attention to a problem long neglected. This current effort is an exploratory investigation, which has its limitations. Specifically, the small nonrepresentative sample does not allow for systematic comparisons across agencies, and the "chain-referral" sample used may have resulted in possible selection bias. More empirical and qualitative work is needed to uncover the causes and complexities of this behavior.

Second, all police personnel should be educated and trained about sexual misconduct and its effects on policing. This article suggests that only the most severe forms of PSM are considered problematic by police officers and their supervisors. Not until the secrecy surrounding PSM is removed, and police administrators, supervisors, and officers take this problem seriously, is it likely that the true extent of PSM will be discovered and legitimate efforts can be made to control it.

Third, a broader, more systematic approach must be adopted by law enforcement to help define, measure, and control PSM, especially in its more common manifestations. This will require a concerted effort of focus groups led by both local and national police agencies, as well as input from police personnel, unions, and associations. Law enforcement agencies should consider adopting clear policies and procedures aimed at regulating PSM and all unethical police behavior. Some research suggests that policies help establish uniformity in policing and create a formal framework for controlling police behavior (Kappeler et al., 1998; Walker, 1999). No agency represented in this sample had a formal written policy on PSM. In addition, representatives of five St. Louis metropolitan area police agencies not represented in this article were also contacted and they too reported having no policy on PSM. No effort was made to determine whether this pattern exists in police departments across the country. However, representatives of two nationally recognized leaders on police policy and standards, the International Association of Chiefs of Police (IACP) and the Commission on Accreditation for Law Enforcement (CALEA), reported to this researcher that they have not specifically addressed this issue.

It is unreasonable to expect police departments to create policies on PSM forbidding every single type of sexual misconduct, just as it is unreasonable to expect pursuit policies to identify every circumstance in which a police pursuit should be allowed to continue or be terminated. However, it is not unreasonable to expect police departments to implement specific policies on sexual misconduct that forbid or restrict several conceptually distinct categories of sexual behavior. Policies would send a message to police officers and the public that this behavior is not condoned or tolerated. There is little doubt that written policies specifically addressing sexual misconduct would help to establish a better understanding of this issue. Policies would assist police administrators, police officers, and the public in the process of constructing a more universal conceptualization of PSM.

Downloaded from http://cjr.sagepub.com by guest on April 29, 2007
© 2003 Georgia State University, College of Health and Human Sciences. All rights reserved. Not for commercial use or unauthorized distribution.

378    *Timothy M. Maher*

The lack of formal policies for PSM may be telling. It may suggest that police officials believe that PSM is not a significant problem and therefore is not worthy of a policy. It may also suggest that PSM is in part a result of police cultural influences. Perhaps, formal policies addressing PSM will be developed and become standard in policing only when law enforcement is pressured by the public, the media, and the courts to enact such policies. Recent attention drawn to other areas, such as racial profiling and police pursuits, demonstrates the powerful role that outside interest groups can play in affecting police policy (Frick, 1997; Homant & Kennedy, 1994).

Finally, many experts have long recognized the crucial role of police supervisors in controlling police behavior (Davis, 1975; Kappeler et al., 1998; Whisenand, 1976). The apparent availability of opportunities for misconduct provided by police work suggests that police administrators must urge supervisors to take a more proactive role in controlling PSM. Police officers surveyed in this study identified police sexual misconduct as a real problem. PSM has been neglected and tolerated too long. Police administrators and officers, policy makers, and researchers must focus so that PSM can be more clearly defined, more accurately measured, and better controlled.

## REFERENCES

Barker, T. (1978). An empirical study of police deviance other than corruption. *Journal of Police Science and Administration, 6,* 264–272.

Barker, T., & Carter, D. L. (1994). *Police deviance.* Cincinnati: Anderson Publishing.

Baro, A. J. (1997). Spheres of consent: An analysis of the sexual abuse and sexual exploitation of women incarcerated in the state of Hawaii. *Women and Criminal Justice, 8,* 61–84.

Best, J., & Luckenbill, D. F. (1994). *Organizing deviance.* Englewood Cliffs, NJ: Prentice Hall.

Bryant, T. (2000, November 1). Three policemen fired over allegations of sex acts with teens. *St. Louis Post Dispatch,* p. A1.

Carter, D. L. (1990). Typology of drug corruption. *Journal of Criminal Justice, 2,* 85–98.

Christopher Commission. (1992). *Report of the independent commission on the Los Angeles Police Department.* Los Angeles: Christopher Commission.

Crank, J. P. (2000). *Police ethics: The corruption of the noble cause.* Cincinnati: Anderson Publishing.

Davis, K. C. (1975). *Police discretion.* St. Paul: West Publishing Co.

Elliston, F. A. (1985). *Moral issues in police work.* Totawa, NJ: Rowan and Allanheld Publishing.

Erickson, B. H. (1979). Some problems of inference from chain data. *Sociological Methodology, 10,* 276–302.

Eschholz, S., & Vaughn, M. S. (2001). Police sexual violence and rape myths: Civil liability under Section 1983. *Journal of Criminal Justice, 29,* 389–405.

Flowers, R. B. (1994). *The victimization and exploitation of women and children: A study of physical, mental, and sexual maltreatment in the United States.* Jefferson, NC: McFarland & Company.

Frick, R. (1997). California's police pursuit immunity statute: Does it work? *Police Chief, 64*(2), 36–43.

Geller, W. A. (1984, February). Police misconduct: Scope of the problems and remedies. *ACJS Today,* pp. 6–8.

Goldstein, H. (1975). *Police corruption: A perspective on its nature and control.* Washington DC: Police Foundation.

Goldstein, H. (1977). *Policing a free society.* Cambridge, MA: Ballinger.

Goldstein, S. L. (1987). *The sexual exploitation of children: A practical guide to assessment, investigation, and intervention.* New York: Elsevier.

Greenlee, M. R. (1980). Discretionary decision making in the field. *Police Chief, 47*(2), 24–37.

Downloaded from ................ .... by guest on April 29, 2007
© 2003 Georgia State University, College of Health and Human Sciences. All rights reserved. Not for commercial use or unauthorized distribution.

Grenz, S. J., & Bell, R. D. (1995). *Betrayal of trust: Sexual misconduct in the pastorate.* Downers Grove, IL: Inter Varsity Press.

Heckathorn, D. D. (2002). Respondent-driven sampling II: Deriving valid population estimates from chain-referral samples of hidden populations. *Social Problems, 49,* 11–34.

Homant, R. J., & Kennedy, D. B. (1994). Citizen preferences and perceptions concerning police pursuits. *Journal of Criminal Justice, 22,* 425–435.

Jacobs, B. A. (2000). *Robbing drug dealers: Violence beyond the law.* Hawthorne, NY: Aldine De Gruyter.

Kappeler, V. E., Sluder, R. D., & Alpert, G. P. (1998). *Forces of deviance: Understanding the dark side of policing.* Prospect Heights, IL: Waveland Press.

Kappeler, V. E., & Vaughn, M. S. (1997). Law enforcement: When the pursuit becomes criminal—Municipal liability for police sexual violence. *Criminal Law Bulletin, 33,* 352–376.

Kleinig, J. (1996a). *The ethics of policing.* New York: Cambridge University Press.

Kleinig, J. (1996b). *Handled with discretion.* Lanham, MD: Rowman & Littlefield Publishers.

Klockars, C. B., Ivkovich, S. K., Harver, W. E., & Haberfeld, M. R. (2000). *The measurement of police integrity.* Washington DC: National Institute of Justice.

Kraska, P. B., & Kappeler, V. E. (1995). To serve and pursue: Police sexual violence against women. *Justice Quarterly, 12,* 85–111.

Lundman, R. J. (1974). *Police behavior.* New York: Oxford University Press.

Manning, P. K. (1995). The police occupational culture in Anglo-American societies. In L. Hoover & J. Dowling (Eds.), *Encyclopedia of police science* (pp. 472–475). New York: Garland.

Manning, P. K. (1997). *Police work: The social organization of policing.* Prospect Heights, IL: Waveland Press.

McGurrin, D., & Kappeler, V. E. (2002). Media accounts of police sexual violence: Rotten apples or state-supported violence? In K. M. Lersch (Ed.), *Policing and misconduct* (pp. 121–142). Upper Saddle River, NJ: Pearson Education.

Murram, D., Hellman, R., & Cassinello, B. (1994). Prevalence of negative attitudes among police officers toward rape victims. *Adolescent and Pediatric Gynecology, 8,* 89–91.

Parish, N. (1998a, March 2). Three Florissant officers accused of sex with police explorer. *St. Louis Post-Dispatch,* p. A2.

Parish, N. (1998b, April 23). Eureka officers fired in sex scandal. *St. Louis Post-Dispatch,* p. A1.

Parish, N. (2001, January 9). Cover-up in Webster Groves. *St. Louis Post-Dispatch,* p. D8.

Pollock, J. M. (1997). Ethics and law enforcement. In R. D. Dunham & G. P. Alpert (Eds.), *Critical issues in policing* (pp. 337–354). Prospect Heights IL: Waveland Press.

Pollock, J. M., & Becker, R. (1991). Ethical dilemmas in police work. In M. Braswell, B. R. McCarthy, & B. J. McCarthy (Eds.), *Justice, crime, and ethics* (pp. 221–228). Cincinnati: Anderson Publishing.

President's Task Force on Victims of Crime. (1982). *Final report.* Washington DC: U.S. Government Printing Office.

Reuss-Ianni, E. (1983). *Two cultures of policing.* New Brunswick, NJ: Transaction Books.

St. Louis County Police Department. (2000). *Facts on St. Louis County police services.* St. Louis, MO: St. Louis County Police Department.

Sapp, A. D. (1994). Sexual misconduct by police officers. In T. Barker & D. L. Carter (Eds.), *Police deviance* (pp. 187–189). Cincinnati: Anderson Publishing.

Sapp, A. D. (1998). The seductions of sex. In J. P. Crank (Ed.), *Understanding police culture* (pp. 41–43). Cincinnati: Anderson Publishing.

Schneider, B. E. (1993). Put up and shut up: Workplace sexual assaults. In P. B. Bart & E. G. Moran (Eds.), *Violence against women: The bloody footprints* (pp. 57–72). Newbury Park, CA: Sage.

Sexual misconduct by officer: Department's policy of silence. (1992, December). *National Bulletin on Police Misconduct,* p. 8.

Sherman, L. W. (1980). Causes of police behavior: The current state of qualitative research. *Journal of Research in Crime and Delinquency, 17,* 69–96.

Sudman, S. (1976). *Applied sampling.* New York: Academic Press.

Sykes, G. M., & Matza, D. (1957). Techniques of neutralization. *American Sociological Review, 22,* 664–670.

Taylor, L. (1985). *In the underworld.* London, England: Unwin.

Vaughn, M. S. (1999). Police sexual violence. *Crime and Delinquency, 45,* 334–357.

Walker, S. (1999). *The police in America.* Boston: McGraw-Hill College.

Downloaded from http://cjr.sagepub.com by guest on April 29, 2007
© 2003 Georgia State University, College of Health and Human Sciences. All rights reserved. Not for commercial use or unauthorized distribution.

380    *Timothy M. Maher*

Walker, S., & Iribeck, D. (2002, May). *"Driving while female": A national problem in police misconduct* (Special Report). Omaha: University of Nebraska at Omaha. Accessed July 13, 2003, from http://www.policeaccountability.org/drivingfemale.htm.

Watters, J. K., & Biernacki, P. (1989). Targeted sampling: Options for the study of hidden populations. *Social Problems, 36*, 416–429.

Whisenand, P. M. (1976). *Police supervision: Theory and practice* (2nd ed.). Englewood Cliffs, NJ: Prentice-Hall.

Wright, R. T., & Decker, S. H. (1994). *Burglars on the job: Streetlife and residential break-ins.* Boston: Northeastern University Press.

**Appendix**

**On-duty Police Sexual Activity Survey**

1. To the nearest year, how long have you been a police officer in the St. Louis metropolitan area?

2. Gender
   1. male
   2. female

3. What is your marital status?
   1. single
   2. married
   3. divorced

4. What is your rank?
   a. patrol officer
   b. detective
   c. sergeant
   d. other

5. Which of the following describes the size of the police department where you are currently employed?
   a. less than 20 sworn officers
   b. between 20 and 50 sworn officer.
   c. more than 50 sworn officers

6. How do you define police "sexual misconduct"?

**For the purpose of answering the following questions, please use the definition of police sexual misconduct and list of forms of sexual misconduct provided to you by this researcher.**

7. Since you began working as a police officer in the St. Louis metropolitan area, do you have first hand knowledge of sexual misconduct by officers at the departments where you have been employed?
   1. yes
   2. no

8. If you answered yes to question 7, indicate the number of times next to the types of misconduct listed below.

| In last year | Ever | |
|---|---|---|
| ——— | ——— | Non-sexual contacts that are sexually motivated |
| ——— | ——— | Sexually motivated voyeuristic behaviors |
| ——— | ——— | Sexually motivated contacts with crime victims |
| ——— | ——— | Sexually motivated contacts with juveniles |
| ——— | ——— | Sexually motivated shakedowns |
| ——— | ——— | Sexually motivated contacts with offenders |
| ——— | ——— | Citizen initiated sexual contacts |
| ——— | ——— | Officer initiated sexual contacts with any citizen or fellow police personnel |

Downloaded from [illegible] by guest on April 29, 2007
© 2003 Georgia State University, College of Health and Human Sciences. All rights reserved. Not for commercial use or unauthorized distribution.

*Criminal Justice Review*    381

9.  Do you have second hand knowledge of sexual misconduct by officers at police departments where you have been employed?
    1. yes
    2. no

10. If you answered yes to question 9, indicate the number of times next to the types of misconduct listed below.

| In last year | Ever | |
| --- | --- | --- |
| ——— | ——— | Non-sexual contacts that are sexually motivated |
| ——— | ——— | Sexually motivated voyeuristic behaviors |
| ——— | ——— | Sexually motivated contacts with crime victims |
| ——— | ——— | Sexually motivated contacts with juveniles |
| ——— | ——— | Sexually motivated shakedowns |
| ——— | ——— | Sexually motivated contacts with offenders |
| ——— | ——— | Citizen initiated sexual contacts |
| ——— | ——— | Officer initiated sexual contacts with any citizen or fellow police personnel |

11. That you are aware of, does any police department where you are currently employed have a formal written policy or special order regarding sexual misconduct?
    1. yes
    2. no

12. That you are aware of, did any police department in the St. Louis metropolitan area where you have previously been employed have a formal written policy or special order regarding sexual misconduct?
    1. yes
    2. no

13. In what police assignment do you believe most on-duty sexual misconduct occurs?
    1. patrol
    2. detective
    3. other

14. During what work shift do you believe most on-duty sexual misconduct takes place?
    1. days (7 a.m.–3 p.m.)
    b. afternoons (3 p.m.–11 p.m.)
    c. nights (11 p.m.–7 a.m.)

15. On a scale of 1 to 4 with 1 being not important and 4 being very important, rate each of the following items with respect to their influence to engage in or refrain from sexual misconduct.

    ——— Formal written policy of department prohibiting on-duty sexual behavior
    ——— Personal morals and values
    ——— Officer peer pressure
    ——— Lack of adequate supervision
    ——— Availability of misconduct opportunities
    ——— Disciplinary measures taken by department if misconduct is discovered
    ——— Concern or reaction of spouse or significant other if misconduct is discovered
    ——— Climate of department and/or squad assignment
    ——— Self-control (the opportunity for PSM presents itself, but no action is taken)

Downloaded from http://cjr.sagepub.com by guest on April 29, 2007
© 2003 Georgia State University, College of Health and Human Sciences. All rights reserved. Not for commercial use or unauthorized distribution.